**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**
www.okwd.uscourts.gov

**CARMELITA REEDER SHINN**
CLERK

**JOAN C. KANE**
CHIEF DEPUTY

200 N.W. 4th Street, Room 1210
Oklahoma City, Oklahoma 73102
(405) 609-5000   Fax (405) 609-5099

September 14, 2023

☐ Pro Se   ☑ Retained   ☐ Court Appointed   ☐ USA
(IFP Granted)

Case No: CIV-09-985-G          Date Filed: 09/14/2023
Style of Case: Moore v. Embry
Appellant: Tamika White

☑ Notice of Appeal                    ☐ Amended Notice of Appeal
☐ Interlocutory Appeal                ☐ Cross Appeal
                                      ☐ Tenth Cir. Case No.

Pro se Appellant:
☐ Motion IFP Forms Mailed/Given   ☐ Motion IFP Filed   ☐ Appeal Fee Paid

Retained Counsel:
☑ Appeal Fee Paid   ☐ Appeal Fee Not Paid

The Preliminary Record on Appeal is hereby transmitted to the Tenth Circuit Court of Appeals. Please refer to the forms and procedures concerning the requirements for ordering transcripts, preparing docketing statements and briefs, and designations of the record found on the Tenth Circuit's website, www.ca10.uscourts.gov.

Payment for this case or motion to proceed *in forma pauperis* will be made to this District Court.

The transcript order form must be filed in the District Court as well as the Court of Appeals within 14 working days after the notice of appeal was filed in the Circuit Court. This form must contain the signature of the court reporter if transcripts are being ordered.

If you have questions, please contact this office.

Sincerely,

CARMELITA REEDER SHINN, COURT CLERK

by: s/ R. Rosson
Case Administrator

cc:   Clerk of the Court, Tenth Circuit Court of Appeals

APPEAL,BACHARACH,CLOSED,CONV,PRISONER

Email All Attys

Email All Attys and Secondary Emails

# U.S. District Court
# Western District of Oklahoma[LIVE] (Oklahoma City)
# CIVIL DOCKET FOR CASE #: <u>5:09–cv–00985–G</u>

Moore v. Embry

Assigned to: Honorable Charles Goodwin

Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 09/04/2009

Date Terminated: 09/11/2023

Jury Demand: None

Nature of Suit: 530 Habeas Corpus (General)

Jurisdiction: Federal Question

**<u>Petitioner</u>**

**Beverly M Moore**                 represented by  **Andrea D Miller**

Oklahoma Innocence Project

800 N. Hudson

Address Line 2

Suite 317

Oklahoma City, OK 73102

405–208–6161

Email: <u>admiller@okcu.edu</u>

*ATTORNEY TO BE NOTICED*

**Christine M Cave**

Employers Legal Resource Center

3500 South Blvd

Suite 14–B

Edmond, OK 73013

405–702–9797

Fax: 405–576–3956

Email: <u>ccave@okemployerlaw.com</u>

*ATTORNEY TO BE NOTICED*

V.

**<u>Respondent</u>**

**Warden Tamika White**             represented by  **Caroline EJ Hunt**

Attorney General's Ofc–NE

21STREET–OKC

313 NE 21st St

Oklahoma City, OK 73105

405–521–3921

Fax: 405–522–4534

Email: <u>fhc.docket@oag.ok.gov</u>

*ATTORNEY TO BE NOTICED*

**Tessa L Henry**

1

Attorney General's Ofc−NE
21STREET−OKC
313 NE 21st St
Oklahoma City, OK 73105
405−521−3921
Fax: 405−522−4534
Email: fhc.docket@oag.ok.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/04/2009 | 1 | PETITION for Writ of Habeas Corpus, filed by Beverly M Moore. (Attachments: # 1 Attachment 1−Opinion)(db, ) (Entered: 09/08/2009) |
| 09/04/2009 | 2 | MOTION for Leave to Proceed in forma pauperis by Beverly M Moore. (db, ) (Entered: 09/08/2009) |
| 09/04/2009 | 3 | PREVIOUS Cases (db, ) (Entered: 09/08/2009) |
| 09/08/2009 | 4 | ENTER ORDER REFERRING CASE to Magistrate Judge Robert Bacharach. Motions referred to Robert Bacharach.. By Direction of Honorable Robin J. Cauthron on 9/8/09. (db, ) (Entered: 09/08/2009) |
| 09/08/2009 | 5 | REPORT AND RECOMMENDATION re 2 MOTION for Leave to Proceed in forma pauperis filed by Beverly M Moore. IT IS RECOMMENDED that the Court (1) deny the motion for leave to proceed in forma pauperis, (2) order payment of the filing fee within 20 days, and (3) dismiss the action without prejudice if Ms. Moore fails to timely pay the filing fee. Objections to R&R due by 9/28/2009. This R&R terminates the referral. Signed by Magistrate Judge Robert Bacharach on 9/8/09. (lb) (Entered: 09/08/2009) |
| 09/08/2009 | | Magistrate Judge Robert Bacharach no longer assigned to case. (lb) (Entered: 09/08/2009) |
| 09/29/2009 | 6 | Receipt for Money Received from State of OK for Beverly M Moore in the amount of $5.00, receipt number OKW500004567 regarding 5 REPORT AND RECOMMENDATION re 2 MOTION for Leave to Proceed in forma pauperis filed by Beverly M Moore (nm, ) (Entered: 09/29/2009) |
| 10/05/2009 | 7 | REPORT AND RECOMMENDATION / ORDER the undersigned vacates the prior report and recommendation (Doc. 5) and recommends dismissal of the request for leave to proceed in forma pauperis (Doc. 2) on grounds of mootness. The Petitioner is advised of his right to object to this report and recommendation byOctober 26, 2009. The referral is not terminated. re 5 REPORT AND RECOMMENDATION re 2 6 . Signed by Magistrate Judge Robert Bacharach on 10/5/09. (sr, ) (Entered: 10/05/2009) |
| 10/05/2009 | | Magistrate Judge Robert Bacharach added. (sr, ) (Entered: 10/05/2009) |
| 10/13/2009 | 8 | ORDER FOR RESPONSE by Oklahoma Attorney General to 1 Petition for Writ of Habeas Corpus filed by Beverly M Moore. Signed by Magistrate Judge Robert Bacharach on 10/13/09. (lb) (Entered: 10/13/2009) |
| 10/19/2009 | 9 | ENTRY of Appearance by Jared A Looper on behalf of Millicent Newton Embry (Looper, Jared) (Entered: 10/19/2009) |

2

| 10/30/2009 | 10 | MOTION to Dismiss *Petition for Writ of Habeas Corpus* by Millicent Newton Embry. Motions referred to Robert Bacharach. (Looper, Jared) (Entered: 10/30/2009) |
| 10/30/2009 | 11 | BRIEF IN SUPPORT re 10 MOTION to Dismiss *Petition for Writ of Habeas Corpus* by Millicent Newton Embry. (Attachments: # 1 Exhibit 1 – Judgment and Sentence, # 2 Exhibit 2 – OCCA Opinion, # 3 Exhibit 3 – Application for PC Relief filed in OCCA, # 4 Exhibit 4 – OCCA Order Dismissing PC–2008–844, # 5 Exhibit 5 – Application for PC Relief filed in Okla. County, # 6 Exhibit 6 – Order Denying PC Relief, # 7 Exhibit 7 – PC Petition in Error, # 8 Exhibit 8 – Order Declining Appellate Jurisdiction)(Looper, Jared) (Entered: 10/30/2009) |
| 11/04/2009 | 12 | ORDER Respondent has filed a motion to dismiss, relying in part on evidence outside of the petition. Accordingly, the Court must convert the motion to one for summary judgment. The Court thus provides notice to the Petitioner of her need to respond to the motion for summary judgment. The Petitioner shall respond to the motion for summary judgment by November 22, 2009. re 10 MOTION to Dismiss *Petition for Writ of Habeas Corpus* filed by Millicent Newton Embry. Signed by Magistrate Judge Robert Bacharach on 11/4/09. (sr, ) (Entered: 11/04/2009) |
| 11/19/2009 | 13 | MOTION for Extension of Time by Beverly M Moore. Motions referred to Robert Bacharach. (db, ) (Entered: 11/20/2009) |
| 11/23/2009 | 14 | ORDER granting 13 Petitioner's Motion for Extension of Time to File Response to Respondent's 10 Motion for Summary Judgment. Petitioner's response due 12/8/09. Signed by Magistrate Judge Robert Bacharach on 11/23/09. (lb) (Entered: 11/23/2009) |
| 11/24/2009 | 15 | ORDER ADOPTING 7 REPORT AND RECOMMENDATION. Signed by Honorable Robin J. Cauthron on 11/24/09. (lg, ) (Entered: 11/24/2009) |
| 12/09/2009 | 16 | RESPONSE to Motion re 10 MOTION to Dismiss *Petition for Writ of Habeas Corpus* filed by Beverly M Moore. (db, ) (Entered: 12/09/2009) |
| 12/09/2009 | 17 | MOTION for Leave to File Amended Petition by Beverly M Moore. Motions referred to Robert Bacharach. (Attachments: # 1 Attachment 1–Amended Petition, # 2 Attachment 2–Brief)(db, ) (Entered: 12/09/2009) |
| 12/22/2009 | 18 | ORDER regarding 17 Petitioner's Motion for Leave to file an amended habeas petition. The Respondent's deadline for a response is 12/30/09. Signed by Magistrate Judge Robert Bacharach on 12/22/09. (lb) (Entered: 12/22/2009) |
| 12/29/2009 | 19 | OBJECTIONS re 17 MOTION for Leave *to File Amended Habeas Petition* filed by Millicent Newton Embry. (Slayton, Diane) (Entered: 12/29/2009) |
| 12/29/2009 | 20 | ENTRY of Appearance by Diane L Slayton on behalf of Millicent Newton Embry (Slayton, Diane) (Entered: 12/29/2009) |
| 01/11/2010 | 21 | ORDER granting 17 Petitioner's Motion for Leave to Amend Petition. The deadline for filing of the amended petition is 1/26/10. When the amended petition is filed, the original petition will be deemed superseded by the new document. As a result, amendment of the petition would automatically moot the pending motion for summary judgment. Within 21 days of the filing of the amended habeas petition, the Respondent shall file an answer or motion to dismiss. Signed by Magistrate Judge Robert Bacharach on 1/11/10. (lb) (Entered: 01/11/2010) |
| 02/02/2010 | 22 | |

| | | PETITION for Writ of Habeas Corpus (Amended) Filed by Beverly M Moore.(db, ) (Entered: 02/03/2010) |
|---|---|---|
| 02/02/2010 | 23 | BRIEF IN SUPPORT re 22 Petition for Writ of Habeas Corpus (Amended) by Beverly M Moore. (db, ) (Entered: 02/03/2010) |
| 02/23/2010 | 24 | MOTION to Dismiss *Amended Petition for Habeas Corpus* by Millicent Newton Embry. Motions referred to Robert Bacharach. (Looper, Jared) (Entered: 02/23/2010) |
| 02/23/2010 | 25 | BRIEF IN SUPPORT re 24 MOTION to Dismiss *Amended Petition for Habeas Corpus* by Millicent Newton Embry. (Attachments: # 1 Exhibit 1 – Judgment and Sentence, # 2 Exhibit 2 – Opinion, # 3 Exhibit 3 – Appl for PC Relief filed with OCCA, PC–08–844, # 4 Exhibit 4 – Order Dismissing PC–2008–844, # 5 Exhibit 5 – Appl for PC Relief filed in Okla County, # 6 Exhibit 6 – Order Denying PC Relief, # 7 Exhibit 7 – PC Petition in Error, # 8 Exhibit 8 – Order Declining Jurisdiction and Dismissing Pet in Error, # 9 Exhibit 9 – Hollie v. Booher, unpublished opinion, # 10 Exhibit 10 – Riley v. Snider, unpublished opinion, # 11 Exhibit 11 – Mitchell v. Murphy, unpublished opinion, # 12 Exhibit 12 – Harvey v. Addison, unpublished opinion)(Looper, Jared) (Entered: 02/23/2010) |
| 02/25/2010 | 26 | ORDER regarding 24 Respondent's Motion to Dismiss. Petitioner's response deadline is 3/16/10. Signed by Magistrate Judge Robert Bacharach on 2/25/10. (lb) (Entered: 02/25/2010) |
| 03/02/2010 | 27 | LETTER from Beverly Moore (db, ) (Entered: 03/02/2010) |
| 03/11/2010 | 28 | MOTION for Extension of Time to Respond to Motion to Dismiss by Beverly M Moore. Motions referred to Robert Bacharach. (Attachments: # 1 Exhibit A–Subpoena to Deaconess Hosp, # 2 Exhibit B–Subpoena to ME Office)(db, ) (Attachment 1 replaced on 6/14/2022) (MC). (Attachment 2 replaced on 6/14/2022)(Previously redacted Exhibit stickers appear as red and numbered now) (MC) (Entered: 03/11/2010) |
| 03/15/2010 | 29 | ORDER granting 28 Petitioner's Motion for Extension of Time to respond to 24 Respondent's motion to dismiss. Petitioner shall respond to the motion to dismiss by 4/12/10. Signed by Magistrate Judge Robert Bacharach on 3/15/10. (lb) (Entered: 03/15/2010) |
| 03/16/2010 | 30 | LETTER from Beverly Moore (db, ) (Entered: 03/16/2010) |
| 03/24/2010 | 31 | ENTER ORDER. The Court has received two documents entitled "Agreed Order." There was no motion associated with either proposed order. The Court Clerk is directed to file the proposed orders. The present order will serve to clarify that the Court is not approving the proposed orders. Entered by direction of Magistrate Judge Robert Bacharach on 3/24/10. (lb) (Entered: 03/25/2010) |
| 03/24/2010 | 32 | Proposed Orders from Petitioner (not approved by the Court). (lb) (Entered: 03/25/2010) |
| 03/31/2010 | 33 | ENTRY of Appearance by Sandra J Balzer on behalf of Office of Chief Medical Examiner (Balzer, Sandra) (Entered: 03/31/2010) |
| 03/31/2010 | 34 | MOTION to Quash *Subpoena Duces Tecum in Part* by Office of Chief Medical Examiner. (Attachments: # 1 Exhibit 1 – Subpoena, # 2 Exhibit 2 – 63 OS s. 949, # 3 Exhibit 3 – 51 OS s 24A.5)(Balzer, Sandra) (Entered: 03/31/2010) |

| 04/01/2010 | 35 | MOTION to Compel by Beverly M Moore. Motions referred to Robert Bacharach. (Attachments: # 1 Attachment 1–Agreed Order to Compel)(db, ) (Entered: 04/02/2010) |
| 04/07/2010 | 36 | MOTION for Extension of Time by Beverly M Moore. Motions referred to Robert Bacharach. (db, ) (Entered: 04/07/2010) |
| 04/07/2010 | 37 | MOTION to Compel Discovery Response by Beverly M Moore. Motions referred to Robert Bacharach. (Attachments: # 1 Attachment 1–Agreed Order to Compel)(db, ) (Entered: 04/07/2010) |
| 04/08/2010 | 38 | AMENDED MOTION to Quash *Subpoena Duces Tecum in Part* by Office of Chief Medical Examiner. (Attachments: # 1 Exhibit Exh 1 – Subpoena, # 2 Exhibit Exh 2 – 63 OS 949, # 3 Exhibit Exh 3 – 24A.5, # 4 Exhibit Exh 4 – Cert of Mailing)(Balzer, Sandra) (Entered: 04/08/2010) |
| 04/09/2010 | 39 | ENTER ORDER granting 36 Petitioner's Motion for Extension of Time to respond to motion to dismiss. Petitioner's new deadline is 5/12/10. Entered by direction of Magistrate Judge Robert Bacharach on 4/9/10. (lb) (Entered: 04/09/2010) |
| 04/13/2010 | | Docket Annotation: In light of the filing of The Office of the Chief Medical Examiner's AMENDED Motion to Quash Subpoena Duces Tecum in Part (Doc. 38), the Motion to Quash Subpoena Duces Tecum in Part (Doc. 34) is hereby terminated as a pending motion. (lb) (Entered: 04/13/2010) |
| 04/13/2010 | 40 | NOTICE OF HEARING on Motions re: 38 AMENDED MOTION to Quash Subpoena Duces Tecum in Part, 37 MOTION to Compel, 35 MOTION to Compel. Motions Hearing set for 5/6/2010 at 10:30 AM in Courtroom 101 before Magistrate Judge Robert Bacharach. (lb) (Entered: 04/13/2010) |
| 04/13/2010 | 41 | ENTER ORDER. The deadline for response to Petitioner's Motion to Compel Discovery Response (Doc. 37) is 4/23/10, due to the motion being set for hearing on 5/6/10. Entered by direction of Magistrate Judge Robert Bacharach on 4/13/10. (lb) (Entered: 04/13/2010) |
| 04/21/2010 | 42 | RESPONSE in Opposition re 35 MOTION to Compel filed by Office of Chief Medical Examiner. (Balzer, Sandra) (Entered: 04/21/2010) |
| 04/22/2010 | 43 | RESPONSE in Opposition re 35 MOTION to Compel filed by Millicent Newton Embry. (Attachments: # 1 Exhibit 1 – Hollie v. Booher, unpublished opinion, # 2 Exhibit 2 – OCCA Opinion)(Looper, Jared) (Entered: 04/22/2010) |
| 04/22/2010 | 44 | RESPONSE in Opposition re 37 MOTION to Compel filed by Millicent Newton Embry. (Attachments: # 1 Exhibit 1 – Hollie v. Booher, unpublished opinion, # 2 Exhibit 2 – OCCA Opinion)(Looper, Jared) (Entered: 04/22/2010) |
| 05/04/2010 | 45 | ENTRY of Appearance by Donald D Self on behalf of Millicent Newton Embry (Self, Donald) (Entered: 05/04/2010) |
| 05/06/2010 | 46 | Minute Entry for motions hearing held on 5/6/2010 before Magistrate Judge Robert Bacharach. The Court DENIED 35 Motion to Compel filed by Beverly M Moore and granted Petitioner 30 days to file a new motion to compel with respect to Deaconess Hospital. The Court OVERRULED 38 Amended Motion to Quash Subpoena Duces Tecum in Part filed by Office of Chief Medical Examiner and GRANTED 37 Motion to Compel as to Chief Medical Examiner filed by Beverly M Moore. The Court ordered the Chief Medical Examiner to make the requested docs available no later |

|  |  | than 21 days from the date of the hrg. The parties agreed to treat the motion to dismiss the amended petition 24 as a motion for summary judgment. The Petitioner's new deadline to respond to the summary judgment motion is 6/11/2010. (#10:29:51.) (lb) (Entered: 05/06/2010) |
| --- | --- | --- |
| 05/06/2010 |  | Set/Reset Deadlines as to 24 MOTION to Dismiss Amended Petition for Habeas Corpus (treated now as a summary judgment motion). Petitioner's response due by 6/11/2010. (lb) (Entered: 05/06/2010) |
| 05/06/2010 | 47 | AMENDED Minute Entry for motions hearing held on 5/6/2010 before Magistrate Judge Robert Bacharach. The Court DENIED 35 Motion to Compel filed by Beverly M Moore and granted Petitioner 30 days to file a new motion to compel with respect to Deaconess Hospital. The Court OVERRULED 38 Amended Motion to Quash Subpoena Duces Tecum in Part filed by Office of Chief Medical Examiner and GRANTED 37 Motion to Compel as to Chief Medical Examiner filed by Beverly M Moore. The Court ordered the Chief Medical Examiner to make the requested docs available no later than 21 days from the date of the hrg. The parties agreed to treat the motion to dismiss the amended petition 24 as a motion for summary judgment. The Petitioner's new deadline to respond to the summary judgment motion is 6/11/2010. (#10:29:51.) (AMENDED to correct the spelling of counsel's last name.)(lb) (Entered: 05/06/2010) |
| 05/26/2010 | 48 | MOTION for Extension of Time by Beverly M Moore. Motions referred to Robert Bacharach. (db, ) (Entered: 05/26/2010) |
| 05/28/2010 | 49 | ORDER The Petitioner has moved for a 30–day extension to respond to the Respondent's summary judgment motion. Through the Court Clerk's office, the Respondent states that she does no object. The extension request is granted. The Petitioner's new deadline for a response is July 10, 2010.granting 48 Motion for Extension of Time to File. Signed by Magistrate Judge Robert Bacharach on 5/28/2010. (sr, ) (Entered: 05/28/2010) |
| 06/24/2010 | 50 | LETTER from Beverly Michelle Moore (db, ) (Entered: 06/24/2010) |
| 06/30/2010 | 51 | MOTION to Compel Discovery Response Out of Time by Beverly M Moore. Motions referred to Robert Bacharach. (Attachments: # 1 Attachment Agreed Order to Compel)(db, ) (Entered: 07/01/2010) |
| 07/06/2010 | 52 | MOTION to Compel Discovery Response by Beverly M Moore. Motions referred to Robert Bacharach. (Attachments: # 1 Attachment Agreed Order to Compel)(db, ) (Entered: 07/07/2010) |
| 07/09/2010 | 53 | MOTION for Extension of Time to Respond by Beverly M Moore. Motions referred to Robert Bacharach. (db, ) (Entered: 07/09/2010) |
| 07/09/2010 | 54 | ENTER ORDER re Telephone Conference held on 7/9/2010. The Court concluded that Petitioner is financially eligible for appointment of counsel. In light of the appointment of counsel, Ms. Moore's new deadline to respond to the summary judgment motion is 8/9/10. The Court requests the Clerk to transmit a copy of the present order to Ms. Susan Otto, Federal Public Defender. Entered by direction of Judge Robert Bacharach on 7/9/10. (lb) (Entered: 07/09/2010) |
| 07/09/2010 | 55 | ORDER regarding 53 Motion for Extension of Time. In a telephone conference on 7/9/10, the Petitioner orally requested an extension of time to respond to the motion for summary judgment. In light of the grant of the Petitioner's oral request, the |

| | | written request is moot. Accordingly, the Court strikes the written request on grounds of mootness. Signed by Magistrate Judge Robert Bacharach on 7/9/10. (lb) (Entered: 07/12/2010) |
|---|---|---|
| 07/09/2010 | 56 | LETTER from Beverly Moore (db, ) (Entered: 07/12/2010) |
| 07/09/2010 | | Set/Reset Deadlines as to 24 MOTION to Dismiss Amended Petition for Habeas Corpus (treated as a summary judgment motion). Petitioner's response due 8/9/2010. (lb) (Entered: 07/12/2010) |
| 07/14/2010 | 57 | ENTER ORDER. The Court appoints Christine Cave for Petitioner. In light of the attorney's new involvement, the Court sua sponte extends the deadline until 10/9/10, for Petitioner to respond to the summary judgment motion. The Court requests Ms. Cave enter an appearance w/in 30 days. Entered by direction of Magistrate Judge Robert Bacharach on 7/14/10. (lb) (Entered: 07/15/2010) |
| 07/14/2010 | | Set/Reset Deadlines as to 24 MOTION to Dismiss Amended Petition for Habeas Corpus (treated as a summary judgment motion). Petitioner's response due 10/9/2010, (lb) (Entered: 07/15/2010) |
| 07/21/2010 | 58 | ENTRY of Appearance by Christine M Cave on behalf of Beverly M Moore (Cave, Christine) (Entered: 07/21/2010) |
| 07/30/2010 | 59 | ORDER regarding 51 Motion to Compel; 52 Motion to Compel. The Court directs the Petitioner to conduct a personal conference on the two pending motions to compel and file a short report regarding the status by 9/10/10. Signed by Magistrate Judge Robert Bacharach on 7/30/10. (lb) (Entered: 07/30/2010) |
| 08/19/2010 | 60 | MOTION to Compel *and Notice to the Court* by Beverly M Moore. Motions referred to Robert Bacharach. (Cave, Christine) (Entered: 08/19/2010) |
| 08/19/2010 | 61 | SEALED ORDER, granting 51 Motion to Compel, 52 Motion to Compel, 60 Motion to Compel. Signed by Magistrate Judge Robert Bacharach on 8/19/10. (This Order is filed under seal by direction of Judge Bacharach because it contains personal data identifiers.)(lb) (Entered: 08/19/2010) |
| 10/04/2010 | 62 | RESPONSE to Motion re 24 MOTION to Dismiss *Amended Petition for Habeas Corpus and in the Alternative, Motion for Extension of Time* filed by Beverly M Moore. (Attachments: # 1 Exhibit Affidavit of Christine Cave, # 2 Exhibit Gardner Article in Pediatric Neurosurgery, # 3 Exhibit Goldsmith and Plunkett Article)(Cave, Christine) (Entered: 10/04/2010) |
| 10/11/2010 | 63 | RESPONSE re 62 Response to Motion, *Petitioner's Motion for Extension* filed by Millicent Newton Embry. (Looper, Jared) (Entered: 10/11/2010) |
| 10/20/2010 | 64 | ORDER re 62 Petitioner's Response to Motion or, Alternatively, Motion for Extension of Time, filed by Beverly M Moore. The Court grants the Petitioner's request for an extension of time to respond to the summary judgment motion. However, the Court rejects the Petitioner's suggestions that she be allowed to respond to the summary judgment motion through an evidentiary hearing. In addition, the Court rejects the Petitioner's request to deny the summary judgment motion based on her desire to obtain further discovery and review the materials recently obtained. The Petitioner's new deadline to respond to the Respondent's summary judgment motion is 11/30/10. Signed by Magistrate Judge Robert Bacharach on 10/20/10. (lb) (Entered: 10/20/2010) |

| 11/10/2010 | 65 | MOTION for Discovery by Beverly M Moore. Motions referred to Robert Bacharach. (Cave, Christine) (Entered: 11/10/2010) |
| 11/12/2010 | 66 | ORDER regarding 65 Motion for Discovery; regarding 24 Motion for Summary Judgment. If Respondent objects to the motion for leave to conduct discovery, she shall file a written objection no later than 11/30/10. The Court sua sponte extends the Petitioner's deadline to 12/15/10, in which to respond to the Respondent's motion for summary judgment. Signed by Magistrate Judge Robert Bacharach on 11/12/10. (lb) (Entered: 11/12/2010) |
| 11/17/2010 | 67 | NOTICE of Conventional Filing *re: Ex Parte Motion to Authorize Funds* by Christine M Cave on behalf of Beverly M Moore (Cave, Christine) (Entered: 11/17/2010) |
| 11/17/2010 | 68 | EX PARTE MOTION for Order to Authorize Payment of Expert by Beverly M Moore. Motions referred to Robert Bacharach. (Attachments: # 1 Exhibit 1 – Education, # 2 Exhibit 2 – Letterdated April 2010, # 3 Exhibit 3 – Letter dated 1/21/1947)(cps) (Entered: 11/18/2010) |
| 11/18/2010 | 69 | ORDER granting 68 Ex Parte Motion for Order to Authorize Payment of Expert. Signed by Magistrate Judge Robert Bacharach on 11/18/10. (lb) (Entered: 11/18/2010) |
| 11/19/2010 | 70 | MOTION to Clarify *May 6, 2010, Order* by Beverly M Moore. Motions referred to Robert Bacharach. (Cave, Christine) (Entered: 11/19/2010) |
| 11/19/2010 | 71 | MOTION for Discovery *for Medical Documents Made in the Alternative* by Beverly M Moore. Motions referred to Robert Bacharach. (Cave, Christine) (Entered: 11/19/2010) |
| 11/19/2010 | 72 | MOTION to Expedite *Response* by Beverly M Moore. Motions referred to Robert Bacharach. (Cave, Christine) (Entered: 11/19/2010) |
| 11/22/2010 | 73 | ENTER ORDER granting 70 Motion to Clarify; granting 72 Motion to Expedite. Respondent shall respond to the discovery motions by 11/30/10. Entered by direction of Judge Robert Bacharach on 11/22/10. (lb) (Entered: 11/23/2010) |
| 11/30/2010 | 74 | RESPONSE in Opposition re 65 MOTION for Discovery, 71 MOTION for Discovery *for Medical Documents Made in the Alternative* filed by Millicent Newton Embry. (Attachments: # 1 Exhibit 1 – Price v. Friel, unpublished opinion, # 2 Exhibit 2 – U.S. v. Starr, unpublished opinion, # 3 Exhibit 3 – Brief of Appellant, # 4 Exhibit 4 – OCCA Petition in Error, # 5 Exhibit 5 – Order Declining Appellate Jurisdiction and Dismissing Petition in Error, # 6 Exhibit 6 – Johnson v. Gibson, unpublished opinion)(Looper, Jared) (Entered: 11/30/2010) |
| 12/02/2010 | 75 | NOTICE of Hearing on Motion 65 MOTION for Discovery, 71 MOTION for Discovery *for Medical Documents Made in the Alternative*: Motion Hearing set for 12/14/2010 at 3:30 PM in Courtroom 101 before Magistrate Judge Robert Bacharach. (lb) (Entered: 12/02/2010) |
| 12/06/2010 | 76 | MOTION for Extension of Time by Beverly M Moore. Motions referred to Robert Bacharach. (Cave, Christine) (Entered: 12/06/2010) |
| 12/06/2010 | 77 | ORDER granting 76 Motion for Extension of Time to File. Petitioner's deadline to respond to the summary judgment motion is 1/31/11. Signed by Magistrate Judge Robert Bacharach on 12/6/10. (lb) (Entered: 12/06/2010) |

| 12/14/2010 | 78 | Minute Entry for proceedings held before Magistrate Judge Robert Bacharach: Oral Argument held on 12/14/2010 re 65 MOTION for Discovery filed by Beverly M Moore, 71 MOTION for Discovery *for Medical Documents Made in the Alternative* filed by Beverly M Moore. Christine Cave apprd on behalf of Petitioner; Jared Looper and Donald Self apprd on behalf of Respondent. The Court granted in part and denied in part the two motions for discovery, as more fully set out in the court minute. (Court Reporter Alana LaGrow.) (lb) (Entered: 12/15/2010) |
|---|---|---|
| 12/29/2010 | 79 | MOTION to Compel by Beverly M Moore. Motions referred to Robert Bacharach. (Attachments: # 1 Exhibit Subpoena of OU Children's Hospital, # 2 Exhibit Subpoena of EMSA, # 3 Exhibit EMSA Objections to Subpoena, # 4 Exhibit Subpoena of Oklahoma City Fire Department)(Cave, Christine) (Entered: 12/29/2010) |
| 01/06/2011 | 80 | ENTER ORDER re Telephone Conference held on 1/6/2011 before Magistrate Judge Robert Bacharach re 79 Motion to Compel by Beverly M. Moore. The Court inquired of the parties whether they would agree to an interim order, satisfying the restrictions under 45 C.F.R. Section 164.512(e)(v)(A)–(B). Both parties consented. Entered by direction of Judge Robert Bacharach on 1/6/11. (lb) (Entered: 01/06/2011) |
| 01/06/2011 | 81 | SEALED ORDER regarding information that is subject to the Motion to Compel. The Motion to Compel will remain pending at this time. Signed by Judge Robert Bacharach on 1/6/11. (lb) (Entered: 01/06/2011) |
| 01/21/2011 | 82 | SEALED DOCUMENT – CERTIFICATE re CJA voucher for payment of expert services. Signed by Judge Robin Cauthron on 1/21/11.(lb) (Entered: 01/21/2011) |
| 01/21/2011 | 83 | ENTER ORDER. Upon the oral representation of Petitioner's counsel, Doc. 79 MOTION to Compel is moot. Entered by direction of Magistrate Judge Robert Bacharach on 1/21/11. (lb) (Entered: 01/21/2011) |
| 01/26/2011 | 84 | MOTION for Order *to Excuse Compliance with Redaction Requirement* by Beverly M Moore. Motions referred to Robert Bacharach. (Cave, Christine) (Entered: 01/26/2011) |
| 01/27/2011 | 85 | MOTION for Leave *to File Oversized Brief* by Beverly M Moore. Motions referred to Robert Bacharach. (Cave, Christine) (Entered: 01/27/2011) |
| 01/27/2011 | 86 | ORDER granting 85 Motion for Leave to File a Brief in Excess of 30 Pages. The petitioner's response brief cannot exceed 35 pages, as more fully set out. Signed by Magistrate Judge Robert Bacharach on 1/27/11. (jw) (Entered: 01/27/2011) |
| 01/28/2011 | 87 | ORDER granting Petitioner's 84 Request for relaxation of the redaction requirement concerning the child's identity. Court will excuse Petitioner from the provision in Fed R Civ P 5(a)(3) for redaction of the child's name. Signed by Magistrate Judge Robert Bacharach on 1/28/11. (ch, ) (Entered: 01/28/2011) |
| 01/31/2011 | 88 | RESPONSE to Motion re 24 MOTION to Dismiss *Amended Petition for Habeas Corpus* filed by Beverly M Moore. (Attachments: # 1 Exhibit 911 Transcript, # 2 Exhibit American Academy of Ophthalmology Paper, # 3 Exhibit American Academy of Pediatrics Paper, # 4 Exhibit Giardino and Giardino Article, # 5 Exhibit Autopsy Report, # 6 Exhibit Barnes Preliminary Report, # 7 Attachment Barnes CV – Part 1, # 8 Attachment Barnes CV – Part 2, # 9 Attachment Barnes 2011 Article, # 10 Exhibit Barnes and Krasnokutsky Article, # 11 Exhibit Criminal Information, Case No. CF–2004–0351 (Oklahoma County, Okla.), # 12 Exhibit Deaconess |

| | | |
|---|---|---|
| | | Medical Records of A.S., # 13 Exhibit Dena Richardson News Report, # 14 Exhibit EMSA Report, # 15 Exhibit Bandak Article, # 16 Exhibit Graeme Moore News Report, # 17 Exhibit IBMC CT Images, # 18 Exhibit IBMC Discharge Summary, # 19 Exhibit IBMC History and Physical Report, # 20 Exhibit IBMC Progress Note, # 21 Exhibit IBMC Radiology Report, # 22 Exhibit Jameson Cook News Report, # 23 Exhibit Jan Leestma Book Excerpts, # 24 Exhibit John Plunkett Article, # 25 Exhibit Kassin Article Part 1, # 26 Attachment Kassin Article Part 2, # 27 Exhibit Mack Preliminary Report and Exhibits 1 and 2, # 28 Attachment Mack Article, # 29 Exhibit Moore Declaration, # 30 Exhibit Moore Interrogation Transcript, # 31 Exhibit Ophoven Declaration and CV, # 32 Attachment Barnes 2011 Article, # 33 Exhibit OU Medical Center Medical Records of A.S., # 34 Exhibit Roth Declaration, # 35 Exhibit Saints Pediatrics Medical Records, # 36 Exhibit Snyder Police Interview Transcript, # 37 Exhibit Application for Temporary Order, # 38 Exhibit Sooner Start Records, # 39 Exhibit Trial Transcript Volume I, # 40 Exhibit Trial Transcript Volume II Part 1, # 41 Attachment Trial Transcript Volume II Part 2, # 42 Exhibit Trial Transcript Volume III, # 43 Exhibit Trial Transcript Volume IV, # 44 Exhibit Ty Tagami News Report, # 45 Exhibit Goldsmith and Plunkett Article)(Cave, Christine) (Entered: 01/31/2011) |
| 02/07/2011 | 89 | MOTION for Extension of Time to File Response/Reply as to 12 Order,, *Reply in Support of Motion for Summary Judgment* by Millicent Newton Embry. Motions referred to Robert Bacharach. (Looper, Jared) (Entered: 02/07/2011) |
| 02/08/2011 | 90 | ORDER on this 8th day of February 2011, before the Court is Respondent's Motion for Extension of Time to file a Reply in Support of the Motion for Summary Judgment (Doc. #89). For good cause shown, Respondent is granted thirty (30) days from and after February 7, 2011 (or until March 9, 2011) to file a Reply. granting 89 Motion for Extension of Time to File Response/Reply. Signed by Magistrate Judge Robert Bacharach on 2/8/2011. (sr, ) (Entered: 02/08/2011) |
| 02/10/2011 | 91 | ENTER ORDER. The Court will confer with counsel for both parties on 2/15/11, at 2:00 p.m., in Room 1305. Counsel can appear by telephone or in person, whichever they prefer. Entered by direction of Magistrate Judge Robert Bacharach on 2/10/11. (lb) (Entered: 02/10/2011) |
| 02/16/2011 | 93 | ENTER ORDER. Judge Bacharach conducted a conference on 2/15/11, at 2:00 p.m. (recorded). Christine Cave appeared for the Petitioner, and Donald Self and Jared Looper participated by telephone for the Respondent. The Respondent orally requested conversion of the summary judgment briefs to a limited answer on the issue of timeliness. The Petitioner stated that she did not object. The Court granted the Respondent's request. Therefore, the motion to dismiss (later converted to a summary judgment motion), the Petitioner's response, and the Respondent's subsequent reply will be considered as an answer on the issue of timeliness. If the Court concludes that the habeas claim is timely, the Respondent will be permitted to file a subsequent answer on the merits, AS MORE FULLY SET OUT. Entered by direction of Judge Robert Bacharach on 2/16/11.(lb) (Entered: 02/16/2011) |
| 02/24/2011 | 94 | ORDER. The Court requests that Respondent's counsel file by 3/7/11, anyof the items required by Rule 5(c)–(d) that have not already been filed, AS MORE FULLY SET OUT. Signed by Magistrate Judge Robert Bacharach on 2/24/11. (lb) (Entered: 02/24/2011) |
| 03/02/2011 | 95 | NOTICE of Conventional Filing *Ex Parte Motion to Authorize Payment of Psychology Expert* by Christine M Cave on behalf of Beverly M Moore (Cave, |

| | | Christine) (Entered: 03/02/2011) |
|---|---|---|
| 03/02/2011 | 96 | NOTICE of Conventional Filing *Ex Parte Motion to Authorize Payment of Ophthalmology Expert* by Christine M Cave on behalf of Beverly M Moore (Cave, Christine) (Entered: 03/02/2011) |
| 03/02/2011 | 97 | MOTION for Order by Beverly M Moore. Motions referred to Robert Bacharach. (Attachments: # 1 Exhibit 1 – Curriculum Vitae)(cps) (Entered: 03/03/2011) |
| 03/02/2011 | 98 | MOTION for Order by Beverly M Moore. Motions referred to Robert Bacharach. (Attachments: # 1 Exhibit 1 – Curriculum Vitae)(cps) (Entered: 03/03/2011) |
| 03/04/2011 | 99 | ORDER granting 97 Petitioner's Ex Parte Motion to Authorize Payment; granting 98 Petitioner's Ex Parte Motion to Authorize Payment. Signed by Magistrate Judge Robert Bacharach on 3/4/11. (lb) (Entered: 03/04/2011) |
| 03/07/2011 | 100 | NOTICE (other) by Millicent Newton Embry re 94 Order (Attachments: # 1 Exhibit 1 – Brief of Appellant, # 2 Exhibit 2 – Brief of Appellee, # 3 Exhibit 3 – Opinion)(Looper, Jared) (Entered: 03/07/2011) |
| 03/07/2011 | 101 | NOTICE of Conventional Filing *of State Court Record* by Jared A Looper on behalf of Millicent Newton Embry (Looper, Jared) (Entered: 03/07/2011) |
| 03/08/2011 | 102 | STATE COURT RECORDS RECEIVED – CONVENTIONAL FILING by Millicent Newton Embry re 101 Notice of Conventional Filing. (cps) (cps, ). (Additional attachment(s) added on 7/1/2022: # 1 Attachment 1 – State Court Records – Preliminary Hearing and Trial Transcripts, # 2 Attachment 2 – State Court Records – Trial Exhibits, # 3 Attachment 3 – State Court Records – Sentencing and Original Record) (MPF). (Entered: 03/08/2011) |
| 03/21/2011 | 103 | MOTION for Extension of Time by Beverly M Moore. Motions referred to Robert Bacharach. (Cave, Christine) (Entered: 03/21/2011) |
| 03/21/2011 | 104 | MOTION for Extension of Time by Beverly M Moore. Motions referred to Robert Bacharach. (Attachments: # 1 Exhibit FedEx Airbill, # 2 Exhibit FedEx Online Tracking, # 3 Exhibit Forensic Neuropathology)(Cave, Christine) (Entered: 03/21/2011) |
| 03/21/2011 | | Docket Annotation: At docket entry no. 103, Petitioner filed a motion for extension of time but inadvertently failed to attach the exhibits to the motion. Petitioner has refiled her motion for extension of time with the attached exhibits at docket entry no. 104. Therefore, docket entry no. 103 is hereby terminated as a pending motion. (lb) (Entered: 03/21/2011) |
| 03/21/2011 | 105 | RESPONSE in Opposition re 104 MOTION for Extension of Time filed by Millicent Newton Embry. (Looper, Jared) (Entered: 03/21/2011) |
| 03/23/2011 | 106 | ORDER granting 104 Respondent's Motion for Extension of Time. Signed by Magistrate Judge Robert Bacharach on 3/23/11. (lb) (Entered: 03/23/2011) |
| 04/08/2011 | 107 | MOTION for Leave *to Expand the Record and Hold Evidentiary Hearing on Actual Innocence and Brief in Support* by Beverly M Moore. Motions referred to Robert Bacharach. (Attachments: # 1 Exhibit Titsworth v. Mullin)(Cave, Christine) (Entered: 04/08/2011) |
| 04/08/2011 | 108 | APPENDIX *Volume 1* by Beverly M Moore. (Attachments: # 1 Exhibit 911 Transcript, # 2 Exhibit Am. Academy of Ophthalmology Information Statement, # 3 |

| | | |
|---|---|---|
| | | Exhibit Am. Academy of Pediatrics Paper, # 4 Exhibit Giardino Article, # 5 Exhibit Autopsy Report, # 6 Exhibit B. Moore Declaration, # 7 Exhibit Barnes Preliminary Report, # 8 Attachment Barnes CV – Part 1, # 9 Attachment Barnes CV – Part 2, # 10 Attachment Barnes Article, # 11 Exhibit Barnes and Krasnokutsky, # 12 Exhibit Criminal Information, # 13 Exhibit D. Carmichael Declaration, # 14 Exhibit Deaconess Medical Records of A.S., # 15 Exhibit Dena Richardson News Article, # 16 Exhibit E. Roth Declaration, # 17 Exhibit EMSA Report, # 18 Exhibit Bandak Article, # 19 Exhibit G. Carmichael Declaration, # 20 Exhibit Gardner Report, # 21 Exhibit Graeme Moore News Article, # 22 Exhibit Handler Declaration, # 23 Exhibit IBMC Medical Records of A.S., # 24 Exhibit J. Roth Declaration, # 25 Exhibit J. Roth Supplemental Declaration, # 26 Exhibit Jameson Cook News Article, # 27 Exhibit Jan Leestma Book Excerpts, # 28 Exhibit John Plunkett Article)(Cave, Christine) (Entered: 04/08/2011) |
| 04/08/2011 | 109 | APPENDIX *Volume II* by Beverly M Moore. (Attachments: # 1 Exhibit M. Jones Declaration, # 2 Exhibit Kassin Article – Part 1, # 3 Attachment Kassin Article – Part 2, # 4 Exhibit Mack Preliminary Report – Part 1, # 5 Attachment Mack Preliminary Report – Part 2, # 6 Exhibit Moore Interrogation Transcript, # 7 Exhibit Ophoven Declaration – Part 1, # 8 Attachment Ophoven Declaration – Part 2, # 9 Exhibit OU Medical Center Medical Records of A.S., # 10 Exhibit Preliminary Hearing Transcript – Part 1, # 11 Attachment Preliminary Hearing Transcript – Part 2, # 12 Exhibit Roberson Curriculum Vitae, # 13 Exhibit Roberson Report, # 14 Exhibit Saints Pediatrics Medical Records of A.S., # 15 Exhibit Snyder Police Interview Transcript, # 16 Exhibit Snyder Police Interview DVD, # 17 Exhibit Application for Temporary Order, # 18 Exhibit Sooner Start Records, # 19 Exhibit Squier Declaration, # 20 Exhibit T. Moore Declaration, # 21 Exhibit Trial Transcript Volume I, # 22 Exhibit Trial Transcript Volume II – Part 1, # 23 Attachment Trial Transcript Volume II – Part 2, # 24 Exhibit Trial Transcript Volume III, # 25 Exhibit Trial Transcript Volume IV, # 26 Exhibit Ty Tagami News Article, # 27 Exhibit Goldsmith and Plunkett Article)(Cave, Christine) (Entered: 04/08/2011) |
| 04/08/2011 | 110 | NOTICE of Conventional Filing *of Video Exhibits* by Christine M Cave on behalf of Beverly M Moore (Cave, Christine) (Entered: 04/08/2011) |
| 04/08/2011 | 111 | REPLY by Petitioner Beverly M Moore *on Issue of Timeliness* filed by Beverly M Moore. (Attachments: # 1 Exhibit Wisconsin v. Louis)(Cave, Christine) (Entered: 04/08/2011) |
| 04/08/2011 | 112 | EXHIBIT in disc format for exhibits 6–A and 37 by Petitioner Beverly M Moore. (cps) (Entered: 04/08/2011) |
| 06/13/2011 | 114 | MOTION for Leave to File Excess Pages by Millicent Newton Embry. Motions referred to Robert Bacharach. (Looper, Jared) (Entered: 06/13/2011) |
| 06/13/2011 | 115 | ORDER granting 114 Respondent's Motion for Leave to File Excess Pages. Respondent's consolidated response brief shall not exceed 65 pages. Signed by Magistrate Judge Robert Bacharach on 6/13/11. (lb) (Entered: 06/13/2011) |
| 06/14/2011 | 116 | SURREPLY re 107 MOTION for Leave *to Expand the Record and Hold Evidentiary Hearing on Actual Innocence and Brief in Support*, 111 Reply filed by Millicent Newton Embry. (Attachments: # 1 Exhibit 1 – Hollie v. Booher, unpublished opinion, # 2 Exhibit 2 – Price v. Friel, unpublished, # 3 Exhibit 3 – U.S. v. Starr, unpublished, # 4 Exhibit 4 – Affidavit of Sara McAmis, # 5 Exhibit 5 – Howard v. Wolfe, unpublished, # 6 Exhibit 6 – Stein v. Eberlin, unpublished, # 7 Exhibit 7 – |

| | | |
|---|---|---|
| | | Affidavit of Eric Reynolds, # 8 Exhibit 8 – MSNBC article, # 9 Exhibit 9 – Bedford County, VA article, # 10 Exhibit 10 – The Record article, # 11 Exhibit 11 – Orlando Press article, # 12 Exhibit 12 – Virginia Beach article, # 13 Exhibit 13 – CBC News article, # 14 Exhibit 14 – Mayo Clinic report, # 15 Exhibit 15 – National Institute of Neurological Disorders report, # 16 Exhibit 16 – National Institutes of Health report, # 17 Exhibit 17 – CDC report, # 18 Exhibit 18 – American Academy of Pediatrics report, # 19 Exhibit 19 – AA of Pediatrics Letters to Editor NY Times, # 20 Exhibit 20 – J Neurosurg Pediatrics report, # 21 Exhibit 21 – WebMD report, # 22 Exhibit 22 – Hess v. Tilton, unpublished, # 23 Exhibit 23 – Jones v. Knoles, unpublished, # 24 Exhibit 24 – Johnson v. Felker, unpublished, # 25 Exhibit 25 – Crossley v. Bell, unpublished, # 26 Exhibit 26 – Flick v. Warren, unpublished, # 27 Exhibit 27 – ABA Journal article, # 28 Exhibit 28 – BMJ letter, # 29 Exhibit 29 – Phillips v. Steele, unpublished, # 30 Exhibit 30 – NY Times article, # 31 Exhibit 31 – Discover Magazine article, # 32 Exhibit 32 – Washington Post article, # 33 Exhibit 33 – Watertown Daily Times article, # 34 Exhibit 34 – Minnesota Medicine letters to Editor, # 35 Exhibit 35 – John Plunkett, Forensic Pathologist report, # 36 Exhibit 36 – New Hampton article, # 37 Exhibit 37 – New Hampton article–2, # 38 Exhibit 38 – Beyond reasonable doubt article)(Looper, Jared) (Entered: 06/14/2011) |
| 06/15/2011 | 117 | MOTION for Extension of Time by Beverly M Moore. Motions referred to Robert Bacharach. (Cave, Christine) (Entered: 06/15/2011) |
| 06/15/2011 | 118 | MOTION for Leave, MOTION for Leave to File Reply *to Brief on the Merits of Actual Innocence Claim* by Beverly M Moore. Motions referred to Robert Bacharach. (Cave, Christine) (Entered: 06/15/2011) |
| 06/16/2011 | 119 | ORDER granting 117 Petitioner's Motion for Extension of Time. Petitioner shall have until 6/24/11, in which to file her Reply in support of her Motion for Leave to Expand the Record and Hold Evidentiary Hearing on Actual Innocence. Signed by Magistrate Judge Robert Bacharach on 6/16/11. (lb) (Entered: 06/16/2011) |
| 06/16/2011 | 120 | ORDER granting 118 Petitioner's Motion for Leave to File Reply Brief on the merits of her actual innocence. The deadline for the reply brief in 6/30/11. Signed by Magistrate Judge Robert Bacharach on 6/16/11. (lb) (Entered: 06/16/2011) |
| 06/23/2011 | 121 | REPLY to Response to Motion re 107 MOTION for Leave *to Expand the Record and Hold Evidentiary Hearing on Actual Innocence and Brief in Support* filed by Beverly M Moore. (Attachments: # 1 Exhibit Declaration of Janus Roth, # 2 Exhibit Declaration of Edward Roth)(Cave, Christine) (Entered: 06/23/2011) |
| 06/29/2011 | 122 | REPLY by Petitioner Beverly M Moore re 111 Reply *(Supplemental) on Issue of Actual Innocence* filed by Beverly M Moore. (Attachments: # 1 Exhibit Autopsy Report, # 2 Exhibit Supplemental Declaration of Dr. Ophoven, # 3 Exhibit Trial Transcript Excerpts)(Cave, Christine) (Entered: 06/29/2011) |
| 07/15/2011 | 123 | ENTER ORDER. The Court conducted a telephonic conference on 7/15/11. Donald Self and Jared Looper participated by telephone and Christine Cave participated in person. Both sides' attorneys expressed the preliminary view that Dr. Ingels Bacharach's limited involvement would not merit recusal, but would file a request for recusal by 7/19/11, if they gained further information suggesting greater involvement by Dr. Ingels Bacharach. Entered by direction of Judge Robert Bacharach on 7/15/11. (lb) (Entered: 07/15/2011) |
| 07/19/2011 | 124 | MOTION for Recusal *Limited* by Millicent Newton Embry. (Looper, Jared) (Entered: 07/19/2011) |

| 07/20/2011 | 125 | ORDER. The present order addresses the evidence attached to the Respondent's surreply, the materials attached to the Petitioner's response to the Respondent's surreply, and identification of the items that the Petitioner wants to be included in the expanded record, AS MORE FULLY SET OUT. Signed by Magistrate Judge Robert Bacharach on 7/20/11. (lb) (Entered: 07/20/2011) |
| --- | --- | --- |
| 07/22/2011 | 126 | MOTION for Leave *to Expand the Record (Limited)* by Millicent Newton Embry. Motions referred to Robert Bacharach. (Looper, Jared) (Entered: 07/22/2011) |
| 07/25/2011 | 127 | NOTICE (other) by Beverly M Moore re 125 Order, *in Response to July 20,2011, Court Order* (Cave, Christine) (Entered: 07/25/2011) |
| 07/27/2011 | 128 | RESPONSE to Motion re 124 MOTION for Recusal *Limited* filed by Beverly M Moore. (Attachments: # 1 Exhibit US v Siegleman, # 2 Exhibit IBMC Pediatric Assess, # 3 Exhibit Trial Transcript Excerpts)(Cave, Christine) (Entered: 07/27/2011) |
| 08/04/2011 | 129 | NOTICE (other) by Millicent Newton Embry re 125 Order, (Looper, Jared) (Entered: 08/04/2011) |
| 08/15/2011 | 130 | ENTER ORDER. The Court conducted a brief telephonic conference on 8/12/11 regarding the multiple copies of the police interview of Beverly Moore, States Exhibit 48/Ct. Exh. 1, in the Court file. Entered by direction of Judge Robert Bacharach on 8/15/11. (lb) (Entered: 08/15/2011) |
| 08/15/2011 | 131 | RESPONSE to Motion re 126 MOTION for Leave *to Expand the Record (Limited)* filed by Beverly M Moore. (Cave, Christine) (Entered: 08/15/2011) |
| 09/07/2011 | 132 | ORDER granting in part and denying in part 107 Petitioner's Motion for Leave to Expand the Record and Hold Evidentiary Hearing. Signed by Magistrate Judge Robert Bacharach on 9/7/11. (lb) (Entered: 09/08/2011) |
| 09/07/2011 | 133 | ORDER granting in part and denying in part 126 Respondent's Motion for Leave to Expand the Record. Signed by Magistrate Judge Robert Bacharach on 9/7/11. (lb) (Entered: 09/08/2011) |
| 09/07/2011 | 134 | ORDER denying 124 Respondent's Motion for Recusal. Signed by Magistrate Judge Robert Bacharach on 9/7/11. (lb) (Entered: 09/08/2011) |
| 09/07/2011 | 135 | PROPOSED Findings of Fact and Conclusions of Law re 22 Petition for Writ of Habeas Corpus (Amended) filed by Beverly M Moore. With the new evidence, the Court should apply an exception to the time–bar because Ms. Moore has proven her actual innocence. Objections to R&R due by 9/26/2011. This referral is discharged. Signed by Magistrate Judge Robert Bacharach on 9/7/11. (lb) (Entered: 09/08/2011) |
| 09/26/2011 | 136 | OBJECTION TO REPORT AND RECOMMENDATION 135 filed by Millicent Newton Embry. (Looper, Jared) (Entered: 09/26/2011) |
| 09/26/2011 | 137 | OBJECTION TO REPORT AND RECOMMENDATION 135 *on Limited Issue of Causation* filed by Beverly M Moore. (Cave, Christine) (Entered: 09/26/2011) |
| 10/11/2011 | 138 | RESPONSE re 136 Objection to Report and Recommendation filed by Beverly M Moore. (Attachments: # 1 Exhibit Declaration of Cave, # 2 Attachment Medical Examiner Records Part 1, # 3 Attachment Medical Examiner Records Part 2)(Cave, Christine) (Entered: 10/11/2011) |
| 10/28/2011 | 139 | ORDER ADOPTING 135 Findings of Fact and Conclusions of Law; ORDER REFERRING CASE to Magistrate Judge Robert Bacharach.. Signed by Honorable |

| | | Robin J. Cauthron on 10/28/11. (lg, ) (Entered: 10/28/2011) |
|---|---|---|
| 11/07/2011 | 140 | ORDER FOR RESPONSE ON THE MERITS The Court orders as follows: The Respondent shall file a response on the merits to the habeas petition by November 28, 2011. With the response, the Respondent shall file any additional exhibits that it wishes to be considered in connection with the habeas record (if any). The Petitioner may file a reply brief by December 9, 2011. With the reply brief, the Petitioner may file any: (1) objections to the Respondent's additions to the habeas record (if any), and (2) additional exhibits to be considered in connection with the habeas record (if any). By December 23, 2011, the Respondent may file any objections to the Petitioner's additions to the habeas record (if any).. Signed by Magistrate Judge Robert Bacharach on 11/7/2011. (sr, ) (Entered: 11/07/2011) |
| 11/10/2011 | 141 | MOTION for Discovery by Beverly M Moore. Motions referred to Robert Bacharach. (Attachments: # 1 Exhibit Aug. 23, 2005, Vanderventer Email to Funderburk, # 2 Exhibit Sept. 4, 2005, Vanderventer Email to Funderburk, # 3 Exhibit T. Moore Decl., # 4 Exhibit Aug.24, 2006, Vanderventer Letter re: Funderburk Bar Grievance, # 5 Exhibit July 30, 2005, Vanderventer Letter to Funderburk, # 6 Exhibit Vanderventer Bar Grievance)(Cave, Christine) (Entered: 11/10/2011) |
| 11/28/2011 | 142 | MOTION to Dismiss *Amended Petition for Habeas Corpus for Failure to Exhaust* by Millicent Newton Embry. Motions referred to Robert Bacharach. (Looper, Jared) STRICKEN by Order dated 11/29/11 (Doc. 145). Modified on 11/29/2011 (lb). (Entered: 11/28/2011) |
| 11/28/2011 | 143 | BRIEF IN SUPPORT re 142 MOTION to Dismiss *Amended Petition for Habeas Corpus for Failure to Exhaust* by Millicent Newton Embry. (Attachments: # 1 Exhibit 1 – Chart of Procedural History)(Looper, Jared) (Entered: 11/28/2011) |
| 11/28/2011 | 144 | RESPONSE in Opposition re 141 MOTION for Discovery filed by Millicent Newton Embry. (Looper, Jared) (Entered: 11/28/2011) |
| 11/29/2011 | 145 | ORDER striking 142 Respondent's Motion to Dismiss. The Court sua sponte extends the Respondent's deadline for a response on the merits to 12/2/11. Signed by Magistrate Judge Robert Bacharach on 11/29/11. (lb) (Entered: 11/29/2011) |
| 12/02/2011 | 146 | NOTICE of Hearing on Motion re 141 Petitioner's MOTION for Discovery : Motion Hearing set for 12/12/2011 at 2:00 PM in Courtroom 101 before Magistrate Judge Robert Bacharach. (lb) (Entered: 12/02/2011) |
| 12/02/2011 | 147 | MOTION for Order *Motion and Brief in Support to Modify the Court's Order of November 7, 2011*, MOTION for Leave *to File a Successive Motion Requesting Dismissal for Failure to Exhaust State Remedies, OR in the Alternative*, MOTION for Extension of Time to File Response/Reply as to 140 Order,,, 22 Petition for Writ of Habeas Corpus (Amended) by Millicent Newton Embry. Motions referred to Robert Bacharach. (Looper, Jared) (Entered: 12/02/2011) |
| 12/02/2011 | 148 | REPLY to Response to Motion re 141 MOTION for Discovery filed by Beverly M Moore. (Attachments: # 1 Attachment In re Davis, # 2 Attachment McKnight v. Bobby)(Cave, Christine) (Entered: 12/02/2011) |
| 12/06/2011 | 149 | ENTER ORDER. In light of the pendency of the motion for leave to file a successive motion to dismiss, the Court extends the Respondent's deadline to comply with the order of 11/7/11, as more fully set out in the Enter Order. Entered by direction of |

| | | |
|---|---|---|
| | | Judge Robert Bacharach on 12/6/11. (lb) (Entered: 12/07/2011) |
| 12/08/2011 | 150 | ENTER ORDER regarding 147 Motion for Leave to file successive motion to dismiss on the issue of exhaustion, as more fully set out in the Enter Order. Petitioner's response to the motion is due 12/23/11. A hearing will be conducted in Courtroom 101 on 1/10/12, at 1:30 p.m. Entered by direction of Judge Robert Bacharach on 12/8/11. (lb) (Entered: 12/08/2011) |
| 12/08/2011 | | Set/Reset Deadlines as to 147 MOTION for Leave *to File a Successive Motion Requesting Dismissal for Failure to Exhaust State Remedies. Motion Hearing set for 1/10/2012 at 1:30 PM in Courtroom 101 before Magistrate Judge Robert Bacharach.* (lb) (Entered: 12/08/2011) |
| 12/08/2011 | 151 | AMENDED ENTER ORDER re 147 Motion for Leave to file successive motion to dismiss on the issue of exhaustion, as more fully set out in the Amended Enter Order. Petitioner's response to the motion is due 12/23/11. A hearing will be conducted in Courtroom 101 on 1/10/12, at 1:30 p.m. Entered by direction of Judge Robert Bacharach on 12/8/11. (lb) (Entered: 12/08/2011) |
| 12/09/2011 | 152 | ENTER ORDER. The Court conducted a telephonic conference with counsel for both parties. The Court concluded that it should postpone the hearing on the motion for leave to conduct discovery. That hearing will be conducted on 1/10/2012, after the Court conducts the hearing on the Respondent's motion for leave to file a second motion to dismiss. Entered by direction of Judge Robert Bacharach on 12/9/11. (lb) (Entered: 12/12/2011) |
| 12/09/2011 | | Set/Reset Hearings as to 141 Petitioner's MOTION for Discovery. Motion Hearing reset for 1/10/2012 at 1:30 PM in Courtroom 101 before Magistrate Judge Robert Bacharach. (lb) (Entered: 12/12/2011) |
| 12/16/2011 | 153 | NOTICE of Hearing on Motion 141 Petitioner's MOTION for Discovery, 147 Respondent's MOTION for Leave *to File a Successive Motion Requesting Dismissal for Failure to Exhaust State Remedies*. Motion Hearing set for 1/18/2012 at 1:30 PM in Courtroom 101 before Magistrate Judge Robert Bacharach. (lb) (Entered: 12/16/2011) |
| 12/21/2011 | 154 | RESPONSE to Motion re 147 MOTION for Order *Motion and Brief in Support to Modify the Court's Order of November 7, 2011* MOTION for Leave *to File a Successive Motion Requesting Dismissal for Failure to Exhaust State Remedies, OR in the Alternative* MOTION for Extension of Time to File Response/Reply as to 140 Order,,, 22 Petition for Writ of Habeas Corpus (Amended) MOTION for Extension of Time to File Response/Reply as to 140 Order,,, 22 Petition for Writ of Habeas Corpus (Amended) filed by Beverly M Moore. (Cave, Christine) (Entered: 12/21/2011) |
| 12/29/2011 | 155 | MOTION to Withdraw as Attorney by Millicent Newton Embry. Motions referred to Robert Bacharach. (Looper, Jared) (Entered: 12/29/2011) |
| 12/29/2011 | 156 | ORDER granting 155 Motion to Withdraw as Attorney. Attorney Jared A Looper terminated. Signed by Magistrate Judge Robert Bacharach on 12/29/2011. (brs) (Entered: 12/29/2011) |
| 01/18/2012 | 158 | Minute Entry for proceedings held before Magistrate Judge Robert Bacharach: Motion Hearing held on 1/18/2012 re 147 Respondent's MOTION and Brief in Support to Modify the Court's Order of November 7, 2011, MOTION for Leave to |

|  |  | File a Successive Motion Requesting Dismissal for Failure to Exhaust State Remedies, OR in the Alternative, MOTION for Extension of Time to File Response/Reply, and 141 Petitioner's MOTION for Discovery. For the reasons stated on the record, the Court granted the motions. Respondent to file a limited answer on the issue of exhaustion by 1/20/12. (#13:35:08.) (lb) (Entered: 01/19/2012) |
| 01/20/2012 | 159 | RESPONSE to Petition for Writ of Habeas Corpus (Amended) *limited answer on exhaustion* by Millicent Newton Embry. (Attachments: # 1 Exhibit Chart of Procedural History)(Self, Donald) (Entered: 01/20/2012) |
| 01/23/2012 | 160 | ENTER ORDER: The Petitioner is granted 21 days, or until February 13, 2012, to reply to Respondents limited answer on the issue of exhaustion. Signed by Magistrate Judge Robert Bacharach on 1/23/2012. (brs) (Entered: 01/23/2012) |
| 01/30/2012 | 161 | REPLY by Petitioner Beverly M Moore re 159 Response to Habeas Petition (Amended) *on Issue of Exhaustion* filed by Beverly M Moore. (Attachments: # 1 Exhibit Form 13.11, # 2 Exhibit State's Response, # 3 Exhibit Petition for Appeal)(Cave, Christine) (Entered: 01/30/2012) |
| 02/10/2012 | 162 | REPORT AND RECOMMENDATION re 159 Limited Answer on the Issue of Exhaustion by Millicent Newton Embry. IT IS RECOMMENDED that the Court overrule the Respondent's limited answer. Objections to R&R due by 2/27/2012. The referral is not discharged. Signed by Magistrate Judge Robert Bacharach on 2/10/12. (lb) (Entered: 02/10/2012) |
| 02/10/2012 | 163 | ORDER. The undersigned is contemporaneously issuing a report, which recommends that the Court overrule the Respondent's limited answer on the issue of exhaustion of state court remedies. In light of this report, the Court orders the Respondent to file an answer to the amended habeas petition by 3/12/12. Petitioner's reply is due 15 days after the filing of Respondent's answer. Signed by Magistrate Judge Robert Bacharach on 2/10/12. (lb) (Entered: 02/10/2012) |
| 02/24/2012 | 164 | NOTICE of Change of Address by Christine M Cave (Cave, Christine) (Entered: 02/24/2012) |
| 02/27/2012 | 165 | OBJECTION TO REPORT AND RECOMMENDATION 162 *Exhaustion* filed by Millicent Newton Embry. (Self, Donald) (Entered: 02/27/2012) |
| 02/27/2012 | 166 | MOTION to Stay Case *answer on merits* by Millicent Newton Embry. Motions referred to Robert Bacharach. (Self, Donald) (Entered: 02/27/2012) |
| 02/29/2012 | 167 | ORDER deferring ruling on 166 Motion to Stay Case. The Court sua sponte extends the Respondent's deadline to file an answer on the merits of the amended habeas petition to 3/27/12. Signed by Magistrate Judge Robert Bacharach on 2/29/12. (lb) (Entered: 02/29/2012) |
| 03/09/2012 | 168 | MOTION for Leave *to Expand the Record and Hold Evidentiary Hearing* by Beverly M Moore. Motions referred to Robert Bacharach. (Attachments: # 1 Exhibit Declaration of Beverly Moore)(Cave, Christine) (Entered: 03/09/2012) |
| 03/12/2012 | 169 | ENTER ORDER regarding 168 Motion for Leave to expand the record and conduct evidentiary hearing. The Court will hold in abeyance the request for an evidentiary hearing. Respondent has until 3/30/12, in which to object to the motion for leave to expand the record. The Court again sua sponte extends the Respondent's deadline for an answer from 3/27/12, to 4/10/12. Entered by direction of Judge Robert Bacharach on 3/12/12. (lb) (Entered: 03/12/2012) |

17

| 03/12/2012 | 170 | APPENDIX *Second* by Beverly M Moore. (Attachments: # 1 Exhibit Autopsy Report re Isaac Funderburk, # 2 Exhibit Bev Moore 2nd Declaration, # 3 Exhibit Christine Cave Declaration, # 4 Exhibit Citibank v Isaac Funderburk, # 5 Exhibit Isaac Funderburk's Death Certificate, # 6 Exhibit Donna Carmichael Declaration, # 7 Exhibit El Nacional v Isaac Funderburk, # 8 Exhibit Funderburk's Grievance Response, # 9 Exhibit IRS Tax Lien filed against Isaac Funderburk 7–11–06, # 10 Exhibit Janus Roth Declaration–Third, # 11 Exhibit Judkins et al Am Journal of Forensic Med Article 2004, # 12 Exhibit Learned Declaration – Medical Examiner's office, # 13 Exhibit Dr Corey May Subpoena Documents, # 14 Exhibit Michael Moore Declaration, # 15 Exhibit Mortg Elec Reg Systems v Isaac Funderburk, # 16 Exhibit Oklahoma v. IF Child Support Enforcement Action, # 17 Exhibit Oklahoma v. Isaac Funderburk Criminal Case, # 18 Exhibit MI–2005–2563 Criminal Minute Sheet, # 19 Exhibit Oklahoma v Martinez, # 20 Exhibit OK County Jail Records of Visits to Moore, # 21 Exhibit Okla Co Treasurer Property Tax Records re Funderburk, # 22 Exhibit SWBell v Isaac Funderburk, # 23 Exhibit Steffen Article re Papilledema and acute ICP, # 24 Exhibit Terri Moore 2d Declaration, # 25 Exhibit US v Isaac Funderburk – MO –Criminal Felony, # 26 Exhibit Union Federal Bank v Funderburk, # 27 Exhibit Wecht Forensic Sciences 2008 Ophoven Ch Excerpts, # 28 Exhibit Vanderventer Declaration 12–6–11)(Cave, Christine) (Entered: 03/12/2012) |
| --- | --- | --- |
| 03/15/2012 | 171 | RESPONSE re 165 Objection to Report and Recommendation *on Issue of Exhaustion* filed by Beverly M Moore. (Cave, Christine) (Entered: 03/15/2012) |
| 03/19/2012 | 172 | RESPONSE to Motion re 166 MOTION to Stay Case *answer on merits* filed by Beverly M Moore. (Cave, Christine) (Entered: 03/19/2012) |
| 03/19/2012 | 173 | NOTICE of Hearing on Motion 166 Respondent's MOTION to Stay Case *answer on merits* : Motion Hearing set for 4/6/2012 at 1:30 PM in Courtroom 101 before Magistrate Judge Robert Bacharach. (lb, ) (Entered: 03/19/2012) |
| 03/23/2012 | 174 | SUPPLEMENT re 170 Appendix,,,,,, by Beverly M Moore. (Attachments: # 1 Attachment Exhibit 18B to Second Appendix, # 2 Attachment Exhibit 19B to Second Appendix, # 3 Attachment Exhibit 25B to Second Appendix(Cave, Christine) STRICKEN by Order dated 3/26/12. Modified on 3/26/2012 (lb, ). (Entered: 03/23/2012) |
| 03/26/2012 | 175 | SUPPLEMENT re 170 Appendix,,,,,, by Beverly M Moore. (Attachments: # 1 Attachment Attachment Exhibit 18B to Second Appendix, # 2 Attachment 19B to Second Appendix, # 3 Attachment Attachment Exhibit 25B to Second Appendix)(Cave, Christine) (Entered: 03/26/2012) |
| 03/26/2012 | 176 | MOTION to Strike 174 Supplement *to Second Appendix* by Beverly M Moore. Motions referred to Robert Bacharach. (Cave, Christine) (Entered: 03/26/2012) |
| 03/26/2012 | 177 | ORDER granting 176 Motion to Strike 174 Supplement. Signed by Magistrate Judge Robert Bacharach on 3/26/12. (lb, ) (Entered: 03/26/2012) |
| 03/27/2012 | 178 | MOTION for Extension of Time *to respond to motion* by Millicent Newton Embry. Motions referred to Robert Bacharach. (Self, Donald) (Entered: 03/27/2012) |
| 03/29/2012 | 179 | ORDER granting 178 Motion for Extension of Time. The Court grants the proposed extension and gives the Respondent until 4/19/12, to respond to the motion for leave to expand the habeas record. Signed by Magistrate Judge Robert Bacharach on 3/29/12. (lb, ) (Entered: 03/29/2012) |

| 03/30/2012 | 180 | FIRST MOTION for Leave *to Submit Interim Voucher* by Beverly M Moore. Motions referred to Robert Bacharach. (Cave, Christine) (Entered: 03/30/2012) |
|---|---|---|
| 03/30/2012 | 181 | ORDER The Court grants the Petitioner's Motion for Leave to Submit an Interim Voucher (Dkt. No. 180). Petitioner's counsel may submit an interim voucher for work performed and expenses incurred from the time of appointment through March 15, 2012.granting 180 Motion for Leave to. Signed by Magistrate Judge Robert Bacharach on 3/30/2012. (sr, ) (Entered: 03/30/2012) |
| 04/06/2012 | 182 | ORDER declines to Adopt 162 Report and Recommendation; moot 166 Motion to Stay Case filed by Millicent Newton Embry ; administratively closed. Signed by Honorable Robin J. Cauthron on 4/6/12. (lg, ) (Entered: 04/06/2012) |
| 04/11/2012 | 183 | CERTIFICATE 18 USC 3006A(d)(3). Signed by Honorable Robin J. Cauthron on 4/11/12. (lg, ) (Entered: 04/11/2012) |
| 04/11/2012 | 184 | EX PARTE MOTION to Clarify by Beverly M Moore. Motions referred to Robert Bacharach. (Cave, Christine) (Entered: 04/11/2012) |
| 04/12/2012 | 185 | AMENDED CERTIFICATE 18 USC 3006A(d)(3). Signed by Honorable Robin J. Cauthron on 4/12/12. (lg, ) (Entered: 04/12/2012) |
| 04/16/2012 | 186 | ORDER regarding 184 Motion to Clarify. The Court gave Ms. Cave until 5/3/12, in which to file supplemental authorities and sua sponte extended the deadline for initiation of post–conviction proceedings by 30 days. The Court will give Respondent's counsel until 4/20/12, to state whether he wishes to respond to the motion to clarify. Signed by Magistrate Judge Robert Bacharach on 4/16/12. (lb, ) (Entered: 04/16/2012) |
| 04/16/2012 | 187 | SEALED DOCUMENT (Re: 186 Order on Motion to Clarify – Tape Recording of Ex Parte Conference conducted 4/13/12).(lb, ) (Entered: 04/17/2012) |
| 04/20/2012 | 188 | RESPONSE *to Order Apr. 16, 2012* filed by Millicent Newton Embry. (Self, Donald) (Entered: 04/20/2012) |
| 04/23/2012 | 189 | Minute Entry for proceedings held before Magistrate Judge Robert Bacharach: Telephone Conference held on 4/23/2012. (lb, ) (Entered: 04/24/2012) |
| 05/03/2012 | 190 | SUPPLEMENT *to Ex Parte Motion to Clarify* by Beverly M Moore. (Attachments: # 1 Exhibit Puksar v Beard Stay and Abey, # 2 Exhibit Beaty v Ryan, # 3 Exhibit Gwinn v Beard Stay and Abey, # 4 Exhibit Geren v Carey)(Cave, Christine) (Entered: 05/03/2012) |
| 05/03/2012 | 191 | ** SEALED DOCUMENT ** CJA 20: Authorization to Pay Cave. Voucher # 120430000049. Signed by Honorable Robin J. Cauthron on 4/10/12. (kr) (Entered: 05/03/2012) |
| 05/10/2012 | 192 | RESPONSE in Opposition re 184 EX PARTE MOTION to Clarify filed by Millicent Newton Embry. (Self, Donald) (Entered: 05/10/2012) |
| 05/16/2012 | 193 | NOTICE of Hearing on Motion 184 EX PARTE MOTION to Clarify : Motion Hearing set for 5/22/2012 at 2:00 PM in Courtroom 101 before Magistrate Judge Robert Bacharach. (lb, ) (Entered: 05/16/2012) |
| 05/22/2012 | 194 | Minute Order. Proceedings held before Magistrate Judge Robert Bacharach: Oral argument held on 5/22/1012 re 184 EX PARTE MOTION to Clarify filed by Beverly M Moore. For the reasons stated in open court, the Court clarified the ruling but |

| | | declined to authorize compensation for the state post–conviction proceedings. (#14:09:10.) (lb) (Entered: 05/23/2012) |
|---|---|---|
| 06/05/2012 | 195 | NOTICE (other) by Beverly M Moore *Regarding Initiation of State Proceedings* (Cave, Christine) (Entered: 06/05/2012) |
| 06/14/2012 | 196 | CJA 24: Authorization to Pay Cave Voucher # 120601000005, 120601000007,120601000008, 120601000009. Signed by Magistrate Judge Robert Bacharach on 5/29/12. (kr) (Entered: 06/14/2012) |
| 06/25/2012 | 197 | SECOND MOTION for Leave *to Submit Interim Voucher* by Beverly M Moore. Motions referred to Robert Bacharach. (Cave, Christine) (Entered: 06/25/2012) |
| 06/26/2012 | 198 | ORDER granting 197 Petitioner's Second Motion for Leave to Submit Interim Voucher. Signed by Magistrate Judge Robert Bacharach on 6/26/12. (lb) (Entered: 06/26/2012) |
| 08/06/2012 | 199 | ** SEALED DOCUMENT ** CJA 20: Authorization to Pay Cave Voucher # 120709000130. Signed by Magistrate Judge Robert Bacharach on 7/2/12. (kr) (Entered: 08/06/2012) |
| 11/15/2013 | 200 | STATUS REPORT *First* by Petitioner Beverly M Moore. (Cave, Christine) (Entered: 11/15/2013) |
| 05/15/2014 | 201 | STATUS REPORT *(SECOND)* by Petitioner Beverly M Moore. (Cave, Christine) (Entered: 05/15/2014) |
| 05/15/2014 | 202 | UNOPPOSED MOTION for Order *to Use Federal Hearing Room for State Hearings* by Beverly M Moore. Motions referred to Robert Bacharach. (Attachments: # 1 Exhibit State's Resp to 2nd App for Post–Conviction Relief)(Cave, Christine) (Entered: 05/15/2014) |
| 10/03/2014 | 203 | MOTION to Lift Stay *and Excuse Exhaustion* by Beverly M Moore. Motions referred to Robert Bacharach. (Attachments: # 1 Exhibit State's Response to 2nd App for Relief final, # 2 Exhibit June 25, 2013 Hearing Transcript, # 3 Exhibit July 09, 2013 Hearing Transcript, # 4 Exhibit May 23, 2014 Hearing Transcript, # 5 Exhibit Cave Declaration)(Cave, Christine) (Entered: 10/03/2014) |
| 10/03/2014 | 204 | MOTION to Expedite *CONSIDERATION OF PETITIONERS POST–REMAND MOTION TO LIFT STAY AND EXCUSE EXHAUSTION* by Beverly M Moore. Motions referred to Robert Bacharach. (Cave, Christine) (Entered: 10/03/2014) |
| 10/06/2014 | 205 | ORDER granting 204 MOTION to Expedite *CONSIDERATION OF PETITIONERS POST–REMAND MOTION TO LIFT STAY AND EXCUSE EXHAUSTION* filed by Beverly M Moore.. Signed by Honorable Robin J. Cauthron on 10/6/14. (lg) (Entered: 10/06/2014) |
| 10/09/2014 | 206 | RESPONSE in Opposition re 203 MOTION to Lift Stay *and Excuse Exhaustion* filed by Millicent Newton Embry. (Attachments: # 1 Exhibit 1 – Oklahoma County Case CF–2004–351, docket sheet, # 2 Exhibit 2 – Motion Hearing transcript, June 25, 2013, # 3 Exhibit 3 – Motion to Quash transcript, May 23, 2014, # 4 Exhibit 4 – Status Conference transcript, July 09, 2013, # 5 Exhibit 5 – Order to Dr. John C. Yang filed Sept. 28, 2012, # 6 Exhibit 6 – Order to Coyle Law Firm filed Oct. 3, 2012, # 7 Exhibit 7 – Order to Prohealth Pharmacy filed Oct 3, 2012, # 8 Exhibit 8 – Order to Dr. Larry Prater filed Oct. 31, 2012, # 9 Exhibit 9 – Order to Dr. Lanny G. Anderson filed Oct. 31, 2012, # 10 Exhibit 10 – Petitioner's Second Motion for Discovery, # 11 |

| | | |
|---|---|---|
| | | Exhibit 11 – Order to Dr. Charles H. Funderburk filed Dec. 18, 2012, # 12 Exhibit 12 – Order to Walgreens filed Dec. 18, 2012, # 13 Exhibit 13 – Order to Walmart filed Dec. 18, 2012, # 14 Exhibit 14 – Order to Dr. Claudia Rossavik filed Dec. 18, 2012, # 15 Exhibit 15 – Order to Dr. Sally Varghese filed Dec. 18, 2012, # 16 Exhibit 16 – Order to Mercy Hospital filed Dec. 18, 2012, # 17 Exhibit 17 – Order to Integris Baptist Medical Ctr filed Dec. 18, 2012, # 18 Exhibit 18 – Order to Dr. Erin Glasgow filed Dec. 18, 2012, # 19 Exhibit 19 – Order to Dr. Billy Buffington filed Dec. 18, 2012, # 20 Exhibit 20 – Minute Order filed Dec. 18, 2012, # 21 Exhibit 21 – Order to Dr. Carla Werner filed Jan. 31, 2013, # 22 Exhibit 22 – Order to Buy for Less Pharmacy filed Jan. 31, 2013, # 23 Exhibit 23 – Order to Dr. John Pittman filed Jan. 31, 2013, # 24 Exhibit 24 Order to Wheeler Stuckey filed Jan. 31, 2013, # 25 Exhibit 25 – Order to Dr. Sally Varghese filed Jan. 31, 2013, # 26 Exhibit 26 – Order to First Med filed Feb. 22, 2013, # 27 Exhibit 27 – Order to CVS filed Feb. 22, 2013, # 28 Exhibit 28 – Order to Target filed Feb. 22, 2013, # 29 Exhibit 29 – Order First Med filed Feb. 22, 2013, # 30 Exhibit 30 – OK Bar Assoc. Special Appearance and Motion to Quash, # 31 Exhibit 31 – Court Minute Order filed May 5, 2014, # 32 Exhibit 32 – Court Minute Order filed Jun 10, 2014)(Self, Donald) (Entered: 10/09/2014) |
| 10/14/2014 | 207 | REPLY to Response to Motion re 203 MOTION to Lift Stay *and Excuse Exhaustion* filed by Beverly M Moore. (Cave, Christine) (Entered: 10/14/2014) |
| 11/05/2014 | 208 | ORDER denying 203 Petitioner Moore's Post–Remand Motion to Lift Stay and Excuse Exhaustion. Signed by Honorable Robin J. Cauthron on 11/5/14. (lg) (Entered: 11/05/2014) |
| 12/11/2014 | 209 | NOTICE (other) by Beverly M Moore re 202 UNOPPOSED MOTION for Order *to Use Federal Hearing Room for State Hearings* (Cave, Christine) (Entered: 12/11/2014) |
| 12/16/2014 | 210 | ORDER withdrawing 202 Unopposed Motion for Use of Federal Court Hearing Room. Signed by Honorable Robin J. Cauthron on 12/16/14. (lg) (Entered: 12/16/2014) |
| 09/07/2017 | 211 | STATUS REPORT *On State Proceedings* by Petitioner Beverly M Moore. (Cave, Christine) (Entered: 09/07/2017) |
| 02/27/2018 | 212 | NOTICE of Change of Address by Christine M Cave (Cave, Christine) (Entered: 02/27/2018) |
| 03/23/2018 | 213 | SECOND MOTION to Lift Stay *and Excuse Exhaustion* by Beverly M Moore. (Cave, Christine) (Entered: 03/23/2018) |
| 04/02/2018 | 214 | RESPONSE in Opposition re 213 SECOND MOTION to Lift Stay *and Excuse Exhaustion* filed by Millicent Newton Embry. (Attachments: # 1 Exhibit 1 – Order Denying PC Relief after EH)(Self, Donald) (Entered: 04/02/2018) |
| 04/09/2018 | 215 | REPLY to Response to Motion re 213 SECOND MOTION to Lift Stay *and Excuse Exhaustion* filed by Beverly M Moore. (Cave, Christine) (Entered: 04/09/2018) |
| 05/30/2018 | 216 | MEMORANDUM OPINION AND ORDER denying 213 SECOND MOTION to Lift Stay and Excuse Exhaustion. Signed by Honorable Robin J. Cauthron on 05/30/18. (wh) (Entered: 05/30/2018) |
| 09/12/2018 | 217 | ORDER REASSIGNING CASE. Case reassigned to Honorable Charles Goodwin for all further proceedings. Honorable Robin J. Cauthron no longer assigned to case. |

| | | Signed by Honorable Robin J. Cauthron on 9/12/18. (wh) (Entered: 09/12/2018) |
|---|---|---|
| 11/09/2018 | 218 | MOTION to Lift Stay *to Resume Habeas Proceedings* by Beverly M Moore. (Attachments: # 1 Exhibit State District Court Denies Post–Conviction Application, # 2 Exhibit OCCA Order Affirming Denial of Subsequent Application for Post–Conviction Relief)(Cave, Christine) (Entered: 11/09/2018) |
| 01/18/2019 | 219 | ORDER granting 218 MOTION to Lift Stay *to Resume Habeas Proceedings* filed by Beverly M Moore as set forth herein. Signed by Honorable Charles Goodwin on 01/18/2019. (jb) (Entered: 01/18/2019) |
| 02/13/2019 | 220 | ENTRY of Appearance by Tessa L Henry on behalf of Millicent Newton Embry (Henry, Tessa) (Entered: 02/13/2019) |
| 03/14/2019 | 221 | MOTION to Withdraw as Attorney *Donald D. Self* by Millicent Newton Embry. (Slayton, Diane) (Entered: 03/14/2019) |
| 03/14/2019 | 222 | UNOPPOSED MOTION for Extension of Time *to File Amended Pleading and Related Legal Briefs* by Beverly M Moore. (Cave, Christine) (Entered: 03/14/2019) |
| 03/20/2019 | 223 | ORDER granting 221 Motion to Withdraw as Attorney. Attorney Donald D Self terminated. Signed by Honorable Charles Goodwin on 03/20/2019. (jb) (Entered: 03/20/2019) |
| 03/20/2019 | 224 | ORDER granting 222 Motion for Extension of Time. Petitioner shall file her amended petition on or before April 19, 2019. No later than June 18, 2019, Respondent shall file an answer addressing the allegations of Petitioners amended petition, as set forth more particularly in the Courts January 18, 2019 order. Signed by Honorable Charles Goodwin on 03/20/2019. (jb) (Entered: 03/20/2019) |
| 04/04/2019 | 225 | ENTER ORDER REFERRING CASE to Magistrate Judge Gary M. Purcell. Signed by the direction of Honorable Charles Goodwin on 04/04/2019. (jb) (Entered: 04/04/2019) |
| 04/19/2019 | 226 | SECOND PETITION for Writ of Habeas Corpus (Amended) filed by Beverly M Moore.(Cave, Christine) (Entered: 04/19/2019) |
| 04/19/2019 | 227 | BRIEF IN SUPPORT re 226 Petition for Writ of Habeas Corpus (Amended) by Beverly M Moore. (Attachments: # 1 Attachment A – COCA Order Affirming Denial of Subsequent Application for Post–Conviction Relief, # 2 Attachment B – State Court's Order Denying PC Relief, # 3 Attachment C – State's Proposed Findings of Facts and Conclusions of Law)(Cave, Christine) (Entered: 04/19/2019) |
| 04/19/2019 | 228 | MOTION for Hearing re 226 Petition for Writ of Habeas Corpus (Amended) by Beverly M Moore. Motions referred to Gary M. Purcell. (Cave, Christine) (Entered: 04/19/2019) |
| 04/24/2019 | 229 | MOTION for Extension of Time to File Response/Reply as to 228 MOTION for Hearing re 226 Petition for Writ of Habeas Corpus (Amended) by Millicent Newton Embry. Motions referred to Gary M. Purcell. (Slayton, Diane) (Entered: 04/24/2019) |
| 04/25/2019 | 230 | ORDER granting 229 Motion for Extension of Time to File Response/Reply.. Respondent shall file the Response to Petitioner's Motion to Hold Evidentiary Hearing no later than June 18, 2019. Signed by Magistrate Judge Gary M. Purcell on 4/25/2019. (cps) (Entered: 04/25/2019) |
| 06/17/2019 | 231 | |

|  |  | UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 226 Petition for Writ of Habeas Corpus (Amended), 228 MOTION for Hearing re 226 Petition for Writ of Habeas Corpus (Amended) by Millicent Newton Embry. Motions referred to Gary M. Purcell. (Slayton, Diane) (Entered: 06/17/2019) |
|---|---|---|
| 06/19/2019 | 232 | ORDER granting 231 Motion for Extension of Time to File Response/Reply. Responses due by 7/18/2019. Respondent shall file the Response(s) to Petitioner's Second Amended Habeas Petition and Motion to HoldEvidentiary Hearing Docs. 226 and 228 no later than July 18, 2019. Signed by Magistrate Judge Gary M. Purcell on 6/19/2019. (cps) (Entered: 06/19/2019) |
| 07/18/2019 | 233 | RESPONSE in Opposition re 228 MOTION for Hearing re 226 Petition for Writ of Habeas Corpus (Amended) filed by Millicent Newton Embry. (Slayton, Diane) (Entered: 07/18/2019) |
| 07/18/2019 | 234 | RESPONSE re 227 Brief, 226 Petition for Writ of Habeas Corpus (Amended) filed by Millicent Newton Embry. (Attachments: # 1 Exhibit 1 – Opinion Case No. F–06–63, # 2 Exhibit 2 – Amended Judgment and Sentence, # 3 Exhibit 3 – App. for PCR 9–26–08, # 4 Exhibit 4 – Order Denying PCR 10–23–08, # 5 Exhibit 5 – Petition in Error HC–09–33 1–16–09, # 6 Exhibit 6 – Order Declining Jurisdiction and Dismissal 3–9–09, # 7 Exhibit 7 – 2nd App. for PCR, # 8 Exhibit 8 – Brief in Suppt of 2nd App. for PCR, # 9 Exhibit 9 – Joint Statement of Procedural Hist., # 10 Exhibit 10 – Order Denying App. for PCR after Evid. Hrg., # 11 Exhibit 11 – Org. Brief for Beverly Moore, # 12 Exhibit 12 – Order Affirming Denial of Sub. App. for PCR, # 13 Exhibit 13 – Relevant PC OR pages, # 14 Exhibit 14 – Evid. Hrg. Ex. 45, # 15 Exhibit 15 – Defendant's Witness and Exhibit List, # 16 Exhibit 16 – Motion in Limine, # 17 Exhibit 17 – Motion for Continuance, # 18 Exhibit 18 – Motion for Cont. and Waiver of Speedy Trial, # 19 Exhibit 19 – Relavant Trial Transcript Pages, # 20 Exhibit 20 – Relevant Evid. Hrg. Pgs)(Slayton, Diane) (Entered: 07/18/2019) |
| 07/23/2019 | 235 | ENTRY of Appearance by Andrea D Miller on behalf of Beverly M Moore (Miller, Andrea) (Entered: 07/23/2019) |
| 07/24/2019 | 236 | UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 234 Response,,,, 233 Response in Opposition to Motion by Beverly M Moore. Motions referred to Gary M. Purcell. (Cave, Christine) (Entered: 07/24/2019) |
| 07/25/2019 | 237 | ORDER granting 236 Motion for Extension of Time to File Response/Reply. Responses due by 8/15/2019. Petitioner may submit her reply to Respondent's Response to Petitioner's Motion to Hold Evidentiary Hearing; and her reply to Respondent's Response to Second Amended Petition for Writ of Habeas Corpus no later than August 15, 2019.Signed by Magistrate Judge Gary M. Purcell on 7/25/2019. (cps) (Entered: 07/25/2019) |
| 08/15/2019 | 238 | REPLY to Response to Motion re 228 MOTION for Hearing re 226 Petition for Writ of Habeas Corpus (Amended) filed by Beverly M Moore. (Cave, Christine) (Entered: 08/15/2019) |
| 08/15/2019 | 239 | REPLY to Response re 227 Brief in Support re 226 Petition for Writ of Habeas Corpus (Amended) filed by Beverly M Moore. (Attachments: # 1 Exhibit 1 – Tr. July 9 2013, # 2 Exhibit 2 – Pet's Proposed Findings of Facts)(Cave, Christine) (Entered: 08/15/2019) |
| 09/03/2019 | 240 | STATE COURT RECORDS RECEIVED – CONVENTIONAL FILING – Received on 07/18/19. (ank) (Entered: 09/03/2019) |

| 10/15/2019 | 241 | MOTION to Withdraw as Attorney by Millicent Newton Embry. Motions referred to Gary M. Purcell. (Slayton, Diane) (Entered: 10/15/2019) |
| 10/17/2019 | 242 | ORDER granting 241 Motion to Withdraw as Attorney. Attorney Diane L Slayton terminated. Signed by Magistrate Judge Gary M. Purcell on 10/17/2019. (cps) (Entered: 10/17/2019) |
| 12/12/2019 | 243 | ORDER denying 228 Motion for Evidentiary Hearing without prejudice. Signed by Magistrate Judge Gary M. Purcell on 12/12/2019. (cps) (Entered: 12/12/2019) |
| 12/12/2019 | 244 | REPORT AND RECOMMENDATION: it is recommended that Respondent be ordered to respond to the merits of Petitioners constitutional claims. Objections to R&R due by 1/2/2020.This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter. Signed by Magistrate Judge Gary M. Purcell on 12/12/2019. (cps) (Entered: 12/12/2019) |
| 12/12/2019 | | Magistrate Judge Gary M. Purcell no longer assigned to case. (cps) (Entered: 12/12/2019) |
| 01/02/2020 | 245 | OBJECTION TO REPORT AND RECOMMENDATION 244 *Petitioner's Limited Objection to Report and Recommendation* filed by Beverly M Moore. (Attachments: # 1 Exhibit 1 – 2012 09 04 – State's Response to Second App. for Relief)(Cave, Christine) (Entered: 01/02/2020) |
| 01/09/2020 | 246 | ENTRY of Appearance by Caroline EJ Hunt on behalf of Millicent Newton Embry (Hunt, Caroline) (Entered: 01/09/2020) |
| 01/14/2020 | 247 | RESPONSE re 245 Objection to Report and Recommendation, filed by Millicent Newton Embry. (Henry, Tessa) (Entered: 01/14/2020) |
| 05/14/2020 | 248 | ORDER ADOPTING 244 REPORT AND RECOMMENDATION. Respondent shall be permitted to file an answer to the Second Amended Petition that addresses the merits of the federal habeas claims raised therein. This matter is again referred to Magistrate Judge Purcell for further proceedings consistent with the previous order of referral. Signed by Honorable Charles Goodwin on 05/14/2020. (jb) (Entered: 05/14/2020) |
| 05/15/2020 | 249 | ENTER ORDER. Respondent shall file a response to Petitioners Second Amended Petition addressing the merits of the same no later than June 15, 2020. Signed by Magistrate Judge Gary M. Purcell on 5/15/2020. (cps) (Entered: 05/15/2020) |
| 06/15/2020 | 250 | RESPONSE re 226 Petition for Writ of Habeas Corpus (Amended), 227 Brief, filed by Millicent Newton Embry. (Hunt, Caroline) (Entered: 06/15/2020) |
| 06/16/2020 | 251 | ENTER ORDER. Petitioner may reply to the Supplemental Response to Second Amended Petition Doc. 250 on or before July 6th, 2020 if she so desires. Signed by Magistrate Judge Gary M. Purcell on 6/16/2020. (cps) (Entered: 06/16/2020) |
| 07/02/2020 | 252 | UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 251 Order, 250 Response *Re: Supplemental Response to Second Amended Petition for Writ of Habeas Corpus* by Beverly M Moore. Motions referred to Gary M. Purcell. (Cave, Christine) (Entered: 07/02/2020) |
| 07/06/2020 | 253 | ORDER granting 252 Motion for Extension of Time to File Response/Reply. Petitioner may submit her reply to Respondent's Supplemental Response to Second Amended Petition no later than July 27, 2020. Signed by Magistrate Judge Gary M. |

| | | Purcell on 7/6/2020. (cps) (Entered: 07/06/2020) |
|---|---|---|
| 07/20/2020 | | **IMPORTANT NOTICE:** The United States District Court for the Western District of Oklahoma (OKWD) is upgrading its current CM/ECF system to the Next Generation of CM/ECF (NextGen CM/ECF) on Monday, August 3, 2020. Complete information regarding the OKWD NextGen CM/ECF implementation is available at http://www.okwd.uscourts.gov/nextgen−information.****Currently, you may share a single PACER account with other attorneys in your firm. With the new OKWD NextGen CM/ECF system, sharing of individual PACER accounts is prohibited. You must have an individual upgraded PACER account linked to your e−filing account. Once again, shared PACER accounts cannot be used by OKWD e−filing attorneys. ****Preparing for NextGen CM/ECF is a two−step process. Step one is to upgrade your PACER account and step two is to link your upgraded PACER account to the OKWD e−filing account in the upgraded NextGen CM/ECF system. This notice only addresses the first step because the second step cannot be completed until on or after August 3, 2020. ****Many PACER accounts have already been upgraded. The first step is to determine whether you have an "Upgraded" PACER account. If any of the following is true, you have an upgraded PACER account and no action is required until after the OKWD NextGen CM/ECF upgrade on August 3, 2020: 1) You have an upgraded PACER account for another NextGen court or 2) Your PACER account was created after August 10, 2014. If neither of these is true, you must upgrade your legacy PACER account before you can link your PACER account to your new NextGen CM/ECF account. ****OKWDs current CM/ECF system will NOT be available from 11:00 AM on 07/31/20 until 8:00 AM on 08/03/20 due to the upgrade. ****Additional notices will be sent at a later date regarding the second step of this process. If you have questions, please contact the PACER Service Center at 800−676−6856 or the OKWD Clerk's Office CM/ECF Help Desk at 405−609−5555. (Pigott, William) (ADI) (Entered: 07/20/2020) |
| 07/27/2020 | 254 | REPLY by Petitioner Beverly M Moore re 226 Petition for Writ of Habeas Corpus (Amended), 227 Brief, 250 Response filed by Beverly M Moore. (Attachments: # 1 Attachment Facts Alleged to Support Claim of Def. Performance, # 2 Attachment Summary of Material Facts Alleged to Support Conflict of Interest Claim, # 3 Exhibit 2017 01 17 − Pet'r's Proposed Findings of Facts, # 4 Exhibit Medical Examiner's Report)(Cave, Christine) (Entered: 07/27/2020) |
| 07/27/2020 | 255 | MOTION for Hearing *Mot for Evidentiary Hearing* by Beverly M Moore. Motions referred to Gary M. Purcell. (Attachments: # 1 Attachment Attachment A − Facts Alleged to Support Claim of Deficient Performance, # 2 Attachment Attachment B − Summary of Material Facts Alleged to Support Conflict of Interest Claim)(Cave, Christine) (Entered: 07/27/2020) |
| 08/17/2020 | 256 | OBJECTIONS re 255 MOTION for Hearing *Mot for Evidentiary Hearing* filed by Aboutanaa El Habti. (Hunt, Caroline) (Entered: 08/17/2020) |
| 08/24/2020 | 257 | UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 256 Objections, 255 MOTION for Hearing *Mot for Evidentiary Hearing* by Beverly M Moore. Motions referred to Gary M. Purcell. (Cave, Christine) (Entered: 08/24/2020) |
| 08/24/2020 | 258 | ORDER granting 257 Motion for Extension of Time to File Response/Reply. Responses due by 8/31/2020. Signed by Magistrate Judge Gary M. Purcell on 8/24/2020. (cps) (Entered: 08/24/2020) |
| 08/31/2020 | 259 | |

| | | |
|---|---|---|
| | | REPLY to Response to Motion re 255 MOTION for Hearing *Mot for Evidentiary Hearing* filed by Beverly M Moore. (Cave, Christine) (Entered: 08/31/2020) |
| 03/22/2021 | 260 | ORDER denying 255 Motion for Hearing. Signed by Magistrate Judge Gary M. Purcell on 3/22/2021. (cps) (Entered: 03/22/2021) |
| 03/22/2021 | 261 | SUPPLEMENTAL REPORT AND RECOMMENDATION – It is recommended the Petitioner's Second Amended Petition for Writ of Habeas Corpus be granted. Objections to R&R due by 4/12/2021. It is further recommended that the Writ of Habeas Corpus be issued, unless within ninety (90) days of the entry of an Order adopting this Supplemental Report and Recommendation, the State grants Petitioner a new trial or, in the alternative, orders her permanent release from custody. This Supplemental Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied. Signed by Magistrate Judge Gary M. Purcell on 3/22/2021. (cps) (Entered: 03/22/2021) |
| 03/22/2021 | | Magistrate Judge Gary M. Purcell no longer assigned to case. (cps) (Entered: 03/30/2021) |
| 04/07/2021 | 262 | MOTION for Extension of Time to File Response/Reply as to 261 REPORT AND RECOMMENDATION re 22 Petition for Writ of Habeas Corpus (Amended) filed by Beverly M Moore by Aboutanaa El Habti. (Hunt, Caroline) (Entered: 04/07/2021) |
| 04/07/2021 | 263 | ORDER granting 262 Motion for Extension of Time to File Response/Reply re 261 REPORT AND RECOMMENDATION re 22 Petition for Writ of Habeas Corpus (Amended) filed by Beverly M Moore. Responses due by 4/26/2021. Signed by Honorable Charles Goodwin on 04/07/2021. (jb) (Entered: 04/07/2021) |
| 04/26/2021 | 264 | OBJECTION TO REPORT AND RECOMMENDATION 261 filed by Aboutanaa El Habti. (Hunt, Caroline) (Entered: 04/26/2021) |
| 05/07/2021 | 265 | UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 264 Objection to Report and Recommendation, 261 REPORT AND RECOMMENDATION re 22 Petition for Writ of Habeas Corpus (Amended) filed by Beverly M Moore by Beverly M Moore. (Cave, Christine) (Entered: 05/07/2021) |
| 05/07/2021 | 266 | ORDER granting 265 UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 264 Objection to Report and Recommendation, 261 REPORT AND RECOMMENDATION re 22 Petition for Writ of Habeas Corpus (Amended) filed by Beverly M Moore . Petitioner's response is due on or before May 17, 2021. Signed by Honorable Charles Goodwin on 05/07/2021. (jb) (Entered: 05/07/2021) |
| 05/17/2021 | 267 | RESPONSE re 264 Objection to Report and Recommendation *re 261 Supplemental Report and Recommendation re 22 Petition for Writ of Habeas Corpus (Amended)* filed by Beverly M Moore. (Attachments: # 1 Exhibit 1 – Declaration of Eric Reynolds)(Cave, Christine) (Entered: 05/17/2021) |
| 08/14/2023 | 268 | MOTION for Hearing *Status Conference* by Beverly M Moore. (Cave, Christine) (Entered: 08/14/2023) |
| 09/11/2023 | 269 | ORDER ADOPTING 261 SUPPLEMENTAL REPORT AND RECOMMENDATION as modified. The Second Amended Petition for Writ of Habeas Corpus (Doc. No. 226 ) is CONDITIONALLY GRANTED as to Ground One as follows: The State of Oklahoma may commence proceedings for a new trial on the underlying charge within 90 days of the entry of this Order. Failure to commence |

| | | |
|---|---|---|
| | | such proceedings within 90 days shall result in this Court ordering Petitioner Beverly Michelle Moore's permanent discharge and release from all restraints and custody of the State of Oklahoma on the conviction at issue. IT IS FURTHER ORDERED that Petitioner's Request for Status Conference (Doc. No. 268 ) is DENIED AS MOOT. Signed by Judge Charles Goodwin on 09/11/2023. (jb) (Entered: 09/11/2023) |
| 09/11/2023 | 270 | JUDGMENT. The Second Amended Petition for Writ of Habeas Corpus (Doc. No. 226 ) is CONDITIONALLY GRANTED as to Ground One as follows: The State of Oklahoma may commence proceedings for a new trial on the underlying charge within 90 days of the entry of this Order. Failure to commence such proceedings within 90 days shall result in this Court ordering Petitioner's permanent discharge and release from all restraints and custody of the State of Oklahoma on the conviction at issue. Grounds Two through Five of the Second Amended Petition for Writ of Habeas Corpus are hereby dismissed without prejudice. Signed by Judge Charles Goodwin on 09/11/2023. (jb) (Entered: 09/11/2023) |
| 09/14/2023 | 271 | NOTICE OF APPEAL by Aboutanaa El Habti. Filing fee $ 505, receipt number AOKWDC–4250468. (Hunt, Caroline) (Entered: 09/14/2023) |

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

BEVERLY MICHELLE MOORE,   )
                                    )
     Petitioner,              )
                                      )
v.                                 )     CIV-09-985-G
                                      )
ABOUTANAA EL HABTI, Warden, )
                                      )
     Respondent.           )

SUPPLEMENTAL REPORT AND RECOMMENDATION

Petitioner, a state prisoner appearing through counsel, brings this habeas action under 28 U.S.C. § 2254 challenging her state court conviction of Murder in the First Degree. United States District Judge Charles Goodwin has referred this case for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). Respondent has filed a Supplemental Response, Doc. No. 250, and Petitioner has filed a Reply. Doc. No. 254. For the reasons set forth herein, it is recommended the Second Amended Petition be granted.

I.    Background Information

On January 13, 2004, at approximately 2:58 p.m., Petitioner called 911 explaining that A.S., her boyfriend's son who was 18 months old, had fallen, had a bump on the back of his head, and was "sort of" breathing. Todd Snyder, A.S.'s father, had left the home at approximately 2:45 p.m. to go to a pawn shop and A.S. had been upset when his father left. Following the arrival of EMSA and the fire

1

department, A.S. was taken by ambulance to Baptist Integris Medical Hospital ("Integris"). The following day, A.S. was pronounced brain dead, the physicians withdrew life support, and he passed away.

The Integris treating physicians immediately suspected that child abuse caused A.S.'s condition. Dr. Johnny Griggs, one of A.S.'s treating physicians, diagnosed A.S.'s cause of death as shaken baby syndrome. Dr. Chai Choi, who performed A.S.'s autopsy, concluded the cause of death was blunt force head trauma.[1] Dr. Griggs later testified that Mr. Snyder and Petitioner told him that prior to January 13, 2004, A.S. was a well-developed, functioning, and very healthy child.

Prior to A.S.'s death, police interviewed both Petitioner and Mr. Snyder separately. Eventually, Petitioner offered a confession of "shaking" A.S. There is conflicting evidence regarding whether the confession was coerced, voluntary, and/or whether her descriptions of shaking A.S. correspond with his injuries. Petitioner was ultimately charged with First Degree Murder by "on or about the 13th day of January 2004 . . . willfully or maliciously injur[ing] . . . or using unreasonable force upon a child under the age of eighteen, specifically: [A.S.], thereby . . . caus[ing] his death." Doc. No. 108-12 at 1. Following a jury trial held from September 12-16, 2005, Petitioner was found guilty and sentenced to life

---

[1] In the interest of clarity, the Court notes this combination may be referred to as "shaken impact."

imprisonment. The legal representation Petitioner received during her criminal proceedings is the primary basis of her claim for habeas relief and the claim the Court addresses herein.

Of particular relevance, it is undisputed A.S. was not an entirely healthy, well-developed child prior to January 13, 2004. He was diagnosed with failure to thrive and displayed significant developmental delays and behavioral problems, including tantrums in which he would throw himself backward onto the floor. He experienced multiple falls during the few months before his death, including one resulting in hitting his head and being taken to the emergency room for medical care, though no scans or x-rays were performed. During the week prior to his death, A.S. fell in a cast iron tub at his biological mother's home. He was also lethargic and experiencing diarrhea during that week.

Petitioner retained Isaac Funderburk to represent her during her criminal proceedings. He enlisted the assistance of David Slane who had more experience in criminal defense. Prior to Petitioner's trial, funds were provided to Mr. Funderburk to, *inter alia*, hire medical expert witnesses. Initially, the defense theory was based upon the contention that A.S.'s fatal injuries were incurred outside of the approximately thirteen minutes in which Petitioner was alone with him prior to his collapse. Petitioner and her supporters communicated to Mr. Funderburk their desire to obtain a medical expert witness from the Shaken Baby Syndrome Defense

website. This was one resource out of several that had arisen from a growing debate within the medical community regarding whether short falls could explain injuries to children that were being diagnosed as shaken baby syndrome. It is undisputed the defense did not contact an expert witness from this or any similar resource.

On September 1, 2005, less than two weeks before trial, Mr. Funderburk contacted Dr. Corrie May, a medical expert witness located in Kansas City. Dr. May reviewed the records provided by Mr. Funderburk and the defense received her opinion during the weekend before Petitioner's trial. Therein, she concluded that A.S.'s injuries were consistent with the opinions of the medical examiner and treating physician. However, she also suggested additional testing or evaluations by certain specialists, but these were not performed.

The defense did not offer any expert witness testimony during Petitioner's trial. Instead, they relied on attacking the State's case through cross-examination of its medical experts. They also put forth the theory that Mr. Snyder inflicted A.S.'s fatal injuries.

During post-conviction proceedings, Petitioner obtained further medical evaluations, including histological slides taken during A.S.'s autopsy. She has presented five different expert witness opinions detailing their findings and indicating A.S.'s fatal injuries were incurred days, if not weeks or months, prior to January 13, 2004. One of her primary claims in requesting habeas relief is that Mr.

Funderburk provided ineffective assistance of counsel based on his failure to obtain and present medical expert witness testimony. Respondent contends that any such expert testimony would have been challenged as a "minority" opinion within the medical community and found not credible.

Additionally, following her conviction, Petitioner suspected Mr. Funderburk had misappropriated the funds provided for her defense. Petitioner and individuals who provided funds for her defense filed grievances with the Oklahoma Bar Association ("OBA") regarding Mr. Funderburk's representation and possible misappropriation of funds. The OBA requested responses from Mr. Funderburk, including but not limited to an accounting of the funds received and disbursed for Petitioner's defense. The OBA found that Mr. Funderburk's accounting was inadequate, but it did not choose to further prosecute him. The record contains an indication that the OBA never reviewed Mr. Funderburk's financial records, specifically in relation to his trust account.

Further, it is undisputed that at times prior to and certainly after Mr. Funderburk represented Petitioner, he struggled with substance abuse problems. There is evidence suggesting this also occurred during Mr. Funderburk's representation of Petitioner. In the years following Petitioner's trial, Mr. Funderburk's difficulties in this regard worsened. He died from an accidental drug

overdose in January 2010. Whether and/or to what extent these issues affected his

representation of Petitioner is unclear.

By this action, as well as in her lower court proceedings on her second

application for post-conviction relief, Petitioner asserts claims of ineffective

assistance of counsel based on failure to fully investigate A.S.'s cause of death and

the timing of his fatal injuries, failure to timely consult with and retain expert

witnesses regarding the same, conflict of interest, failure to interview witnesses,

failure to present a cohesive defense, failure to communicate with his client, and

failure to act diligently on Petitioner's behalf. Doc. Nos. 226, 227. Petitioner also

raises a claim under *Brady v. Maryland*, 373 U.S. 83 (1963) that the State failed to

disclose exculpatory evidence. *Id.* Finally, Petitioner asserts a claim of ineffective

assistance of appellate counsel based on appellate counsel's failure to raise these

claims in her direct appeal. *Id.*[2]

## II.   Procedural Background

As noted in this Court's previous Report and Recommendation, the summary

of the lengthy procedural history of this case is primarily based upon the undisputed

---

[2] Mr. Funderburk handled all the financial aspects of Petitioner's representation. There is some dispute regarding the extent of Mr. Slane's involvement in Petitioner's representation. Based on the record, including the testimony of multiple witnesses and various documents, the Court concludes it is likely Mr. Slane did not become actively involved in Petitioner's defense until immediately before trial. Regardless, although Mr. Slane's testimony is discussed in detail herein, the Court primarily addresses Petitioner's ineffective assistance of counsel claims with regard to Mr. Funderburk.

procedural history included in Petitioner's Brief in Support of Second Amended Petition for Writ of Habeas Corpus, Doc. No. 227 at 27-34, documents attached to Respondent's Response to Second Amended Petition for Writ of Habeas Corpus, Doc. No. 234, and additional documents filed in this habeas action.

At trial, Petitioner was initially represented by Assistant Public Defender, Jennifer Richard. After Petitioner's mother retained Mr. Funderburk, he and Mr. Slane filed their entries of appearance on February 10, 2005. Doc. No. 227 at 27. Approximately one to two weeks before trial, attorney Eric Reynolds joined the team. *Id.* The three represented Petitioner at the jury trial held from September 12-16, 2005. *Id.*

After a jury found Petitioner guilty, the Honorable Susan P. Caswell followed the jury's recommendation and entered judgment and sentence in the District Court of Oklahoma County on October 11, 2005. Petitioner was sentenced to life without possibility of parole. *Id.*

Mr. Slane filed an application for post-conviction relief, seeking an appeal out of time on November 9, 2005, and the application was granted. *Id.* Through counsel, Petitioner filed a notice of intent to appeal on January 20, 2006, with the following proposed list of errors:

a.   Defendant was not allowed to put on evidence of her theory of the case, which was crucial to her defense.

      b.      Defendant's witnesses were limited to character testimony only.

      c.      Defendant was not allowed to introduce a taped police interview of Todd Snyder.

      d.      Potential ineffective assistance of counsel.

      e.      Any additional error found by Appellate Counsel.

*Id.* at 27-28. However, the attorney who ultimately filed Petitioner's appellate brief on direct appeal alleged only two propositions of error:

> Proposition I: The jury should have been instructed on the definition of Life Without Parole and that if sentenced to Life With Parole, Ms. Moore would have to serve 85% of her sentence; and

> Proposition II: Defense counsel rendered ineffective assistance of counsel by not requesting argument or instruction on parole ineligibility or application of the 85% Rule to any sentence given to Ms. Moore.

*Id.* at 28. On June 11, 2007, the Oklahoma Court of Criminal Appeals ("OCCA") affirmed Petitioner's conviction on direct appeal, Case No. F-2006-63, but modified her sentence to life imprisonment with the possibility of parole based on the trial court's failure to instruct the jury on the 85% Rule. *Id.*

Petitioner filed a *pro se* application for post-conviction relief on September 26, 2008, alleging a single proposition for relief:

> Proposition I: Defense counsel rendered ineffective assistance of counsel by failing to have a medical expert testify to medical evidence proving [the] child was not killed by shaking.

*Id.* The Oklahoma County District Court denied Petitioner's application on October 23, 2008, and notified her of her right to appeal to the OCCA. *Id.* Petitioner, still proceeding *pro se*, filed a petition in error in the OCCA on January 16, 2009, alleging the following thirteen instances of ineffective assistance of counsel by Mr. Funderburk:

[a].    Counsel failed to communicate with co-counsel as to the existence of two favorable exculpatory witnesses that [she] explicitly requested to be put on the stand in [her] defense.

[b].    Co-counsel[, Mr. Slane,] was never made aware of the fact that there was over $40,000 in a trust account for expert witnesses and investigators, which he complained to [her] about after [her] trial.

[c].    Because of counsel's flawed defense, he excluded valuable foundational evidence.

[d].    Counsel failed to elicit evidence from character witnesses who would have been vital defense witnesses, because it did not fit with his flawed defense.

[e].    Counsel did not try to exclude the coerced confession, which was the sole evidence for prosecution.

[f].    Counsel did not give an alternative theory for [her] defense that further compounded his flawed defense and his lack of strategy in clearing [her] of the charge of Murder in the 1st Degree.

[g].    [She] had insufficient counsel which resulted in sufficient prejudice to warrant a retrial.

[h].    The crib sheet that was admitted as evidence was not disputed by counsel even though the father's testimony told the court that the stain was not current.

[i].    The daycare provider was brought in as a character witness, which limited her testimony. Had she been brought in as an exculpatory witness, her testimony would have been beneficial to the outcome of the trial. Her testimony was vital to [Petitioner's] defense.

[j].    Counsel did not even counter any of the prosecution's assertions.

[k].    Counsel forced [her] on the stand without adequate preparation and told [her] that [she] would definitely be convicted [if she] upheld [her] adamant reluctance to testify. Counsel did not prepare [her] adequately before [she] took the stand.

[l].    It would behoove counsel for [her] to be found guilty so that his financial misconduct would not be brought to light.

[m].    Counsel's failure to focus attention on the actual [perpetrator], the victim's father, resulted in sufficient harm for reversible error per *Strickland v. Washington*.

*Id.* at 29. The OCCA dismissed Petitioner's appeal for lack of jurisdiction on procedural grounds—Petitioner had failed to attach a certified copy of the district court's order denying post-conviction relief to her petition in error. *Id.* at 29-30.

On September 4, 2009, Petitioner, still proceeding *pro se*, filed a Petition for Writ of Habeas Corpus in this Court, alleging ineffective assistance of counsel. Doc. No. 1. Respondent filed a Motion to Dismiss the Petition and Brief in Support, Doc. Nos. 10, 11, on grounds that the Petition was filed after the statute of limitations in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") had expired. Then Magistrate Judge Robert Bacharach,[3] to whom the case had been referred for

---

[3] Judge Bacharach is currently sitting as a Judge on the Tenth Circuit Court of Appeals.

10

initial proceedings, converted Respondent's Motion to Dismiss to a Motion for Summary Judgment on November 4, 2009. Doc. No. 12.

On December 9, 2009, Petitioner filed a Motion for Leave to Amend Habeas Petition. Doc. No. 17. Judge Bacharach granted the Motion, Doc. No. 21, and Petitioner filed her Amended Petition and Brief in Support, Doc. Nos. 22, 23, on February 2, 2010, alleging the same propositions of error as the first Petition and claiming that she was entitled to equitable tolling because she was actually innocent of the crime for which she was convicted.

Respondent filed a Motion to Dismiss the Amended Petition on February 23, 2010, again alleging it was time-barred. Doc. Nos. 24, 25. After a telephone conference with the parties, Judge Bacharach appointed counsel to represent Petitioner on July 14, 2010, Doc. No. 57, and Petitioner, through her court-appointed attorney, engaged in discovery and filed a Response on January 31, 2011. Doc. No. 88.

On February 16, 2011, the Court converted the State's Motion to Dismiss to a limited Answer on the issue of timeliness. Petitioner replied on April 8, 2011, and filed two appendices with documented newly-discovered evidence supporting her claim that she was actually innocent of the crime for which she had been convicted. Doc. Nos. 108-11. Respondent filed a Sur-Reply. Doc. No. 116. Judge Bacharach considered the evidence included in the appendices and filed an Order granting the

admission of certain exhibits included in Petitioner's Motion to Expand the Record, and denying the admission of certain other exhibits. Doc. No. 132.

Thereafter, Petitioner filed a Motion for Leave to File Reply to Brief on the Merits of Actual Innocence Claim. Doc. No.118. The Court granted the Motion, and Petitioner filed her Supplemental Reply on June 29, 2011.  Doc. No. 122.

The expert evidence Petitioner submitted with her brief, particularly the expert evidence on the issue of the time the fatal injury was inflicted, was compelling. So compelling in fact that on September 7, 2011, Judge Bacharach issued Proposed Findings of Fact and Conclusions of Law finding Petitioner had produced sufficient new scientific evidence from medical experts to support the miscarriage of justice, or actual innocence, exception to the time-bar:

> [N]o reasonable jury could have found guilt of murder without some reason to believe the actions [of Petitioner] on January 13, 2004, had contributed to the death [of A.S.]. Doctors Mack, Barnes, Squier, Ophoven, and Gardner have uniformly opined, based on the medical findings of the State's own expert witnesses, that the fatal injuries would have preceded January 13, 2004, by days, weeks, or months.
>
> The only persons to express a different conclusion were Doctors Griggs and Choi, and both assumed that A.S. had been a perfectly healthy child before January 13, 2004. And, of course, they thought so only because Dr. Griggs had either misunderstood or Ms. Moore had given misinformation. But no one disputes the evidence of: (1) falls in October 2003, December 2003, and January 2004: (2) the existence of significant developmental delays; and (3) lethargy in the week preceding A.S.'s death. With this undisputed evidence, no reasonable juror would have accepted the testimony of Doctors Griggs and Choi regarding the immediacy of the fatal injuries. Without this testimony, the jury would have had no basis to tie A.S.'s death to anything Ms.

Moore had done on or about January 13, 2004, as charged in the
Information. The omission of any such evidence on this crucial link in
the prosecution's case would have required any reasonable jury to find
Ms. Moore not guilty with the benefit of the old and new evidence.
Thus, Ms. Moore has shown her actual innocence on the charged
offense and that innocence entitles her to avoid the time-bar.

Doc. No. 135 at 33-34. Over Respondent's objection, Judge Cauthron adopted the

Proposed Findings of Fact and Conclusions of Law in full on October 28, 2011.

Doc. No. 139.

Although Judge Bacharach ordered Respondent to file a response to the merits

of Petitioner's grounds for habeas relief, Respondent instead filed a limited answer

contending Petitioner had failed to exhaust state court remedies as to the claims in

her Amended Petition. Doc. No. 159. Judge Bacharach entered a Report and

Recommendation in which he determined that requiring Petitioner to return to state

court to exhaust state court remedies would be futile because the state courts would

find Petitioner was procedurally barred from asserting her claims in a second

application for post-conviction relief. On this basis, Judge Bacharach recommended

Petitioner's failure to exhaust be excused as it would be futile for her to return to the

state courts. He further recommended Petitioner be allowed to proceed with her

habeas action. Doc. No. 162.

On April 6, 2012, Judge Cauthron declined to adopt Judge Bacharach's

recommendation and did not address whether the conclusions in the Report and

Recommendation were accurate. Instead, Judge Cauthron focused on the newly-

discovered evidence, the state attorneys' insistence Petitioner be required to present this matter to the state courts before continuing with habeas proceedings, and the doctrines of comity and federalism. Based on these considerations, Judge Cauthron entered an Order staying the habeas case until Petitioner had presented her claims to the state courts. Doc. No. 182.

As directed, on June 5, 2012, Petitioner filed a second application for post-conviction relief and brief in support in the Oklahoma County District Court, along with a motion for evidentiary hearing, motion for discovery, and motion for appointment of counsel.  In her application, she raised six propositions for relief:

Proposition 1: Ineffective [a]ssistance of [t]rial [c]ounsel for (a) failure to fully investigate the cause of death and the timing of the injuries attributed to Petitioner, including the failure to timely consult with and retain expert witnesses, and (b) failure to present testimony from expert witnesses as to the cause and timing of the fatal injuries.

Proposition 2: Ineffective [a]ssistance of [t]rial [c]ounsel resulting from conflicts of interest.

Proposition 3: The State of Oklahoma [d]eprived Petitioner of her [r]ight to [d]ue [p]rocess [w]hen it [f]ailed to [d]isclose [e]xculpatory [e]vidence.

Proposition 4: Ineffective [a]ssistance of [a]ppellate [c]ounsel due to failure to raise the claim of ineffective assistance of trial counsel arising out of failure to investigate medical issues and present medical testimony.

Proposition 5: Ineffective [a]ssistance of [a]ppellate [c]ounsel due to failure to uncover the conflict of interest of trial counsel and raise the claim of ineffective assistance of trial counsel arising from the conflict.

Proposition 6: Ineffective [a]ssistance of [a]ppellate [c]ounsel due to [failure to] discover[] the violation of *Brady v. Maryland* and raise the claim on direct appeal.

Doc. No. 227 at 31-32; Doc. No. 234-7.

After a hearing, Judge Kenneth C. Watson granted Petitioner's motion for discovery and ordered the State to make its file in Petitioner's criminal case and the file in the case of *State v. Funderburk*, CF-2003-6954,[4] available to Petitioner. Doc. No. 227 at 32. Additionally, the trial court permitted discovery of the medical examiner's file and the financial and medical records of Mr. Funderburk. *Id.*

The State filed a response to Petitioner's second application for post-conviction relief on September 4, 2012, arguing Petitioner's claims were procedurally barred by the doctrines of waiver and *res judicata* and, alternatively, were without merit. *Id.* On July 9, 2013, Judge Watson announced his finding that Petitioner was not barred from presenting the claims raised in the application and overruled the State's request for dismissal based on procedural bar grounds. By agreement of the parties, Petitioner's claims were divided into two separate parts: the first hearing would be devoted to consideration of whether trial counsel rendered deficient performance or labored under a conflict of interest. *Id.* If the court so found,

---

[4] *State v. Funderburk*, District Court of Oklahoma County, Case No. CF-2003-6954, was a case involving criminal charges against Mr. Funderburk, wherein he was convicted of misdemeanor possession of a Schedule III controlled dangerous substance and driving under the influence of alcohol. The case was ongoing during Petitioner's criminal proceedings.

the second hearing would consider whether Petitioner suffered resulting prejudice.

Petitioner's *Brady* claim was also to be considered at the second hearing. *Id.*

In an evidentiary hearing held sporadically over nine months, the trial court

heard testimony on the issue of whether Petitioner's trial counsel had either rendered

deficient performance or labored under a conflict of interest. *Id.* at 33. Petitioner

appeared and was represented by appointed counsel Christine Cave and Assistant

Public Defender Andrea Miller. The State was represented by Assistant District

Attorneys Gayland Gieger and Jennifer Hinsperger. *Id.* at 33.[5]

---

[5] The Court notes a great deal of confusion by the state district court and the State's counsel regarding the posture of this matter upon remand. The state district court initially indicated utter confusion regarding why the case was before it and the issues it was supposed to address. Tr. June 25, 2013 at 9, 13-15, 23-27; Tr. July 9, 2013 at 4-13. At one point, in referencing Petitioner's ineffective assistance of counsel claims, Judge Watson stated, "I will not let federal court dictate to me what I should do. I mean, if they felt so strongly in favor of that they should have done it themselves. You know, I still maintain my opinion about it and I'm not going to succumb to their opinion just because they have found something different." Tr. July 9, 2013 at 9. However, contrary to these statements, the federal court had not issued an opinion regarding Petitioner's ineffective assistance claims. Similarly, counsel for the State, during cross-examination of Dr. Laura Burdette who was testifying regarding Mr. Funderburk's prescription medications during his representation of Petitioner, stated that an affidavit she provided to the federal court regarding the same was "one of the reasons we're here, isn't it?" Tr. Jan. 8, 2015 at 65. Again, this Court never previously considered whether Mr. Funderburk was ineffective, much less whether he was impaired by prescription medications during Petitioner's criminal proceedings. At the end of the proceedings, after nine months of hearings, the state district judge asked, "[T]his isn't necessarily - - this hearing hasn't necessarily been on post-conviction, has it? I mean, it was - - a post-conviction was filed, went to the Federal Court and then sent back to this Court to make some - - to have an evidentiary hearing. Is that - -" Tr. Aug. 4, 2015 at 28. Counsel for both parties explained the procedural history again, followed by more inquiry from the court regarding Petitioner's post-conviction application history, and further explanation from counsel. *Id.* at 28-30.

Almost four years after Judge Watson's order granting an evidentiary hearing, the attorneys finally received transcripts of the hearing and filed their proposed findings of facts and conclusions of law, as ordered by the trial court, on January 17, 2017. *Id.* After another fourteen months had elapsed with no ruling from the trial court, Petitioner, on March 23, 2018, requested this Court lift the stay in Petitioner's federal habeas action and excuse her from having to further exhaust her claims. Petitioner contended that her due process rights had been violated by the lengthy state court proceedings and the anticipated future state court proceedings. Doc. No. 213.

Four days later, on March 27, 2018, the trial court entered its findings of fact and conclusions of law. Doc. No. 227-2. The trial court essentially adopted the State's proposed findings from January 2017, Doc. No. 227-3, reached the merits of Petitioner's ineffective assistance of counsel claim, and denied her application for post-conviction relief. Doc. No. 227-2. Judge Cauthron denied Petitioner's previously-filed Motion to Lift the Stay on May 30, 2018. Doc. No. 216.

Petitioner filed a notice of post-conviction appeal on April 5, 2018, and filed a brief in support of her post-conviction appeal in the OCCA on August 1, 2018. Doc. No. 227 at 33. The OCCA declined to reach the merits of Petitioner's appeal, finding all claims waived because they had not been raised in her direct appeal. Doc. No. 234-12 at 9.

On November 9, 2018, Petitioner notified this Court that the OCCA had
rendered its decision, resolving the appeal from the trial court's post-conviction
ruling. Doc. No. 218. For good cause shown, Judge Goodwin granted Petitioner's
Motion to Lift Stay on January 18, 2019, and ordered Petitioner to file "any amended
pleading" on or before March 19, 2019. Doc. No. 219. After the deadline was
extended, Petitioner filed her Second Amended Petition and Brief in Support on
April 19, 2019, raising the same claims she had raised in her second application for
post-conviction relief. Doc. Nos. 226, 227.

Rather than addressing the merits of Petitioner's Second Amended Petition,
Respondent filed a Response arguing Petitioner's grounds for relief are unexhausted,
untimely, and/or procedurally barred. Doc. No. 234. Respondent also asserted that
the scientific evidence supporting Petitioner's actual innocence claim does not apply
to her claims for ineffective assistance of counsel. *Id.* Ultimately, the Court rejected
these arguments and directed Respondent to respond to the merits of Petitioner's
claims. Doc. Nos. 244, 248. Respondent filed a Supplemental Response to the
Second Amended Habeas Petition on June 15, 2020, Doc. No. 250, to which
Petitioner filed a Reply on July 27, 2020. Doc. No. 254.

III.   Standard of Review

The AEDPA provides for consideration of a prisoner's writ of habeas corpus
on the ground that "he is in custody in violation of the Constitution or laws or treaties

of the United States." 28 U.S.C. § 2254(a). Generally, the AEDPA requires deference by a federal court to a state court's adjudication of a claim on the merits. 28 U.S.C. § 2254(d). However, in the present case, the last reasoned decision from the state courts was the OCCA's ruling that Petitioner's claims were procedurally barred from review. "[C]laims not 'adjudicated on the merits' in state court are entitled to no deference." *Harmon v. Sharp*, 936 F.3d 1044, 1057 (10th Cir. 2019) (quoting *Fairchild v. Trammell*, 784 F.3d 702, 711 (2015)). The parties agree that in this situation, § 2254(d)'s deference does not apply, and Petitioner's claims are entitled to *de novo* review before this Court. *Wilson v. Sellers*, __ U.S. __, 138 S.Ct. 1188, 1192 (2018) (explaining that § 2254(d) focuses on last reasoned opinion from the state courts); *Ylst v. Nunnemaker*, 501 U.S. 797, 799-805 (1991) (explaining that courts are to look at last reasoned decision from a state court to determine whether the claim was adjudicated on the merits); *Williams v. Alabama,* 791 F.3d 1267 (11th Cir. 2015) (holding that where the state district court ruled on the merits but the state criminal appeals court ruled claim was procedurally barred, § 2254(d) deference does not apply and the claim is subject to *de novo* review by federal habeas court).

## IV.    State Court's Findings of Fact

28 U.S.C. § 2254(e)(1) provides, "In a proceeding instituted by an application for a writ of habeas corpus . . . a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of

rebutting the presumption of correctness by clear and convincing evidence." In other words, when a state court makes a factual finding, the Court presumes the determination to be correct; a petitioner can only rebut this presumption with clear and convincing evidence. *Davis v. Ayala*, 576 U.S. 257, 271 (2015)*; see also Grant v. Royal*, 886 F.3d 874, 889 (10th Cir. 2018) ("[E]ven in the setting where we lack a state court merits determination, '[a]ny state-court findings of fact that bear upon the claim are entitled to a presumption of correctness rebuttable only by clear and convincing evidence.'" (quoting 28 U.S.C. § 2254(e)(1)).

The parties each offer lengthy arguments regarding whether, in light of the OCCA's ruling that did not address the merits but instead, ruled Petitioner's claims were procedurally barred, the state district court's findings of fact are entitled to § 2254(e)(1)'s presumption of correctness. Although in *Grant*, the Tenth Circuit stated that § 2254(e)(1)'s presumption would apply in the absence of *any* ruling on the merits, the Tenth Circuit has not addressed the application of § 2254(e)(1) in this circumstance.

At least two Circuit Courts that have addressed this issue have concluded the presumption of correctness applies to a state district court's findings of fact where the state appellate court dismissed the underlying claims for relief on procedural grounds but did not vacate or otherwise address the merits. *See Wardlow v. Davis*, 750 F. App'x 374, 377-78 (5th Cir. 2018) (holding that the "AEDPA requires

20

deference to a state trial court's factual findings unless they are expressly rejected by, or are directly inconsistent with, the highest state court's ultimate resolution of the case" and that this "is true even when the state high court's ultimate resolution is on procedural grounds."); *Taylor v. Roper*, 577 F.3d 848, 856 (8th Cir. 2009) (applying § 2254(e)(1)'s presumption of correctness to state court's factual findings where the state appellate court found the underlying basis for relief "waived" but did not reject or otherwise vacate the lower court's factual findings).

The Court finds it is not necessary to resolve whether § 2254(e)(1)'s presumption applies. As set out more fully below, presuming, without deciding, that said presumption applies, Petitioner has met her burden of rebutting the presumption by clear and convincing evidence as to several factual findings relevant to her claims.

The undersigned also notes the manner in which the state district court issued its findings of fact. The state court had the parties' proposed findings of fact and conclusions of law for well over one year prior to issuing its ruling. Doc. Nos. 227-2, 227-3, 254-3. Petitioner submitted for the court's consideration proposed findings of fact and conclusions of law totaling 117 substantive pages, Doc. No. 254-3, and the State's totaled 23 substantive pages. Doc. No. 227-3. The state district court entered its ruling two business days after Petitioner filed her request to this Court to lift its stay on proceedings due to the state court's delay in issuing a ruling. As Petitioner points out and Respondent concedes, the state district court's ruling

mirrored the State's proposed findings of fact almost verbatim. Doc. Nos. 227-2 at

7-31, 227-3 at 3-25. Indeed, the state court's order includes the typographical errors

and misused vocabulary from the State's proposed factual findings and conclusions

of law. Doc. Nos. 227-2 at 12, 15; Doc. No. 227-3 at 8, 11.

Respondent contends the manner of the lower court's adoption of the State's

proposed ruling is outside the purview of this Court. According to Respondent, the

"federal courts have no authority to impose mandatory opinion-writing standards on

state courts." Doc. No. 250 at 61 (quoting *Johnson v. Williams*, 568 U.S. 289, 298,

300 (2013)). In *Johnson*, the Court addressed whether a federal court should

conclude that a state court failed to decide a case on the merits merely because the

state court did not address one argument, among many, that it regarded "as too

insubstantial to merit discussion . . . ." *Id.* at 299. That is not the situation presented

here.

More significant to the present case is the Supreme Court precedent criticizing

courts that adopt verbatim proposed orders from prevailing parties.

> We [] **have** criticized courts for their verbatim adoption of findings of
> fact prepared by prevailing parties, particularly when those findings
> have taken the form of conclusory statements unsupported by citation
> to the record. We are also aware of the potential for overreaching and
> exaggeration on the part of attorneys preparing findings of fact when
> they have already been informed that the judge has decided in their
> favor.

*Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 572 (1985) (citations omitted).[6] *See also Avila v. Jostens, Inc.,* 316 F. App'x 826, 831 (10th Cir. 2009) ("The Supreme Court has criticized [] verbatim adoption of one parties' proposed findings of fact, and this court has noted that it provides 'little aid on appellate review.'" (quoting *Flying J Inc. v. Comdata Network, Inc*., 405 F.3d 821, 830 (10th Cir. 2005) (additional citation omitted)); *Rosa v. Williams*, No. 07–0713 JH/CG, 2010 WL 11523658, at *6 n.9 (D.N.M. June 15, 2010) ("The Supreme Court has criticized the practice of a court's 'verbatim adoption of findings of fact prepared by prevailing parties.'" (quoting *Jefferson v. Upton*, 560 U.S. 284, 293 (2010)).

Nevertheless, the state court's findings of fact, though adopted verbatim from the State's proposed findings, are accepted as the lower court's findings and the same review applies. *Jefferson*, 560 U.S. at 293 ("Although we have stated that a court's 'verbatim adoption of findings of fact prepared by prevailing parties' should be treated as findings of the court, we have also criticized that practice." (quoting *Anderson*, 470 U.S. at 572)); *Avila*, 316 F. App'x at 831; *Rosa,* 2010 WL 11523658, at *6 n.9. Thus, this Court should accept the state court's findings of fact and apply

---

[6] While the State had presumably not been informed prior to submitting its proposed findings to the state court that it would ultimately prevail, the criticism of a court's verbatim adoption of proposed factual findings from the prevailing party and an attorney's potential for overreaching and/or selective factual choosing remains relevant to the underlying events in this matter.

the § 2254(e)(1) standard of review. However, the manner in which they were adopted does provide relevant context in considering the same.

In its order the state court set forth eighteen findings of fact, preceded by a narrative of supportive reasoning. Doc. No. 227-2. The Court will discuss only those factual findings most relevant to Petitioner's grounds for relief addressed herein.

A. Finding of Fact #13: Misappropriation of Funds

Petitioner contends that during his representation of her, Mr. Funderburk misappropriated funds provided for her criminal defense. The state court finding of fact with regard to this issue provided, "While the evidence presented to this Court supports that Mr. Funderburk did not provide an adequate accounting for Petitioner's client-trust fund, there has been no evidence to support Petitioner's allegation that Mr. Funderburk misappropriated those funds for his own benefit." Doc. No. 227-2 at 30. In thoroughly reviewing the state court record, the Court finds Petitioner has presented a significant amount of evidence indicating Mr. Funderburk likely misappropriated funds provided for her defense. The Court shall address this issue somewhat briefly because, while it may provide context for the remainder of the claims addressed herein, it is not determinative of the ultimate issues.

There is absolutely no dispute that Mr. Funderburk's accounting of the funds received and disbursed related to his representation of Petitioner was abysmal, at best. Although recognizing that abysmal accounting practices do not equate to

misappropriation *per se*, the record creates significant questions regarding how Petitioner's funds were handled and ultimately disbursed. Significant to Petitioner's specific claims herein, it is clear funds were provided to Mr. Funderburk for investigators and expert witnesses that were not used for their intended purpose.

Jeff Trevillion, an attorney and certified public accountant, performed an accounting of the funds provided to Mr. Funderburk for Petitioner's defense. Tr. March 3, 2015 at 66, 79-82. He concluded, and Respondent does not dispute, that Mr. Funderburk received a total of $81,000.00. *Id.* at 97-98. Of that amount, $50,000.00 was to be paid toward attorney fees. Tr. March 3, 2015 at 76, 87-88, 97, 111, 122-25; St. Ct. Ex. 3 at 2-3.[7] Mr. Trevillion noted that of the remaining $31,000.00 ("Defense Funds"), the money was authorized to be spent as follows: $20,000.00 on expert witnesses, $7,500.00 for consultation/assistance by Marion Stinson,[8] $6,000.00 for investigators, and $2,000.00 for investigation. Tr. March 3,

---

[7] The representation agreement between Petitioner and Mr. Funderburk indicated Petitioner would pay $35,000.00 in attorney fees and she would be "responsible for expert fees if the innocence project can't provide funding." St. Ct. Ex. 3 at 2-3. The evidentiary hearings included significant debate about whether counsel were entitled to only $35,000.00 in attorney fees or if instead another $15,000.00 was later authorized and if so, whether Mr. Funderburk had already withdrawn the additional $15,000.00 before receiving such authorization. In concluding Petitioner had not presented evidence supporting misappropriation, the state court partially relied on its conclusion that Mr. Funderburk was in fact entitled to this additional $15,000.00. Doc. No. 227-2 at 25. For purposes of this recommendation, the Court presumes, without deciding, that the $15,000.00 additional fee was proper.

[8] Ms. Stinson was a municipal judge in 2005 in Adair, Oklahoma and Pryor, Oklahoma. Tr. Dec. 2, 2014 at 140. Though she does not recall the defendant's name, during that time

2015 at 102-03.[9] Mr. Trevillion concluded that only $1,040.00 of the Defense Funds were spent as authorized, specifically $650.00 was paid to Mr. Reynolds for investigation and $390.00 was paid to Lynn McComber as an "expert ex-police officer with experience in confessions." *Id.* at 103, 112; St. Ct. Ex. 39 at 35, 44; St. Ct. Ex. 45 at 20.[10]

Mr. Trevillion also testified that Mr. Funderburk's accounting submitted to the OBA did not accurately report the amount of funds he paid to himself. Tr. March 3, 2015 at 107-08. For example, Mr. Funderburk's banking records include a $5,000 check, dated August 31, 2005, made out to "BOK" for cash and on the Memo line,

---

period she recalls Mr. Funderburk, who had been a law school classmate, requesting her assistance in a murder trial on multiple occasions over a three to four month period and she declined each time. *Id.* at 140-41, 143-45.

[9] The Court is aware the total of these designations is greater than the total of the Defense Funds. Mr. Funderburk's accounting was not amenable to proper balancing. However, as established below, the fact that the totals do not balance is only somewhat relevant to Petitioner's ineffective assistance claim because regardless of the poor accounting, the funds were not spent according to these authorizations.

[10] In Mr. Funderburk's accounting submitted to the OBA, he indicates that an additional payment of $350.00 was paid to Mr. Reynolds as an "Investigator Fee prior to being hired as a part of the trial team." St. Ct. Ex. 45 at 20. However, the only check from Mr. Funderburk's account to Mr. Reynolds reflecting a $350.00 payment is dated October 20, 2005, one month after Petitioner's trial. St. Ct. Ex. 39 at 46. The notation in the Memo portion of the check is illegible, but it does not appear to reference Petitioner's case. The Court notes Mr. Trevillion's testimony that no evidence supports a finding that the OBA reviewed Mr. Funderburk's financial records in considering the grievances submitted against him. Tr. March 4, 2015 at 51.

26

he indicated it was an "advance for expenses" in Petitioner's case. St. Ct. Ex. 39 at

17. This payment is not reflected in his OBA accounting. St. Ct. Ex. 45 at 18-20.

Additionally, Mr. Funderburk paid Mr. Reynolds $5,000.00 for representation

in Petitioner's case and those payments are not reflected in the OBA accounting. St.

Ct. Ex. 39 at 45, 47; St. Ct. Ex. 45 at 18-20. Mr. Funderburk's banking records also

reflect a significant number of checks from his Trust Account from July through

September 2005 written to restaurants, residential facilities, supply stores, a hotel,

credit cards, and staff members, including $7,635.00 for "case prep" in Petitioner's

case to Delisa Camp, Mr. Funderburk's girlfriend who worked as his assistant. St.

Ct. Ex. 39 at 15, 18, 29, 31, 32, 34, 37, 39; St. Ct. Ex. 45 at 19; Tr. Dec. 3, 2014 at

6-7; Tr. Jan. 22, 2015 at 13-14.

In its ruling, the state court provided the following reasoning regarding the

question of misappropriation:

> Mr. Trevillion [] conceded he had no knowledge regarding what Mr.
> Funderburk did with funds withdrawn from Petitioner's client trust
> account that were made out to "cash." He further conceded it was
> possible such funds went to pay expert witnesses although it was not
> documented. Similarly, his opinion did not account for funds which
> may have been withdrawn in relation to trips to Kansas City and San
> Antonio in relation to Petitioner's case.

Doc. No. 227-2 at 25 (citations omitted). The Court notes again that the state court

merely adopted wholesale Respondent's proposed findings of fact and conclusions

of law. A more thorough review of the record reveals substantial flaws in this reasoning.

The only medical expert witness the defense retained was Dr. May and, as addressed more thoroughly below, her bill was never paid, in cash or otherwise. Moreover, presuming, without deciding, Mr. Funderburk used the funds received through the checks made out to cash on expenses related to Petitioner's case, as noted, he wholly failed to include at least one in the amount of $5,000.00 in his accounting to the OBA. St. Ct. Ex. 39 at 17; St. Ct. Ex. No. 45 at 18-20. He also did not include any notation of travel reimbursement in his accounting to the OBA. St. Ct. Ex. 45 18-20; Tr. March 3, 2015 at 59-60. Additionally, the record is devoid of any documentation authorizing, separate from the agreed upon attorney fees, the over $7,500.00 in payments to Ms. Camp, Mr. Funderburk's assistant/girlfriend, for "case prep." St. Ct. Ex. 39 at 15, 29, 34.

While the above is by no means a comprehensive discussion of every discrepancy and/or red flag raised by Mr. Funderburk's financial records and accounting, it is sufficient to establish that serious questions exist as to the propriety of Mr. Funderburk's handling of the funds provided to him for Petitioner's defense. Petitioner has certainly presented clear and convincing evidence, *see Grant*, 886 F.3d at 889, to rebut the state court finding that "there *has been no evidence to support* Petitioner's allegation that Mr. Funderburk misappropriated [Defense

Funds] for his own benefit." Doc. No. 227-2 at 30 (emphasis added). Most significant to the present case, however, it is clear funds available to the defense for expert witnesses were not used for that purpose.

B. Finding of Fact #12: Mr. Funderburk's Substance Abuse Issues

Petitioner also challenges the state court's finding of fact #12 in which it stated, "There has been no evidence presented that Mr. Funderburk was impaired or under the influence of intoxicating substances at the time he represented Petitioner in this matter. On the contrary, witness testimony supports that Mr. Funderburk was functioning normally throughout the course of his representation." Doc. No. 227-2 at 29-30. In the Response, Respondent focuses solely on Mr. Funderburk's behavior during Petitioner's criminal trial, even though the majority of Petitioner's grounds for habeas relief focus on the time period during which Mr. Funderburk should have been preparing for the same. That time period is also imperative to a successful criminal defense.

Petitioner presented evidence that from February 2005 through September 2005, Petitioner filled prescriptions for 500 tablets of diazepam and 500 tablets of clonazepem, as well as six bottles of promethazine with codeine cough syrup. Tr. Jan. 8, 2015 at 29-30. A pharmaceutical expert, Dr. Laura Burdette, testified on behalf of Petitioner that these prescriptions far exceeded the therapeutic benefit of these medications. *Id.* Presuming without deciding that Mr. Funderburk took these

prescription medications, Dr. Burdette indicated this would constitute abuse of the medications. *Id.* at 31.

Dr. Burdette also identified drug seeking behaviors on the part of Mr. Funderburk during this time period including multiple prescribers, multiple pharmacies, high quantities of duplicate commonly abused medications, paying cash for prescriptions, and refilling prescriptions early. *Id.* at 26-27. Dr. Burdette further explained that an individual taking these medications can be impaired without appearing to be so to other individuals. *Id.* at 36.[11]

Additionally, various circumstances in Mr. Funderburk's life throughout 2005 are indicative of an individual with a drug problem. Records from Mr. Funderburk's therapist during 2005 and early 2006 indicate many missed appointments and/or on multiple occasions arriving in the morning for afternoon appointments. St. Ct. Ex. 100 at 10-12. He was also experiencing severe financial difficulties, including a foreclosure action commenced in June 2005 resulting in a judgment of foreclosure

---

[11] The Court notes Mr. Funderburk's apparent substance abuse problems did not form in a vacuum. He was convicted on federal drug-related charges in the early 1990s. St. Ct. Ex. 101. Medical records from 2001 reflect an extreme behavioral and belligerent reaction when a doctor failed to timely refill a Valium prescription and the doctor's office described him as "med-seeking" and "drug seeking." St. Ct. Ex. 54 at 4, 6. In April 2004, Mr. Funderburk visited an emergency room where the physician diagnosed him with, *inter alia*, "benzo withdrawal" and recommended he follow up with a psychiatrist for "benzo dependence" and "detox." Tr. March 3, 2015 at 7-10; St. Ct. Ex. 55R at 31. As noted, Mr. Funderburk's drug-related problems continued to worsen, and he passed away from an accidental drug overdose of diazepam and morphine in January 2010. Tr. Dec. 4, 2014 Vol II at 58.

issued on November 1, 2005,[12] the filing of various creditor liens upon real property, state court judgments based upon nonpayment of debts, and ongoing proceedings regarding failure to pay child support. St. Ct. Ex. 104 at 1-2, 4-5, St. Ct. Ex. 108, St. Ct. Ex. 109, St. Ct. Ex. 123, St. Ct. Ex. 124, St. Ct. Ex. 126. Additionally, Mr. Funderburk had been charged in December 2003 with drug-related criminal charges and that case was ongoing until November 4, 2005, when a plea deal was reached. St. Ct. Ex. 105.

It appears an exceedingly reasonable conclusion that Mr. Funderburk was abusing prescription medications during his representation of Petitioner. The parties have presented conflicting evidence regarding whether it affected his performance *during trial*. Tr. Dec. 1, 2014 at 184; Tr. Dec. 2, 2014 at 178; Tr. Dec. 3, 2014 at 31-32, 58-65, 81-82; Tr. Dec. 4, 2014 Vol. I at 12-13, 128-30; Tr. March 20, 2015 at 59-60. However, as this case illustrates, an attorney's representation of a client is not limited merely to his performance in the courtroom. On the other hand, an attorney who is abusing prescription medications is not *per se* ineffective.

Regardless, it is not necessary for the Court to make a specific determination as to whether Petitioner met her burden in rebutting the state court's finding that no

---

[12] Notably, Mr. Funderburk wrote a check from his trust account to Lakeview Towers on August 8, 2005, approximately one month prior to Petitioner's trial, in the amount of $791.00. St. Ct. Ex. 39 at 37. The Memo portion indicates it was for an application fee, deposit, and one month of rent. *Id.*

evidence was presented indicating Mr. Funderburk's performance was impaired during his representation of Petitioner. While Mr. Funderburk's use, and likely abuse, of prescription medication during his representation of Petitioner may provide context for various issues raised herein, the Court's finding that Petitioner received ineffective assistance of counsel is not dependent upon the same.

C. <u>Finding of Fact #4: Two Experts</u>

The state court's fourth finding of fact stated, "The defense did consult with two 'mainstream' medical experts, Dr. Corrie May and an unnamed male doctor, prior to Petitioner's trial. Both doctors indicated they would be harmful to Petitioner's defense." Doc. No. 227-2 at 28. The existence of this unknown male expert is significant because otherwise, it is clear the defense did not contact a single medical expert witness until less than two weeks before trial. The Court finds Petitioner has presented clear and convincing evidence to rebut § 2254(e)(1)'s presumption of correctness that the defense consulted with an unnamed male expert witness prior to contacting Dr. May.

Respondent concedes that the evidence supporting this finding is the testimony of Mr. Slane. Doc. No. 250 at 72-75. However, the bulk of Mr. Slane's testimony related to expert witnesses is not merely lacking in support in the record but is directly contradicted by additional state court findings, multiple witnesses, and underlying documentation from multiple sources, including Mr. Funderburk.

Respondent argues that because Mr. Slane's testimony was the sole evidentiary support for this finding, the state court clearly found the testimony credible. Based on this, Respondent contends that as a credibility determination, it must stand. *Id.* at 73-75. The undersigned and the United States Supreme Court disagree.

In *El-Miller v. Cockrell*, 537 U.S. 322 (2003), the Supreme Court issued a lengthy decision discussing, *inter alia*, § 2254(e)(1)'s presumption of correctness and its application to state court factual findings.

> A federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system. Where 28 U.S.C. § 2254 applies, our habeas jurisprudence embodies this deference. Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1) . . . .
>
> Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. *A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.*

*Id.* at 340 (emphasis added). Thus, contrary to Respondent's assertions, credibility determinations are not insulated from review and can be rebutted. A federal court can not only disagree with a state court's credibility determination but, as here, can find said determination was unreasonable or incorrect based on clear and convincing evidence. *Id.*

33

As an initial matter, this Court is not making an affirmative finding that Mr. Slane was intentionally untruthful during his testimony. Mr. Slane acknowledged that his memory regarding Petitioner's case was not entirely reliable at the time of the evidentiary hearing as it had been ten years since Petitioner's trial. Moreover, Mr. Slane no longer possessed a file from Petitioner's case or any of his notes. Tr. Dec. 4, 2014 Vol. I at 27. By 2015, when Mr. Slane testified in this matter, he had practiced twenty-one years, represented thousands of defendants, tried hundreds of cases, and noted that his cases ran together in his memory. *Id.* at 7, 24. The Court finds this reasonable. Indeed, Petitioner's own evidentiary hearing expert, criminal defense attorney Robert Wyatt, stated that he could not remember every expert he had hired over the years without consulting a case file. Tr. March 19, 2015 at 144-45.

Mr. Slane testified that he, along with Mr. Funderburk, spoke with two doctors regarding Petitioner's case, a male expert and Dr. May. He testified that they first spoke with a male doctor "that we sent the information to." Tr. Dec. 4, 2014 Vol. I at 26. He thinks the male doctor was a forensic pathologist. *Id.* at 26, 85. Mr. Slane testified that he cannot recall this male doctor's name, when they spoke with him, where he resided other than it was not in Oklahoma, nor when they received his opinion. *Id.* at 26, 29, 85-86. Indeed, the only things he can recall are that the male

expert charged them a fee for his services and that the expert's opinion would have been harmful to their case.

There are three amounts Mr. Slane believes they paid to doctors - $1,000.00, $2,000.00, and $5,000.00. *Id.* at 27.[13] "I don't remember who got what and when. But I thought that we had sent a packet to a male doctor and asked him to review the information to see if he could help us. And we got a pretty quick response back from him." *Id.* Mr. Slane later testified he thought they paid the unknown male doctor $1,000.00 to review their materials. *Id.* at 84-85. Mr. Slane indicated they later spoke with the male doctor on the speakerphone in Mr. Slane's office. *Id.* at 27-28, 85-86. The doctor informed them that he would be harmful to their case and therefore, they did not speak with him further. *Id.*

By contrast to Mr. Slane's vague testimony, the record has a wealth of evidence that undermines or outright contradicts his testimony. Petitioner was never told that her attorneys had consulted with a male doctor as a potential expert witness, or any medical expert witness other than Dr. May. Tr. March 5, 2015 at 54. On September 4, 2012, Mr. Slane signed an affidavit pertaining to the work he performed on Petitioner's case. Tr. Dec. 4, 2014 Vol. I at 83-85. The affidavit does

---

[13] Although Mr. Slane also testified that they contacted only two doctors, the unnamed male doctor and Dr. May. *Id.* at 29-30.

not mention consulting with any other expert witness besides Dr. May. *Id.* He does not recall why the affidavit did not include any mention of the male doctor. *Id.*

As of three weeks before trial, Petitioner's mother, Donna Carmichael, understood from a meeting with Mr. Funderburk that the defense had not hired any expert witnesses. Tr. Dec. 1, 2013 at 165-66, 177-78. Also, no member of the defense team ever mentioned to Dr. May that another expert had been consulted and/or concurred with her findings. Tr. Jan. 22, 2015 at 24.

Granted, one could interpret Ms. Carmichael's impression to be that the defense had not *secured* expert witness testimony, which does not mean defense counsel had not consulted an expert witness they could not use. Doc. No. 250 at 75 n.25. Moreover, Respondent notes Mr. Slane's statement that there are other things he did in the case that are not reflected in his 2012 affidavit. Doc. No. 250 at 74 (citing Tr. Dec. 4, 2014 Vol I at 84-85). However, this evidence coupled with the remainder discussed below sufficiently rebuts the presumption of correctness that might otherwise apply to this finding of fact.

Mr. Slane testified that although he did not handle the financial aspects of Petitioner's case, he recalls they paid the male expert and he thinks the amount was $1,000.00. Tr. Dec. 4, 2014 Vol. 1 at 27, 85 ("I kind of think we may have paid a doctor $1,000 to review the medical records to see if he could even be of help. . . . I think we paid a male doctor $1,000 or he was going to be paid $1,000 to review it.

And he reviewed it and wasn't helpful to us."). Mr. Funderburk's records do not include any payment to an unknown male expert witness. St. Ct. Ex. 39 at 12-22, 29-39, 42-48, 51-58, 61-73, 76-81, 86, 90-93, 96, 98; St. Ct. Ex. 45 at 18-20. Additionally, in Mr. Funderburk's responses to the OBA regarding the grievances against him that included allegations regarding his failure to secure a medical expert witness, he did not include any reference to consultation with this unknown male expert witness or any medical expert witness other than Dr. May. Doc. No. 45 at 1-6, 18-20.

Respondent argues Mr. Funderburk did refer to this second expert witness in his response to the OBA based on his use of the word, "experts." Doc. No. 250 at 74. However, a reading of Mr. Funderburk's response in its entirety belies this argument as he was clearly referencing spending funds on a medical expert, Dr. May, and a confession expert. Doc. No. 45 at 3-4. After discussing each, the relevant portion of his response ends with the following: "In my professional opinion the money for the experts would be better spent employing a medical expert to try to combat the bunt [sic] force trauma issue and a confession expert to see if we could find any type of coercion to get the confession thrown out." *Id.* at 4.[14] Thus, in a response to the OBA in which Mr. Funderburk had to defend his representation of

---

[14] As previously noted, Mr. Funderburk did pay Lynn McComber $390.00 and indicated that she was an "expert ex-police officer with experience in confessions." St. Ct. Ex. 39 at 44; St. Ct. Ex. 45 at 20.

Petitioner based on, *inter alia*, his failure to secure expert witness testimony to support her defense, Mr. Funderburk never mentioned a consultation with an additional medical expert prior to deciding not to present the testimony of any such experts at trial. Also, Mr. Funderburk's accounting did not include any payment to any other expert witness other than Ms. McComber. *Id.* at 18-20.

Relying on an Eleventh Circuit case, *Bishop v. Warden, GDCP*, 726 F.3d 1243 (11th Cir. 2013), Respondent argues the Court must apply the presumption of correctness to the state court's finding regarding consultation with two experts because the record contains only *conflicting* evidence. Doc. No. 250 at 74-75. In *Bishop*, the petitioner had been convicted of malice murder and armed robbery and sentenced to death. *Id.* at 1247. There was a co-defendant involved in the underlying murder and robbery who was also indicted on the same charges. *Id.* at 1247-48. During the petitioner's trial, the prosecution repeatedly stated that the co-defendant would face his own day in court. *Id.* The petitioner later raised a *Brady* claim based on his contention that his co-defendant had already accepted a plea deal of life imprisonment, and "that the prosecution suppressed the evidence of this plea offer by failing to disclose it to Bishop's defense counsel." *Id.* at 1258.

The Eleventh Circuit affirmed the district court's denial of habeas relief on this ground explaining,

> The record reflects that both District Attorney Bright and Braxley's
> counsel Prince claimed direct knowledge of the timing of the plea offer.

Both were armed only with their own recollections, and neither possessed any additional evidence conclusively documenting the timing of the plea offer. The state habeas court heard from both witnesses and, as we've said, credited Bright's recollection over Prince's. In the absence of clear and convincing evidence, we have no power on federal habeas review to revisit the state court's credibility determinations. *See Marshall v. Lonberger*, 459 U.S. 422, 434 [] (1983) (federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them"); *Consalvo v. Sec'y, Dept. of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011) (denying habeas relief on *Brady* and *Giglio* claims that "turn[ed] upon credibility," because "[d]etermining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review"); *see also Turner v. Crosby*, 339 F.3d 1247, 1273 (11th Cir. 2003) (The deference compelled by AEDPA "requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even fair support in the record." (quoting *Lonberger*, 459 U.S. at 432 [])). The state court's factual finding found fair support in the record testimony of District Attorney Bright; there was no clear and convincing evidence to rebut that testimony. 28 U.S.C. § 2254(e)(1).

*Id.* at 1259. Thus, *Bishop* was limited to the conflicting testimony of two individuals.

By contrast, the record in the present case contains significant evidence to rebut Mr. Slane's vague testimony regarding this unknown male expert. Not only was no one else involved in this case aware of the existence of this previous expert consultation, there were indications within three weeks of trial that no medical experts had been consulted/hired and there is no receipt of money ever paid to this unknown expert,[15] Mr. Slane never mentioned this expert in his own 2012 affidavit

---

[15] Notably, considering the sole detail Mr. Slane recalls about this alleged male expert witness is that he lived out of state, it is exceedingly unlikely, if not entirely unrealistic,

pertaining to his work in Petitioner's case, and Mr. Funderburk never mentioned this alleged expert in his response to the OBA even though one of the specific issues raised against him was his failure to obtain expert testimony.

This case, unlike *Bishop*, does not merely turn on two competing individual memories and testimonies. Further, unlike *Bishop*, the record does not contain "fair support" for the state court's factual finding. *Bishop*, 726 F.3d at 1259. Instead, there is clear and convincing evidence to rebut Mr. Slane's testimony. The Court concludes Petitioner has rebutted the state court's finding that defense counsel consulted with two medical experts prior to Petitioner's trial.

D. <u>Finding of Fact #5: Retention of Dr. May</u>

The state court found, "The defense first retained Dr. May's services on September 1, 2005, and were aware of her opinion that the victim's injuries were consistent with child abuse by September 9, 2005." Doc. No. 227-2 at 28. Petitioner's challenge to this finding is limited to whether the defense was aware of Dr. May's opinion by Friday, September 9, 2005, or if it was instead Sunday, September 11, 2005. Doc. No. 227 at 45-46. In addition to that challenge, Mr. Funderburk's retention of Dr. May and the court's factual finding in relation thereto warrants particular discussion.

---

that Mr. Funderburk paid the individual in cash, as suggested by the state court and Respondent.

During his testimony, Mr. Slane discussed contacting Dr. May as a potential expert witness. His testimony in this regard is entirely contradicted by multiple witnesses, including Dr. May and Dr. May's contemporaneous notes from Petitioner's case. Mr. Slane's testimony also contradicts this finding of fact by the state court.

According to Mr. Slane, he and Mr. Funderburk spoke with Dr. May on the telephone several times. Tr. Dec. 4, 2014 Vol. I at 30-31. During that process, Dr. May asked for more information on several occasions, and they provided it to her. *Id.* Mr. Slane testified that approximately two to three weeks before trial, they spoke with Dr. May by telephone and she relayed her opinion, which was that A.S.'s injuries were consistent with child abuse. *Id.* at 31-32. Mr. Slane also testified that Dr. May explained the medical records to him over the telephone. *Id.* at 82-83. He stated that her opinion was consistent with that of the unidentified male doctor. *Id.* at 33. Mr. Slane testified that he and Mr. Funderburk decided together *at that point* not to consult a third doctor and instead, to change their defense theory to asserting that someone else had harmed A.S., specifically A.S.'s father. *Id.* at 33-34, 47-48, 79-81.

Thus, according to Mr. Slane, the defense knew two to three weeks before trial that they were not going to use Dr. May as an expert witness. *Id.* at 31-32. He

testified that they nevertheless had her travel to Oklahoma during the trial in order to explain her findings to Petitioner's family. *Id.* at 88-89, 92-93.

Additionally, Dr. May's expert report included a suggestion that a neuropathologist could do a better evaluation of the timing of A.S.'s injuries and that it may be similarly beneficial for an ophthalmic pathologist to review the autopsy report. *Id.* at 104-06; Doc. No. 32 at 51. Mr. Slane testified that they did not follow up on any of these because in their conversation with Dr. May two to three weeks before trial she told him that additional doctors would not get around the problematic areas she highlighted in her conclusion. Tr. Dec. 4, 2014 Vol. I at 110.

By contrast, Dr. May's testimony and the notes from her work on Petitioner's case contradicts every aspect of Mr. Slane's testimony.[16] Dr. May testified, and her contemporaneous notes confirm, that she was first contacted about Petitioner's case by Mr. Funderburk on September 1, 2005, less than two weeks before trial. Tr. Jan. 22, 2015 at 7-8. Mr. Funderburk contacted her by telephone. *Id.* Her notes reflect they spoke for approximately one hour and forty-five minutes during which she requested autopsy records and medical records because she understood A.S. died in the hospital. *Id.* at 10-11. She also requested autopsy photographs, a time line regarding the events and when they happened, and a report of death, which is an

---

[16] Mr. Slane hired Dr. May as an expert witness in a case at some point after Petitioner's trial. Tr. Jan. 22, 2015 at 38. It is possible Mr. Slane's own acknowledgment that his cases run together after so many years explains these discrepancies.

independent investigatory report from the medical examiner's office. *Id.* The only individual with whom she spoke was Mr. Funderburk. *Id.* at 11. Her understanding was that trial was imminent. *Id.* Her general role in these types of cases is to "go through the medical records and the autopsy, explain the medical data and then talk about how these injuries may have occurred." *Id.* at 12. At some point, Mr. Funderburk requested she prepare a list of potential questions for the State's medical witnesses, though that might not have been during the initial consultation. *Id.* at 12, 23-24.

Dr. May lives in Kansas. *Id.* at 4. On September 3, 2005, Mr. Funderburk met Dr. May at an Applebee's restaurant in Kansas City. *Id.* at 12-13.[17] He was accompanied by his girlfriend and several children. *Id.* at 13. They met for approximately one hour, during which Mr. Funderburk provided Dr. May documents totaling 209 pages that included the records she requested, except for the time line of events and a report of death from the medical examiner. *Id.* at 14-16, 40; St. Ct. Ex. 32 at 51.[18] With regard to the report of death, the only thing included was the initial page of the autopsy report – location of the incident, age of child, but no

---

[17] The mother of Mr. Funderburk's girlfriend, Ms. Camp, was ill and lived in Iowa. They were driving back and forth from Oklahoma City to Iowa when they met with Dr. May. *Id.* at 49.

[18] Mr. Funderburk did possess a time line of events but did not provide it to Dr. May. St. Ct. Ex. 29; Tr. Dec. 1, 2014 at 168-69.

formal narrative. Tr. Jan. 22, 2015 at 14. Dr. May stated that Mr. Funderburk may
not have had a formal narrative from the medical examiner. *Id.* She also did not
receive any radiological, or histological, slides. Tr. Jan. 22, 2015 at 18.[19] She
received photographs of A.S. after his autopsy but no photographs of the internal
injuries the pathologist detailed in the autopsy report. *Id.* at 16.

Dr. May began reviewing the records on September 5, 2005. *Id.* at 18. She
reviewed them through Friday, September 9, 2005. *Id.* at 18-19. One week is the
common amount of time she spends on a case and she felt she had enough time to
form her opinion. *Id.* at 41-42. She does not always have microscopic, or
histological, slides in every case. *Id.* She explained that she does not know if such
slides would have affected her opinion in this matter since she has no way of
knowing what they would have shown. *Id.* at 43. Dr. May further explained such
slides are most useful when a question of timing of an injury has arisen in a case. *Id.*
at 51. She was never asked specifically about the timing of A.S.'s injuries. *Id.*

Dr. May never went through the medical records with any member of the
defense in order to explain them. *Id.* at 17. The medical records she reviewed referred
to A.S. throwing "tantrums," but she did not receive any information about him
routinely throwing himself backward and hitting his head on the ground. *Id.* The

---

[19] Microscopic, or histological slides, reflect biopsy size specimens of organs that are taken
at the time of autopsy, then prepared for examination under a microscope. *Id.* at 42. The
relevance of such slides in the present case is discussed more thoroughly below.

medical records did not reflect, nor did any individual inform her, that A.S. had been diagnosed with failure to thrive, or of the fall A.S. experienced in the week leading up to his death, nor that he was lethargic and experiencing positional discomfort during that week. *Id.* at 17-18.

Upon review of the records, she agreed with the pathologist's opinions that A.S.'s injuries resulted from abuse. *Id.* at 43. Dr. May testified that the abdominal injuries were significant because they indicated another area of the body that was injured besides the head. *Id.* at 46. The location of that injury typically signifies force being applied to the abdominal area and therefore, could not have been caused by a tantrum, hitting the back of the head, or a fall. *Id.* at 46. However, included in the report, Dr. May stated that the injury may have been caused by Petitioner's attempt to perform CPR on A.S. at the residence following his collapse. *Id.* at 55; St. Ct. Ex. 32 at 51. The injury was consistent with "inappropriate cardiopulmonary resuscitation by pressing too low on the abdomen of a small child." *Id.*

On September 9, 2005, Dr. May sent her report by Federal Express and facsimile to Mr. Funderburk's office. Tr. Jan. 22, 2015 at 18-19, 33. The Federal Express package was due to arrive to Mr. Funderburk's office by 3:00 p.m. on Monday, September 12, 2005, the first day of trial. *Id.* at 20-21. She also met with Mr. Funderburk, again at Applebee's with his girlfriend and several children on Sunday, September 11, 2005, and provided the report to him there. *Id.* at 21. She

stated that prior to that date, no one on the defense team could have known her conclusions. *Id.* They met for approximately one hour. *Id.* at 22.

Her notes indicate Mr. Funderburk called her on Monday, September 12, 2005, at 2:08 p.m. and because she recorded no billable hours, she believes the call was brief, consistent with her memory of it. *Id.* at 24. Mr. Funderburk told her that she would not be expected to testify at the trial in Oklahoma, but he would like her to be present for the testimony of the medical examiner who performed the autopsy. *Id.* at 25-26. However, that decision was not made until a telephone conversation on Tuesday evening when she spoke with Eric Reynolds and Mr. Funderburk. *Id.* At that time, she brought Mr. Reynolds up to speed on her conclusions. *Id.* at 25-26, 50; Tr. Dec. 3, 2014 at 22-26. Mr. Funderburk wanted her to be at the trial the following day. Tr Jan. 22, 2015 at 25-26. It is a five hour drive from where she lived to Oklahoma City, so she did not arrive at trial until after the medical examiner had already testified. *Id.*[20] She saw a portion of the testimony of Dr. Griggs, the attending

---

[20] During his testimony, Mr. Slane repeatedly referenced the defense "flying her out" in reference to Dr. May's travel to Oklahoma City, allegedly so that she could explain her findings to Petitioner and her family. Indeed, he referenced already having paid her travel expenses as a reason for her to attend trial even though they allegedly knew well in advance that she would not testify. Tr. Dec. 4, 2014 Vol. I at 89, 93-94, 140-42. However, Dr. May drove to Oklahoma City on the Wednesday of trial and drove back that night as no accommodations had been reserved or arranged for her. Tr. Jan. 22, 2015 at 25-26, 28-30. In fact, she ran into bad weather on her return trip and had to stay overnight in Perry, Oklahoma. *Id.* She included travel expenses in the bill she sent to Mr. Funderburk. *Id.* at 30. Mr. Slane later admitted in his testimony that he does not know whether any expert witness was paid. Tr. Dec. 4, 2014 Vol. I at 140. Yet, he continued to cite her having been paid $5,000.00 as the reason they asked her to come to Oklahoma City. *Id.* at 142.

physician at Integris where A.S. passed away, and that of an ophthalmologist. *Id.* at 26-27.

Dr. May does not know why the defense team wanted her to go to Oklahoma City. *Id* at 27. "[I]t may have [had] something to do with the medical examiner, but because of the travel distance and the late notification I did not hear the medical examiner's testimony." *Id.*[21] After trial ended that day, Mr. Funderburk, Mr. Slane, and she went to where Petitioner was incarcerated and had a discussion. *Id.* at 27-28, 38. They met with Petitioner for approximately one hour. *Id.* at 28, 38. After that, they went to dinner with members of Petitioner's family. *Id.* at 28. Dr. May does not know the purpose of her presence at dinner. *Id.* Between 7:45 and 8:00 p.m. the dinner ended, and someone gave her directions to get back onto Interstate 35 to drive back to Kansas City. *Id.* at 28, 38.

Dr. May sent a bill totaling $3,946.02 to Mr. Funderburk on September 20, 2005, and sent it to him again in December 2005. *Id.* at 30-31. Mr. Funderburk never paid Dr. May for her time and services. *Id.*

Prior to arriving in Oklahoma City and going to the courthouse, Dr. May had never spoken with or heard of David Slane. *Id.* at 26. Contrary to Mr. Slane's

---

[21] Mr. Slane testified that Dr. May helped them during trial by meeting with them during breaks and helping formulate questions. Tr. Dec. 4, 2014 at 93-94. Dr. May testified this never happened. Tr. Jan. 22, 2015 at 49-50. Indeed, Dr. May did not give the attorneys any notes that she took during trial until after trial concluded that day. *Id.*

testimony, Dr. May never brought him up to speed on her conclusions. When asked if she had ever discussed the case with Mr. Slane, Dr. May testified, "We may have had some discussion at the correctional facility but I don't have specific notes regarding that." *Id.* at 29-30.

Other witness testimony also contradicted Mr. Slane's recollection of Dr. May's involvement in Petitioner's case. Mr. Funderburk hired Mr. Reynolds to work on Petitioner's case approximately two weeks before trial started. Tr. Dec. 3, 2014 at 8.[22] The prosecution's theory was that A.S. had been injured and died almost immediately. Tr. Dec. 3, 2014 at 15. Mr. Reynolds testified that prior to trial starting, the defense theory was focused on the timing of A.S.'s injuries, that A.S. had been injured outside of that time frame and therefore, someone else could have injured the child. *Id.* He explained that they received Dr. May's opinion either immediately before or after the trial started. *Id.* at 23-24, 30. He stated this made it "much less likely that [they] were going to succeed" as they could not argue as well that the injuries occurred outside the prosecution's time frame. *Id.* at 30.

Additionally, in August 2005, approximately three weeks before Petitioner's trial, Mr. Funderburk had the previously referenced meeting with Ms. Carmichael in

---

[22] Contrary to Mr. Slane's testimony in which he stated that he asked Mr. Reynolds to meet with and coordinate character witnesses, Tr. Dec. 4, 2014 Vol. I at 67, Mr. Reynolds stated that Mr. Funderburk hired him to do so. Tr. Dec. 3, 2014 at 7-8. He explained that he did not meet Mr. Slane until Petitioner's trial began and they did not spend time together preparing for trial. *Id.*

San Antonio, Texas. Tr. Dec. 1, 2014 at 165-66. Ms. Carmichael understood from that meeting that Mr. Funderburk had not yet hired any expert medical witnesses. *Id.* at 177-78. Following that meeting and before trial, Ms. Carmichael requested Mr. Funderburk attempt to delay the trial due to the lack of expert witnesses. *Id.* at 177. However, Mr. Funderburk did not want to do so. *Id.* at 180. Ms. Carmichael learned on the second day of Petitioner's trial that Dr. May had been hired. *Id.* at 180-81.

Petitioner challenges this finding to the extent it states defense counsel received Dr. May's opinion on September 9, 2005. Doc. No. 227 at 45-46. The Court determines the finding is entitled to § 2254(e)(1)'s presumption of correctness. It is unlikely a member of the defense team reviewed Dr. May's opinion prior to the night of Sunday, September 11, 2005, when Mr. Funderburk met with Dr. May in Kansas City. Certainly that was Dr. May's impression. Tr. Jan. 22, 2015 at 21. Nevertheless, Dr. May did send the report by facsimile to Mr. Funderburk's office on the afternoon of Friday, September 9, 2005. Petitioner has not presented clear and convincing evidence that no one accessed the report prior to Sunday. In any event, whether the defense first reviewed the opinion on the Friday or Sunday before trial began on Monday has no effect on the Court's determinations.

V.    <u>Ineffective Assistance of Trial Counsel</u>

Petitioner contends her trial counsel was ineffective in seven ways. Specifically, Mr. Funderburk failed to (1) investigate A.S.'s medical records and

behavioral history, multiple resources and information regarding potential expert witnesses provided by the assistant public defender who initially represented Petitioner, and follow up analysis based on an expert witness's recommendations in order to develop a cohesive defense strategy prior to trial; (2) interview potential fact and expert witnesses necessary to present a defense to the State's case; (3) timely consult with and present qualified expert witnesses; (4) present a cohesive defense theory; (5) request a continuance in order to consult with other potential expert witnesses and interview the State's medical witnesses; (6) act diligently on Petitioner's behalf; and (7) adequately communicate with Petitioner. Although the undersigned will focus primarily on Petitioner's claim as to Mr. Funderburk's failure to secure and present expert medical testimony, this issue overlaps with several of the bases for this claim.

To prevail on a claim of ineffective assistance of counsel, a petitioner must establish the following: (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Regarding the first prong of a *Strickland* claim, *i.e.*, deficient performance, the Supreme Court has held that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. Of course, whether an attorney's conduct is reasonable will depend on the facts of the particular case. *Id.* To avoid the "distorting effects of hindsight," an

attorney's conduct should be judged "from counsel's perspective at the time." *Id.* at 689. Review of an attorney's performance is highly deferential, and there is a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

In addition to deficient performance, a petitioner must also satisfy the second prong under *Strickland* by showing his counsel's errors were prejudicial to the defense. *Id.* at 692. Prejudice exists where there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "If the alleged ineffective assistance occurred during the guilt stage, the question is whether there is a reasonable probability the jury would have had reasonable doubt regarding guilt." *Moore v. Gibson*, 195 F.3d 1152, 1178 (10th Cir. 1999).

A. Deficient Performance

The record establishes Mr. Funderburk did not retain Dr. May until September 1, 2005, less than two weeks prior to trial. As an initial matter, Respondent's argument challenging Petitioner's claim is based almost entirely on the premise that defense counsel consulted with two medical expert witnesses prior to deciding not to present expert testimony. Doc. No. 250 at 93-99. This Court has already determined Petitioner successfully rebutted by clear and convincing evidence that

finding of fact with regard to the unknown male expert. Regardless, the timing of Dr. May's retention does not constitute effective assistance of counsel.

The parties argue at length regarding whether Mr. Funderburk was ineffective based on his failure to interview and/or hire an expert witness who held a "minority" opinion with regard to shaken baby syndrome. These discussions are not entirely without relevance. However, in a case where the timing of A.S.'s injuries were of critical importance, Mr. Funderburk did not contact a medical expert holding *any* opinion until less than two weeks before trial, endorsed her (likely as a result of this delay) as an expert witness prior to knowing her opinion, and did not realistically have enough time after receiving her opinion to follow up on her suggestions or consult other experts for a potentially more helpful opinion.[23] This, standing alone, raises the specter at the very least of ineffective assistance.

With regard to the majority/minority view regarding shaken baby syndrome, the Court will discuss two cases cited by the parties in which the courts addressed the competing views and their history. In *Commonwealth v. Epps*, 53 N.E.3d 1247 (Mass. 2016), the defendant was convicted of assault and battery on a child. *Id.* at 1249. *Epps* shares some similarities with the present case.

> The prosecution contended that the defendant violently shook the two year old child in his care based on medical testimony that the child was

---

[23] The degree to which following up on Dr. May's suggestions may have affected the outcome of Petitioner's case is discussed in the section below addressing the prejudice prong of *Strickland*.

diagnosed with traumatic brain injury, and scans of her brain that showed retinal hemorrhages, subdural hematoma, and brain swelling, the three symptoms known as "the triad" associated with shaken baby syndrome. The defendant, when interviewed by the police, denied having injured the child and reported that, hours before the child's grievous injuries became manifest, she had fallen down the wooden stairs in her home and had later fallen off a kitchen stool, leaving a bump on her forehead. The Commonwealth's medical expert offered the opinion that injuries of the type and severity suffered by the child could not have been caused by the short falls described by the defendant. The defendant called no expert to offer an opinion to the contrary.

*Id.* at 1249-50. The defendant filed a postconviction motion for a new trial asserting, *inter alia*, ineffective assistance of counsel based on counsel's failure to "retain a medical expert to question whether [the subject child's] injuries were caused by shaken baby syndrome and to acknowledge the possibility that her injuries could have been caused by an accidental short-distance fall." *Id.* at 1255.

While the defendant's ineffective assistance claim is certainly similar to the present case, the factual events regarding defense counsel's performance differ. In *Epps*, trial counsel retained one expert, Dr. Edward Sussman, and counsel was aware before doing so that Dr. Sussman believed in the validity of shaken baby syndrome as a diagnosis. *Id.* Without viewing the CT and other radiological scans, Dr. Sussman advised counsel that the child's injuries were compatible with impact to the left temporal lobe of the brain and "the tearing of veins in her brain and bilateral retinal hemorrhaging were some evidence of shaking." *Id.* at 1255 (quotations omitted). He also concluded portions of the child's injuries were not compatible with the reported

falls because he did not believe the falls were of a great enough height. *Id.* Based on this, "counsel chose not to call Dr. Sussman as a witness because counsel did not believe that he would be of value." *Id.* (quotations omitted).

The court further explained,

> Trial counsel also contacted other attorneys who had worked on shaken baby cases to find out which experts they had used. At the time of the motion hearing, he could recall that he had spoken with only one attorney and that the attorney had consulted with Dr. Plunkett, but had not called him to testify at trial. Counsel said that the attorney expressed an opinion about Dr. Plunkett that led him to decide that Dr. Sussman was "best." Counsel spoke with Dr. Sussman about Dr. Plunkett's research regarding short falls, and Dr. Sussman told him that Dr. Plunkett was an opponent of shaken baby syndrome but that his opinions "had been refuted in several peer review articles."

> Although trial counsel read literature critical of shaken baby syndrome, he did not contact any of the authors of that literature and did not seek to retain any other critics who could be helpful as expert witnesses. He testified that he did not choose to call an expert because he believed, based on his conversations with other attorneys, that doctors who questioned the validity of shaken baby syndrome were subject to attack by their peers, which would render them more vulnerable to cross-examination and might lead to a counter-expert being called by the Commonwealth. He said, however, that if he had found an expert from out-of-State who had solid credentials and could assist the defense, he would have "brought in" that witness to testify.

*Id.* at 1255-56 (additional quotations omitted).

At the evidentiary hearing on the motion for new trial, the defendant presented an expert, Dr. Joseph Scheller, a pediatrician and child neurologist, who described the questionable validity of shaken baby syndrome as a valid and scientifically supported diagnosis, the lack of scientific evidence to support the same, that the

confessions in these types of cases are usually "either exaggerated or coerced," and that he had "never once seen a confession that explains every injury." *Id.* (quotations omitted). He also challenged Dr. Wilson's diagnosis. In detailing the medical evidence of the child's injuries, he concluded that the injuries could have resulted from either a short fall, such as three stairs or a fall from 1½ to 2 feet, or an intentional act, and that there was no way to tell from the CT scans and other medical evidence. *Id.* at 1257.

In considering the defendant's claims, the court discussed the evolving literature and opinions on shaken baby syndrome and its influence on the medical field overall. *Id.* at 1257-58, 1260-61, 1264-65.

> [] Dr. Scheller testified that shaken baby syndrome is the subject of heated debate and widespread disagreement among forensic pathologists, radiologists, pediatricians, ophthalmologists, and physicists and biomedical engineers. He stated that, although in 2006 every pediatrician and child abuse specialist he met believed strongly that shaken baby syndrome was a valid diagnosis, in the more recent past a "significant minority" has recognized that the science behind shaken baby syndrome is questionable and has instead adopted the term "abusive head trauma" or "abusive head injury" as a more general term for inflicted injury. He stated that ophthalmologists disagree on whether retinal hemorrhages prove shaken baby syndrome; although the majority agree that retinal hemorrhages provide some evidence in support of a shaken baby syndrome diagnosis, a minority of ophthalmologists believe that their presence does not point to a specific diagnosis. Dr. Scheller testified that, among radiologists, pathologists, and pediatricians, the majority supporting the shaken baby syndrome theory has shrunk.
>       . . . .

At the time of trial [in 2007], there was substantial scientific and medical literature that recognized the possibility that accidental short falls can cause serious head injuries in young children of the type generally associated with shaken baby syndrome. Numerous studies had also been published at the time of trial challenging the view that shaking alone can produce the types of injuries associated with shaken baby syndrome. Although these issues were hotly contested in the relevant medical and scientific fields, *see People v. Ackley*, [] 870 N.W.2d 858 (2015); *State v. Edmunds*, [] 746 N.W.2d 590 (2008), and although the experts who would support the positions beneficial to the defense were in the minority in this debate, there was significant medical and scientific support for these minority positions. See notes 15 and 16, *supra*; note 17, *infra*; *Millien*, [] 50 N.E.3d 808. There were also published articles that identified the methodological shortcomings of the research supporting the majority view on shaken baby syndrome, and that highlighted the difficulties faced by physicians in accurately diagnosing the cause of injuries that appear to have been caused by child abuse.

*Id.* at 1257-58, 1260-61 (footnotes omitted).[24]

The court in *Epps* also noted that this growing change in opinions regarding shaken baby syndrome influenced the American Academy of Pediatrics ("AAP") to change its position regarding the diagnosis of child abuse in head injuries. *Id.* at 1264-65.

In July[] 2001, the Committee on Child Abuse and Neglect of the AAP declared, "Although physical abuse in the past has been a diagnosis of exclusion, data regarding the nature and frequency of head trauma consistently support the need for a presumption of child abuse when a

---

[24] The Court has omitted lengthy footnotes that cite numerous studies and/or literature supporting the "minority" view that short falls can cause the head injuries associated with shaken baby syndrome, as well as questioning the methodologies used to diagnose the same. *Id.* Though not determinative in this matter, it is noteworthy that the majority of these studies and/or literature were published before 2005 when Petitioner's trial occurred. *Id.*

56

child younger than [one] year has suffered an intracranial injury."
Shaken Baby Syndrome: Rotational Cranial Injuries—Technical
Report, 108 Pediatrics 206, 206 (2001). In 2009, however, the AAP
acknowledged in a policy statement that "[f]ew pediatric diagnoses
engender as much debate as [abusive head trauma]." Christian, Block,
& Committee on Child Abuse and Neglect of American Academy of
Pediatrics, Abusive Head Trauma in Infants and Children, 123
Pediatrics 1409, 1410 (2009). The AAP recognized that the
"[c]ontroversy is fueled because the mechanisms and resultant injuries
of accidental and abusive head injury overlap, the abuse is rarely
witnessed, an accurate history of trauma is rarely offered by the
perpetrator, there is no single or simple test to determine the accuracy
of the diagnosis, and the legal consequences of the diagnosis can be so
significant." *Id.* The 2009 policy statement no longer spoke of a
presumption of child abuse, and instead declared, "A medical diagnosis
of [abusive head trauma] is made only after consideration of all clinical
data," noting that pediatricians "have a responsibility to consider
alternative hypotheses when presented with a patient with findings
suggestive of [abusive head trauma]." *Id.*

*Id.*

The court in *Epps* noted that the defendant's trial counsel had two alternative

defense theories: "[H]e could argue that there was a reasonable doubt whether the

defendant caused [the child's] injuries because of the possibility that her injuries

were caused by the accidental falls she sustained earlier that morning . . .; or that

there was a reasonable doubt whether the defendant caused [the child's] injuries

because of the possibility that [the mother] intentionally inflicted the injury." *Id.* at

1260. The court also noted the former theory had significant support in the record as

the defendant had consistently reported the falls and they were strongly corroborated

by other evidence. *Id.* Within this context, the court considered whether "it was

57

manifestly unreasonable for counsel to have decided to confer with no other expert who might challenge the diagnosis of shaken baby syndrome or who might challenge the opinion that [the child's] symptoms could not possibly have been caused by the accidental falls described by the defendant." *Id.*

> Without an expert to testify to the possibility that [the child's] injuries might have been caused by her accidental falls, all that trial counsel was able to do to advance the theory of accident was to ask Dr. Wilson to acknowledge the existence of Dr. Plunkett's findings regarding short falls, which Dr. Wilson did and then noted that Dr. Plunkett's findings were not widely accepted within the national community of pediatricians and were not recognized by the [AAP]. . . . And without an expert to testify in support of the minority position, or vigorous cross-examination prepared with the assistance of such an expert, there is no reason to believe that a jury will be persuaded by a view rejected by the majority of experts in a learned field. Defense counsel apparently recognized the futility of an accident defense without the testimony or aid of such an expert, because, in closing argument, he effectively abandoned the accident defense entirely, and asked the jury simply to consider who "struck the blow."

*Id.* at 1262.

The court concluded it was unreasonable for counsel to make so little effort in retaining an expert to support the defense of accident. *Id.* at 1263.

> Having informed the judge at the beginning of trial that he did not plan to pursue a third-party culprit defense, defense counsel's failure to consult with any expert other than Dr. Sussman effectively meant that the defendant commenced trial without any substantial defense, even though further investigation would have supported a potentially substantial defense of accident. Trial counsel testified that he would have retained an expert to testify if he could have found one with "solid credentials" who could assist the defense. But when asked if he made "any inquiries into whether any experts other than Dr. Plunkett would be helpful as witnesses in this case," he answered, "No." He also

testified that he never contacted any of the authors of the scholarly articles that questioned the validity of shaken baby syndrome or that recognized the possibility that short falls could cause the type of injuries usually associated with shaken baby syndrome. Where there was strong, corroborated evidence that [the child] had suffered a head injury from at least one short accidental fall, where accident was the defense that counsel presented to the jury in opening statement, and where this defense was tenable only with the aid of an expert to challenge the majority views on short falls and shaken baby syndrome, it would have been manifestly unreasonable for counsel to have made so little effort to find and retain such an expert if there were experts available with "solid credentials," that is, experts who could have been found credible by a reasonable jury, and who challenged these views.

*Id.*

The court further addressed whether counsel could have been considered ineffective in 2007, when the trial occurred, because while there were certainly scientific and medical studies supporting the "minority view," the record was sparse on whether there were credible experts available to testify regarding the same. *Id.* Ultimately, the court decided that it did not have to make such a determination. Relying on the evolution of scientific and medical studies following 2007 and the fact that defense counsel did not present *any* expert testimony, the court concluded:

[O]ur touchstone must be to do justice, and that requires us to order a new trial where there is a substantial risk of a miscarriage of justice because a defendant was deprived of a substantial defense, regardless whether the source of the deprivation is counsel's performance alone, or the inability to make use of relevant new research findings alone, or the confluence of the two. *See Commonwealth v. Brescia*, [] 29 N.E.3d 837 (2015) ("if it appears that justice may not have been done, the valuable finality of judicial proceedings must yield to our system's reluctance to countenance significant individual injustices").

> Therefore, we need not determine whether it was manifestly unreasonable in July [] 2007, for trial counsel to have failed to make the additional effort needed to find an appropriate expert. It suffices that we conclude that the defendant was deprived of a defense from the confluence of counsel's failure to find such an expert and the evolving scientific research that demonstrates that a credible expert could offer important evidence in support of this defense.

*Id.* at 1266.

This Court is not performing an appellate review and thus, has less flexibility to consider a "confluence" of factors outside of Mr. Funderburk's performance. Unlike the attorney in *Epps* though, Mr. Funderburk did not consult an expert well before trial. As established, counsel did not contact Dr. May until September 1, 2005, did not provide the necessary records for her review until the night of September 4, 2005, so that she began reviewing the records the following morning – one week before trial started. Due to the looming trial deadlines, defense counsel endorsed her as a witness without knowing Dr. May's ultimate opinions or suggestions. By the time they received Dr. May's opinion on the eve of trial, there was no time to consult with another medical expert to see if they could possibly find an expert that might reach a different conclusion. Like the defendant in *Epps*, this left Petitioner without a substantial defense and with no expert testimony to support an alternative cause of death or injury.

The Court agrees that defense counsel was not required to "doctor shop," as Respondent phrased it. In other words, counsel was not required to perpetually

continue searching for an expert witness until he found one to support an alternative cause of death. However, there is a cavernous divide between "doctor shopping" and failing to contact a medical expert witness until less than two weeks before trial. As noted, by the time he received Dr. May's opinions, he had no time to contact another expert or consider her follow-up suggestions.

Another case cited by each party speaks to this issue. In *People v. Ackley*, 870 N.W.2d 858 (Mich. 2015), the defendant was convicted by a jury of first-degree child abuse. There were no witnesses to the acts that caused the child's injuries and death and, therefore, no direct evidence of causation. To prove causation, the prosecution called five medical experts, each of whom testified, similar to the present case, that the child had died as the result of nonaccidental shaking, blunt force trauma, or a combination of both.

The defendant denied hurting the child and stated that the child's injuries and death were the result of an accidental fall – he testified that he found the unconscious child on the floor in the child's bedroom. Defense counsel contacted one expert prior to trial, Dr. Brian Hunter. *Id.* at 860. Dr. Hunter informed him immediately of the debate within the medical community regarding shaken baby syndrome and/or abusive head trauma and that he was not the best expert for the defendant because he was on the opposite side of the debate. *Id.* at 861. Dr. Hunter specifically recommended at least one well-known forensic pathologist, Dr. Mark Shuman, who

had conducted substantial research on short falls and who may support the defendant's theory. *Id.* Defense counsel never contacted Dr. Shuman or any other expert and instead, consulted with Dr. Hunter a second time stating inexplicably that Dr. Shuman was not going to work out. *Id.* Dr Hunter again advised against using him as an expert. *Id.* Counsel later testified that he nevertheless continued to use Dr. Hunter to prepare for trial regarding how to approach the prosecution's witnesses. *Id.*

Following his conviction, the defendant filed a motion for new trial raising ineffective assistance of counsel based on the above. In support, the defendant submitted an affidavit from another well-known expert in forensic pathology who opined that the bruises on the child's body were consistent with the intubation and CPR she received on the day of her death. *Id.* at 861-62. He further explained that he would have testified that her injuries could not be attributed to shaken baby syndrome, or abusive head trauma, but were caused by a likely accidental 'mild impact.' *Id.* at 862. The trial court granted the motion, but the court of criminal appeals reversed concluding that "counsel's decision not to consult a second opinion constituted trial strategy." *Id.* (quotations omitted).

The Michigan Supreme Court reversed concluding that counsel did not have sufficient information to legitimate his choice to consult only Dr. Hunter. *Id.* at 863.

As defense counsel was well aware before trial, the prosecution's theory of the case was that the defendant intentionally caused the

child's unwitnessed injuries, a premise that it intended to prove with expert testimony. This testimony would require a response, and indeed, the court granted counsel funding to seek expert assistance of his own. Yet counsel contacted only Hunter, who repeatedly made clear that he credited the prosecution's SBS/AHT theory and disagreed with the defense's theory. While conceding that the SBS/AHT diagnosis was not universally accepted within the medical community, Hunter explained to counsel that he "really d[id]n't think [he] could help" the defendant because he was on the wrong side of this debate in his field.

As a solution, he advised counsel to consult Dr. Shuman, who not only was on the defendant's side of the SBS/AHT debate generally, but was significantly more likely to agree with the defendant's claim that the child's death in this case must have been accidental. Hunter even suggested that Dr. Shuman was more qualified because he had studied short falls extensively. Whereas Hunter was part of the group of experts who "don't have a good model" to support the accidental fall theory, Dr. Shuman was "someone who has dug into the physics" and the "proposed models" of a short-fall injury. Hunter also characterized Dr. Shuman as a "man of science" and as "the best expert in these types of situations." Yet counsel ignored this advice. He did not contact Dr. Shuman or any other forensic pathologist with expertise in short falls, rendering Hunter his expert by default.

*Id.*

In finding that counsel did not have enough information to label his choice to

consult only Dr. Hunter "strategic," the court noted the Supreme Court's holding,

"While an attorney's selection of an expert witness may be a 'paradigmatic example'

of trial strategy, that is so only when it is made '*after* thorough investigation of [the]

law and facts' in a case." *Id.* (quoting *Hinton v. Alabama*, 571 U.S. 263, 274 (2014))

(emphasis in *Ackley*). The court explained, "We fail to see how counsel's sparse

efforts satisfied his 'duty to make reasonable investigations or to make a reasonable

decision that makes particular investigations unnecessary.'" *Id.* at 864 (quoting

*Hinton,* 571 U.S. at 274). The court also noted,

> . . . [While] counsel is not required to shop for experts until finding one who will offer favorable testimony . . . . we fail to see [the] relevance [of that general proposition] here. In this case, counsel did no consultation at all beyond settling on the very first expert he encountered, despite the importance of expert medical testimony in the case and despite that expert's specific recommendation to contact a different and more suitable expert.
>
> . . . .
>
> Accordingly, we conclude that counsel's efforts to investigate and attempt to secure suitable expert assistance in preparing and presenting defendant's case fell below an objective standard of reasonableness. While the Court of Appeals may be correct that counsel's deficiencies in this regard did not infect all of his conduct throughout the trial, the rest of his advocacy could not cure this crucial error. As the Supreme Court has said, "a single, serious error may support a claim of ineffective assistance of counsel." *Kimmelman v. Morrison*, 477 U.S. 365, 383 [] (1986). Given the centrality of expert testimony to the prosecution's proofs and the highly contested nature of the underlying medical issue, counsel committed exactly that kind of error by failing to consult an expert who could meaningfully assist him in advancing his theory of defense and in countering the prosecution's theory of guilt.

*Id.* at 864-65 (additional citation omitted)

*Ackley* is distinguishable from the present case, though nevertheless relevant.

Here, Dr. May did not recommend a specific expert witness who may have been

better suited to consider Petitioner's defense of an alternative cause of death.

However, there are similarities. Dr. May did suggest certain follow up tests and/or

other types of medical experts who may be able to more directly illuminate the cause of death and/or the timing of the injury. In Dr. May's report, she stated:

> (2) The documentation of the microscopic analysis of the brain by the pathologist for the presence or absence of axonal retraction bulbs, indicating diffuse axonal injury (DAI) fails to include the use of special histological stains and which areas of the brain were sampled.
>
>     . . . .
>
> (4) In my view the inclusion of specialized pathology consultants, specifically a neuropathologist and ophthalmic pathologist[,] would have afforded a more thorough examination of the brain and eyes.

St. Ct. Ex. 32 at 51.[25] During the evidentiary hearing, Dr. May testified that the types of medical experts she referenced, including neuropathologists, presumably existed in Oklahoma City. Tr. Jan. 25, 2015 at 53-54. However, counsel could not realistically make a choice about whether to follow up on her suggestions as trial was starting within two days, at most. Furthermore, counsel could not make a decision regarding whether it was feasible to consult an additional expert also because trial was imminent.

Thus, as in *Ackley*, the Court finds counsel's decisions to either not consult an additional expert and/or not follow up on Dr. May's suggestions were not strategic choices. In a case that relied so heavily on medical evidence, "counsel's efforts to

---

[25] At the evidentiary hearing, Dr. May explained that histological slides are helpful when there is a question regarding when the subject injury occurred. Tr. Jan. 22, 2015 at 51. She further explained that she does not recall being asked any questions in this case regarding the timing of A.S.'s injuries. *Id.*

investigate and attempt to secure suitable expert assistance in preparing and presenting defendant's case fell below an objective standard of reasonableness." *Ackley*, 870 N.W.2d at 865. Counsel was not able to make a "strategic choice" due to his delay in consulting a medical expert for Petitioner's defense. The choice was out of his hands at that point, unless he was willing to seek a continuance, and it is clear from the record he did not attempt to do so.

The Supreme Court has explained:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003) (quoting *Strickland*, 466 U.S. at 690-91). Based on the record, the Court cannot conclude Mr. Funderburk engaged in a reasonable investigation that would make his decision not to consult with and/or potentially present other expert witnesses a strategic choice.

The deficient performance prong of *Strickland* is "is necessarily linked to the practice and expectations of the legal community: The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Hinton*, 571 U.S. at 273 (quotations omitted). Petitioner presented Robert Wyatt, a

66

local criminal defense attorney recognized by various organizations for the quality of his legal representation, to offer his opinion regarding whether Mr. Funderburk's representation violated the *Strickland* standard of effective assistance of counsel. Tr. March 19, 2015 at 89-96.

He testified that specifically in a case that turns so starkly on medical evidence and, where funds were provided, it was unreasonable "to not engage an expert until about 10 days before trial, which is the day the witness list is due." *Id.* at 103.

> [It was not reasonable] for the reason that you don't know what the answers are. If you knew what the answers were, you might be able to say yes and have that person ready. But if your witness and exhibit list is due 10 days before trial, you can't wait until that day to provide it, because you have to give a significant summary of what the witness will testify to.
>
> They also, the State generally wants a report, and they want to know what that person has reviewed and what they are looking at, and what they are going to say.
>
> And in addition to that, let's say that as a result of the findings of the doctor, which I think there are some here that were relevant, they may need to send that material off to another expert, someone who's a specialist to look at things. And you can't have that done if you wait until 10 days before trial. It's just not feasible logistically to do that.
>
>         . . . .
>
> So I don't think that's reasonable, I don't think it's sound trial strategy.

*Id.* at 106-07.[26]

---

[26] Notably, during a motion *in limine* hearing on the first day of Petitioner's criminal trial, the State complained that it had not received timely notice of Petitioner's defenses, nor the

Mr. Wyatt also explained that unless you were using it solely for cross-examination purposes, it would not be possible that a report received as close to the beginning of trial as Dr. May's would adequately inform a defense strategy. *Id.* at 107. For example, in this case, Dr. May specifically suggested that defense counsel investigate particular issues that might show the subject injuries were older than alleged in this case. *Id.* Mr. Wyatt concluded that the delay in obtaining an expert witness in this case could not be considered strategic.

> Not a strategic reason, if they didn't have other expert testimony lined up.
>
> I can't see that there's strategy at all when it's 10 days before trial. That's where I have a problem with it.
>
>       . . . .
>
>  . . . That's not a strategic approach. You have to have a game plan going into trial, not seat of your pants. And you don't get the materials the Friday before Monday's trial, or the night before, that's not strategic period.
>
> So any questions regarding strategy, I have to say that with respect to expert testimony in this case, I don't think it's strategic, period.

*Id.* at 115-16.

---

report of Petitioner's endorsed expert witness, Dr. May. Doc. No. 250 at 101-05. Additionally, the court ruled therein that Petitioner could not introduce evidence of A.S.'s falls, behavioral problems, and developmental delays because counsel had no expert medical testimony to support its relevancy. *Id.*; Tr. Dec. 2, 2014 at 22-23 ("My concern is if you have no medical personnel [who are] going to say these injuries could have been caused by the child inflicting them on himself then the fact that this child may have had these behavior issues or these things going on is irrelevant.").

Mr. Wyatt also noted that even if the expert witness, such as Dr. May, states that they had ample time to review the record and provide an opinion, it is still not reasonable performance by counsel because they have no time to adjust their strategy. *Id.* at 139. Mr. Slane stated that they consulted with an additional expert witness and he had adequate time to adjust their strategy following receipt of Dr. May's report.[27] However, the defense did not have time to follow up on Dr. May's suggestions regarding histological stains and the presence of iron in A.S.'s injuries. She indicated further examination and testing of these issues might prove A.S.'s fatal injuries were older than the State alleged. *Id.* at 139.

Respondent contends that when told about additional elements of the case on cross-examination, Mr. Wyatt "substantially revised his opinion." Doc. No. 250 at 86-87. A review of the transcript reveals Respondent's characterization of Mr. Wyatt's testimony in this regard is exaggerated.

The State, in cross-examining Mr. Wyatt, referenced a taped confession in which Petitioner described actions she took that were consistent with the injuries A.S. received. State's counsel then asked Mr. Wyatt if this evidence would change his opinion regarding whether it was reasonable for defense counsel to change their strategy to "some other person did it?" Tr. March 20, 2015 at 15-16. Mr. Wyatt

---

[27] Though Mr. Slane also incorrectly testified they received Dr. May's opinion weeks before Petitioner's trial. *Supra.*

responded, "Certainly all of those factors would go into a determination of whether you would use an alternative theory" and that it "could potentially" change his opinion. *Id.* at 16, 17.

Respondent does not include Petitioner's objection at the hearing explaining that in actuality, the medical testimony at trial indicated Petitioner's taped confession was not consistent with the medical findings. *Id.* at 16; Doc. No. 250 at 86 (wherein Respondent summarizes this portion of the transcript as "[Petitioner's objection overruled]."). Moreover, Mr. Wyatt continued to testify both during the remainder of cross-examination and on redirect following this questioning that these types of issues would not affect his conclusion that counsel's delay in contacting an expert witness until 10-12 days before trial was unreasonable, deficient, and not a sound strategic decision. Tr. March 20, 2015 at 17-19, 25-27.

The Court agrees with Mr. Wyatt's conclusions regarding Mr. Funderburk's representation in this matter. The Court cannot conclude that Mr. Funderburk's failure to engage an expert witness until eleven days before trial "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quotations omitted). While Mr. Funderburk was not required to shop around for an expert until he found one that supported an alternative theory of causation, the fact that he did not consult a medical expert until trial was imminent, his witness list was due, and he had no time to follow up on any potential suggestions from the expert and/or alter his

strategy is undeniably deficient. Mr. Funderburk was clearly not making "strategic choices . . . after thorough investigation of law and facts . . . ." *Id.* at 690. His "complete lack of pretrial preparation put[s] at risk both [Petitioner's] right to an 'ample opportunity to meet the case of the prosecution' and the reliability of the adversarial testimony process." *Kimmelman*, 477 U.S. at 385 (quoting *Strickland*, 466 U.S. at 685, 688) (additional citation omitted).[28]

"*Strickland* recognized that the Sixth Amendment's guarantee that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for [her] defence' entails that defendants are entitled to be represented by an attorney who meets at least a minimal standard of competence." *Hinton*, 571 U.S. at 272 (quoting *Strickland*, 466 U.S. at 685-87). "Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Hinton*, 571 U.S. at 273 (quoting *Harrington v. Richter*, 562 U.S. 86, 106 (2011)). As in *Hinton*, *Ackley*, and *Epps*, where the underlying injuries are unwitnessed and the prosecution's case rests heavily on expert testimony, this was such a case.

---

[28] The Court notes its conclusion would not be altered if indeed counsel had contacted an unknown male witness. Contrary to Mr. Slane's testimony, it is clear that counsel did not contact Dr. May until September 1, 2005, did not deliver records for her to review and examine until late on September 4, 2005, and therefore, did not have her opinion until the weekend before trial. At that point, it was too late to make any real strategic determination as to whether further expert consultations were necessary and/or whether to follow up on Dr. May's suggestions regarding additional testing.

Nothing in the record indicates counsel's failure to contact a medical expert witness until September 1, 2005, when trial was imminent, was a strategic decision. Counsel simply did not take any action to secure necessary medical expert testimony until approximately eleven days before trial. It is clear from the testimony and evidence presented at the state's evidentiary hearing in this matter that Mr. Funderburk's "overall performance" did not live up to "prevailing professional norms" and was constitutionally deficient. *Hinton*, 571 U.S. at 273; *Kimmelman*, 477 U.S. at 381. Based on a review of the record in this matter, the relevant law, and the state court's order and reasoning, the Court concludes Petitioner has met the deficient performance prong under *Strickland*.[29]

B. Prejudice

Having established Mr. Funderburk's performance was constitutionally deficient under the first prong of *Strickland*, Petitioner "must also 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of

---

[29] In light of the recommendation, it is unnecessary to address the remaining bases for Petitioner's ineffective assistance of counsel claim. However, Petitioner's allegations that Mr. Funderburk's failure to adequately investigate her defense, request a continuance in order to consult with additional expert witnesses, and present a cohesive defense overlaps with the Court's finding as to his failure to timely consult with and present expert witnesses at Petitioner's trial. Additionally, Petitioner's claim that counsel failed to present a cohesive theory of defense is supported by Tr. Vol. I at 7-20. Finally, it seems unlikely that anyone from the defense team met with Petitioner between February 2005 and the weekend before her trial. Though Mr. Slane claims to have met with Petitioner between six and twelve times during those months and that he signs in at the county jail only "occasionally," the Jail Logs do not show that he signed in on even one occasion. St. Ct. Ex. 43B.

72

the proceeding would have been different.'" *Hinton*, 571 U.S. at 275 (quoting *Strickland*, 466 U.S. at 694). The primary basis for the Court's finding that Petitioner has met the prejudice prong of *Strickland* was set forth in this Court's previous ruling finding Petitioner's evidence, which remains largely unrebutted, from five medical experts met the threshold finding of actual innocence and allowed this Court to consider her procedurally barred claims. Doc. Nos. 135, 139.[30] Thus, the Court will review the previous findings, Respondent's arguments, and additional evidence herein.

In his previous Findings in this case, Judge Bacharach discussed the relevant evidence presented by the State's medical experts regarding the cause and timing of A.S.'s injuries. The State's three medical expert witnesses were Dr. Johnny Griggs, Dr. David Korber, and Dr. Chai Choi. Doc. No. 135 at 2.

> Dr. Griggs is a physician who treated A.S. at the hospital and opined that the boy had died from shaken-baby syndrome. For this opinion, Dr. Griggs relied on subdural hemorrhages in both eyes, massive swelling of the brain, and some bleeding into the brain.
>
> . . . .

---

[30] The Court notes Petitioner's burden of proof for actual innocence permitting this Court to consider otherwise procedurally barred claims is more strenuous than *Strickland's* prejudice prong. In order to establish "actual innocence," Petitioner had to establish that "in light of the new evidence, no juror, acting reasonably, would have voted to find [her] guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 329 (1995). By comparison, *Strickland* requires Petitioner show only that there is "a reasonable probability" that a jury would have believed Petitioner's new medical experts and the result of her criminal proceeding would have been different. *Strickland*, 466 U.S. at 694.

Dr. David Korber is an ophthalmologist who treated A.S. on January 14, 2005. . . . Dr. Korber concluded that his findings were consistent with shaken baby syndrome. These findings involved "thousands" of retinal hemorrhages, a "massive amount of blood all over the retina," and two detached retinas. For the level of eye damage Dr. Korber saw, he initially stated that he thought the injuries would probably have been sustained between "a few days" to "a week" before January 13, 2004. Later in his testimony, however, Dr. Korber appeared to question the ability of anyone to estimate how much time had passed between the injuries and the loss of consciousness.

. . . .

A forensic pathologist, Dr. Chai Choi, performed the autopsy on A.S. and attributed the death to head trauma with blunt force. At trial, Dr. Choi testified that prior to [January] 13, 2004, A.S. had been "essentially . . . a normal child" without any "known medical specific history." At the time of the autopsy, however, the boy had a massive brain edema (swelling), tearing of the bridging veins, retinal hemorrhages, periserosal mesenteric hemorrhages of a duodenum, subscapular bruises, subarachnoid hemorrhages, a subdural hematoma, and a subgaleal hematoma. Based on these newly-acquired conditions, the physician concluded that the brain injury had been caused by shaken baby syndrome with impact.

Like Dr. Griggs and Dr. Korber, Dr. Choi was asked how much time would have elapsed between the shaking and the boy's loss of consciousness. Dr. Choi answered that the time-period would depend on how the child tolerated the shaken impact, but would usually have taken only minutes. Similarly, Dr. Choi stated that if the impact had been "very violent," the brain-swelling would immediately have resulted in an inability to breathe and a loss of consciousness.

*Id.* at 3, 5-7 (footnotes omitted).

Petitioner presents reports of five medical expert witnesses: Dr. Julie Mack, a

radiologist, Dr. Ophoven, a pathologist, Dr. Wayne Squier, a neuropathologist, Dr.

Horace Gardner, an ophthalmologist, and Dr. Patrick Barnes, a neuroradiologist. As noted by Judge Bacharach, the reports reflect two broad categories of opinions – "criticism of the conclusions expressed by Doctors Griggs, Korber, and Choi, tying the boy's death to trauma or shaken baby syndrome" and "expression of a belief that if the death had involved trauma, the injury would have been inflicted days, weeks, or months before January 13, 2004." *Id.* at 8.

Focusing on Petitioner's medical expert testimony regarding the timing of A.S.'s fatal injuries, there is no question that a reasonable probability exists that it could have affected the jury's verdict. As Judge Bacharach explained,

> The State's theory was that Ms. Moore had shaken A.S. roughly within [approximately] thirteen minutes of the time that he lost consciousness. There was no evidence of any abuse by Ms. Moore prior to January 13, 2004, the day that A.S. died. And, the Information was specific in charging Ms. Moore with the commission of a murder "on or about" January 13, 2004. Thus, if Ms. Moore had not caused the injuries on January 13, 2004, the jury would have had no reason to blame her for the trauma or for murder. In these circumstances, the timing of the death provided a critical link in the prosecution's theory of guilt. With the new collection of expert reports, that link appears unsupportable because of the undisputed scientific evidence that the trauma would have preceded the collapse by days, weeks, or months.

Doc. No. 135 at 10-11.

In reviewing the testimony of Drs. Griggs and Choi, Judge Bacharach noted that each of them opined that A.S's traumatic injury would have immediately resulted in loss of consciousness but that they also relied at least in part on the absence of any prior traumatic experience. *Id.* at 11. Dr. Griggs also presumed that

A.S. "'[had been] perfectly fine' until his collapse on January 13, 2014." *Id.* at 14 (footnote omitted). However, Petitioner offers undisputed evidence of prior traumatic experiences and health problems, including but not limited to, "a prior diagnosis of a 'failure to thrive,'" "the existence of significant developmental delays," "a fall from a porch in October 2003, resulting in edema, contusions, and a hematoma," "two falls in December 2003, one involving a landing on a tile and concrete floor," "a fall in a cast iron tub roughly one week before A.S. died," and "observations that A.S. had appeared to be lethargic in the week preceding his death." *Id.* at 12 (citing Doc. No. 108-6 at 1, Doc. No. 108-13, Doc. No. 108-14, Doc. No. 108-19, Doc. No. 108-24 at 1-2, 4-5, Doc. No. 109-9, Doc. No. 109-1 at 1-3, 4, Doc. No. 109-17 at 2, Doc. No. 109-18, Doc. No. 109-20 at 3).

In previous proceedings before this Court, Respondent has not denied that A.S. suffered these prior falls but instead, merely challenged their severity.[31] However, Judge Bacharach found this argument unavailing, *see* Doc. No. 135 at 13-14, and the Court agrees. As Judge Bacharach noted,

> [] Petitioner has presented new scientific evidence suggesting that the falls in October 2003, December 2003, and early January 2004 could have resulted in the kinds of injuries relied upon by Doctors Griggs, Korber, and Choi.

---

[31] Respondent's address of prejudice in the current proceedings is limited to a lengthy footnote in the Supplemental Response. Doc. No. 250 at 116-17 n.55. The arguments contained therein are addressed below.

. . . [T]hese physicians relied largely on: (1) subdural and retinal hemorrhages, and (2) swelling of the brain. But, in an article published in 2011, Patrick Barnes, M.D. concluded that these hemorrhages and swelling could "be associated with a lucid interval."

The potential for a lucid interval becomes critical with Ms. Moore's new scientific evidence that the traumatic injuries, which ultimately proved fatal, had taken place before Ms. Moore and the boy were left alone on January 13, 2004. Thus, even if the jury had attributed the death to trauma, it would have had no reason to single anyone out as the caretaker who was present when the fatal injury took place.

*Id.* at 14-15 (footnotes omitted).

Petitioner's experts explain that the presence of hemosiderin[32] and papilledema shows that any traumatic injury suffered by A.S. occurred days before his collapse. The presence of hemosiderin in the bruising on the back of A.S.'s head was undisputed. *Id.* at 16. Drs. Ophoven and Mack explained, in scientific detail, that the presence of hemosiderin indicates that the bruising on the back of A.S.'s head was 5-7 days old. *Id.* at 17 (citing Doc. No. 108-27 at 7, Doc. No. 109-4 at 3, Doc. No. 109-7 at 3). This undisputed evidence signifies that the hemosiderin had taken at least days to develop and because Dr. Choi had conducted the autopsy only about 1½ days after A.S.'s collapse, his injury could not have occurred within those

---

[32] "Hemosiderin is an iron-storage protein complex found within cells." *Id.* at 16 (citation omitted).

minutes Petitioner was alone with him on January 13, 2004. Doc. No. 135 at 18.[33]

Based on this unrebutted evidence, the Court finds there is a reasonable probability

that if presented with the same, a jury may determine that the bruising on A.S.'s head

was caused by something taking place prior to the time Petitioner was alone with

him on January 13, 2004.

Similarly, Dr. Ophoven's finding that papilledema, which refers to "optic disc

swelling," was present is undisputed. *Id.* at 20 (citing Doc. No. 108-20 at 4; Doc.

No. 109-7 at 4-5). Drs. Gardner and Ophoven concluded that the presence of

papilledema indicates that A.S.'s fatal injuries were incurred days before January

13, 2004. *Id.* at 21-22 (citing Doc. No. 108-20 at 4, 6-7; Doc. No. 108-27 at 5; Doc.

No. 109-7 at 5).

Petitioner has presented similarly unrebutted evidence and expert witness

testimony regarding the presence of Perl's positive material in A.S.'s blood when he

collapsed as well as vitreous hemorrhaging indicating that his fatal injuries occurred

days, if not longer, before his collapse on January 13, 2004. *Id.* at 22-24. The Court

concludes that if presented with this unrebutted evidence regarding the presence of

---

[33] Respondent attempts to rebut this evidence solely on the basis that Dr. Choi had
conducted the microscopic analysis on February 10, 2004, 28 days after the assumed act of
shaking A.S. *Id.* However, Dr. Ophoven explained that the samples taken from an autopsy
are "fixed" to preserve the cells/tissue. *Id.* at 18-19. If the fixation process is not done
appropriately, samples deteriorate. *Id.* at 19.

papilledema, Perl's positive material, and vitreous hemorrhaging indicating A.S.'s fatal injury occurred days before January 13, 2004, there is a reasonable probability Petitioner's trial would have had a different outcome.

This Court must also consider whether the lack of evidence that might have been offered by Petitioner's expert witnesses would be prejudicial when considered with the other evidence presented at trial. As Judge Bacharach discussed in his previous Findings of Fact, in a police interview, Petitioner "admitted that she had shaken A.S. three to four times while the two were alone on January 13, 2004." Doc. No. 135 at 28 (citing Doc. No. 109-6 at 10). Petitioner challenged the believability of this "confession" on numerous grounds. The Court concludes, similar to Judge Bacharach, that Petitioner's challenges standing alone are not sufficient to satisfy the *Strickland* prejudice prong. When considered with the new evidence, however, there remains a reasonable probability the outcome of her trial would still have been different. The Court agrees with Judge Bacharach's reasoning, as follows:

> . . . [T]he Petitioner's admissions to law enforcement could not have supported a guilty verdict if the jury were to have the benefit of the new evidence on the timing of A.S.'s fatal injuries. With Ms. Moore's admissions, the jury could have believed that she had shaken the boy three or four times on the day that he died. For murder, however, the jury would have needed to tie an action by Ms. Moore to the traumatic injury that had ultimately caused A.S.'s death. The sole reason for the jury to find this connection was, as the police told Ms. Moore in the interrogation, the fact that she had been the last person to be alone with A.S. before he died. That fact bore relevance only because the jury had uncontested evidence that the traumatic injuries would have caused the death within minutes to a perfectly healthy child. A

79

> reasonable jury would not possibly regard A.S. as perfectly healthy or
> regard the loss of consciousness as immediate with the benefit of Ms.
> Moore's new evidence of the breakdown of the auto-regulation system
> and the significance of A.S.'s hemosiderin, papilledema, Perl's positive
> material, and vitreous hemorrhaging.

*Id.* at 31-32 (footnotes omitted).

In reviewing the record as a whole, the Court finds there is a reasonable probability that a jury would have believed Petitioner's new medical experts and the result of her criminal proceeding would have been different. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Certainly the evidence presented by Petitioner's experts, that was never presented to the jury, undermines confidence in the outcome of her trial.

In the Response, Respondent limits arguments regarding *Strickland's* prejudice prong to one lengthy footnote. Doc. No. 250 at 116-17 n.55. Respondent does not concede the prejudice prong based upon this Court's previous finding that Petitioner had sufficiently shown actual innocence. *Id.* at 116 n.55. Respondent further argues:

> Judge Bacharach acknowledged that Doctors Griggs and Choi both
> opined that A.S.'s fatal injuries were very recent, but dismissed this
> testimony because it was based on "misinformation" that "A.S. had
> been a perfectly healthy child before January 13, 2004," while
> Petitioner's "new" and "undisputed" evidence showed prior falls,
> developmental delays, and lethargy on A.S.'s part. But now this
> evidence *is disputed*. For instance, Petitioner's habeas expert Dr. Janice
> Ophoven concluded A.S. suffered a fall and head injury and was
> "lethargic the week before his death" based on information from Ms.
> Roth. As shown at length above, Ms. Roth was thoroughly impeached

at the evidentiary hearing and has no credibility, *see* Ground One(C)(3)(ii), *supra.* As another example, it appears that Dr. Ophoven is the only one of Petitioner's habeas experts to address A.S.'s abdominal injury and offer any explanation for same other than child abuse. Dr. Ophoven claimed the injury "was most likely caused when Ms. Moore performed CPR on the child." At the evidentiary hearing, however, Petitioner specifically denied that she did CPR "hard" enough to cause A.S.'s abdominal injuries. In sum, although Petitioner's habeas experts were not tested under the crucible of cross-examination at the evidentiary hearing, some of the critical information on which they relied was and came up short. While the evidentiary hearing did not specifically cover prejudice, it certainly developed the record far beyond what was before Judge Bacharach, and his preliminary "actual innocence" determination does not foreclose a finding that Petitioner has not carried her burden on prejudice.

*Id.* (citations omitted). In reviewing the evidentiary hearing transcripts, the Court finds Respondent highly overstates the extent of impeachment of witnesses and evidentiary disputes.

Ms. Roth provided day care services to A.S., as well as Petitioner's son, A.M. During the evidentiary hearing, Ms. Roth stated that she *saw* Todd Snyder shake A.M., Petitioner's son, one morning when Mr. Snyder dropped off A.M. at her day care business. As subsequently pointed out to her, in the Incident Report dated September 7, 2003, she specifically stated that she was *not watching* but heard her assistant "shout at Todd, 'If you ever touch him again like that I'll lay you out right here on the floor.' She also told Todd to get his hands off [A.M.]. Todd immediately left." State's Ex 1; Tr. Dec. 5, 2014 at 29-30. In the report, Ms. Roth explained that she then asked her assistant, Michelle Jones, what had just occurred, and the assistant

told her "that she had seen Todd grab [A.M.] by the shoulders & spin him back around to face him. She said it had been done with a lot of force & that Todd was squeezing [A.M.'s] shoulders as he shouted at him. That is when Michelle yelled at Todd to let go of [A.M.]." *Id.* Ms. Roth also explained in the Report, "I checked [A.M.'s] shoulders & they appeared red. [A.M.] was crying & I consoled him. We will check him later for bruising on the shoulders & arms. If they appear, a Child Abuse Hotline report will be made." *Id.*

Ms. Roth's testimony did not contradict the acts described other than she testified that she *saw* the underlying event occur. Ms. Roth stated in the report that she *heard* it happen from an adjoining room, her assistant immediately described it to her, and Ms. Roth checked A.M.'s shoulders and arms for injuries. While clearly contradictory, the contradiction is relatively minor and hardly warrants Respondent's description of Ms. Roth as having "no credibility."[34]

Similarly, Respondent also discusses whether Ms. Roth had perjured herself by claiming to have practiced law at one time. During Petitioner's criminal trial, the State asked Ms. Roth if she had ever claimed to be or had she ever been a practicing attorney. Doc. No. 250 at 90-91. The first time she was asked, she responded, "I had a – yes." *Id.* at 91 (quoting Tr. Vol. III 235-36). The second time, she answered in

---

[34] Additionally, Ms. Roth's assistant, Ms. Jones, submitted a Declaration noting her account of the underlying incident, and it supports Ms. Roth's Incident Report. Doc. No. 109-1 at 3.

the affirmative that she had been a practicing attorney in California. *Id.* At the evidentiary hearing, she explained that in the late 1980s when she lived in California, she held a certification "where under a supervising attorney you could perform work that would typically be done by an attorney. Limited [to family law]. . . . We were called little LA – AAs. And I know that that was either associate attorney or attorney associate. It was a very long time ago." Tr. March 2, 2015 at 51-52.

Due to Ms. Roth's familiarity with the parties involved, including A.S. for whom she provided childcare, she inherently possessed a great deal of relevant information to Petitioner's criminal case. The two contradictions are by no means so egregious as to render her knowledge, information, and/or potential testimony either irrelevant or completely lacking in credibility.

Moreover, evidence related to A.S.'s falls and lethargic behavior the week prior to his death has been provided by other witnesses in addition to Ms. Roth. Doc. No. 108-6 at 1; Doc. No. 108-16 at 1-2; Doc. No. 109-1 at 4; Doc. No. 109-20 at 3. Indeed, there is a medical report dated January 8, 2004, five days before A.S.'s collapse, wherein Sooner Start was conducting an Early Intervention Program appointment with A.S. apparently related to his developmental delays. Doc. No. 109-18 at 5. The physician who prepared the medical report described A.S. as "very lethargic and uncooperative." *Id.*

More significantly, Dr. Ophoven's detailed opinion illustrates clearly that though she referenced "evidence from the day care provider," that was by no means the sole basis for her conclusions. Within the exact section of her opinion to which Respondent cites, Dr. Ophoven described the fall that A.S. suffered in October 2003, its physical effects, and other medical evidence as strongly supporting her conclusions that A.S.'s fatal injuries did not occur in the hour preceding his death.

> I have reviewed the investigative reports in his case and am aware that witnesses described the child with recent symptoms strongly suggesting a significant headache. As I understand the symptoms the child was unusually quiet and when held placed his head in a specific position. Headache is very unusual in a child this age and must be included in the forensic analysis. These symptoms are consistent with increased intracranial pressure and or meningeal irritation.

> Most notably, there was medical evidence that the child suffered head injuries in falls pre-dating January 13, 2004. For example, in October 2003, the child suffered a significant fall and struck his head on a concrete step. He was sent home from Deaconess Hospital without a CT scan or MRI. In pictures taken two months later, the bruising and swelling from that fall is still evident. Indeed, three months after the fall, contusions over his left forehead and towards the left temple – the area injured in the October fall – are evident in the autopsy. After this fall, the child suddenly stopped growing – as reflected in the abrupt change in his growth curve – a significant fact that was not addressed by Dr. Choi, the forensic pathologist who did the autopsy. Evidence from the daycare provider and the Sooner Start records further indicate that the child was "unresponsive" and lethargic the week before his death, seemingly after suffering another significant fall and head injury. This history indicates that [A.S.] was not a "normal" child on January 13, 2004. Complications from multiple accidental blunt force impacts to the head could certainly have caused the death as well as the medical findings. The postmortem examination included histological sections of skin and underlying tissues from the back of [A.S.'s] head. These tissue sections are designated as slides B, C, and D. I have examined

these tissue slides as well as iron and trichrome stains to assist in determining the degree of tissue healing in the damaged tissue. The tissue slides indicate the presence of a significant impact to the back of the head many days or even longer prior to death. The tissues contain abundant iron positive cells, maturing scar tissue and new blood vessel formation indicating substantial healing. An impact to the back of the head could very well have been a significant contributing factor in the terminal cascade. Individuals with significant concussions are at substantial risk for fatal deterioration with subsequent blows. Whether or not this impact was associated with the onset of his seizures cannot be determined from the postmortem analysis.

Doc. No. 88-31 at 7-8. As is evident from this portion of Dr. Ophoven's opinion, she relied on far more than Ms. Roth's information regarding lethargic behavior and/or another fall the week prior to his death. Thus, Respondent's argument that Ms. Roth's supposed impeachment negates Dr. Ophoven's opinion is utterly without merit.

Respondent also states that Dr. Ophoven is the only one of Petitioner's experts that addressed A.S.'s abdominal injuries and in doing so, stated that it was possible said injury occurred when Petitioner performed CPR on A.S. Doc. No 250 at 116 n.55 (citing Doc. No. 88-31 at 3 n.1). Respondent argues that this portion of Dr. Ophoven's opinion is negated because at the evidentiary hearing, Petitioner "specifically denied that she did CPR 'hard' enough to cause A.S.'s abdominal injuries." Doc. No. 250 at 116 n.55. Dr. Ophoven's report provides:

The[] medical examiner at the trial also referenced an injury to the duodenum region and hypothesized that this injury *could* have been caused by a punch to the abdomen. This injury played no role in causing the death of the child and was most likely an injury caused when Ms.

> Moore performed CPR on the child. The area of the bowel with the bleeding lies right over the vertebral column immediately underneath the area Ms. Moore indicated she applied two-handed pressure. The procedure would compress the bowel between her hands and the underlying bone and fully explains the findings. There was no evidence of serious abdominal trauma indicating the classic findings observed in blunt force abusive trauma to the abdomen.

Doc. No. 88-31 at 3-4 n.1. At the evidentiary hearing, Petitioner testified, "I don't believe I did it that hard to cause that kind of damage. . . . But I don't know. I was scared." Tr. March 5, 2015 at 144. Clearly, Petitioner's testimony does not negate, nor otherwise undermine, Dr. Ophoven's opinion in this regard. Respondent's argument to the contrary is without merit.

Respondent also argues Petitioner cannot rely on her expert witnesses now to prove prejudice because she "agreed" to bifurcation in state court, allowing the parties to present evidence as to the first prong of *Strickland* and then only proceeding to the prejudice prong if successful. "In consenting to this arrangement, Petitioner ultimately consented to not presenting her alleged newly discovered evidence of the medical doctors and their opinions in State court. Having failed to present the doctors so that their credibility might be tested, Petitioner should not be permitted now to hide behind the law of the case doctrine." Doc. No. 250 at 117 n.55. Not surprisingly, Respondent cites no authority to support this assertion and the Court finds this argument unavailing.

Under the circumstances of the evidentiary proceedings, merely agreeing to an expedient litigation schedule does not constitute a party's waiver of the remaining issues in future proceedings.[35] Moreover, as Respondent is aware, having ruled Petitioner met the "actual innocence" threshold, this Court is permitted to consider claims not previously presented to the state court.

Relying on *Littlejohn v. Royal*, 875 F.3d 548 (10th Cir. 2017), Respondent also argues that "the evidentiary hearing included overwhelming evidence, and undisputed factual findings, that minority view experts like Petitioner's habeas experts suffer from some credibility problems." Doc. No. 250 at 117 n.55. Respondent accurately describes the holding of *Littlejohn* as "finding lack of prejudice [under *Strickland*] based on counsel's failure to present expert testimony from Dr. Manual Saint Martin regarding brain damage where, *inter alia*, 'the prosecution could have cast doubt on Dr. Saint Martin's diagnosis, as well as painted Mr. Littlejohn as a liar, based on Mr. Littlejohn's documented efforts to manipulate mental-health experts.'" Doc. No. 250 at 117 n. 55 (quoting *Littlejohn*, 875 F.3d at 565-66). Unlike *Littlejohn*, there is nothing in the record suggesting bad acts/behavior on the part of Petitioner with regard to her experts and Respondent has not presented any evidence that casts doubt on her experts' opinions. Respondent's

---

[35] This is especially true where limited to only the first prong of Petitioner's *Strickland* claim and her conflict of interest claim, the state district court proceedings took almost six years to complete.

disagreement with their opinions does not undermine their credibility. Further, as discussed above, Respondent's attempts to challenge one expert's conclusions based on the credibility of other witnesses falls short.

As established, the defense did not attempt to hire *any* expert witness, minority view or otherwise, until less than two weeks before trial and did not have time to make such an attempt after contacting Dr. May so late in the criminal proceedings. However, it is worth noting that one portion of the transcripts upon which Respondent relies is the testimony of Robert Estrada, a Texas attorney who had represented a defendant in a high profile shaken impact case in or around 2003 and that defendant received a plea deal of deferred adjudication. Tr. April 14, 2015 at 8, 10, 20-21. Mr. Estrada testified that while the necessary expert in 2005 would have been in the minority view, he had been able to hire a credible expert in 2003. *Id.* at 16-18. Additionally, he testified that multiple resources were available in 2005 to find such experts. *Id.* at 18.

Thus, Respondent's only substantive challenge to Petitioner's expert witnesses is that they represent the minority view in this area. But, Respondent has not cited to any law indicating that positing a minority view *inherently* means that a jury will not find that view credible in a particular case.[36]

---

[36] It is notable, though not determinative, that as illustrated in the case law discussed herein, the opinions of Plaintiff's experts represent less of a minority within the medical field than in the past.

The Court concludes Mr. Funderburk's deficient performance prejudiced Petitioner. The evidence presented by Petitioner's expert witnesses indicates A.S.'s fatal injury occurred prior to January 13, 2004. Had this evidence been presented at trial, Petitioner could have challenged the opinions of Drs. Korber, Griggs, and Choi that A.S.'s death was caused by injuries incurred immediately prior to his collapse. The Court cannot conclude that such evidence would not have been persuasive.

According to the case law discussed herein, an expert testifying even as early as 2005, once his or her opinion was challenged on cross-examination, could have cited to numerous scientific studies supporting their opinions regarding short falls and traumatic head injuries. *Epps*, 53 N.E.3d at 1260-61 n.15-18. If a defense expert had caused the jury to doubt whether A.S.'s fatal injuries occurred immediately prior to his collapse on January 13, 2004, the jurors may have then questioned whether the State had eliminated the possibility that A.S.'s death was the result of other health conditions or accidental injuries incurred prior to that date. If the jury had been presented with the testimony of Petitioner's experts, as well as the evidence regarding A.S.'s previous falls, significant developmental delays, and lethargy in the week preceding his death, there is a reasonable probability that Petitioner's case would have had a different result.

The Court finds Petitioner has satisfied *Strickland's* prejudicial prong establishing ineffective assistance of counsel. Accordingly, the Court should grant Petitioner's request for a writ of habeas corpus.

<u>RECOMMENDATION</u>

Based on the foregoing findings, it is recommended that Petitioner's Second Amended Petition for Writ of Habeas Corpus be GRANTED. It is further recommended that the Writ of Habeas Corpus be issued, unless within ninety (90) days of the entry of an Order adopting this Supplemental Report and Recommendation, the State grants Petitioner a new trial or, in the alternative, orders her permanent release from custody.

The parties are advised of their right to file an objection to this Supplemental Report and Recommendation with the Clerk of this Court by  April 12th , 2021, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Supplemental Report and Recommendation would waive appellate review of the recommended ruling. *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991); *cf. Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) ("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Supplemental Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this __22nd__ day of __March__, 2021.


GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **BEVERLY MICHELLE MOORE,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )    **Case No. CIV-09-985-G** |
| | ) |
| **TAMIKA WHITE, Warden,** | ) |
| | ) |
| **Respondent.[1]** | ) |

## ORDER

Petitioner Beverly Michelle Moore, a state prisoner appearing through counsel, filed this action seeking federal habeas corpus relief pursuant to 28 U.S.C. § 2254. Following extensive proceedings, including a stay pending primary determination by the state courts of issues raised herein by Petitioner, the controlling pleading—Petitioner's Second Amended Petition—was filed. *See* Second Am. Pet. (Doc. No. 226); Pet'r's Br. (Doc. No. 227). Respondent, Warden Tamika White, filed an Answer (Doc. No. 250), and Petitioner filed a Reply (Doc. No. 254).

In accordance with 28 U.S.C. § 636(b)(1), the matter was referred to Magistrate Judge Gary M. Purcell for initial findings and recommendations. Judge Purcell issued a Supplemental Report and Recommendation ("Suppl. R. & R.," Doc. No. 261), in which he recommended that Petitioner's request for habeas relief be conditionally granted. Respondent filed an Objection (Doc. No. 264), to which Petitioner has responded (Doc.

---

[1] The current warden of the facility where Petitioner is incarcerated is hereby substituted as Respondent. *See* R. 2(a), R. Governing § 2254 Cases in U.S. Dist. Cts.; Fed. R. Civ. P. 25(d), 81(a)(4).

No. 267).  Having conducted the requisite de novo review of the Supplemental R. & R.,
the Court finds and concludes as follows.

PROCEDURAL HISTORY

Petitioner's state- and federal-court proceedings have followed a circuitous path.
*See* Mem. Op. & Order of Nov. 5, 2014 (Cauthron, J.) at 1-4 (Doc. No. 208); R. & R. of
Dec. 12, 2019 (Purcell, Mag. J.) at 4-15 (Doc. No. 244).  The Court will discuss that
background herein only as necessary to evaluate the currently pending Second Amended
Petition.

In September of 2005, following a jury trial in the District Court of Oklahoma
County, Oklahoma, Petitioner was convicted of murder in the first degree of her
boyfriend's 22-month-old son, A.S., by use of unreasonable force.  Petitioner was
sentenced to life imprisonment without the possibility of parole.  *See State v. Moore*, No.
CF-2004-351 (Okla. Cnty. Dist. Ct.).[2]  Petitioner appealed to the Oklahoma Court of
Criminal Appeals ("OCCA"), which affirmed the conviction but modified her sentence to
life imprisonment with the possibility of parole.  *See Moore v. State*, No. F-2006-63 (Okla.
Crim. App.).

In September of 2008, Petitioner filed a pro se application for postconviction relief.
The state trial court denied the application, and the OCCA dismissed Petitioner's appeal of
that disposition for lack of jurisdiction.  *See* Second Am. Pet. (Doc. No. 226) at 2-4.

---

[2] The state-court dockets cited herein are publicly available through http://www.oscn.net.

Petitioner filed the instant habeas action on September 4, 2009. An attorney was appointed to represent Petitioner in July of 2010. Respondent challenged the timeliness of Petitioner's habeas application. The Court held that Petitioner was entitled to review of the merits of her constitutional claims because she "had made a . . . showing of the probability of actual innocence sufficient to permit her case to overcome the limitations bar." Order of Oct. 28, 2011 (Cauthron, J.) at 2-4 (Doc. No. 139) (adopting Proposed Findings of Fact and Conclusions of Law of Sept. 7, 2011 ("Proposed FFCL," Bacharach, Mag. J.) (Doc. No. 135)). *See generally Schlup v. Delo*, 513 U.S. 298, 313-29 (1995).

Respondent further argued that Petitioner had failed to exhaust available state-court remedies as required by 28 U.S.C. § 2254(b). *See* Limited Answer (Doc. No. 159) at 1-14. The Court determined that in light of various factors, including "the substantial newfound evidence developed in federal court regarding the Petitioner's actual innocence," "the state courts should be given an opportunity to address this matter in the first instance." Order of Apr. 6, 2012 (Cauthron, J.) at 2 (Doc. No. 182). The Court therefore stayed proceedings in this matter pending Petitioner's exhaustion of her claims in the state courts. *See id.* at 3.

On June 5, 2012, Petitioner filed a second application for postconviction relief in the state trial court. *See* Pet'r's Notice (Doc. No. 195) at 1. The application raised six propositions of error: (1) ineffective assistance of trial counsel for (a) failure to fully investigate the cause of death of A.S. and the timing of injuries to A.S. alleged to have been caused by Petitioner, and (b) failure to present testimony from expert witnesses as to the cause and timing of the fatal injuries; (2) ineffective assistance of trial counsel due to trial counsel suffering from conflicts of interest; (3) deprivation of due process due to the State's

3

failure to disclose exculpatory evidence; (4) ineffective assistance of appellate counsel due to failure to argue ineffective assistance of trial counsel as to the lack of investigation of medical issues and lack of presentation of medical testimony; (5) ineffective assistance of appellate counsel arising from the failure to uncover the conflicts of interest of trial counsel and raise a corresponding claim of ineffective assistance of trial counsel; and (6) ineffective assistance of appellate counsel due to failure to uncover and seek relief on the State's violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *See* Pet'r's Second Appl. Postconviction Relief (Doc. No. 234-7) at 2-8.

The trial court rejected the State's assertion of procedural bar, and, by agreement of the parties, bifurcated its determination of Petitioner's postconviction claims into two parts. The trial court would first consider whether defense counsel rendered deficient performance or labored under a conflict of interest. If the trial court found that defense counsel's performance was deficient or subject to a conflict of interest, the trial court would then separately consider whether that performance had resulted in prejudice to Petitioner, as well as Petitioner's *Brady* claim and ineffective assistance of appellate counsel claims. *See* J. Statement of Proc. Hist. (Doc. No. 234-9) at 8.

Regarding the first determination, the trial court conducted an evidentiary hearing on various dates between December 2014 and August 2015. *See id.* at 9. The state-court docket reflects that the complete hearing transcript was filed in August 2016, and each party submitted proposed findings of fact and conclusions of law to the trial court on January 17, 2017. *See State v. Moore*, No. CF-2004-351 (Okla. Cnty. Dist. Ct.).

On March 23, 2018, Petitioner filed a Motion to Lift Stay (Doc. No. 213) in this Court, arguing that the exhaustion requirement should be excused and that federal habeas proceedings should resume due to both exceptional circumstances and the "ongoing and lengthy delays in state court proceedings." *Id.* at 6. Four days later, the state trial court issued an order denying relief on Petitioner's Second Application for Postconviction Relief. *See* Trial Ct. Order of Mar. 27, 2018 (Doc. No. 227-2). Petitioner appealed the denial to the OCCA. The appellate court did not address the merits of Petitioner's claims but affirmed on the basis that Petitioner's claims were procedurally barred. *See* OCCA Order of Oct. 12, 2018 (Doc. No. 227-1), *Moore v. State*, No. PC-2018-403 (Okla. Crim. App.).

This Court then lifted the stay that had been imposed in this matter and permitted Petitioner to file an amended pleading. On April 19, 2019, Petitioner filed the verified Second Amended Petition. Petitioner presents six grounds for relief, urging the same propositions of error as were argued to the state courts in her Second Application for Postconviction Relief. *See* Second Am. Pet. at 7-14. In Ground One, Petitioner argues that she was deprived of her Sixth Amendment right to effective assistance of trial counsel based upon counsel's: "a) failure to fully investigate the cause of death and the timing of injuries attribute[d] to Petitioner, including the failure to timely consult with and retain expert witnesses, and b) failure to present testimony from the expert witnesses as to the cause and timing of the fatal injuries." *Id.* at 7. According to Petitioner, "Trial Counsel was aware that there were reasons to question the cause and timing of the child's death but failed to reasonably investigate those issues, failed to timely consult with and retain

appropriate experts[,] and failed to present expert testimony at trial, which resulted in Petitioner's conviction." *Id.*; *see also* Pet'r's Br. at 55-72.

Respondent initially responded to the Second Amended Petition by asserting that Petitioner's claims were unexhausted, untimely, or procedurally barred. *See* Initial Answer (Doc. No. 234) at 39-117; 28 U.S.C. §§ 2244(d), 2254(b). Rejecting these arguments, Judge Purcell recommended that Petitioner's claims be permitted to proceed on their merits due to Petitioner having made a sufficient showing of actual innocence. *See* R. & R. of Dec. 12, 2019, at 9-10, 16-21. Neither party objected to this aspect of the R. & R., which was accepted and adopted by the undersigned. *See* Order of May 14, 2020 (Goodwin, J.) at 2-3 (Doc. No. 248); *see also id.* at 3 n.2.

Judge Purcell also recommended, and the Court agreed, that Respondent be permitted to file an answer addressing the merits of the federal habeas claims presented in the Second Amended Petition. *See id.* at 5. Respondent then filed an Answer (Doc. No. 250), and Petitioner filed a Reply (Doc. No. 254). Upon due consideration, Judge Purcell issued the Supplemental R. & R. (Doc. No. 261) now under review. In his 90-page Supplemental R. & R., Judge Purcell provided background information and procedural history for the matter. *See id.* at 1-18. Judge Purcell then addressed Ground One of the Second Amended Petition in detail, ultimately finding that Petitioner had shown a deprivation of her right to effective assistance of trial counsel and recommending that the petition be granted on that basis. *See id.* at 18-90.

6

DISCUSSION

A state prisoner may seek federal habeas relief "on the ground that [she] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A petitioner who otherwise establishes a right to habeas relief must also show that "law and justice require" such relief from the federal court. 28 U.S.C. § 2243; *see Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022). Here, Petitioner contends—and Judge Purcell in the Supplemental R. & R. found—that the attorneys representing Petitioner in the state-court trial that resulted in her conviction did not provide her the effective assistance of counsel guaranteed by the Sixth Amendment (the "IATC claim" or "Ground One").

The Sixth Amendment prescribes: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).

> Without counsel the right to a fair trial itself would be of little consequence, for it is through counsel that the accused secures his other rights. The constitutional guarantee of counsel, however, cannot be satisfied by mere formal appointment. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair. In other words, the right to counsel is the right to effective assistance of counsel.

*Id.* at 377 (citations and internal quotation marks omitted); *accord Smith v. Mullin*, 379 F.3d 919, 929 (10th Cir. 2004).

7

The Tenth Circuit has instructed that "[t]he gravity of a claim of ineffective assistance of counsel cannot be overstated." *Smith*, 379 F.3d at 929. The purpose of the Sixth Amendment's requirement of effective assistance is "to ensure a fair trial." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman*, 477 U.S. at 374; *accord Strickland*, 466 U.S. at 686 ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.").

Pursuant to governing authority, the Court determines de novo any part of the proposed findings and recommended disposition to which proper objection has been made. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. 2121 E. 30th St.*, 73 F.3d 1057, 1060 (10th Cir. 1996). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The Court "may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Having conducted a de novo review of the objections made by Respondent to the Supplemental R. & R., and applying the standards and limitations set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the Court modifies

the findings and conclusions recommended by Judge Purcell to the limited extent set forth
below and agrees that the Second Amended Petition should be conditionally granted.

I.     Relevant Limitations and Standards for Federal Court Review Under AEDPA

   *A.  AEDPA's Exhaustion and Timeliness Requirements*

"As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a
federal court to grant an application for a writ of habeas corpus on behalf of a state
prisoner." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  "Sections 2254(b) and (c)
provide that a federal court may not grant such applications unless, with certain exceptions,
the applicant has exhausted state remedies." *Id.*  And 28 U.S.C. § 2244(d) imposes a one-
year statute of limitations on petitions for federal habeas relief by state prisoners. *See* 28
U.S.C. § 2244(d)(1).

   As noted, this Court already has found that Petitioner is entitled to review of the
merits of her constitutional claims because she "ha[s] made a . . . showing of the probability
of actual innocence sufficient to permit her case to overcome the limitations bar."  Order
of Oct. 28, 2011, at 2; *accord* Order of May 14, 2020, at 2-3, 3 n.2; *see Schlup*, 513 U.S.
at 313-29; *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) ("[A]ctual innocence, if
proved, serves as a gateway through which a petitioner may pass whether the impediment
is a procedural bar . . . or . . . expiration of the statute of limitations.").  Accordingly, the
Court's review is not proscribed by application of § 2254(b) and (c) or § 2244(d).[3]

---

[3] Respondent's Objection challenges the Court's prior finding "for appellate purposes."
Resp't's Obj. (Doc. No. 264) at 104-06.  Petitioner responds that "Respondent has waived
any argument as to the finding of actual innocence for appellate purposes."  Pet'r's Resp.
(Doc. No. 267) at 31-34.  This Court need not and does not address this waiver issue.

B.  *The Inapplicability of 28 U.S.C. § 2254(d)*

Pursuant to 28 U.S.C. § 2254(d), the "additional restriction" of a "highly deferential standard" applies if a habeas corpus petition "includes a claim that has been 'adjudicated on the merits in State court proceedings.'"  *Cullen*, 563 U.S. at 181 (quoting 28 U.S.C. § 2254(d)).  In determining whether there has been such an adjudication, the federal court should look to "the last related state-court decision that . . . provide[s] a relevant rationale" for that court's disposition of the claim.  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192-94 (2018) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)); *accord Hawes v. Pacheco*, 7 F.4th 1252, 1261 n.6 (10th Cir. 2021) (explaining that the habeas court looks to the "last reasoned opinion" of the state court on the petitioner's federal claims (internal quotation marks omitted)).

As noted above, although the state trial court issued findings and conclusions in denying the Second Application for Postconviction Relief, the OCCA did not reach the merits of Petitioner's claims on appeal, instead expressly rejecting the application on procedural grounds.  *See* OCCA Order of Oct. 12, 2018, at 9 ("Petitioner's propositions of error . . . are thus barred or waived.").  In their pleadings, the parties agreed that this disposition, the "last reasoned opinion" of the state courts, does not implicate review under § 2254(d).  *See* Pet'r's Br. at 34-35; Answer at 36, 38, 54.  Judge Purcell found likewise, explaining that because the claims were not "adjudicated on the merits," but instead resolved by the OCCA on procedural grounds, "§ 2254(d)'s deference does not apply."  28 U.S.C. § 2254(d); Suppl. R. & R. at 19.

10

Neither party now argues otherwise, and the Court concurs with the Supplemental R. & R. on this point. The OCCA's affirmance of the trial court's decision "on alternative procedural grounds" was the "last reasoned decision" but was "not . . . a decision resulting from [a] merits adjudication." *Greene v. Fisher*, 565 U.S. 34, 40 (2011) (emphasis omitted); *Ylst*, 501 U.S. at 804; *see also Johnson v. Williams*, 568 U.S. 289, 302 (2013); *Williams v. Alabama*, 791 F.3d 1267, 1271-72, 1273-76 (11th Cir. 2015). Because the OCCA did not reach the merits of Petitioner's Second Application for Postconviction Relief, there is no state-court decision to defer to when considering the merits of Petitioner's federal claims.

### C. The Presumption of Correctness Under 28 U.S.C. § 2254(e)(1)

The lack of a state-court § 2254(d) merits adjudication is not by itself determinative of the federal habeas court's application of § 2254(e)(1), which provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

> "Clear and convincing" is "an intermediate standard of proof," *Santosky v. Kramer*, 455 U.S. 745, 756 (1982), satisfied by evidence that would "place in the ultimate factfinder an abiding conviction that the truth of its factual contentions [is] 'highly probable,'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (quoting C. McCormick, Law of Evidence § 320, p. 679 (1954)).

*Fontenot v. Crow*, 4 F.4th 982, 1018 (10th Cir. 2021) (parallel citations omitted).

Before the magistrate judge, the parties disagreed as to whether § 2254(e)(1)'s presumption of correctness should be applied to the factual findings made by the state trial

court in denying the Second Application for Postconviction Relief.  *Compare* Pet'r's Br.

at 40, *and* Pet'r's Reply at 7-16, *with* Answer at 18, 37-38, 52-62.  Judge Purcell found that

there was a lack of authority directly on point but nevertheless assumed that the

presumption would apply and proceeded to consider Petitioner's Ground One subject to

that express assumption.  *See* Suppl. R. & R. at 19-21.

Petitioner did not file a written objection to the Supplemental R. & R.  Thus,

although she continues to contend that the statutory presumption should not apply, *see*

Pet'r's Resp. at 10, she has not presented an actionable challenge to Judge Purcell's

approach.  For her part, Respondent faults the manner in which the magistrate judge applied

the § 2254(e)(1) presumption of correctness, but she likewise does not object to the

underlying application of that presumption to the state trial court's factual determinations.

*See* Resp't's Obj. at 14-15, 31.[4]

Accordingly, the undersigned accepts that the state trial court's "findings of fact that

bear upon [Ground One] are entitled to a presumption of correctness rebuttable only by

clear and convincing evidence" under 28 U.S.C. § 2254(e)(1).  *Grant*, 886 F.3d at 889

(internal quotation marks omitted).

---

[4] Judge Purcell's approach appears consistent with both the statutory language and relevant authority.  *See* 28 U.S.C. § 2254(e)(1) (prescribing that a state-court factual determination "*shall* be presumed to be correct" (emphasis added)); *see, e.g.*, *Fontenot*, 4 F.4th at 1061 ("Even when reviewing a habeas claim de novo rather than under § 2254(d), state-court factfinding still receives the benefit of doubt under § 2254(e)(1) . . . ."); *Grant v. Royal*, 886 F.3d 874, 889 (10th Cir. 2018) (explaining that the presumption applies "even in the setting where we lack a state court merits determination").

12

### D. Summary of Petitioner's Burden

In sum, because the Court is not bound by 28 U.S.C. § 2254(d) deference, it reviews Petitioner's Ground One de novo. *See Fontenot*, 4 F.4th at 1061; *Hooks v. Workman*, 689 F.3d 1148, 1194 (10th Cir. 2012). Petitioner "bear[s] the burden of showing a right to habeas relief based on a preponderance of the evidence." *Menzies v. Powell*, 52 F.4th 1178, 1210 (10th Cir. 2022), *petition for cert. filed*, No. 22-7482 (U.S. May 8, 2023). That is, Petitioner must show by a preponderance of the evidence that her representation at trial was constitutionally ineffective. *See id.* "A preponderance of the evidence is evidence sufficient to persuade the court that a fact is more likely present than not present." *United States v. King*, No. CR-13-63-F, 2014 WL 12623415, at *6 (W.D. Okla. Dec. 1, 2014); *accord Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Further, because 28 U.S.C. § 2254(e)(1) is assumed to apply, the Court in conducting its de novo review of Ground One extends to all material state-court factual findings the presumption of correctness directed by that provision. To the extent Petitioner challenges any such finding she must rebut that presumption by clear and convincing evidence. *See Grant*, 886 F.3d at 889.[5]

---

[5] The state court's legal conclusions or mixed findings of law and fact are not entitled to AEDPA's presumption of correctness, however. *See Martinez v. Zavaras*, 330 F.3d 1259, 1262 (10th Cir. 2003).

II.    Review of the Supplemental Report and Recommendation

    *A.  Respondent's General Objections*

        1.  <u>The "Background Information" Section</u>

The Supplemental R. & R. opens with a short section titled "Background Information," wherein Judge Purcell summarizes the circumstances of A.S.'s death, details Petitioner's judicial proceedings and events involving her defense counsel, and identifies Petitioner's habeas claims. *See* Suppl. R. & R. at 1-6.  Respondent objects that this portion of the Supplemental R. & R. is improper for several reasons, including: its failure to include a record citation for every proposition, its inclusion of certain items presented to the magistrate judge by Petitioner and exclusion of certain other items presented by Respondent, its alleged disregard of presumptively correct state-court factual findings, and its making of "new findings totally unsupported by the record."  Resp't's Obj. at 15-30. Respondent contends that the deficiencies of the Background Information section render the entire Supplemental R. & R. unreliable, as this section "sets the stage" for Judge Purcell's erroneous conclusion as to Petitioner's ineffective-assistance claim. *Id.* at 15-16.

The Court readily concludes that the "Background Information" section serves as an introduction of the parties' controversy and not an exhaustive cataloging of all evidence considered and all facts found in the analysis of Petitioner's habeas claims.  *See* Pet'r's Resp. at 8.  Respondent does not establish that the general recounting of the case history, or a lack of citations therein, undermines the remainder of the analysis of the Supplemental R. & R.  The Court also notes that this portion of the Supplemental R. & R. presents much of the same "Factual Background" as did a previous R. & R., to which Respondent did not

object.  *See* R. & R. of Dec. 12, 2019, at 2-4, 3 n.1.  To the extent Respondent raises specific

objections to particular aspects of the Background Information section, *see* Resp't's Obj.

at 23-30, the undersigned will address those objections in connection with the relevant

analysis of Ground One, as applicable.

### 2. Discussion of the Trial Court's Factfinding Process

Following the evidentiary hearing on Petitioner's Second Application for

Postconviction Relief, both parties submitted written proposed findings of fact and

conclusions of law to the trial court.  The trial court incorporated the State's proposed

narrative discussion, findings of fact, and conclusions of law nearly verbatim into its order

denying relief.  *See id.* at 31.  *Compare* Trial Ct. Order of Mar. 27, 2018, at 7-30, *with*

State's Proposed Order (Doc. No. 227-3) at 3-25.

In the Supplemental R. & R., Judge Purcell noted the trial court's wholesale

adoption of the State's proposed findings of fact and cited several judicial decisions

criticizing the practice by courts of "verbatim adoption" and "uncritical[] accept[ance]" of

findings of fact "prepared without judicial guidance" "by prevailing parties."  *Anderson v.*

*City of Bessemer City*, 470 U.S. 564, 572 (1985); *see* Suppl. R. & R. at 21-23.

According to Respondent, the Supplemental R. & R.'s recognition of the context of

the trial court's ruling necessarily establishes that Judge Purcell was improperly applying

pre-AEDPA law and did not actually presume the trial court's factual findings were correct

as prescribed by 28 U.S.C. § 2254(e)(1).  *See* Resp't's Obj. at 31-42.  Respondent objects

that *how* the trial court reached its disposition is "irrelevant" and that consideration of the

circumstances underlying the trial court's order is not authorized by the current AEDPA

statutory scheme. *Id.* at 31-39.[6]   In support, Respondent focuses upon the fact that decisions cited by the magistrate judge as disapproving of courts' verbatim adoption of prevailing parties' findings were issued prior to AEDPA's enactment or occurred in a different class of cases. *See id.* at 34-39.  Respondent also relies on *Sharpe v. Bell*, wherein the Fourth Circuit explained that "AEDPA does not make deference to state court fact-finding dependent on the adequacy of the procedures followed by the state court." *Sharpe*, 593 F.3d 372, 378 (4th Cir. 2010); *see* Resp't's Obj. at 36-42.

Respondent's objection misreads the Supplemental R. and R.   Judge Purcell expressly stated that he was applying the § 2254(e)(1) presumption of correctness to the state court's decision. *See, e.g.*, Suppl. R. & R. at 21, 23-24.  While the magistrate judge criticized the trial court's verbatim adoption of findings submitted by the State, he specified that he examined the provenance of the trial court's order only as "context." *Id.* at 23-24 (emphasizing that the trial court's adoption of the State's findings does not affect application of § 2254(e)(1)).  To the extent Respondent suggests that Judge Purcell deviated from the § 2254(e)(1) standard, Respondent has not shown that to be the case.

Nor has Respondent demonstrated that Judge Purcell otherwise erred in addressing the circumstances underlying the issuance of the state court's determination.  A federal habeas court is required to apply a presumption of correctness to the state court's factual determinations.  This requirement does not preclude that court from considering how those

---

[6] Prior to the 1996 enactment of AEDPA, a statutory presumption of correctness applied to state-court findings of fact but was subject to eight enumerated exceptions.  *See Jefferson v. Upton*, 560 U.S. 284, 290-291 (2010) (citing 28 U.S.C. § 2254(d)(1)-(8) (1966)).

16

findings were reached, however. "[T]he character of the process upon which the state court based its conclusion may have some bearing on whether a petitioner's showing amounts to 'clear and convincing' evidence that the state court erred." *Sharpe*, 593 F.3d at 378; *accord Lambert v. Blackwell*, 387 F.3d 210, 239 (10th Cir. 2004) ("[T]he extent to which a state court provides a full and fair hearing . . . might be a consideration while applying deference under . . . § 2254(e)(1)." (internal quotation marks omitted)).

> [P]rocedure often *affects* substance—that is, the procedural process through which a court makes a substantive determination influences the reasonableness of the substantive determination itself.
>
> We consequently have little trouble concluding the procedures a state court employs to make factual determinations . . . can affect the reasonableness of the court's subsequent factual determinations.

*Smith v. Aldridge*, 904 F.3d 874, 882 (10th Cir. 2018) (citation omitted) (discussing the "unreasonable determination" standard under 28 U.S.C. § 2254(d)(2)).

Respondent therefore does not show that the Supplemental R. & R.'s consideration of the "character of the process" undermines or is inconsistent with employment of the statutory presumption of correctness set forth by § 2254(e)(1). *Sharpe*, 593 F.3d at 378.

### 3.    Application of the Presumption of Correctness to Implicit Findings

In its order denying Petitioner's Second Application for Postconviction Relief, the trial court first identified the materials it had reviewed and presented a procedural history of the case. *See* Trial Ct. Order of Mar. 27, 2018, at 1-7.[7] There is then a discussion (the

---

[7] This Procedural History was a joint stipulation submitted by the parties at the close of the evidentiary hearing. *See* Trial Ct. Order of Mar. 27, 2018, at 2; Postconviction Hr'g Tr. of Aug. 4, 2015, at 27-28 (conventionally filed).

17

"Narrative" section) of Petitioner's IATC claim, *id.* at 7-27, followed by a "Conclusion" section that sets forth 18 "specific findings of fact and conclusions of law" and denies relief on the IATC claim.  *Id.* at 27-30.[8]  In the Supplemental R. & R., Judge Purcell discussed the case and § 2254(e)(1) generally and then stated: "In its order the state court set forth eighteen findings of fact, preceded by a narrative of supportive reasoning.  The Court will address only those factual findings most relevant to Petitioner's grounds for relief addressed therein."  Suppl. R. & R. at 24 (citation omitted).

Citing *Register v. Thaler*, 681 F.3d 623 (5th Cir. 2012), Respondent argues that "'the presumption of correctness in § 2254(e)(1) applies both to explicit findings and to unarticulated findings which are necessary to the state court's conclusions of mixed law and fact.'"  Resp't's Obj. at 43 (alterations omitted) (quoting *Register*, 681 F.3d at 629).[9] Respondent objects that the magistrate judge erred by applying the statutory presumption to the enumerated findings in the trial court's "Conclusion" section but failing to apply that presumption to factual findings made by the trial court in the preceding "Narrative" section. *See* Resp't's Obj. at 43.

The Court sees nothing in the magistrate judge's treatment of these two sections that would amount to a failure to properly apply § 2254(e)(1) to any factual finding implied in

---

[8] Although Petitioner's claims for ineffective assistance of appellate counsel were reserved and not addressed at the postconviction hearing, the trial court denied relief as to certain of those claims as well.  *See* Trial Ct. Order of Mar. 27, 2018, at 26-27, 30.

[9] Tenth Circuit authority likewise supports the extension of the statutory presumption to implicit factual findings made by state courts.  *See, e.g.*, *Ellis v. Raemisch*, 872 F.3d 1064, 1071 n.2 (10th Cir. 2017).

the "Narrative" section of the trial court's order. A more natural reading of the Supplemental R. & R. reflects that Judge Purcell simply chose to focus his discussion upon the findings and conclusions that Judge Purcell considered germane to Ground One. *See, e.g.*, Suppl. R. & R. at 17 (referring generally to the trial court's order as "its findings of fact and conclusions of law"), 21-22 (citing the "Narrative" section). Further, Respondent does not identify any specific factual finding from the "Narrative" section, as opposed to the "Conclusion" section, to which Judge Purcell allegedly failed to accord the presumption of correctness. *See* Resp't's Obj. at 43.

        4.  Summary

In sum, Respondent has not shown any error that generally tainted the magistrate judge's consideration of the state court's factual findings or resulted in a failure to properly apply § 2254(e)(1). To the extent Respondent raises specific, material objection to the facts underlying the magistrate judge's recommendation, the undersigned will address those objections below.

    B.  *Discussion of the Magistrate Judge's Review of Specific Factual Findings by the State Trial Court*

        1.  Misappropriation of Defense Funds

After being criminally charged in January 2004, Petitioner was initially represented by a public defender named Jennifer Richard. In February 2005, Petitioner, through her mother, retained attorneys Isaac Funderburk and David Slane to replace Ms. Richard. Mr. Funderburk and Mr. Slane entered their appearances in the state court on February 10,

2005.  Attorney Eric Reynolds joined the defense team shortly before the trial, which was conducted September 12-16, 2005.

Petitioner alleges that Mr. Funderburk, who was her contact on the defense team and handled the financial aspect of her representation, "was distracted from attending to her case and using funds she provided for experts for his own personal expenses" or for purposes "other than for their intended use."  Second Am. Pet. at 9.  The state trial court found in relevant part: "While the evidence presented to this Court supports that Mr. Funderburk did not provide an adequate accounting for Petitioner's client-trust fund, there has been no evidence to support Petitioner's allegation that Mr. Funderburk misappropriated those funds for his own benefit."  Trial Ct. Order of Mar. 27, 2018, at 30; *see also id.* at 24-26.

The magistrate judge considered this finding in detail, reviewing the postconviction hearing testimony and record to conclude that Petitioner had rebutted the presumption of correctness:

> [S]erious questions exist as to the propriety of Mr. Funderburk's handling of the funds provided to him for Petitioner's defense.  Petitioner has certainly presented clear and convincing evidence to rebut the state court finding that "there *has been no evidence to support* Petitioner's allegation that Mr. Funderburk misappropriated Defense Funds for his own benefit."  Most significant to the present case, however, it is clear funds available to the defense for expert witnesses were not used for that purpose.

Suppl. R. & R. at 28-29 (alteration and citation omitted).

Respondent raises no objection to this aspect of the Supplemental R. & R., and the Court concurs with Judge Purcell's conclusion.  *See id.* at 24-29.

2.  Mr. Funderburk's Substance Abuse Issues

In connection with her ineffective-assistance claims, Petitioner alleges that Mr. Funderburk was dealing with serious "personal and financial difficulties" prior to and during the September 2005 criminal trial, including substance abuse. Second Am. Pet. at 9; *see also* Pet'r's Br. at 79-81. Whether and to what extent Mr. Funderburk was impaired in his representation of Petitioner due to his drug and alcohol issues[10] was addressed in depth during the state court's evidentiary hearing. *See* Trial Ct. Order of Mar. 27, 2018, at 21-24. The trial court ultimately found:

> There has been no evidence presented that Mr. Funderburk was impaired or under the influence of intoxicating substances at the time he represented Petitioner in this matter. On the contrary, witness testimony supports that Mr. Funderburk was functioning normally throughout the course of his representation.

*Id.* at 29-30 ("Factual Finding No. 12").

In the Supplemental R. & R., Judge Purcell discussed in detail the relevant evidence and testimony in the record. This included evidence reflecting that, between February and September 2005, Mr. Funderburk had engaged in behaviors opined to be consistent with the abuse of prescription drugs and that, during the same period, he experienced significant financial and personal troubles, including an ongoing prosecution against him by the Oklahoma County District Attorney's Office for drug- and alcohol-related criminal

---

[10] It is undisputed that, prior to practicing law in Oklahoma, Mr. Funderburk served three years in federal prison after pleading guilty to two criminal counts, including a felony drug conspiracy charge. In January 2010, Mr. Funderburk died as a result of an accidental drug overdose.

charges. *See* Suppl. R. & R. at 29-32.[11]  Judge Purcell ultimately concluded that, despite

the trial court's finding of "no evidence" of impairment or intoxication, "[t]here is evidence

suggesting [Mr. Funderburk's struggle with substance abuse problems] also occurred

during Mr. Funderburk's representation of Petitioner" and that "[w]hether and/or to what

extent these issues affected his representation of Petitioner is unclear." *Id.* at 5-6.

> It appears an exceedingly reasonable conclusion that Mr. Funderburk was
> abusing prescription medications during his representation of Petitioner.  The
> parties have presented conflicting evidence regarding whether it affected his
> performance *during trial*. . . . .
>
> Regardless, it is not necessary for the Court to make a specific
> determination as to whether Petitioner met her burden in rebutting the state
> court's finding that no evidence was presented indicating Mr. Funderburk's
> performance was impaired during his representation of Petitioner.  While Mr.
> Funderburk's use, and likely abuse, of prescription medication during his
> representation of Petitioner may provide context for various issues raised
> herein, the Court's finding that Petitioner received ineffective assistance of
> counsel is not dependent upon the same.

*Id.* at 31-32 (citation omitted).

Respondent asserts that this approach "makes a mockery of" 28 U.S.C. § 2254(e)(1),

as the magistrate judge found that Mr. Funderburk was likely abusing prescription

medication without directly concluding that the presumption of correctness owed to the

state court's arguably incompatible factual finding had been rebutted.  Resp't's Obj. at 44-

45; *see also id.* at 28 & n.17.  Respondent, somewhat inconsistently, also objects that the

magistrate judge erred in applying § 2254(e)(1) because the burden was placed on

Respondent to justify the state court's finding rather than on Petitioner to rebut the

---

[11] Mr. Funderburk pleaded guilty to those charges on November 4, 2005.  *See State v.
Funderburk*, No. CF-2003-6954 (Okla. Cnty. Dist. Ct.).

associated presumption.  *See id.* at 45-46.  Petitioner responds that Judge Purcell's comments on this point are "clearly dicta" and so these objections are "not relevant." Pet'r's Resp. at 7 n.1.

It would not have been proper for the magistrate judge to rely upon his own finding as to Mr. Funderburk's likely substance abuse without first deciding that the § 2254(e)(1) presumption had been in relevant part rebutted.  *Cf. Gardner v. Galetka*, 568 F.3d 862, 879 (10th Cir. 2009) ("[T]he correct standard of review under AEDPA is not waivable."). Reading this portion of the Supplemental R. & R. in context, however, reflects that Judge Purcell's statements regarding Mr. Funderburk's substance-abuse issues are "unnecessary to the decision in the case" and therefore dicta.  *Hetronic Int'l, Inc. v. Hetronic Ger. GmbH*, 10 F.4th 1016, 1052 (10th Cir. 2021) (internal quotation marks omitted).  Judge Purcell's analysis of the IATC claim does not further reference these issues, but instead focuses upon the ultimate strategic decisions made by defense counsel with respect to causation and expert witnesses.  The objection is therefore overruled.[12]

### 3. Consultation with a Second Expert

At the postconviction hearing, Petitioner's defense attorney David Slane testified that, in addition to a female forensic pathologist named Dr. Corrie May (discussed *infra*), the defense team had consulted with a second doctor, who was male, and decided not to retain him for trial.  *See* Postconviction Hr'g Tr. of Dec. 4, 2014, at 26-29, 47.  Citing this testimony, the state trial court found:

---

[12] Consistent with this view, this Court accords the trial court's Factual Finding No. 12 the presumption of correctness owed it under § 2254(e)(1).

> The defense did consult with two "mainstream" medical experts, Dr. Corrie
> May and an unnamed male doctor, prior to Petitioner's trial. Both doctors
> indicated they would be harmful to Petitioner's defense.

Trial Ct. Order of Mar. 27, 2018, at 28 ("Factual Finding No. 4"); *see also id.* at 13.

Petitioner has argued in this proceeding that the state trial court's determination that

defense counsel consulted with any doctor other than Dr. May should be rejected. *See*

Pet'r's Br. at 43-45; Pet'r's Resp. at 21-27. In the Supplemental R. and R., Judge Purcell

agreed with Petitioner, finding that Petitioner had rebutted the presumption of correctness

owed under § 2254(e)(1). *See* Suppl. R. & R. at 32-40. In support, Judge Purcell contrasted

Mr. Slane's "vague" and uncorroborated testimony about the unknown male expert with

record evidence that Judge Purcell considered to "undermine or outright contradict" that

testimony. *Id.* at 35. Respondent objects to this aspect of the Supplemental R. & R.

First, Respondent argues that the magistrate judge "improperly reweigh[ed]"

credibility determinations made by the state trial court regarding Mr. Slane's testimony at

the postconviction hearing, suggesting that the federal court may not reject any aspect of

that testimony in conducting its habeas review. *See* Resp't's Obj. at 51-53, 54-68. The

undersigned agrees that in reaching Factual Finding No. 4, the state trial court "validated

[Mr. Slane's] testimony both expressly and implicitly," finding that this aspect of the

attorney's testimony was credible. *Ellis*, 872 F.3d at 1071 n.2. This credibility finding is

"one[] of fact." *Id.*

The presence of a credibility determination does not, however, preclude the Court

from considering whether the § 2254(e)(1) presumption has been rebutted or from making

a finding that it has. As prescribed by the Supreme Court, "[a] federal court can disagree

with a state court's credibility determination and, when guided by AEDPA, conclude . . . that the factual premise was incorrect by clear and convincing evidence." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Here, the magistrate judge's rejection of the relevant aspect of the state trial court's Factual Finding No. 4 (the determination that defense counsel consulted with a doctor other than Dr. May) is not based on a wholesale rejection of the credibility of Mr. Slane's testimony.[13] As explained by the magistrate judge,

> Mr. Slane acknowledged that his memory regarding Petitioner's case was not entirely reliable at the time of the evidentiary hearing as it had been ten years since Petitioner's trial. Moreover, Mr. Slane no longer possessed a file from Petitioner's case or any of his notes. By 2015, when Mr. Slane testified in this matter, he had practiced twenty-one years, represented thousands of defendants, tried hundreds of cases, and noted that his cases ran together in his memory. . . . . Indeed, Petitioner's own evidentiary hearing expert, criminal defense attorney Robert Wyatt, stated that he could not remember every expert he had hired over the years without consulting a case file.

Suppl. R. & R. at 34 (citing Postconviction Hr'g Tr. of Dec. 4, 2014, at 7, 24, 27; Postconviction Hr'g Tr. of Mar. 19, 2015, at 144-45); *see also Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (finding that statements provided by defense counsel during postconviction proceedings more than four years after sentencing "may simply reflect a mistaken memory shaped by the passage of time").

On the broader point of whether the relevant aspect of the state trial court's Factual Finding No. 4 has been shown to be incorrect by clear and convincing evidence,

---

[13] Respondent implies that the Court would be endorsing perjured evidence by looking to other witnesses' differing recollections of events. *See* Resp't's Obj. at 52 (arguing that Petitioner and her mother had an "incentive to offer false testimony" regarding the consultation with a second expert). The undersigned has found no indication in the record that any witness—be it Petitioner, a family member, or the defense attorneys whose own performance was being challenged—deliberately testified falsely at the hearing.

Respondent argues that the magistrate judge improperly burdened Respondent with defending the state court's factual finding by "pick[ing] apart" Respondent's evidence and by concluding that the 28 U.S.C. § 2254(e)(1) presumption had been rebutted without identifying evidence that directly "contradict[s]" Mr. Slane's account. Resp't's Obj. at 46-51. The undersigned disagrees.

On the first point, the Supplemental R. & R.'s discussion of the evidence is presented within the framework of determining whether Petitioner had met her burden under § 2254(e)(1). *See* Suppl. R. & R. at 32-33, 40. An examination of whether the record evidence is consistent with the trial court's finding is not "picking apart" Respondent's arguments but rather a proper aspect of that determination. *See, e.g.*, *Wiggins*, 539 U.S. at 528-29, 534 (considering the case record to hold that the state appellate court's underlying factual assumption had been shown to be incorrect by clear and convincing evidence); *cf. Colorado*, 467 U.S. at 316 (noting that the judging of proof by a clear and convincing standard requires "weigh[ing]" the opposing parties' materials on "the evidentiary scales").

Further, Respondent's insistence that Petitioner can rebut the statutory presumption of correctness only by identifying an item of evidence that wholly contradicts Mr. Slane's imprecise testimony and renders it "entirely unreliable" is misguided. Resp't's Obj. at 47-50, 66 (emphasis omitted). As noted above, "clear and convincing" is an "intermediate" standard, calling for proof that the truth of the contention is "highly probable." *Fontenot*, 4 F.4th at 1018. "'Highly probable' is a standard that requires more than a preponderance of the evidence but less than proof beyond a reasonable doubt." *Bishop v. Warden, GDCP*, 726 F.3d 1243, 1258-59 (11th Cir. 2013) (internal quotation marks omitted). "In the §

2254(e)(1) context, this standard 'is demanding but not insatiable.'" *Fontenot*, 4 F.4th at

1018 (quoting *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)).[14]

Having considered the relevant record, the undersigned concurs that Petitioner's

rebuttal burden has been met. As noted in the Supplemental R. & R., Mr. Slane's testimony

regarding the consultation with a second expert was qualified by uncertainty:

> Mr. Slane testified that he, along with Mr. Funderburk, spoke with two doctors regarding Petitioner's case, a male expert and Dr. May. He testified that they first spoke with a male doctor "that we sent the information to." Tr. Dec. 4, 2014 Vol. I at 26. He thinks the male doctor was a forensic pathologist. *Id.* at 26, 85. Mr. Slane testified that he cannot recall this male doctor's name, when they spoke with him, where he resided other than it was not in Oklahoma, []or when they received his opinion. *Id.* at 26, 29, 85-86. Indeed, the only things he can recall are that the male expert charged them a fee for his services and that the expert's opinion would have been harmful to their case.

> There are three amounts Mr. Slane believes they paid to doctors - $1,000.00, $2,000.00, and $5,000.00. *Id.* at 27. "I don't remember who got what and when. But I thought that we had sent a packet to a male doctor and asked him to review the information to see if he could help us. And we got a pretty quick response back from him." *Id.* Mr. Slane later testified he thought they paid the unknown male doctor $1,000.00 to review their materials. *Id.* at 84-85. Mr. Slane indicated they later spoke with the male doctor on the speakerphone in Mr. Slane's office. *Id.* at 27-28, 85-86. The doctor informed them that he would be harmful to their case and therefore, they did not speak with him further. *Id.*

Suppl. R. & R. at 34-35 (footnote omitted). Mr. Slane further testified that he did not recall

whether the second doctor's practice was "mainstream" in nature (as was found by the trial

---

[14] To the extent the magistrate judge concluded that Petitioner's evidence contradicts Mr. Slane's testimony outright, the undersigned disagrees. While not determinative for the reasons set forth above, Petitioner does not identify any item of evidence that *directly* refutes Mr. Slane's contention that a second expert was consulted.

court in Factual Finding No. 4).  Postconviction Hr'g Tr. of Dec. 4, 2014, at 47, 86 ("[I]t

was a doctor that [Mr. Funderburk] was aware of.").

Petitioner directs the Court to numerous items of evidence that are not in accord

with Mr. Slane's recollection of events and therefore undermine the disputed state-court

finding.  These include:

- At the postconviction hearing, Mr. Slane was questioned regarding an affidavit that he had given and signed.  *See* Slane Aff. of Sept. 4, 2012 (Ex. G, State's Resp. to Pet'r's Second Appl. Postconviction Relief (Postconviction R. at 2380-83)) (conventionally filed).  The affidavit provides details as to the attorneys' contact with Dr. May, and other facts regarding their representation of Petitioner, but does not reference consulting with or wanting to hire a second expert.  *See id.*  Mr. Slane "do[es] [not] know" why there is no mention of a second expert in the affidavit. Postconviction Hr'g Tr. of Dec. 4, 2014, at 84-85, 88-89, 113-15.

- Although Mr. Slane "kind of th[ought]" defense counsel "may have paid" or was going to pay the male doctor $1000 to review medical records, the bank records for Petitioner's client trust account do not reflect any payment made in this amount or any payment made to a male expert medical witness.  *Id.* at 27, 84-85; *see* Bank Records, Hr'g Ex. 39 (conventionally filed).  Mr. Slane could not explain why there was no check written to a male medical expert.  *See* Postconviction Hr'g Tr. of Dec. 4, 2014, at 86.

- After the trial had concluded, Petitioner and individuals who had provided funds for Petitioner's defense filed grievances with the Oklahoma Bar Association ("OBA") regarding Isaac Funderburk's defense strategy and possible misappropriation of funds.  Mr. Funderburk submitted at least two written responses to the OBA.  *See* Funderburk Ltr. of Apr. 29, 2006, Hr'g Ex. 45, at 2-6; Funderburk Ltr. of Aug. 3, 2006, Hr'g Ex. 45, at 18-20; *see also* Postconviction Hr'g Tr. of Mar. 3, 2015, at 63-65.  In one of these responses, Mr. Funderburk outlined the pretrial and trial efforts taken on Petitioner's behalf, including his "utiliz[ation] [of] the trust fund monies to employ[] the experts that I thought w[ere] best."  Funderburk Ltr. of Apr. 29, 2006, at 5.  Mr. Funderburk nowhere mentions contacting a second medical expert or any record review undertaken by such an expert.  *See id.* at 2-6.[15]  In the

---

[15] Before the magistrate judge, Respondent argued that Mr. Funderburk's use of "experts" on page three of this letter was an "oblique[]" reference to the second, male medical expert. Answer at 74.  Respondent does not reurge this position here, and the Court agrees with

other OBA response, Mr. Funderburk supplied "a breakdown of how the trust money was spent"; there is no payment to any medical expert identified. Funderburk Ltr. of Aug. 3, 2006, at 19-20.[16]

- Petitioner's defense attorney Eric Reynolds testified that he was not involved in any conversations about consulting with a second medical expert and that, after receiving Dr. May's unfavorable opinion, he was not aware of any discussion having occurred as to whether to obtain another medical opinion. *See* Postconviction Hr'g Tr. of Dec. 3, 2014, at 28; *accord* Hr'g Ex. No. 38, Reynolds Aff. of June 4, 2012, ¶ 6 ("I . . . am not aware of any other experts . . . that were involved in this case, except for Dr. May.") (Pet'r's Postconviction App. Ex. 66 (Postconviction R. at 1812-17)).

- During her consultations with defense counsel, Dr. Corrie May was "[n]ever made aware that anybody else in the defense team had consulted with anybody else about this case on the medical issues." Postconviction Hr'g Tr. of Jan. 22, 2015, at 24.

- When Petitioner met with her defense counsel the week prior to the commencement of trial, they discussed expert witnesses and the retention of Dr. May, but no attorney mentioned having had another medical expert review the files in the case. Postconviction Hr'g Tr. of Mar. 5, 2015, at 52-54.

- Donna Carmichael, Petitioner's mother, understood from a meeting with Mr. Funderburk approximately three weeks prior to trial that defense counsel had not hired any expert witnesses. Postconviction Hr'g Tr. of Dec. 1, 2014, at 165-66, 177-78.

While "the significance of" certain items of Petitioner's evidence "is open to judgment calls," "when [the] evidence" regarding the alleged second expert "is viewed cumulatively," it is "highly probable" that the defense attorneys did not consult with an unknown male doctor prior to trial. *Dretke*, 545 U.S. at 265; *Fontenot*, 4 F.4th at 1018. Having conducted the requisite de novo review, the Court agrees with the magistrate judge

---

Judge Purcell that such an interpretation is not supported when the relevant language is read in context with the remainder of the letter. *See* Suppl. R. & R. at 37.

[16] The lack of an entry for Dr. May in this breakdown is consistent with Dr. May's testimony—i.e., that she billed Mr. Funderburk for her services but never received payment. *See* Postconviction Hr'g Tr. of Jan. 22, 2015, at 30-31.

that Petitioner has rebutted the statutory presumption of correctness as to this aspect of the trial court's Factual Finding No. 4.[17]

### 4. Retention of Dr. Corrie May

The state trial court found that "the defense first retained Dr. May's services on September 1, 2005, and were aware of her opinion that the victim's injuries were consistent with child abuse by September 9, 2005." Trial Ct. Order of Mar. 27, 2018, at 28 ("Factual Finding No. 5"); *see also id.* at 14. Judge Purcell rejected Petitioner's challenge to the latter aspect of this finding, concluding that, while "[i]t is unlikely a member of the defense team reviewed Dr. May's opinion prior to the night of Sunday, September 11, 2005"—i.e., the night before trial commenced—Dr. May had faxed her report to Mr. Funderburk on Friday, September 9, 2005, and Petitioner had not presented clear and convincing evidence that defense counsel had not accessed the report between that September 9 transmission and the evening of September 11, 2005. Suppl. R. & R. at 40-49.

---

[17] Pursuant to 28 U.S.C. § 2254(e)(1), Petitioner's burden is to rebut the presumption of correctness afforded the state court's factual determination. Although arguably a distinction lies between simply rebutting the presumption of correctness attached to a factual determination and establishing that the factual determination is itself erroneous, the Supreme Court has conflated or equated the two showings, indicating that fulfilling the former has the effect of accomplishing the latter, *See Cockrell*, 537 U.S. at 348 (stating that § 2254(e)(1) requires a petitioner to "demonstrate that a state court's finding . . . was incorrect by clear and convincing evidence"); *accord id.* at 341 (noting that a reviewing court will "determine whether the trial court's determination . . . has been rebutted by clear and convincing evidence to the contrary"); *Dretke*, 545 U.S. at 266 ("The state court's conclusion . . . is shown up as wrong to a clear and convincing degree; the state court's conclusion was . . . erroneous."). Accordingly, the undersigned views Petitioner's burden under AEDPA through this lens.

No objection is raised to Judge Purcell's disposition on this point, and the undersigned concurs that Factual Finding No. 5 should be presumed correct.

### 5. The Timing of David Slane's Involvement in Petitioner's Defense

Finally, Respondent objects that Judge Purcell "total[ly] disregard[ed]" Factual Finding No. 5 and other portions of the state trial court's order when concluding that Mr. Slane "likely . . . did not become actively involved in Petitioner's defense until immediately before trial." Resp't's Obj. at 28-30, 53-68; Suppl. R. & R. at 6 n.2. As support, Respondent quotes at length from the trial court order, including multiple mixed conclusions of law and fact not entitled to a presumption of correctness and much that is not specifically connected to Mr. Slane or the timing of his representation. *See, e.g.*, Resp't's Obj. at 30, 61.

Even assuming Judge Purcell's conclusion is improper, and giving all germane factual findings a presumption of correctness, the analysis in the Supplemental R. and R. of Petitioner's IATC claim is not materially affected. That is, regardless of when Mr. Slane first became involved, Petitioner's defense team ultimately performed deficiently for the reasons stated below.

Respondent further complains that the magistrate judge used this belief as to the timing of Mr. Slane's involvement to improperly concentrate the Ground One analysis upon the performance of Mr. Funderburk, rather than upon the representation of the defense team collectively. *See* Resp't's Obj. at 62, 81 n.22 (citing Suppl. R. & R. at 6 n.2). It is true that the Supplemental R. and R. describes the acts and omissions of Mr. Funderburk in detail; however, this approach is largely a function of Mr. Funderburk's key role with

31

respect to the issues—pretrial consultation with Petitioner and with medical experts, trial strategy, and funding—upon which Ground One is based. *See* Second Am. Pet. at 7-8; *see, e.g.*, Postconviction Hr'g Tr. of Dec. 4, 2014, at 47, 85-86 (Mr. Slane testifying that the second medical expert was someone Mr. Funderburk "had been in communication with"); *id.* at 86 ("Mr. Funderburk was handling the money in this case because it was his client."); Slane Aff. of Sept. 4, 2012, ¶ 4 (Mr. Slane stating that Mr. Funderburk "consulted with and retained" Dr. May); Trial Tr. of Sept. 12, 2005, at 6-11 (Doc. No. 102-1) (Mr. Slane stating to trial court that he would prefer not to address the requests in the State's motion in limine that sought to preclude evidence of A.S.'s frequent falls and unusual behavior, self-inflicted head trauma, and developmental delays, and requesting that the trial court wait to allow the absent Mr. Funderburk to "deal with the issue"); Trial Tr. of Sept. 13, 2005, at 14 (Mr. Slane stating to trial court: "Today we got here, Mr. Funderburk got here and gave . . . the two-page letter of what [Dr. May's] summary is."). In any event, even assuming error by the magistrate judge in this respect, the undersigned has conducted the requisite review by examining the assistance provided by Petitioner's defense team as a whole.

### C. Analysis of Ground One: Ineffective Assistance of Trial Counsel

In the Supplemental R. & R., Judge Purcell analyzed Petitioner's IATC claim under the familiar two-pronged test established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668. *See* Suppl. R. & R. at 49-90. This Court applies that same test in its de novo review of Petitioner's claim.

To satisfy the first prong of *Strickland*, Petitioner "must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. That is, Petitioner must show

that her counsel's performance "fell below an objective standard of reasonableness," or, in

other words, that counsel's performance was "not within the range of competence

demanded of attorneys in criminal cases." *Id.* at 687-88 (internal quotation marks omitted).

> The first prong—constitutional deficiency—is necessarily linked to the practice and expectations of the legal community: The proper measure of attorney performance remains simply reasonableness under prevailing professional norms. In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.

*Hinton v. Alabama*, 571 U.S. 263, 273 (2014) (citation and internal quotation marks

omitted). There is a "strong presumption" that counsel acted reasonably, and counsel's

performance will not be deemed deficient if it "might be considered sound trial strategy."

*Strickland*, 466 U.S. at 689 (internal quotation marks omitted).

> Our review of counsel's effectiveness is "highly deferential." [*Strickland*, 466 U.S. at 689.] In assessing [counsel's] performance, we consider all the circumstances, making every effort to eliminate the distorting effects of hindsight, and view his conduct from his perspective at the time. By the same token, we must eschew *post hoc* rationalizations for [counsel's] deliberations, investigations, and defense strategy, or lack thereof.

*Smith*, 379 F.3d at 929 (alteration, citation, and internal quotation marks omitted).

To satisfy the second prong of *Strickland*, Petitioner must show that counsel's

deficient performance prejudiced the defense. *See Strickland*, 466 U.S. at 687. That is,

Petitioner must show that "but for counsel's unprofessional errors," "there is a reasonable

probability that . . . the result of the proceeding would have been different." *Id.* at 694. "A

reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Id.*

1.   Whether Petitioner's Counsel Rendered Deficient Performance

At Petitioner's criminal trial, the State presented three medical experts: Dr. Johnny Griggs, Dr. David Korber, and Dr. Chai Choi.  "Dr. Griggs opined that A.S. had died as a result of 'shaken baby syndrome,' and Dr. Korber reported findings that were consistent with this diagnosis.  Similarly, Dr. Choi concluded that the boy had died from head trauma with blunt force."  Proposed FFCL at 2-3 (footnotes omitted).  For the defense, Petitioner and a handful of character witnesses testified, but counsel presented no expert opinion testimony.  In Ground One, Petitioner alleges that the performance of her defense counsel was deficient in their "failure to fully investigate the cause of death and the timing of the injuries attribute[d] to Petitioner, including the failure to timely consult with and retain expert witnesses," and "failure to present testimony from the expert witnesses as to the cause and timing of the fatal injuries."  Second Am. Pet. at 7.

In the Supplemental R. & R., Judge Purcell considered this IATC claim in detail and ultimately concluded that defense counsel's performance did not meet prevailing professional norms and, therefore, was constitutionally deficient.  Respondent objects that the magistrate judge did not "faithfully apply" *Strickland* and instead viewed counsel's actions "through the distorting effects of hindsight."  Resp't's Obj. at 69-70.  According to Respondent, defense counsel's decisions with respect to medical experts were strategic choices that were reasonable under prevailing professional norms and under the circumstances of Petitioner's criminal case.  *See id.* at 69-103.

The undersigned has reviewed both the trial and postconviction proceedings, as well as the parties' arguments and cited authorities, in undertaking the required de novo review

of the Supplemental R. & R.  Having done so, the undersigned concurs with Judge Purcell's

thorough and well-reasoned analysis.  While Respondent is correct that ineffectiveness is

not established by an unsuccessful outcome, it is clear that, "considering all the

circumstances," defense counsel's representation in this matter fell "below an objective

standard of reasonableness."  *Strickland*, 466 U.S. at 688.

The Supplemental R. & R. found in relevant part that "[n]othing in the record

indicates counsel's failure to contact a medical expert witness until September 1, 2005,

when trial was imminent, was a strategic decision."  Suppl. R. & R. at 72.

> [I]n a case where the timing of A.S.'s injuries were of critical importance,
> Mr. Funderburk did not contact a medical expert holding *any* opinion until
> less than two weeks before trial, endorsed her (likely as a result of this delay)
> as an expert witness prior to knowing her opinion, and did not realistically
> have enough time after receiving her opinion to follow up on her suggestions
> or consult other experts for a potentially more helpful opinion. . . . .
>
>      . . . .
>
>  . . . [C]ounsel did not contact Dr. May until September 1, 2005, [and] did
> not provide the necessary records for her review until the night of September
> [3], 2005, so that she began reviewing the records the following [Monday]
> morning – one week before trial started.  Due to the looming trial deadlines,
> defense counsel endorsed her as a witness without knowing Dr. May's
> ultimate opinions or suggestions.  By the time they received Dr. May's
> opinion on the eve of trial, there was no time to consult with another medical
> expert to see if they could possibly find an expert that might reach a different
> conclusion. . . . [T]his left Petitioner without a substantial defense and with
> no expert testimony to support an alternative cause of death or injury.
>
> The Court agrees that defense counsel was not required to "doctor shop,"
> as Respondent phrased it.  In other words, counsel was not required to
> perpetually continue searching for an expert witness until he found one to
> support an alternative cause of death.  However, there is a cavernous divide
> between "doctor shopping" and failing to contact a medical expert witness
> until less than two weeks before trial. . . . .
>
>      . . . .

. . . Dr. May did suggest certain follow up tests and/or other types of medical experts who may be able to more directly illuminate the cause of death and/or the timing of the injury.  In Dr. May's report, she stated:

> (2) The documentation of the microscopic analysis of the brain by the pathologist for the presence or absence of axonal retraction bulbs, indicating diffuse axonal injury (DAI) fails to include the use of special histological stains and which areas of the brain were sampled.
>
> . . . .
>
> (4) In my view the inclusion of specialized pathology consultants, specifically a neuropathologist and ophthalmic pathologist[,] would have afforded a more thorough examination of the brain and eyes.

[Dr. May Report, Hr'g Ex. 32, at 51.]  During the evidentiary hearing, Dr. May testified that the types of medical experts she referenced, including neuropathologists, presumably existed in Oklahoma City.  [Postconviction Hr'g Tr. of Jan. 22, 2015, at 53-54.]  However, counsel could not realistically make a choice about whether to follow up on her suggestions as trial was starting within two days, at most. . . . .

Thus, . . . the Court finds counsel's decisions to either not consult an additional expert and/or not follow up on Dr. May's suggestions were not strategic choices.  In a case that relied so heavily on medical evidence, "counsel's efforts to investigate and attempt to secure suitable expert assistance in preparing and presenting defendant's case fell below an objective standard of reasonableness."  [*People v. Ackley*, 870 N.W.2d 858, 865 (Mich. 2015).]  Counsel was not able to make a "strategic choice" due to his delay in consulting a medical expert for Petitioner's defense.  The choice was out of his hands at that point, unless he was willing to seek a continuance, and it is clear from the record he did not attempt to do so.

The Supreme Court has explained:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

[*Wiggins*, 539 U.S. at 521-22] (quoting *Strickland*, 466 U.S. at 690-91). Based on the record, the Court cannot conclude Mr. Funderburk engaged in a reasonable investigation that would make his decision not to consult with and/or potentially present other expert witnesses a strategic choice.

The deficient performance prong of *Strickland* . . . "is necessarily linked to the practice and expectations of the legal community: The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Hinton*, 571 U.S. at 273 (quotations omitted). Petitioner presented Robert Wyatt, a local criminal defense attorney recognized by various organizations for the quality of his legal representation, to offer his opinion regarding whether Mr. Funderburk's representation violated the Strickland standard of effective assistance of counsel. [Postconviction Hr'g Tr. of Mar. 19, 2015, at 89-96; Postconviction Hr'g Tr. of Mar. 20, 2015, at 2-42.]

He testified that specifically in a case that turns so starkly on medical evidence and, where funds were provided, it was unreasonable "to not engage an expert until about 10 days before trial, which is the day the witness list is due." [Postconviction Hr'g Tr. of Mar. 19, 2015, at 103.] . . . .

Mr. Wyatt also explained that unless you were using it solely for cross-examination purposes, it would not be possible that a report received as close to the beginning of trial as Dr. May's would adequately inform a defense strategy. *Id.* at 107. For example, in this case, Dr. May specifically suggested that defense counsel investigate particular issues that might show the subject injuries were older than alleged in this case. *Id.* Mr. Wyatt concluded that the delay in obtaining an expert witness in this case could not be considered strategic.

> Not a strategic reason, if they didn't have other expert testimony lined up.
>
> I can't see that there's strategy at all when it's 10 days before trial. That's where I have a problem with it.
>
>      . . . .
>
>  . . . That's not a strategic approach. You have to have a game plan going into trial, not seat of your pants. And you don't get the materials the Friday before Monday's trial, or the night before, that's not strategic period.
>
> So any questions regarding strategy, I have to say that with respect to expert testimony in this case, I don't think it's strategic, period.

*Id.* at 115-16.

Mr. Wyatt also noted that even if the expert witness, such as Dr. May, states that they had ample time to review the record and provide an opinion, it is still not reasonable performance by counsel because they have no time to adjust their strategy. *Id.* at 139. Mr. Slane stated that they consulted with an additional expert witness and he had adequate time to adjust their strategy following receipt of Dr. May's report. However, the defense did not have time to follow up on Dr. May's suggestions regarding histological stains and the presence of iron in A.S.'s injuries. She indicated further examination and testing of these issues might prove A.S.'s fatal injuries were older than the State alleged. *Id.* at 139.

Suppl. R. & R. at 52-69 (footnote and alterations omitted) (certain alterations and omissions in original).

The undersigned agrees that Petitioner has overcome the presumption that her counsel's failure to engage an expert witness until eleven days before Petitioner's first-degree murder trial "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks omitted). Although Petitioner's defense attorneys were "not required to shop around for an expert until [they] found one that supported an alternative theory of causation, the fact that [they] did not consult a medical expert until trial was imminent, [the] witness list was due, and [they] had no time to follow up on any potential suggestions from the expert and/or alter [their] strategy is undeniably deficient." Suppl. R. & R. at 70-71.

Respondent first objects that criticism of defense counsel's timing as to contacting Dr. May as a potential witness is unfounded because Dr. May testified that she had "adequate time" and "materials" to form her opinion regarding Petitioner's records. Postconviction Hr'g Tr. of Jan. 22, 2015, at 41-42; *see* Resp't's Obj. at 81-84. As stated

38

by Petitioner, this objection "misses the point"—that is, that defense counsel did not procure and review that opinion, thereby learning that Dr. May's testimony would be unfavorable to Petitioner, until the trial already was upon them.  Pet'r's Resp. at 29.

Respondent relatedly argues that the defense team's failure to seek out another expert, or to otherwise pursue additional medical evidence regarding the timing and cause of A.S.'s death, was a matter of strategy and the product of a "reasonable investigation." Resp't's Obj. at 80, 88-102.[18]  This view is belied by the record, however, which reflects that the late action by the defense team in contacting Dr. May and reviewing her opinion left them no ability to turn to an alternative expert or pursue a different theory of defense. In other words, the record "underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment."  *Wiggins*, 539 U.S. at 526; *cf.* Wyatt Aff. of June 5, 2012, ¶ 6 (Pet'r's Postconviction App. Ex. 85 (Postconviction R. at 2233-36)) (stating that, in his professional opinion, it would be unreasonable "from a strategy standpoint": to fail to "obtain the full medical record" and send it "as promptly as possible for a medical review"; based upon the outcome of that review, to fail to "either seek a second opinion" or "retain the expert" and "conduct any additional investigation and specialist review suggested by the expert"; "to wait until the day before a final witness list was due to contact or consult

---

[18] Respondent objects that the Supplemental R. & R. incorrectly characterizes Dr. May's opinion as contingent on further testing.  *See* Resp't's Obj. at 27.  To the contrary: the Supplemental R. & R. makes clear that Dr. May's final opinion was unfavorable to Petitioner but correctly notes that Dr. May *also* suggested additional testing or consultations.  *See* Suppl. R. & R. at 4, 42, 52, 64-65, 68.

with a medical expert for the first time"; and to "fail[] to seek a continuance" to follow up on the issues raised in Dr. May's report).[19]

Mr. Funderburk and Mr. Slane entered their appearances on Petitioner's behalf on February 10, 2005.  On March 4, 2005, the trial court set the criminal trial docket call for September 9, 2005, with trial to commence on September 12, 2005.  At no point thereafter did defense counsel seek a continuance.  *See State v. Moore*, No. CF-2004-351 (Okla. Cnty. Dist. Ct.).  It was not until Thursday, September 1, 2005, that defense counsel first contacted Dr. May regarding potential retention in Petitioner's case.  Trial Ct. Order of Mar. 27, 2018, at 28.  Defense counsel did not deliver relevant records to Dr. May for review until a meeting late in the evening on Saturday, September 3, 2005.  Postconviction Hr'g Tr. of Jan. 22, 2015, at 12-14.  But on September 2, 2005, Mr. Funderburk identified Dr. May as the only named testifying medical expert on the defense list filed with the trial court.  *See* Pet'r's Witness & Ex. List (Doc. No. 102-3, at 73-75).  Dr. May transmitted her written report to Mr. Funderburk's office via fax on Friday, September 9, 2005, and also sent a copy via FedEx, to be delivered by the afternoon of September 12, 2005.  Trial Ct. Order of Mar. 27, 2018, at 14, 28.  Mr. Funderburk and Dr. May met in person on the evening of Sunday, September 11, 2005, at which time she provided Mr. Funderburk another copy of her report.  Postconviction Hr'g Tr. of Jan. 22, 2015, at 21-24.

---

[19] The undersigned rejects Respondent's criticism of Mr. Wyatt's testimony as "wholly uni[n]formed."  Resp't's Obj. at 101-02.  Mr. Wyatt's testimony, which was subject to cross-examination by the State, reflected that he had prepared extensively in forming his opinion. *See, e.g.*, Postconviction Hr'g Tr. of Mar. 19, 2015, at 94-95, 102-05.

40

When the criminal trial commenced on Monday, September 12, 2005, the trial court took up the State's motion in limine, which requested that Petitioner not be allowed to mention Dr. May in front of the jury until the State was provided with a report or summary of Dr. May's proposed testimony. Mr. Funderburk was absent from the first day's proceedings. *See* Trial Tr. of Sept. 12, 2005, at 9. Mr. Slane's argument to the trial court indicates that defense counsel had not yet decided whether they would call Dr. May to the stand. *See id.* at 6 (Mr. Slane stating he would "stay away" from mentioning Dr. May at voir dire). Dr. May testified that at 2:08 p.m. on Monday, September 12, 2005, she spoke by telephone with Mr. Funderburk and was told that she "would not be expected to testify" at trial. Postconviction Hr'g Tr. of Jan. 22, 2015, at 24. The next day, Tuesday, September 13, 2005, Mr. Slane and Mr. Funderburk represented to the trial court that they "probably" would not call Dr. May to testify. Trial Tr. of Sept. 13, 2015, at 14. Defense counsel nevertheless turned over Dr. May's summary to the prosecution. *See id.* ("[The State] ha[s] the report.").[20]

The State also moved to preclude the presentation of evidence by the defense regarding A.S.'s tantrums, frequent falls, unusual behavior, self-inflicted head trauma, and developmental delays. *See* State's Mot. in Limine at 90-92; Trial Tr. of Sept. 12, 2005, at 6-12. On Monday, September 12, 2005, Mr. Slane requested to defer to Mr. Funderburk upon that attorney's return as to the response to this aspect of the State's motion in limine.

---

[20] As noted by Petitioner, Dr. May's conclusion was thereafter revealed to the jury through one of the State's witnesses. *See* Pet'r's Resp. at 20 n.11; Trial Tr. of Sept. 14, 2015, at 221-24 (Dr. Griggs testifying that Dr. May agreed with his findings).

41

*See* Trial Tr. of Sept. 12, 2005, at 7-11.  The trial court granted that request but expressed doubts that such evidence would be relevant.  *See id.* at 7-8, 9.  The next day, defense counsel made a confusing and rambling effort to establish admissibility.  *See* Trial Tr. of Sept. 13, 2005, at 14-25.  The trial court rejected this argument, finding that defense counsel had failed to provide the State adequate notice of their intention and had failed to show sufficient relevance or causal connection between such evidence and the charged crime.  *See id.* at 25-27; Trial Tr. of Sept. 15, 2005, at 120-23.

Respondent's argument that defense counsel's performance in this regard was the result of strategic judgment is defeated by the timing and circumstances of the decisions made by those attorneys.  *See Wiggins*, 539 U.S. at 527 ("In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").  According to Mr. Slane and Mr. Reynolds, the working theory for the defense team was to argue that A.S. had been fatally injured through accidental means.  *See* Reynolds Aff. of June 4, 2012, ¶ 4; Postconviction Hr'g Tr. of Dec. 4, 2014, at 47.  Both attorneys related that the receipt of Dr. May's opinion that the cause of A.S.'s death was consistent with abuse, as well as follow-up conversations with Dr. May after trial already had begun, caused them to instead attempt to point the blame for A.S.'s death at the child's father at trial.  *See* Reynolds Aff. of June 4, 2012, ¶ 9; Slane Aff. of Sept. 4, 2012, ¶ 6; Postconviction Hr'g Tr. of Dec. 4, 2014, at 49.  In other words, Petitioner's criminal defense was conceived when they learned of Dr. May's opinion one

to three days prior to trial and, possibly, when the trial court granted the State's motion in limine during trial.

For at least seven months preceding that point, defense counsel "had every reason to develop the most powerful . . . case possible" as to medical causation and timing issues. *Wiggins*, 539 U.S. at 526.  As detailed elsewhere, their failure to do so was not the result of a lack of a plausible defense to pursue or money to fund the pursuit.  *See* Order of May 14, 2020, at 2-3; Suppl. R. & R. at 74-80, 83-86 (summarizing new medical evidence presented by Petitioner to support proposition that A.S. could not have died from actions taken by Petitioner on the date alleged by the State); Slane Aff. of Sept. 4, 2012, ¶ 4 (identifying health and development records that were in counsel's possession); Trial Ct. Order of Mar. 27, 2018, at 12 (same); Proposed FFCL at 12-14 (citing records of A.S.'s preexisting health issues and earlier falls and finding that "[e]ven if the fact-finder were to view the evidence of prior falls with a skeptical eye, it could not possibly regard A.S. as a boy in 'perfectly fine' condition until January 13, 2004"); Suppl. R. & R. at 24-29 (summarizing the funds provided to Mr. Funderburk for use on experts and investigators).[21] This was "inattention, not reasoned strategic judgment."[22]  *Wiggins*, 539 U.S. at 526; *see*

---

[21] Dr. May testified that she did not recall being specifically asked by defense counsel regarding the timing of A.S.'s injuries.  *See* Postconviction Hr'g Tr. of Jan. 22, 2015, at 51-52; *see also* Reynolds Aff. of June 4, 2012, ¶¶ 7-8.

[22] As instructed by the Tenth Circuit:

> [E]ven where an attorney pursued a particular course of action for strategic reasons, courts still consider whether that course of action was objectively reasonable, notwithstanding *Strickland*'s strong presumption in favor of upholding strategic decisions.

*also id.* at 527 ("*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision . . . . Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy.").[23]

Finally, Respondent, while not conceding deficient performance, attempts to justify Petitioner's counsel's delay and inaction by arguing that A.S.'s daycare provider, Janus Roth, misled the defense team as to her credentials and as to the extent that she would be able to assist with trial preparation. *See* Resp't's Obj. at 84-88. Ms. Roth was not an attorney of record for Petitioner and was not otherwise retained to assist in this matter, however. Under "all the circumstances," it would not have been "strategically reasonable" for defense counsel to rely upon Ms. Roth as a basis for failing to conduct their own investigation and to timely procure witnesses and evidence. *Strickland*, 466 U.S. at 691; *Saranchak v. Sec'y, Pa. Dep't of Corr.*, 802 F.3d 579, 594 (3d Cir. 2015) (finding that defense counsel's performance was deficient where, *inter alia*, the attorney failed to obtain a psychiatric evaluation or to retain a defense expert, despite "his belief that [the

---

*Bullock v. Carver*, 297 F.3d 1036, 1048 (10th Cir. 2002). "[T]he mere incantation of 'strategy' does not insulate attorney behavior from review." *Brecheen v. Reynolds*, 41 F.3d 1343, 1369 (10th Cir. 1994) (internal quotation marks omitted).

[23] Further, Respondent's suggestion that simply cross-examining the State's experts was a reasoned and reasonable strategy is seriously undermined by defense counsel's affirmative belief that "without a supporting expert or a better explanation as to how the child was injured," Petitioner "had no chance of an acquittal." Reynolds Aff. of June 4, 2012, ¶ 4; *see also id.* ¶ 8 (Mr. Reynolds stating that he does not recall defense counsel preparing any cross-examination based upon Dr. May's report); *Hinton*, 571 U.S. at 273 ("Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." (internal quotation marks omitted)).

44

defendant's] mental health was important to his case," based only upon a neutral court-appointed expert's competency determination).

As trial commenced, the defense team did not know if they would have a tenable expert and was clearly not making "strategic choices . . . after thorough investigation of law and facts." *Strickland*, 466 U.S. at 690. Their "complete lack of pretrial preparation put[] at risk both [Petitioner's] right to an ample opportunity to meet the case of the prosecution and the reliability of the adversarial testimony process." *Kimmelman*, 477 U.S. at 385 (internal quotation marks omitted). The Court agrees with the Supplemental R. and R. that the performance of Petitioner's defense counsel was deficient for the reasons outlined above.

### 2. Whether Petitioner's Counsel's Deficient Performance Was Prejudicial

The Court previously found that Petitioner "ha[s] made a . . . showing of the probability of actual innocence sufficient to permit her case to overcome the limitations bar." Order of Oct. 28, 2011, at 2-4; *accord* Order of May 14, 2020, at 2-3, 3 n.2; *see* Suppl. R. & R. at 74-80, 83-86. The Supplemental R. & R. relied on this previous finding in concluding that Petitioner had shown prejudice under *Strickland*. *See* Suppl. R. & R. at 72-90.

By making this finding, the Court held that Petitioner had shown that "a constitutional violation has probably resulted in the conviction of one who is actually innocent" and "that it is more likely than not that no reasonable juror would have convicted [her] in the light of the new evidence." *Schlup*, 513 U.S. at 327 (internal quotation marks omitted); *see id.* at 316 ("[I]f a petitioner . . . presents evidence of innocence so strong that

a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims."). The Supreme Court has explained that making this showing of actual innocence requires "a stronger showing than that needed to establish prejudice." *Id.* at 327 (citing *Strickland*, 466 U.S. at 694); *accord Demarest v. Price*, 130 F.3d 922, 942 (10th Cir. 1997).

Put differently, Petitioner already has "show[n] more than just a reasonable probability that the factfinder would have had a reasonable doubt respecting guilt." *House v. Bell*, 547 U.S. 518, 571 (2006) (Roberts, C.J., concurring in the judgment in part and dissenting in part) (omission and internal quotation marks omitted). "As this Court has already found that [Petitioner] meets the more stringent *Schlup* test, it necessarily follows that [she] also satisfies the prejudice test under *Strickland*." *Larsen v. Adams*, 718 F. Supp. 2d 1201, 1224 (C.D. Cal. 2010) (citing *Fisher v. Gibson*, 282 F.3d 1283, 1310 (10th Cir. 2002) (declining to "limit ineffective assistance to only those claims where defendant can demonstrate his innocence")). "Accordingly, for substantially the same reasons, [the Court] now hold[s] that [Petitioner] has established that, absent [her] counsel's unprofessional errors and omissions, a factfinder would have had a reasonable doubt respecting [her] guilt." *Rivas v. Fischer*, 780 F.3d 529, 551 (2d Cir. 2015).[24] "To the extent it is possible for a petitioner to make the *Schlup* actual innocence showing but nonetheless

---

[24] These reasons have been discussed by the Court at length. *See* Suppl. R. & R. at 72-80; Proposed FFCL at 2-9, 10-28; R. & R. of Dec. 12, 2019, at 9-10, 19-21.

fail to demonstrate prejudice under *Strickland*, such a possibility does not exist on the present facts," where the assistance of counsel that is the basis for habeas relief in Ground One of the Second Amended Petition is intertwined with and inseparable from the presentation of experts and evidence that established Petitioner's claim of actual innocence. *Larsen*, 718 F. Supp. 2d at 1225.

Respondent concedes the relative status of the standards but argues that the magistrate judge nonetheless erred in finding Petitioner had satisfied *Strickland*'s prejudice prong. Respondent claims that Judge Purcell, in rejecting Respondent's arguments as to the lack of credibility of Petitioner's habeas experts, improperly placed the burden upon Respondent to disprove prejudice under *Strickland* rather than requiring Petitioner to prove such prejudice. *See* Resp't's Obj. at 114-19. Relatedly, Respondent argues that the Supplemental R. & R. overlooked or ignored credibility and corroboration issues with Petitioner and her witnesses and that these issues defeat the conclusion "that Petitioner has shown a reasonable probability of a different outcome at trial." *Id.* at 106-14.

The evidence Respondent cites in support of these objections already was before the Court in connection with either its October 2011 determination of actual innocence, or its May 2020 determination of actual innocence, or both. Respondent did not seek relief from those Orders and does not here present an adequate basis for the actual-innocence determination to be revisited. *Cf.* Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion."); *id.* R. 60(b) (prescribing that "[o]n motion and just terms" a court may relieve a party from an order). Accordingly, the Court overrules these objections and concludes that Petitioner has met her burden to establish prejudice on Ground One under

*Strickland*.  *See Schlup*, 513 U.S. at 327; *Rivas*, 780 F.3d at 550-51; *Larsen*, 718 F. Supp. 2d at 1224-25.

### 3.  Harmless-Error Review

To be entitled to federal habeas corpus relief, a petitioner generally must show that the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (internal quotation marks omitted); *accord Byrd v. Workman*, 645 F.3d 1159, 1167 n.9 (10th Cir. 2011).  The Tenth Circuit has explained, however, that applying this harmless-error test "is a needless formality in the context of a *Strickland* claim, which itself demands a showing that the alleged deficiency was prejudicial." *Byrd*, 645 F.3d at 1167 n.9 (citing cases); *see also Hall v. Vasbinder*, 563 F.3d 222, 236 (6th Cir. 2009) ("The prejudice prong of the ineffective assistance analysis subsumes the *Brecht* harmless-error review.").

## CONCLUSION

The Court recognizes that Petitioner was not entitled to "perfect representation" from her defense counsel.  *Harrington v. Richter*, 562 U.S. 86, 110 (2011).  But "[a]n accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair." *Strickland*, 466 U.S. at 685.  Having reviewed the relevant record and authorities, the Court concludes that Petitioner's counsel did not fulfill that role and that Petitioner was therefore deprived of her Sixth Amendment right to the effective assistance of trial counsel.  Consistent with this conclusion, the Court determines that "law and justice require" that Petitioner be afforded a new trial.  28 U.S.C.

§ 2243; *see United States v. Bergman*, 746 F.3d 1128, 1134 (10th Cir. 2014) ("[T]he presumptively appropriate remedy for an effective assistance violation is a new trial[.]").

For the foregoing reasons, the Supplemental Report and Recommendation (Doc. No. 261) is ADOPTED as modified. The Second Amended Petition for Writ of Habeas Corpus (Doc. No. 226) is CONDITIONALLY GRANTED as to Ground One as follows:

The State of Oklahoma may commence proceedings for a new trial on the underlying charge within 90 days of the entry of this Order. Failure to commence such proceedings within 90 days shall result in this Court ordering Petitioner Beverly Michelle Moore's permanent discharge and release from all restraints and custody of the State of Oklahoma on the conviction at issue.[25]

IT IS FURTHER ORDERED that Petitioner's Request for Status Conference (Doc. No. 268) is DENIED AS MOOT.

IT IS SO ORDERED this 11th day of September, 2023.

*Charles B. Goodwin*

CHARLES B. GOODWIN
United States District Judge

---

[25] Petitioner's remaining habeas claims (Grounds Two through Five) are moot in light of this entitlement to relief and are hereby dismissed without prejudice.

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **BEVERLY MICHELLE MOORE,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **Case No. CIV-09-985-G** |
| ) | |
| **TAMIKA WHITE, Warden,** ) | |
| ) | |
| **Respondent.** ) | |

### <u>JUDGMENT</u>

In accordance with the Order issued this same date, the Second Amended Petition for Writ of Habeas Corpus (Doc. No. 226) is CONDITIONALLY GRANTED as to Ground One as follows:

The State of Oklahoma may commence proceedings for a new trial on the underlying charge within 90 days of the entry of this Order. Failure to commence such proceedings within 90 days shall result in this Court ordering Petitioner's permanent discharge and release from all restraints and custody of the State of Oklahoma on the conviction at issue.

Grounds Two through Five of the Second Amended Petition for Writ of Habeas Corpus are hereby dismissed without prejudice.

ENTERED this 11th day of September, 2023.

CHARLES B. GOODWIN
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **BEVERLY MICHELLE MOORE,** | ) | |
| | ) | |
| **Petitioner/Appellant,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-09-985-G** |
| | ) | |
| **TAMIKA WHITE, Warden,** | ) | |
| | ) | |
| **Respondent/Appellee.** | ) | |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Respondent, Tamika White, Warden of the Mabel Bassett Correctional Center, in the above-named case, hereby appeals to the United States Court of Appeals for the Tenth Circuit from the final judgment entered in this action on September 11, 2023.

Respectfully submitted,

**GENTNER F. DRUMMOND
ATTORNEY GENERAL OF OKLAHOMA**

**s/ CAROLINE E.J. HUNT**
**CAROLINE E.J. HUNT, OBA #32635**
**TESSA L. HENRY, OBA #33193**
**ASSISTANT ATTORNEYS GENERAL**
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
(405) 522-4534 (FAX)
Service address: fhc.docket@oag.ok.gov

**ATTORNEYS FOR RESPONDENT**

## CERTIFICATE OF SERVICE

**X**      I hereby certify that on September 14, 2023, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant(s):

Andrea D. Miller
Christine M. Cave

s/ CAROLINE E.J. HUNT

2