Case No. 23-6133

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

BEVERLY M. MOORE,
*Petitioner-Appellee,*
v.
TAMIKA WHITE,
*Respondent-Appellant.*

_____

OPENING BRIEF OF RESPONDENT-APPELLANT

_____

On Appeal from the United States District Court
For the Western District of Oklahoma
(D.C. No. CIV-09-985-G)
The Honorable Charles B. Goodwin, United States District Judge

_____

GENTNER F. DRUMMOND
ATTORNEY GENERAL OF OKLAHOMA

TESSA L. HENRY, OBA #33193
KEELEY L. MILLER, OBA #18389
ASSISTANT ATTORNEYS GENERAL

313 NE 21st Street
Oklahoma City, OK   73105
(405) 521-3921 (Voice)/(405) 522-4534 (Fax)
tessa.henry@oag.ok.gov
keeley.miller@oag.ok.gov

ATTORNEYS FOR RESPONDENT-APPELLANT

December 8, 2023                          ORAL ARGUMENT IS REQUESTED

BRIEF HAS ATTACHMENTS IN PDF FORMAT

# TABLE OF CONTENTS

Page

**PRIOR OR RELATED APPEALS** ..................................................................... viii

**STATEMENT OF JURISDICTION** ..................................................................2

**STATEMENT OF ISSUE PRESENTED FOR REVIEW** ...................................2

**STATEMENT OF THE CASE** ..........................................................................3

    **A.**    **Facts** ....................................................................................3

    **B.**    **Procedural History** ..........................................................11

**SUMMARY OF THE ARGUMENT** ..................................................................15

**STANDARD OF REVIEW** .................................................................................17

**ARGUMENT AND AUTHORITY** ....................................................................21

**GROUND FOR RELIEF** ....................................................................................21

    **THE FEDERAL DISTRICT COURT ERRED WHEN
IT FOUND THAT *NO* REASONABLE JURY COULD
HAVE CONVICTED MOORE OF MURDER IN LIGHT
OF HER "NEW" EVIDENCE.**

        **A.**    **Preliminary Statement on Waiver**..........................................21

        **B.**    **The FFCL's Actual-Innocence Finding** .................................24

        **C.**    **The District Court Erred in Finding Moore Passed
Through the Actual-Innocence Gateway Based on a
Battle of the Experts** ............................................................27

            *1.*    *A reasonable, properly instructed jury could have
rejected the findings and conclusions of Moore's
"new"experts and evidence and found that Moore
alone caused A.S.'s death* ..............................................28

                *a.*    *A reasonable, properly instructed jury
could have found that A.S. was "normal"
on January 13, 2004, and died of an acute
injury caused by Moore* ........................................32

i

      *b.*    *A reasonable, properly instructed jury could have rejected the theory that, based on the "scientific" findings, A.S. died of a latent injury following a lucid interval*.............................**39**

   **2.**    ***Even assuming a reasonable, properly instructed jury could have believed Moore's "new" experts and evidence, such reasonable jury could have nonetheless determined that Moore was a substantial contributing factor in A.S.'s death under Oklahoma law*** ......................................**45**

    **D.**    **Conclusion**....................................................**49**

**CONCLUSION**........................................................................**51**

**STATEMENT OF ORAL ARGUMENT** ...............................**51**

**CERTIFICATE OF COMPLIANCE** ...................................**52**

**CERTIFICATE OF SERVICE** ............................................**52**

**CERTIFICATE OF DIGITAL SUBMISSION**......................**52**

**ATTACHMENTS**

   **1.**    **Doc. 135 – Proposed Findings of Facts and Conclusions of Law: Timeline of the Petition, United States District Court for the Western District of Oklahoma, CIV-09-985-G**

   **2.**    **Doc. 139 – Order, United States District Court for the Western District of Oklahoma, CIV-09-985-G**

   **3.**    **Doc. 162 – Report and Recommendation: Exhaustion Issue, United States District Court for the Western District of Oklahoma, CIV-09-985-G**

   **4.**    **Doc. 182 – Order, United States District Court for the Western District of Oklahoma, CIV-09-985-G**

   **5.**    **Doc. 244 – Report and Recommendation, United States District Court for the Western District of Oklahoma, CIV-09-985-G**

6. **Doc. 248 – Order, United States District Court for the Western District of Oklahoma, CIV-09-985-G**

7. **Doc. 261 – Supplemental Report and Recommendation, United States District Court for the Western District of Oklahoma, CIV-09-985-G**

8. **Doc. 269 – Order, United States District Court for the Western District of Oklahoma, CIV-09-985-G**

9. **Doc. 270 – Judgment, United States District Court for the Western District of Oklahoma, CIV-09-985-G**

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abney v. United States*,
  431 U.S. 651 (1977)................................................................................23

*Anderson v. Att'y Gen. of Kansas*,
  425 F.3d 853 (10th Cir. 2005)...........................................................18

*Case v. Hatch*,
  731 F.3d 1015 (10th Cir. 2013)...........................................................20

*Cook v. Kernan*,
  948 F.3d 952 (9th Cir. 2020)...............................................................25

*Darks v. Mullin*,
  327 F.3d 1001 (10th Cir. 2003)............................................................2

*Diestel v. Hines*,
  506 F.3d 1249 (10th Cir. 2007)...........................................................40

*Flores v. Dir.*, TDCJ-CID,
  No. 6:12CV1000, 2016 WL 1253664 (E.D. Tex. Mar. 7, 2016) .....................43

*Fontenot v. Crow*,
  4 F.4th 982 (10th Cir. 2021) ................................................ 17, 18, 20, 28, 49, 50

*Greer v. Dowling*,
  947 F.3d 1297 (10th Cir. 2020)...........................................................23

*House v. Bell*,
  547 U.S. 518 (2006)........................................................ 18, 20, 24, 36

*Jones v. Taylor*,
  763 F.3d 1242 (9th Cir. 2014)...........................................................36

*Kell v. Benzon*,
  925 F.3d 448 (10th Cir. 2019)...........................................................24

*Lomax v. Dir.*, TDCJ-CID,
   No. 6:18CV583, 2020 WL 6298105 (E.D. Tex. Aug. 24, 2020).........................43

*Maes v. Thomas*,
   46 F.3d 979 (10th Cir. 1995).............................................................................17

*McCray v. Vasbinder*,
   499 F.3d 568 (6th Cir. 2007)..............................................................................37

*McQuiggin v. Perkins*,
   569 U.S. 383 (2013)....................................................................... 16, 20, 27, 28

*Mickles on behalf of herself v. Country Club Inc.*,
   887 F.3d 1270 (11th Cir. 2018)..........................................................................21

*Pacheco v. El Habti*,
   62 F.4th 1233 (10th Cir. 2023) ..........................................................................49

*Postelle v. Carpenter*,
   901 F.3d 1202 (10th Cir. 2018)..........................................................................40

*Schlup v. Delo*,
   513 U.S. 298 (1995).................................. 16, 18, 19, 20, 21, 27, 28, 36, 49, 50

*Shelby v. Cain*,
   No. 1:21-CV-406-HSO-RPM, 2023 WL 2567370
   (S.D. Miss. Feb. 7, 2023) ..................................................................................43

*Stern v. Schriro*,
   No. CV0600016TUCDCBJR, 2016 WL 11431554
   (D. Ariz. Aug. 2, 2016) ......................................................................................43

*Strickland v. Washington*,
   466 U.S. 668 (1984)................................. 3, 15, 17, 18, 20, 22, 24, 40, 49, 50, 51

*Sutton v. Bell*,
   No. 3:06-CV-388, 2011 WL 1225891 (E.D. Tenn. Mar. 30, 2011) ...................44

*Taylor v. Powell*,
   7 F.4th 920 (10th Cir. 2021) ...................................................... 19, 20, 40, 50

*United States v. Melton*,
   861 F.3d 1320 (11th Cir. 2017)............................................................**23**

*United States v. Oliver*,
   278 F.3d 1035 (10th Cir. 2001)............................................................**40**

*United States v. One Parcel of Real Prop.*,
   73 F.3d 1057 (10th Cir. 1996)............................................................**22**

*Vitamins Online, Inc. v. Heartwise, Inc.*,
   71 F.4th 1222 (10th Cir. 2023) ............................................................**23**

## STATE CASES

*Chase v. State*,
   382 P.2d 457 (Okla. Crim. App. 1963) ...................................... **46, 47**

*City of Enid v. Crow*,
   316 P.2d 834 (Okla. 1957)...................................................................**43**

*Day v. State*,
   303 P.3d 291 (Okla. Crim. App. 2013) ................................. **40, 41, 44**

*Kennedy v. State*,
   839 P.2d 667 (Okla. Crim. App. 1992) ...............................................**35**

*Ryder v. State*,
   83 P.3d 856 (Okla. Crim. App. 2004) .................................................**40**

*Wofford v. State*,
   584 P.2d 227 (Okla. Crim. App. 1978) ...............................................**47**

## STATUTES

28 U.S.C. § 2244.................................................................................. **12, 21**

28 U.S.C. § 1291....................................................................................**2, 24**

28 U.S.C. § 2253....................................................................................**2, 24**

# **RULES**

**10th Cir. R. 28.1** ................................................................................2

**Fed. R. App. P. 4**................................................................................2

**Fed. R. App. P. 22**.............................................................................2

## <u>PRIOR OR RELATED APPEALS</u>

There are no prior or related appeals.

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| **BEVERLY MICHELLE MOORE,** | ) | |
| | ) | |
| **Petitioner/Appellee,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 23-6133** |
| | ) | |
| **TAMIKA WHITE, Warden,** | ) | |
| | ) | |
| **Respondent/Appellant.** | ) | |

## <u>OPENING BRIEF OF APPELLANT/RESPONDENT</u>

The United States District Court for the Western District of Oklahoma ("District Court") determined that Appellee/Petitioner Beverly Michelle Moore ("Moore") had demonstrated a gateway claim of actual innocence sufficient to overcome the statute of limitations under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") on October 28, 2011 (Attachment 1, 09/07/2011 Findings of Fact and Conclusions of Law; Attachment 2, 10/28/2011 Order). Subsequently, however, the District Court agreed that Moore should return to state court to exhaust her unexhausted federal claims (Attachment 3, 02/10/2012 Report and Recommendation ("R&R"); Attachment 4, 04/06/2012 Order). Upon Moore's return to federal court, on September 11, 2023, the District Court ultimately granted Moore a conditional writ of habeas corpus (Attachment 5, 12/12/2019 R&R; Attachment 6, 05/14/2020 Order; Attachment 7, 03/22/2021, Supplemental R&R; Attachment 8,

9/11/2023 Order; Attachment 9, 09/11/23 Judgment).[1] Respectfully, Appellant/Respondent Tamika White ("White") contends the District Court erred in determining Moore met the actual-innocence gateway and later granting Moore conditional habeas relief. As such, the District Court's actual-innocence finding, as well as its subsequent conditional grant of habeas relief to Moore, must be reversed.

## STATEMENT OF JURISDICTION

The District Court, on September 11, 2023, issued an Order and Judgment in Case No. CIV-09-985-G, conditionally granting Moore habeas corpus relief (Attachments 8-9). On September 14, 2023, White filed a Notice of Appeal (App. Vol. XIV, 3740-41). On September 29, 2023, this Court received a notice of completion of the record from the District Court. This Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1291, 2253, as well as Fed. R. App. P. 4(a) and Fed. R. App. P. 22(b)(3). *See Darks v. Mullin*, 327 F.3d 1001, 1004 & n.1 (10th Cir. 2003).

## STATEMENT OF ISSUE PRESENTED FOR REVIEW

Whether the District Court, in finding Moore demonstrated actual innocence sufficient to overcome the AEDPA's time bar (and, later, to overcome her procedural

---

[1] White will refer to the Appendix as "App. Vol. __, __." *See* 10th Cir. R. 28.1(A)(1). To avoid repetition, White omitted exhibits or attachments from certain filings within the Appendix and noted such omission in the table of contents accompanying each volume of the Appendix.

defaults and meet *Strickland*'s[2] prejudice prong), erred in finding it more likely than not that *no* reasonable jury could have convicted Moore of murder in light of her "new" evidence and experts.

<u>**STATEMENT OF THE CASE**</u>

**A.    Facts:**

In January 2004, Todd Snyder and his twenty-two-month-old son, A.S., lived in Oklahoma City with Mr. Snyder's girlfriend, Moore, and her young son, A.M. (App. Vol. I, 137-40). Tuesday, January 13, 2004, was a fairly normal day for Mr. Snyder and A.S.—the pair woke up, Mr. Snyder fed A.S. breakfast, and then the pair watched "Nemo" together and fell asleep on Mr. Snyder's recliner (App. Vol. I, 141). Other than being a bit sleepy, A.S. "was playing and being relatively normal" (App. Vol. I, 142). Then, that afternoon, Moore prepared spaghetti for Mr. Snyder and A.S., and A.S. took a short nap after lunch (App. Vol. I, 141, 156-57). At some point, Moore placed a call to her credit card company, "was arguing back and forth with them," "was rather upset with them," and "raised her voice a couple of times" (App. Vol. I, 141-42, 153). Meanwhile, Mr. Snyder and A.S. played with some "Hot Wheels," and Mr. Snyder changed A.S.'s diaper and playfully blew raspberries on A.S.'s stomach (App. Vol. I, 179). After Moore's phone call, Mr. Snyder left to pawn a lawnmower at a local pawnshop (App. Vol. I, 141-45, 157-58, 165). As Mr. Snyder

---

[2] *Strickland v. Washington*, 466 U.S. 668 (1984).

got into the car to leave, he saw A.S. "looking out the window crying his eyes out" because A.S. wanted to go to the shop with Mr. Snyder[3] (App. Vol. I, 144, 159, 181).

While Mr. Snyder was gone, A.S. collapsed. Moore called 911 and told the dispatcher that her boyfriend's "eighteen-month-old" son threw a "fit" and threw himself backward on the kitchen floor—she explained that he had a bump on the back of his head, was in "a daze," and was "sort of" breathing (App. Vol. IV, 925 at 0:00:12-0:01:55). Moore asked the dispatcher if she needed to "do anything," and the dispatcher told her to stay on the phone (App. Vol. IV, 925 at 0:00:12-0:01:55). When first responders arrived, A.S. was attempting to breathe but could not draw breath (App. Vol. I, 193-94). A.S. had blood coming from his nose and in his throat, uneven pupils, and "a small amount" of blood on his sleeve (App. Vol. I, 197, 200, 217-18, 230, 243). A.S. appeared "lifeless," and he had blue lips with a pale face (App. Vol. I, 194, 230). The first responders immediately began life-saving measures (App. Vol. I, 194-204, 232-34). Moore told the first responders that A.S. had been throwing a tantrum when his father left, "as usual," and "threw himself down on the floor striking his head" (App. Vol. I, 210, 230-31, 261-62). At no time did Moore

---

[3] A.S. did not like Mr. Snyder to leave him, and he always cried when Mr. Snyder left—Mr. Snyder had always thought this was simply separation anxiety on A.S.'s part (App. Vol. I, 141). A.S. had been "off playing" when Mr. Snyder tried to slip out to leave for the pawnshop that day, but apparently A.S. noticed Mr. Snyder leave and was very upset (App. Vol. I, 165).

tell the first responders she had performed CPR on A.S.[4] (App. Vol. I, 210-11, 235-36, 261-62). One first responder observed that Moore was "stoic and nonchalant" and "didn't really seem to care at that point" (App. Vol. I, 266, 270, 293).

Mr. Snyder returned to the house about thirty to forty-five minutes after leaving for the pawnshop (App. Vol. I, 145). When he arrived, he saw an ambulance and a fire truck parked in front of his house, along with an empty gurney (App. Vol. I, 145). After rushing inside the house, "beside himself" with panic, Mr. Snyder saw A.S. lying on the floor unconscious, with blood on his mouth, and surrounded by first responders (App. Vol. I, 146, 170, 232-33, 263-65). Moore was walking around crying and "repeating over and over again, 'I'm sorry, I'm sorry, I am so sorry'" (App. Vol. I, 146, 168). At some point, Moore relayed to Mr. Snyder that A.S. cried when Mr. Snyder left and could not be consoled despite Moore's attempts to hold and comfort him (App. Vol. I, 146-47, 168). Moore explained that she put A.S. on the floor and told him to go play with his toys—A.S. walked out of Moore's sight into the kitchen, and Moore heard A.S. "hit the floor" (App. Vol. I, 146-49). Moore also told Mr. Snyder that she tried to give A.S. "mouth to mouth" (App. Vol. I, 185).

Shortly thereafter, the paramedics loaded A.S. into the ambulance and took him to the hospital (App. Vol. I, 147, 233-35). After the ambulance departed, Moore

---

[4] She did, however, tell the police and hospital staff that she performed CPR (App. Vol. II, 304-06, 327-28, 413).

did not want to accompany Mr. Snyder to the hospital, stating, "You know how they take people to jail for stupid shit like this" (App. Vol. I, 147-48, 171). Moore lamented that "she didn't want to never see her son [A.M.] again" (App. Vol. I, 147-48). Before leaving for the hospital, Moore also decided to change clothes, as she had A.S.'s blood on her shirt (App. Vol. I, 148). As Mr. Snyder and Moore drove to the hospital, Moore kept telling Mr. Snyder that she was sorry (App. Vol. I, 148-49). Meanwhile, in the ambulance, A.S.'s condition deteriorated, and his heart stopped beating; however, as the ambulance arrived at the hospital, paramedics were able reestablish A.S.'s pulse via life-saving measures (App. Vol. I, 204-08, 234-37).

Upon arrival at the hospital, it was immediately clear that A.S.'s condition was extremely serious (App. Vol. I, 149-50). In fact, according to Mr. Snyder, although he wanted to believe that A.S. would survive, he knew "in [his] heart" that A.S. was going to die (App. Vol. I, 149). Indeed, emergency room doctors soon discovered that A.S. had extensive and severe bilateral retinal and vitreous hemorrhages in his eyes, a partially detached retina in his right eye, and massive brain swelling and bleeding on the brain (App. Vol. II, 403-07, 434-35, 492-93, 497-500, 502-04, 507-10, 524). When doctors inquired about A.S.'s health history, Mr. Snyder and Moore explained that, other than some bouts of diarrhea, A.S. "was a well[-]functioning, well developed two-year old" and "was a very well and healthy child" (App. Vol. II, 410-12). Mr. Snyder and Moore denied that A.S. had been

6

acting abnormally that day; rather, he seemed "totally normal" and in his "usual state of health" before Mr. Snyder left (App. Vol. II, 411-14). A.S. had not been vomiting, confused, or unsteady that day, and there had been "no concerns or unusual behavior" in the period preceding his collapse[5] (App. Vol. II, 411-14).

First responders and emergency room doctors were skeptical, however, about Moore's account that A.S.'s deteriorating state stemmed from a tantrum on the kitchen floor, and they suspected A.S.'s symptoms could be attributable to abusive head trauma (App. Vol. I, 238, 275-76; App. Vol. II, 307-09, 404-05, 412-36, 510-15). Ultimately, hospital staff called 911 to report potential child abuse, and police were summoned to the hospital—the police spoke separately to Mr. Snyder and Moore at the hospital, and Moore was acting very "withdrawn" at this point in time (App. Vol. I, 149-50, 297-99; App. Vol. II, 300-08, 314-15, 437; App. Vol. IV, 925 at 0:01:50-0:03:05). The couple was then taken in separate cars to the police station, where they were questioned in separate rooms by detectives (App. Vol. I, 150-51, 173; App. Vol. II, 309-10, 536-44).

During Moore's interview with detectives, Moore initially repeated her story about A.S. being inconsolable and eventually throwing himself on the floor in the kitchen (App. Vol. IV, 922 at 0:24:00-29:00). When the detectives confronted

---

[5] Indeed, at trial, Moore testified that A.S. seemed "fine" that day and was not acting unusual (App. Vol. III, 724).

Moore with the fact that A.S.'s doctors seemed to agree that A.S.'s injuries could not have been caused by a simple fall, Moore insisted that she did nothing wrong and that she "love[d]" A.S. (App. Vol. IV, 922 at 0:29:00-0:42:00). After a few minutes, however, Moore admitted what really happened: A.S. "threw a fit" after Mr. Snyder left, and would not calm down, even when Moore held him (App. Vol. IV, 922 at 0:41:30-0:42:30). Moore sent A.S. to his room, where he continued to cry inconsolably (App. Vol. IV, 922 at 0:42:15-0:42:40). Moore eventually went into A.S.'s room and told him to stop crying—"he didn't stop" (App. Vol. IV, 922 at 0:42:30-0:43:15). When he did not do so, Moore shook him "three or four times" by the shoulders against the floor, causing A.S.'s head to hit the floor more than once (App. Vol. IV, 922 at 0:43:10-0:45:40, 0:46:00-0:47:40, 0:49:00-0:52:15).

After shaking him, Moore laid A.S. in his crib, and she went back into the living room (App. Vol. IV, 922 at 0:46:10-0:47:00). A.S. was finally quiet (App. Vol. IV, 922 at 0:47:10-0:47:20). However, Moore soon returned to A.S.'s room to find A.S.'s "jaw [] clenched and his tongue [] sticking out" (App. Vol. IV, 922 at 0:45:00-0:45:15). Moore "freaked out," and at that point she realized she had shaken him too hard (App. Vol. IV, 922 at 0:45:10-0:45:40, 0:49:30-0:49:50). Throughout her interview, Moore never inquired about A.S.'s condition (*see generally* App. Vol. IV, 922). She did, however, ask about seeing her own son, and stated that she did not want his father to have custody of him (App. Vol. IV, 922 at 0:38:00-0:40:00,

0:52:45-0:55:15). She also asked, "What's going to happen to me?" and, "Am I ever going to get out of jail?" (App. Vol. IV, 922 at 0:53:00-0:54:00, 0:57:40-0:58:00). Moore further inquired if she would be segregated at the Oklahoma County Jail, since she was a former reserve deputy sheriff, and she asked about getting her belongings from Mr. Snyder's house and money from her bank account (App. Vol. IV, 922 at 0:54:00-0:54:30, 0:58:00-0:58:40, 0:59:45-1:00:15).

After Mr. Snyder and Moore were interviewed, Mr. Snyder was released to return to the hospital, where he spent the last few hours of A.S.'s life by his side (App. Vol. I, 150-52). Ultimately, A.S. was declared brain dead, and Mr. Snyder and A.S.'s mother had to make the difficult decision to remove A.S. from life support (App. Vol. I, 152; App. Vol. II, 431-36). As A.S. died, Mr. Snyder and A.S.'s mother held A.S. in their arms (App. Vol. I, 152). A.S. died on January 14, 2004 (App. Vol. II, 435-36).

During A.S.'s autopsy, the forensic pathologist discovered bruises on A.S.'s face, the back of his head (only visible after shaving A.S.'s hair), and on his right knee (App. Vol. III, 599). Upon reflecting A.S.'s scalp, the pathologist noted a small "subscapular" bruise on A.S.'s temple and a "major injury" to the back of A.S.'s head, near the left side midline (App. Vol. III, 600-01). Specifically, A.S. had a subgaleal hemorrhage (bleeding between the skin and scalp) on the back of his head (App. Vol. III, 601-06). After opening A.S.'s skull, the pathologist discovered

massive edema (swelling) of A.S.'s brain, along with a subarachnoid hemorrhage and a subdural hematoma on the back of his head (App. Vol. III, 607-13). A.S.'s injuries were "violent" (App. Vol. III, 611). In addition to the head injuries, the pathologist discovered "extensive" bilateral retinal hemorrhaging in A.S.'s eyes (App. Vol. III, 614-15). In A.S.'s abdomen, the pathologist discovered periserosal mesenteric hemorrhaging of the duodenum (portion of the small intestine connected to the stomach), which could have been caused by "forceful" trauma of this membrane "against the backbone" (App. Vol. III, 614-19). The tip of A.S.'s tongue also had a red contusion (App. Vol. III, 620). As a result of these injuries, the forensic pathologist concluded that the cause of death was blunt force head trauma, and the manner of death was "child abuse, homicide" (App. Vol. III, 621-22).

At trial, Moore recanted her confession to child abuse, claimed that she never did anything to harm A.S., and returned to her previous story about A.S. falling in the kitchen (App. Vol. III, 650-87). She also explained that she had been trained in "child CPR" and performed CPR on A.S. (App. Vol. III, 663-64, 707-10, 715-16). Further, she claimed that she repeatedly apologized to Mr. Snyder because the CPR had been unsuccessful, and that she only confessed to abusing A.S. because she wanted Mr. Snyder to be able to go back to the hospital to be with A.S.—she testified that she parroted back the details of her confession based on what the detectives told her (App. Vol. III, 650-87, 693, 719-22). Moore also pointed the finger at Mr.

10

Snyder, and she claimed he must have done something to hurt A.S. before leaving for the pawnshop (App. Vol. III, 690-93, 737). At the close of Moore's trial, however, the jury rejected Moore's recantation and found her guilty of causing A.S.'s death (App. Vol. III, 876-78). Additional facts will be discussed as necessary.

## B.    Procedural History:

On September 16, 2005, Moore's jury found her guilty of Murder in the First Degree in Oklahoma County District Court, Case No. CF-2004-351, and the state district court subsequently sentenced Moore to life imprisonment *without* the possibility of parole (App. Vol. IV, 1056-58). On June 11, 2007, the Oklahoma Court of Criminal Appeals ("OCCA") affirmed Moore's conviction on direct appeal, in OCCA Case No. F-2006-63, but modified her sentence to life imprisonment *with* the possibility of parole due to an instructional error (App. Vol. IV, 1163-70; App. Vol. X, 2652-54). On September 26, 2008, Moore filed her first Application for Post-Conviction Relief in state district court, raising a single proposition of error[6] (App. Vol. IV, 1171-73). On October 23, 2008, however, the state district court denied Moore's post-conviction application (App. Vol. IV, 1175-78). On January 16, 2009, Moore filed a "Petition in Error" in OCCA Case No. HC-2009-33, effectively challenging the state district court's denial of post-conviction relief (App. Vol. IV,

---

[6] Moore also filed this same document, on September 9, 2008, in OCCA Case No. PC-2008-844; however, the OCCA dismissed the action (App. Vol. IV, 1174).

1179-86). On March 9, 2009, the OCCA declined jurisdiction for Moore's failure to follow the OCCA's Rules and dismissed the appeal (App. Vol. IV, 1187-89).

On September 4, 2009, Moore filed a Petition for Writ of Habeas Corpus in the United States District Court for the Western District of Oklahoma, raising a claim of ineffective assistance of counsel (App. Vol. IV, 1190-96; App. Vol. V, 1197-99). However, Moore was later granted permission to file an Amended Petition, which she filed on February 2, 2010 (App. Vol. V, 1211-81). On February 23, 2010, White filed a Motion to Dismiss the Amended Petition under 28 U.S.C. § 2244(d) on the ground that the Amended Petition was untimely[7] (App. Vol. V, 1282-96). The United States Magistrate Judge ultimately recommended denial of this Motion to Dismiss on September 7, 2011,[8] and this recommendation was adopted by the District Court over White's objection, on October 28, 2011, on the basis that Moore "had made a sufficient showing of the probability of actual innocence sufficient to permit her case to overcome the [time] limitations bar" (App. Vol. IX, 2328-92; App. Vol. X, 2393-2408, 2507-10). White then moved, on January 20, 2012, to dismiss

---

[7] White had also earlier filed, on October 30, 2009, a request to dismiss the original Petition (App. Vol. V, 1200-09).

[8] This ruling came after a year and a half of litigation, including the Magistrate Judge's appointment of counsel to Moore, court funds for expert witnesses for Moore, requests for discovery and an evidentiary hearing, subpoenas for documents and information, various hearings and oral arguments before the Magistrate Judge, and extensive expansion of the record (App. Vol. I, 3-12).

the Amended Petition as unexhausted or to hold the proceedings in abeyance (App. Vol. X, 2511-26). The Magistrate Judge recommended denial of White's request on February 10, 2012; however, the District Court, on April 6, 2012, declined to adopt this recommendation, granted White's request, and administratively closed this case to allow Moore time to exhaust her ineffectiveness claim in light of her alleged newly discovered evidence (App. Vol. X, 2575-82, 2618-20).

On June 5, 2012, Moore proceeded to state district court and filed a Second Application for Post-Conviction Relief, alleged six propositions of error, and was ultimately afforded an evidentiary hearing that spanned more than twenty days (App. Vol. X, 2621-51). At the close of the evidentiary hearing, the State and Moore entered into a Joint Statement of Procedural History concerning the evolution of the case (App. Vol. X, 2655-64). Thereafter, the state district court, on March 27, 2018, entered an Order Denying Application for Post-Conviction Relief (App. Vol. X, 2665-91; App. Vol. XI, 2692-94). Moore appealed the state district court's denial of post-conviction relief in OCCA Case No. PC-2018-403, but the OCCA ultimately affirmed the denial of post-conviction relief on October 12, 2018, by finding Moore's claims procedurally barred under state law (App. Vol. XI, 2695-2789).

Subsequently, the federal habeas proceedings resumed, and Moore filed a Second Amended Petition for Writ of Habeas Corpus and Brief in Support on April 19, 2019, raising six grounds of error (App. Vol. XI, 2790-2896). On July 18, 2019,

White filed a Response to Second Amended Petition for Writ of Habeas Corpus, asserting that Moore's claims were partially unexhausted and all procedurally barred (App. Vol. XI, 2897-2990; App. Vol. XII, 2991-3015). However, on December 12, 2019, the Magistrate Judge recommended that White's procedural arguments be rejected on the basis of Moore's claim of actual innocence; the Magistrate Judge further recommended that White be ordered to respond to the merits of Moore's claims (App. Vol. XII, 3039-60). On May 14, 2020, over the objection of Moore, the District Court adopted the Magistrate Judge's recommendations (App. Vol. XII, 3093-97). White filed a Supplemental Response to Second Amended Petition for Writ of Habeas Corpus on June 15, 2020, and, while maintaining that Moore's claims were untimely (or unexhausted and procedurally barred), responded on the merits to Moore's claims (App. Vol. XII, 3098-3252).

On March 22, 2021, the Magistrate Judge recommended granting habeas relief as to ground one (ineffective assistance of counsel) of Moore's Second Amended Petition (App. Vol. XIII, 3426-3516). In so doing, the Magistrate Judge based the prejudice finding on the previous actual-innocence finding from 2011 (App. Vol. XIII, 3497-3514). On September 11, 2023, over White's objection, the District Court adopted the Magistrate Judge's recommendation and granted Moore a conditional writ of habeas corpus (App. Vol. XIII, 3517-88; App. Vol. XIV, 3589-3636, 3690-3739). The District Court ordered that Moore be released or that retrial

proceedings be initiated within ninety days of its Order (App. Vol. XIV, 3738). However, White subsequently sought and received a stay of this Order pending the outcome of White's appeal (App. Vol. XIV, 3742-71, 3827-32). White has now fully perfected her appeal of the District Court's decision to this Court.

## SUMMARY OF THE ARGUMENT

"I shook him" (App. Vol. IV, 922 at 0:44:00-0:44:15). Those were the words of Moore less than an hour into her interview with detectives. Following that statement, Moore went on to admit to repeatedly shaking little A.S. and hitting his head against his bedroom floor multiple times before placing him in his crib to suffer alone (App. Vol. IV, 922 at 0:43:10-0:45:40, 0:46:00-0:47:40, 0:49:00-0:52:15). It was against this backdrop that the District Court nevertheless embraced an actual-innocence claim—supported by affidavits from interested parties and expert witnesses with histories[9] of undermining the diagnosis of abusive head trauma—raised by Moore years after trial.

By finding that Moore met the actual-innocence gateway in this case, the District Court erred, and that error permeated the remainder of the proceedings below—eventually leading the District Court to finding *Strickland*, 466 U.S. at 694,

---

[9] *See generally* Joëlle Anne Moreno & Brian Holmgren, *The Supreme Court Screws Up the Science: There Is No Abusive Head Trauma/Shaken Baby Syndrome "Scientific" Controversy*, 2013 Utah L. Rev. 1357, 1376-77, 1396-98, 1408-14 & nn.73, 75, 76, 159, 161, 213, 217 (2013) (listing several of Moore's expert witnesses as frequent defense witnesses).

15

*prejudice* on this basis. Not only did the District Court substitute its own judgment for that of a reasonably and properly instructed jury when analyzing Moore's actual-innocence claim, but it also ignored the fact that a classic battle of the experts does not sufficiently rise to the level of actual innocence under *Schlup v. Delo*, 513 U.S. 298 (1995), and *McQuiggin v. Perkins*, 569 U.S. 383 (2013). In so doing, the District Court erred in two main ways.

*First*, the District Court failed to appreciate that a reasonable jury could have accepted the State's experts' opinions that A.S. immediately collapsed following acute trauma inflicted by Moore when she repeatedly shook him and hit his head against the floor. A reasonable, properly instructed jury could have accepted the State's experts' findings that A.S. was a fairly normal and relatively healthy child in the days leading up to his collapse on January 13, 2004, while also rejecting Moore's newly proffered evidence that A.S. allegedly suffered from head trauma from multiple short-distance falls, poor health, and significant developmental delays. Moreover, a reasonable, properly instructed jury *also* could have believed the State's experts' opinions as to the timing of A.S.'s injury rather than Moore's newly proffered "scientific" evidence—indeed, such a jury would not have been bound to accept Moore's evidence merely because it was "scientific" and offered by experts.

*Second*, the District Court failed to consider that—*even if* a reasonable jury was *bound* to accept Moore's evidence regarding prior falls, old injuries, and poor

16

health—a reasonable, properly instructed jury could have nonetheless found that Moore was a *substantial factor* in bringing about A.S.'s death under Oklahoma law. In other words, based upon the opinions of some of Moore's experts, a reasonable jury could have determined that Moore's abuse of A.S. aggravated preexisting injuries and caused or accelerated A.S.'s death—by repeatedly shaking A.S. and hitting his head against the floor, Moore caused A.S.'s rapid decline.

Ultimately, the District Court erred in finding it more likely than not that *no* reasonable, properly instructed jury would have convicted Moore in light of the trial evidence and Moore's newly proffered evidence. Moreover, the District Court likewise erred in basing its *Strickland* prejudice determination—in other words, a reasonable probability of a different result had Moore's counsel offered this "new" evidence at trial—on this alleged evidence of actual innocence. Accordingly, White is entitled to relief, and reversal of the District Court's conditional grant of habeas relief is required.

## STANDARD OF REVIEW

A claim of actual innocence, or a fundamental miscarriage of justice, is a mixed question of law and fact. *Fontenot v. Crow*, 4 F.4th 982, 1034 (10th Cir. 2021). "A determination of a mixed question of fact and law carries no presumption of correctness and is to be reviewed de novo on federal habeas review." *Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir. 1995). Likewise, a claim of ineffective

assistance under *Strickland* is a mixed question of fact and law and is to be reviewed *de novo*. *Anderson v. Att'y Gen. of Kansas*, 425 F.3d 853, 858 (10th Cir. 2005). For purposes of *Strickland*'s prejudice prong, a petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

As for actual innocence, in connection with the lack of the presumption of correctness, a district court's findings as to actual innocence do not "tie [the] hands" of this Court whatsoever:

> Deference is given to a trial court's assessment of evidence presented to it in the first instance. Yet the *Schlup* inquiry, we repeat, requires a holistic judgment about "'all the evidence,'" 513 U.S., at 328, 115 S.Ct. 851 (quoting Friendly, *supra*, at 160), and its likely effect on reasonable jurors applying the reasonable-doubt standard. As a general rule, the inquiry does not turn on discrete findings regarding disputed points of fact, and "[i]t is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses," 513 U.S., at 329, 115 S.Ct. 851.

*House v. Bell*, 547 U.S. 518, 539-40 (2006) (quoting *Schlup*, 513 U.S. at 328-29). The reasoning of *House* "indicates that *little to no deference* should be given to the application by federal habeas courts of '*Schlup*'s predictive standard regarding whether reasonable jurors would have reasonable doubt.'" *Fontenot*, 4 F.4th at 1034 (emphasis added) (quoting *House*, 547 U.S. at 540).

18

Importantly, in order to pass through the actual-innocence gateway, a petitioner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 329. This "does not merely require a showing that a reasonable doubt exists in the light of the new evidence," but rather that it is more likely than not that "no reasonable juror would have found the defendant guilty." *Id.* As such, "[i]t is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* "Thus, a petitioner does not meet the threshold requirement unless he [or she] persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him [or her] guilty beyond a reasonable doubt." *Id.*

When applying this standard, it must be presumed that a reasonable juror would both "consider fairly all of the evidence presented" and "conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." *Id. See also Taylor v. Powell*, 7 F.4th 920, 927 (10th Cir. 2021) ("This standard requires courts to engage in a counterfactual analysis, determining whether a jury confronted with all the evidence now known would still have convicted the petitioner of the crime charged."). Indeed, "the question must be what a jury would do with the new

evidence, not what [this Court] would do." *Taylor*, 7 F.4th at 938. That also includes not speculating about whether Moore "may have drawn a particularly lenient jury." *Id.* For this reason, the *Schlup* standard is demanding and "by no means easy for a petitioner to meet"; indeed, the *Schlup* standard should be rarely used and only be found satisfied where there is new "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial . . . ." *Fontenot*, 4 F.4th at 1031 (internal quotation marks omitted) (quoting *McQuiggin*, 569 U.S. at 401; *Case v. Hatch*, 731 F.3d 1015, 1036 (10th Cir. 2013)).

Now, considering the above, this Court must "rewind the tape" nearly twenty years and "determine what 'reasonable, properly instructed jurors' would have done in light of all the evidence—including [Moore]'s newly proffered evidence—in this alternate universe." *Taylor*, 7 F.4th at 938 (quoting *Schlup*, 513 U.S. at 329). This Court should "apply the actual innocence gateway only if it is 'more likely than not' that these jurors 'would have reasonable doubt' about whether" Moore murdered A.S. *Id.* (quoting *House*, 547 U.S. at 538). Furthermore, this Court must determine whether that same evidence of actual innocence, had counsel presented it at trial, would have led to a reasonable probability of a different result. *Strickland*, 466 U.S. at 694. Otherwise, this Court should find the District Court erred and reverse.

## ARGUMENT AND AUTHORITY

### GROUND FOR RELIEF

**THE FEDERAL DISTRICT COURT ERRED WHEN IT FOUND THAT *NO* REASONABLE JURY COULD HAVE CONVICTED MOORE OF MURDER IN LIGHT OF HER "NEW" EVIDENCE.**

The Magistrate Judge's September 7, 2011, Findings of Fact and Conclusions of Law ("FFCL"), and the District Court's subsequent October 28, 2011, Order adopting the same—which embraced Moore's actual-innocence claim to overcome the AEDPA's time bar—were in error and permeated the remainder of the proceedings below. Contrary to the FFCL's findings, a reasonable jury could have concluded that A.S.'s death resulted from acute injuries intentionally inflicted by Moore (App. Vol. IX, 2355 ("the jury would have had no basis to find that Ms. Moore had done anything to cause the boy's death")). In other words, Moore did not demonstrate that it was more likely than not that "no reasonable juror would have found [her] guilty." *Schlup*, 513 U.S. at 329. White is entitled to relief.

A.    **Preliminary Statement on Waiver:**

White is challenging the District Court's actual-innocence finding utilized to overcome § 2244(d)'s time bar and, later, the state procedural bars applicable to Moore's claims, as well as the related prejudice finding on Moore's ineffective-assistance claim (*see* Attachments 1-8). *See Mickles on behalf of herself v. Country Club Inc.*, 887 F.3d 1270, 1279 (11th Cir. 2018) (final order typically draws into

21

question all prior orders). To the extent Moore may argue that White has waived or abandoned her ability to challenge this gateway actual-innocence finding or the related prejudice finding under *Strickland*,[10] such assertion would be incorrect. *First*, White objected to the FFCL that initially found the actual-innocence gateway fulfilled (App. Vol. IX, 2363-92; App. Vol. X, 2393-2408); White re-urged the time bar and procedural bars in responding to Moore's Second Amended Petition (App. Vol. XI, 2897-2990; App. Vol. XII, 2991-3015); White, in later responding to the merits of the Second Amended Petition, maintained that Moore's claims were untimely and unexhausted or otherwise procedurally barred (App. Vol. XII, 3114); and White objected to the Supplemental R&R that repeated the actual-innocence finding and relied upon that actual-innocence finding to fulfill *Strickland*'s prejudice prong (App. Vol. XIV, 3619-30). *See United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

*Second*, the only time White did not, in the strictest of terms, object to a ruling on actual innocence was when the Magistrate Judge recommended denying the state procedural bar arguments within White's initial Response to the Second Amended Petition (App. Vol. XII, 3039-60). Rather than objecting, White asked for the opportunity to respond on the merits of Moore's claims (App. Vol. XII, 3083-92).

---

[10] White anticipates such argument because Moore argued as such in the proceedings below (App. Vol. XIV, 3793-97, 3808-09).

This was due in large part to the Magistrate Judge's wholesale reliance on the previous FFCL (to which White had already objected) and its criticisms that White "resort[ed] to previous arguments made before this Court" and wanted the habeas court to "revisit its previous ruling" (App. Vol. XII, 3054-59). In other words, while the law-of-the-case doctrine would not necessarily have barred the habeas court from using its discretion to revisit its prior actual-innocence ruling, the Magistrate Judge essentially indicated that decision would not be revisited—more plainly, the writing was on the wall.[11] *See Vitamins Online, Inc. v. Heartwise, Inc.*, 71 F.4th 1222, 1241 (10th Cir. 2023) (law-of-the-case doctrine does not prevent federal district court from exercising discretion and revisiting interlocutory rulings).

*Third*, even assuming White could have initiated an interlocutory appeal as to the actual-innocence finding in the FFCL, "[a] failure to seek a stay or pursue an interlocutory appeal generally does not waive or otherwise prevent a party from appealing an adverse judgment." *United States v. Melton*, 861 F.3d 1320, 1325 n.2 (11th Cir. 2017). *See also Abney v. United States*, 431 U.S. 651, 656 (1977) ("there

---

[11] Importantly, White's failure to object to the Magistrate Judge's December 12, 2019, recommendation (concerning application of actual innocence to overcome state procedural bars) does not act to waive, abandon, or undo White's *previous* objections regarding actual innocence. *See Greer v. Dowling*, 947 F.3d 1297, 1300-04 (10th Cir. 2020) (declining to review petitioner's complaints as to district court's *second* summary judgment ruling due to petitioner's failure to object, but otherwise reviewing petitioner's complaints as to district court's *first* summary judgment ruling in light of petitioner's timely objection).

has been a firm congressional policy against interlocutory or 'piecemeal' appeals and courts have consistently given effect to that policy"; "[f]inality of judgment has been required as a predicate for federal appellate jurisdiction"); *Kell v. Benzon*, 925 F.3d 448, 452 (10th Cir. 2019) ("We typically acquire jurisdiction through the district court's entry of a final decision."); 28 U.S.C. §§ 1291, 1292.

Considering the above, White has not waived or abandoned her claims contained herein. However, *even if* this Court finds that White waived her arguments as to the gateway finding of actual innocence, White certainly did not waive her challenge to the District Court's prejudice determination under *Strickland*. At the very least, this Court must review White's challenge to the District Court's prejudice finding without deference to that Court's finding that Moore has established actual innocence. *See House*, 547 U.S. at 539-40.

## B.    The FFCL's Actual-Innocence Finding:

It is critical to examine what Moore originally argued in asserting that she satisfied the actual-innocence gateway, as well as what the FFCL ultimately did, and did *not*, find in determining that Moore had satisfied the gateway. Moore asserted essentially a three-part actual-innocence claim, arguing that she had produced (1) "evidence that Ms. Moore was highly susceptible to making a false confession"; (2) "evidence that A.S.'s death was not caused by intentionally inflicted trauma, but instead was the result of natural or accidental causes"; and (3) "evidence that

24

whatever the ultimate cause of A.S.'s brain injury, it was not inflicted by Ms. Moore on January 13, 2004, but occurred days if not much longer before" (App. Vol. V, 1350, 1375). As to the second and third premises, Moore presented reports by five medical doctors and affidavits of several lay witnesses (App. Vol. IX, 2335).

The FFCL accepted only the *last* of these three premises to Moore's actual-innocence argument. For starters, the FFCL soundly rejected any claim that Moore's confession was coerced because "(1) her version of the shaking was inconsistent with the law enforcement officers' suggestions about what had taken place; (2) the new explanation for her admissions conflicted with her sworn testimony; and (3) the jury could reasonably believe her admissions to law enforcement even with the newly presented evidence" (App. Vol. IX, 2355-57).[12]

---

[12] While the FFCL characterized Moore as confessing that she had merely "shaken the boy mildly only three or four times" (App. Vol. IX, 2355-57), the FFCL failed to appreciate that it is not uncommon for defendants to confess to a crime but attempt to minimize their own conduct or culpability. A reasonable jury could find that is exactly what happened here, given the severity of A.S.'s head injury and Moore's other behavior showing consciousness of guilt, including repeatedly apologizing to Mr. Snyder, appearing stoic and nonchalant following A.S.'s collapse, not wanting to visit A.S. at the hospital, and questioning detectives about where she could be housed in jail and asking how long she would be in jail. *Cf. Cook v. Kernan*, 948 F.3d 952, 970 (9th Cir. 2020) (when petitioner finally "confessed" during police interview, he took "affirmative measures to minimize or mask his guilt," such as making "only vague admissions to facts that minimize[d] his culpability for the crimes"). Moreover, it does not appear that the FFCL (or Moore's experts, for that matter) reckoned with the fresh blood coming from A.S.'s nose and throat immediately after the period of time Moore admitted to shaking him (App. Vol. I, 197, 200, 217-18, 230, 243).

Furthermore, the FFCL correctly found, based on the testimony of State's experts Drs. Johnny Griggs and Chai Choi (one of A.S.'s treating physicians and the medical examiner who performed the autopsy, respectively), that "a reasonable jury [could have] attribute[d] A.S.'s death to intentional infliction of trauma notwithstanding the contrary opinions by [Moore's experts] Doctors [Julie] Mack, [Janice] Ophoven, [Waney] Squier, [Horace] Gardner, and [Patrick] Barnes" (App. Vol. IX, 2336). As the FFCL explained, "[b]y definition, a jury could reasonably rely on either side's expert witnesses when resolving the evidentiary conflicts on the existence of trauma" (App. Vol. IX, 2337). Thus, by the FFCL's own findings, Moore has never shown that a reasonable jury would have found an absence of abusive trauma on A.S. or that A.S. did not die from abusive trauma.

The FFCL next found, however, that no reasonable jury could have found that A.S. died from the trauma inflicted by Moore on January 13, 2004—the day *she admitted to inflicting trauma on him*—because of "the undisputed scientific evidence that the trauma would have preceded the collapse by days, weeks, or months" (App. Vol. IX, 2338). In other words, with the possibility of a "lucid interval," the FFCL reasoned, "even if the jury had attributed the death to trauma, it would have had no reason to single anyone out as the caretaker who was present when the fatal injury took place" (App. Vol. IX, 2342). As the FFCL summed it up:

> [Moore's] innocence does not turn on whether Ms. Moore had shaken
> A.S. on January 13, 2004. As discussed above, she told the police she

26

had shaken the boy and the fact-finder could believe that admission even with her new evidence.[13] Still, no reasonable jury could have found guilt of murder without some reason to believe the actions on January 13, 2004, had contributed[14] to the death. Doctors Mack, Barnes, Squier, Ophoven, and Gardner have uniformly opined, based on the medical findings of the State's own expert witnesses, that the fatal injuries would have preceded January 13, 2004, by days, weeks, or months.

(App. Vol. IX, 2360 (footnote omitted)).

## C.    The District Court Erred in Finding Moore Passed Through the Actual-Innocence Gateway Based on a Battle of the Experts:

As will be shown below, in contravention of *Schlup* and *McQuiggin*, rather than recognizing this case as a classic battle of the experts, the District Court, in adopting the FFCL embracing actual innocence, substituted its own judgment for the judgment of a reasonable, properly instructed jury. This was error, and this error permeated the remainder of the proceedings below.

---

[13] It bears repeating that Moore did not admit simply to shaking A.S.—she admitted to shaking A.S. repeatedly and causing his head to hit the floor. Specifically, Moore confessed that, when little A.S. would not stop crying, she shook him "three or four times" by the shoulders *against the floor* (App. Vol. IV, 922 at 0:43:10-0:45:10, 0:46:00-0:46:40, 0:49:00-0:51:45).

[14] Respectfully, as will be shown below, this is not entirely accurate, as several of Moore's experts posited that A.S.'s decline could have followed a repeat injury to his head—thus, even accepting Moore's claims of A.S.'s alleged falls, a reasonable jury could have found that her act of shaking him and hitting his head against the floor contributed to his death.

> **1.    A reasonable, properly instructed jury could have rejected the findings and conclusions of Moore's "new"[15] experts and evidence and found that Moore alone caused A.S.'s death.**

Moore, in her valid confession, admitted to shaking A.S. such that the back of his head repeatedly hit the floor on January 13, 2004 (App. Vol. IV, 922 at 0:43:10-0:45:10, 0:46:00-0:46:40, 0:49:00-0:51:45). Dr. Griggs, medical director of the pediatric intensive care unit at Integris Baptist Hospital, testified at trial to his emergency care of A.S. on that day (App. Vol. II, 390, 398). Based upon A.S.'s presentation at the hospital and A.S.'s subsequent autopsy, Dr. Griggs opined that A.S.'s death resulted from a "violent" episode of "shaking" and "impact" of his head against a surface (App. Vol. II, 424-27, 436-37). Due to the severity of A.S.'s injuries, Dr. Griggs concluded that A.S.'s "clinical symptoms would have been immediate" (App. Vol. II, 428-29). On cross, defense counsel pressed Dr. Griggs at length regarding the timeline of A.S.'s injuries, attempting to establish that perhaps Mr. Snyder inflicted A.S.'s fatal injuries just before leaving him alone in Moore's care[16] (App. Vol. II, 455, 460-69). Despite probing questions and multiple

---

[15] While recognizing that this Court is bound by the panel precedent in *Fontenot*, 4 F.4th at 1032-34, White continues to maintain that "new" for the purposes of the actual-innocence gateway under *Schlup/McQuiggin* means "newly discovered" rather than "newly presented." In that same vein, White notes that much of Moore's evidence is newly presented rather than newly discovered.

[16] The trial defense was to emphasize how, just prior to A.S.'s collapse, Mr. Snyder had been alone with A.S. while Moore slept; how Mr. Snyder awoke Moore and then immediately left to go to the pawnshop; how A.S. was crying but moving around

hypotheticals, Dr. Griggs was unequivocal and steadfast in maintaining his opinion that, in this case, A.S.'s symptoms would have been immediate (App. Vol. II, 446 ("Q. All right. Can you say within a medical [degree of] certainty that it would have been absolutely an immediate onset? A. Yes.")).

Indeed, when counsel specifically explored the possibility that A.S.'s head injury was milder, such that it could have involved a prolonged lucid interval, Dr. Griggs said it was not possible:

> Q.    All right. Now, let me ask you this: **Does the medical community also recognize that some children may have damage that occurs over a long period of time?**
>
> A.    In what regard?
>
> Q.    **In other words, in the lower classifications [of brain damage], the child could sustain injuries over a lower—long period of time and—which would cause brain damage?** . . . [following State's objection] Let me ask you this: This child had massive brain injury, correct?
>
> A.    Yes.
>
> Q.    **Is it possible that this child had any other brain damage before this incident?**
>
> **A.    No.**
>
> . . .
>
> Q.    All right. Is there any studies that show that a child who is shaken very mildly can receive massive injuries?

---

when Moore woke up; and how A.S. collapsed shortly thereafter (App. Vol. I, 131-32).

A.     Yes, there are some.

. . .

Q.     Can you tell this jury with a medical certainty that this could not be one of those cases?

A.     Yes.

Q.     Okay. And how can you—how can you tell us with certainty?

A.     I can tell that based upon the degree of injury that's seen on this child's CT scan, the history that this trauma was exceedingly minor, and the degree of the rapidity of which this child deteriorated . . . [following State's objection] I'm talking about—my discussion about rapidness has nothing to do with when EMSA arrived and the child came to the emergency room. **My discussion about rapidity evolves around the fact that this child was normal at a given point in time and roughly five minutes later was in full-blown cardiopulmonary arrest. And in my opinion, no minor trauma, no trivial shaking could lead to this child being normal and on death's door five minutes later**.

(App. Vol. II, 463-48 (emphasis added)).

Medical examiner, Dr. Choi likewise testified, based on A.S.'s autopsy,[17] that

_____

[17] Only one of Moore's experts discussed the acute abdominal injury Dr. Choi discovered during the autopsy, which Dr. Choi attributed to "forceful" impact of the duodenum against the backbone, and which Dr. Choi further explained was "a rather common finding" in child abuse cases (App. Vol. III, 616-19). Dr. Ophoven merely stated in her declaration that the trauma to A.S.'s abdomen was "most likely" from Moore improperly performing CPR too low on A.S.'s abdomen (App. Vol. VII, 1793-94 & n.1). However, at trial, Dr. Choi did not recall ever seeing CPR result in such an injury (App. Vol. III, 619-20). Moreover, Moore testified that she had been trained in "infant CPR and regular CPR"—thus, it seems unlikely that Moore would have performed CPR so improperly and forcefully as to cause such an injury (App.

30

A.S. died of blunt force head trauma and that his "violent" head injury was the result of a "shaken impact" (App. Vol. II, 587, 592-93; App. Vol. III, 610-11, 621-22). She described the shaking-impact as "[v]iolent enough this injury [led] to brain tissue damage which is become swollen, that swollen is really important, the mechanism to person to die [sic]" (App. Vol. III, 611). On cross-examination, Dr. Choi specifically testified that she expected A.S.'s collapse would have happened "rapidly," within "minutes," following his injury (App. Vol. III, 625). When asked if she could so testify to a reasonable degree of medical certainty, she responded, "That's what I—yes, minutes. In this particular case amount of the brain swelling that could have be [sic] quickly may come" (App. Vol. III, 625-26).

However, the FFCL determined that, in light of Moore's new evidence, a reasonable jury could *not* have found that A.S. died of recent head trauma inflicted by Moore because, *first*, Drs. Griggs and Choi lacked important information regarding A.S.'s alleged prior falls and health issues, and *second*, Moore's "new scientific evidence" established that A.S.'s fatal brain injury occurred at least days before his collapse (App. Vol. IX, 2360-61). Respectfully, however, both findings were erroneous.

---

Vol. III, 715-16). The FFCL only briefly mentioned this injury and did not discuss it with respect to child abuse (App. Vol. IX, 2334).

a.    *A reasonable, properly instructed jury could have found that A.S. was "normal" on January 13, 2004, and died of an acute injury caused by Moore.*

*First*, even in light of Moore's "new" evidence, a reasonable jury could still have credited Drs. Griggs's and Choi's testimony that A.S. died of acute trauma. As described above, Dr. Griggs in particular was unequivocal in his testimony that there was no scenario under which A.S.'s head injury was of the type that is mild enough to involve a prolonged lucid interval. Moreover, while the FFCL criticized Dr. Griggs's "[assumption] that the 'child [had been] perfectly fine' until his collapse on January 13, 2004" (App. Vol. IX, 2341), it is clear based on Dr. Griggs's testimony and reports that his concern was with A.S.'s normal and healthy appearance *on the day of*, and in the days immediately before, his collapse (App. Vol. II, 412 ("And so the history was that he was a well child in his usual state of health. His behavior was totally normal for this child."); App. Vol. VI, 1637, 1641 ("The child was reportedly in good health on the day of his admission with a normal level of activity and playfulness. A history is offered by the father and his girlfriend that the child did have diarrhea with loose stools for approximately a week prior to his presentation. . . . Both father, Todd Snyder, and the girlfriend described [A.S.] as doing well today but noted that he has had a history of diarrhea off and on over the last week.")).

In other words, at no point did Dr. Griggs suggest in his testimony that his diagnosis of acute, abusive head trauma rested on the assumption that A.S. had been healthy *all his life*, or even in the months preceding his death. Rather, it rested on the information that A.S. had been behaving *normally*, meaning normal for A.S., on January 13, 2004, before his collapse. Indeed, rather than being unsteady, confused, vomiting, or exhibiting unusual symptoms or an altered state of consciousness, A.S. ate a normal lunch and breakfast, watched "Nemo" and cuddled with his father, and played with "Hot Wheels" before collapsing (App. Vol. I, 141-42, 156-57, 165, 179; App. Vol. VIII, 1874). Moore even testified at trial that A.S. seemed totally "fine" that day and was not acting unusual (App. Vol. III, 724 ("he seemed fine to me . . . [h]e acted like he always did")).

Indeed, Dr. Griggs's focus on recent events with respect to A.S.'s health and behavior finds support in Moore's own evidence (*see* App. Vol. V, 1452 ("Since the radiology findings in this case are nonspecific for cause and time, a medical diagnosis must be based on a complete review of the child's medical history, including pregnancy, birth and pediatric records, family history, more recent history (*with emphasis on the prior 72 hours*) . . . ." (emphasis added))). To the District Court, Moore presented a study from Dr. John Plunkett, M.D., titled "Fatal Pediatric Head Injuries Caused by Short-Distance Falls" (App. Vol. VI, 1680). In the study of falls by nineteen children, six of the nineteen children had no lucid interval and

immediately lost consciousness (App. Vol. VI, 1680, 1682; App. Vol. VII, 1692).

The remaining thirteen children had lucid intervals, the vast majority of which were

mere minutes or hours, and the *longest* of which was only 48 hours:

- One child: 5-10 minutes
- Two children: 10-15 minutes
- Four children: 10 minutes
- One child: 15 minutes
- One child: 45 minutes
- One child: 1+ hour
- One child: 3 hours
- One child: 12+ hours
- One child: 48 hours

(App. Vol. VI, 1680-82; App. Vol. VII, 1692). Moreover, these "lucid intervals"

prior to loss of consciousness did not mean that the children were acting normally

or like they always did—in many of these cases, the children experienced lethargy

or grogginess, vomiting, limpness, confusion, clumsiness, or headache (App. Vol.

VI, 1681, 1683-85; App. Vol. VII, 1686-92). In light of this data, a reasonable,

properly instructed jury could have accepted the State's medical evidence that A.S.

died from acute head trauma as opposed to trauma from "days, weeks, or months"

prior to collapsing (App. Vol. IX, 2353).

Moreover, even assuming A.S.'s *entire* prior medical history was a material

element of Dr. Griggs's opinion, there is evidence based on which a reasonable jury

could have found that A.S. was in fact a generally healthy child prior to January 13,

2004, without a history of significant falls. Specifically, at the hospital, Dr. Griggs

spoke to Mr. Snyder and Moore regarding A.S.'s medical history (App. Vol. II, 410). Mr. Snyder and Moore told Dr. Griggs that A.S. "was a well[-]functioning, well developed two-year old" and "was a very well and healthy child" (App. Vol. II, 411). In fact, the *only* issue of any significance was that A.S. had diarrhea for a few weeks (App. Vol. II, 411). Moore and Mr. Snyder specifically denied that A.S. had been acting or behaving abnormally in any way (App. Vol. II, 411-12). A.S., they insisted, was perfectly normal right up until Mr. Snyder went to the pawnshop, when, according to Moore, A.S. threw a temper tantrum and eventually collapsed (App. Vol. I, 141-42, 156-57, 165, 179; App. Vol. II, 411-12).

The FFCL concluded that a reasonable jury could not have found A.S. was generally healthy prior to January 13, 2004, because of newly proffered evidence of prior falls[18] (App. Vol. IX, 2338-42). However, a reasonable, properly instructed jury could have credited statements by Moore and Mr. Snyder at the hospital, particularly those of Mr. Snyder, over later-produced claims regarding A.S.'s alleged history of falls. *Cf. Kennedy v. State*, 839 P.2d 667, 670 (Okla. Crim. App. 1992) ("[T]he rationale underlying the [hearsay] exception for statements made for purposes of treatment or diagnosis is that doctors will seek and patients will give

---

[18] Again, however, as indicated above, the FFCL did *not* find that no reasonable jury could have found A.S. died from the intentional infliction of trauma as opposed to an accidental fall. Rather, the FFCL believed the prior falls were relevant insofar as they allegedly undermined the State's experts' opinions that A.S. died from *acute* trauma immediately before his collapse.

reliable information to further necessary medical treatment."). In any event, Moore did not present any *reliable* evidence to the District Court to prove that A.S. suffered any serious accidental falls in the weeks and months prior to his death. *Schlup*, 513 U.S. at 329. After reviewing Moore's evidence, the FFCL pointed to a fall down porch steps in October 2003, two falls in December 2003, and a fall in a cast-iron tub one week prior to A.S.'s death (App. Vol. IX, 2339).

In support of the existence of these alleged falls, the FFCL cited to the following information presented by Moore: 1) Deaconess Hospital medical records from October 7, 2003, regarding a fall down concrete porch steps; 2) an affidavit from Donna Carmichael (Moore's mother) relating the fall down porch steps; 3) an affidavit from Gordon Carmichael (Moore's stepfather) describing two falls in December 2003 on carpet and tile/concrete; and 4) and an affidavit from Moore herself describing a fall in a cast-iron tub in January 2004 (App. Vol. V, 1438-42; App. Vol. VI, 1576-77, 1580-87, 1610-11). These declarations by interested parties—specifically, Moore herself and her parents—simply did not provide *reliable* evidence of prior falls by A.S. *See House*, 547 U.S. at 552 ("The confession evidence here involves an alleged spontaneous statement recounted by two eyewitnesses with no evident motive to lie. For this reason *it has more probative value than*, for example, incriminating testimony from inmates, suspects, or friends or relations of the accused."); *Jones v. Taylor*, 763 F.3d 1242, 1249 (9th Cir. 2014)

(recantations by a defendant's family members receive reduced "weight and reliability"); *McCray v. Vasbinder*, 499 F.3d 568, 573 (6th Cir. 2007) (family members might have a "personal stake" in a defendant's exoneration). Further, notably, these declarations by interested parties were the only evidence of alleged falls *near in time* to A.S.'s death that the FFCL relied upon (App. Vol. IX, 2339).

This means that the only *objective* evidence the FFCL relied upon regarding prior falls were the Deaconess Hospital records from October 7, 2003 (App. Vol. VI, 1580-87). According to the records, A.S. was treated for a head injury on the afternoon of October 7, 2003, *over three months before his death in January 2004* (App. Vol. VI, 1580-87). The Deaconess records indicated that Mr. Snyder reported a fall down two porch steps, describing A.S. as having bumped the front of his head on the edge of a step—Mr. Snyder also reported that A.S. immediately cried after falling (App. Vol. VI, 1580-82, 1585). However, the records hardly described a significant injury. A.S. was alert, walking and talking normally, not suffering from nausea or vomiting, and he had normal respiratory functions; the only issues were a superficial abrasion on A.S.'s upper cheek and a nickel-sized abrasion, with swelling and bruising, on his forehead (*not* on the back of A.S.'s head, the location of the injury that proved fatal in January 2004) (App. Vol. VI, 1582, 1586-87). After examining A.S., hospital personnel simply cleaned the wound and applied

Neosporin and a band-aid, after which A.S. was released to his father's care at home (App. Vol. VI, 1587).

The FFCL also pointed to some medical evidence of alleged previous signs of trauma—specifically, a diagnosis of failure to thrive from OU Medical Center and a SoonerStart referral for "motor and speech concerns"[19]—but these were dated from around June 2003, *months* prior to A.S.'s alleged falls and his death (App. Vol. VIII, 1839-40, 1903-07). Moreover, it defies logic why Moore and Mr. Snyder did not mention these alleged falls (from December 2003 and January 2004) and alleged health concerns during their interviews with detectives—especially with respect to the alleged fall in the bathtub approximately a week before A.S.'s death that Moore later claimed was followed by quietness, lethargy, and clinginess on A.S.'s part (App. Vol. V, 1438). At bottom, a reasonable, properly instructed jury could have found that the evidence newly presented by Moore regarding A.S.'s alleged prior

---

[19] In determining A.S. had "significant developmental delays," the FFCL also relied upon affidavits from Janus Roth, Michelle Jones, and a filing from Mr. Snyder's divorce with his wife concerning custody of A.S. (App. Vol. VI, 1649-54; App. Vol. VII, 1698-1701; App. Vol. VIII, 1900-02). However, the affidavits from Ms. Roth and Ms. Jones suffer from the same pitfalls as the affidavits concerning A.S.'s alleged prior falls—they were drafted by *interested* parties. Indeed, in addition to running a home daycare that A.S. and Moore's son attended, Ms. Roth was *friends* with Moore and testified at trial to this friendship (App. Vol. III, 760). Moreover, Ms. Jones was an employee of Ms. Roth, and portions of her affidavit were nearly identical to Ms. Roth's affidavit (*Compare*, App. Vol. VI, 1649-54, *with* App. Vol. VII, 1698-1701). With respect to the filing from Mr. Snyder's divorce case, this document—like the SoonerStart referral—occurred prior to A.S.'s alleged falls, in September 2003 (App. Vol. VIII, 1900-02).

falls and health issues was of such dubious value, or so far removed in time from A.S.'s death, as to not call into question Drs. Griggs's and Choi's opinions regarding the timing of his fatal injury.

> b. *A reasonable, properly instructed jury could have rejected the theory that, based on the "scientific" findings, A.S. died of a latent injury following a lucid interval.*

*Second*, a reasonable, properly instructed jury could have rejected Moore's "new scientific evidence" claiming that A.S.'s fatal brain injury occurred *at least* days before his collapse. The FFCL found the jury would essentially have been *required* to conclude that A.S.'s collapse resulted from an injury that was "days, weeks, or months before the shaking incident on January 13, 2004" because of the "evidence regarding the complete breakdown of the boy's auto-regulation system and the presence of hemosiderin, papilledema, Perl's positive material, and vitreous hemorrhaging" (App. Vol. IX, 2342-52).

With respect, however, this conclusion rested on the FFCL's erroneous assumption that a jury would have been *bound* to accept the opinions of Moore's habeas experts (over those of the State's trial experts) simply because they offered "scientific"[20] opinions (App. Vol. IX, 2338-39, 2341-52). Crucially, Tenth Circuit

---

[20] The FFCL repeatedly referred to Moore's "scientific" evidence as if it was in some way *objective*. But it manifestly was not. If it were, parties to litigation would not routinely hire their own experts to represent their respective positions on factual disputes, nor would experts routinely come to mutually exclusive conclusions regarding those factual disputes. Moreover, as noted *supra*, Moore's experts are

law and Oklahoma law allow juries to weigh the credibility of lay and expert testimony, including giving juries the ability to believe or *disbelieve* such testimony. *Diestel v. Hines*, 506 F.3d 1249, 1268 (10th Cir. 2007) ("The general rule is that juries are not bound to believe opinions of witnesses, even if they are qualified as experts."); *United States v. Oliver*, 278 F.3d 1035, 1043 (10th Cir. 2001); *see also Day v. State*, 303 P.3d 291, 296 (Okla. Crim. App. 2013) ("jury determined the weight and credibility to give to each witness" in trial surrounding abusive head trauma); *Ryder v. State*, 83 P.3d 856, 868 (Okla. Crim. App. 2004) ("The jury may believe one witness while discrediting other witnesses. This Court has never required a jury to surrender its own opinions to that of an expert witness." (internal citations omitted)). Indeed, the jury in this very case was instructed on the same (App. Vol. IV, 1047 ("You are not required to surrender your own judgment to that of any person testifying, based on that person's education, training or experience. You need not give controlling effect to the opinion of such witnesses for their testimony, like that of any other witness, is to be received by you and given such weight and value as you deem it is entitled to receive.")).

---

common defense experts and critics of Shaken Baby Syndrome/Shaken Impact Syndrome. To that end, had Moore's counsel offered these experts at trial, the State could have cross-examined each expert as to their *biases*. *Postelle v. Carpenter*, 901 F.3d 1202, 1217 (10th Cir. 2018) (in analyzing *Strickland* prejudice, courts can consider "how the state would have responded to the omitted evidence"). *Cf. also Taylor*, 7 F.4th at 938 (in actual-innocence case revolving around guilty plea, court considered "the different theories of guilt the state could have pursued at trial").

Again, the State's experts' opinions provided reasonable grounds for a jury to reject Moore's experts' conclusions regarding the timing of the fatal trauma. For example, the FFCL found that the presence of hemosiderin in the injury at the back of A.S.'s head meant no reasonable jury could find that the wound was newer than at least "days" old (App. Vol. IX, 2343-47). But Dr. Choi, in her autopsy report, specifically noted the hemosiderin but then immediately thereafter reaffirmed her conclusion that A.S.'s head injury was acute: "**Skin contusions, including scalp contusions:** Sections show hemorrhages with occasional neutrophils infiltration in the hemorrhagic area of the back of the head, along with *scattered hemosiderin laden macrophages* present in the contusion at the back of the head, *likely recent and acute hemorrhages*." (App. Vol. V, 1434 (italics added)).[21] In other words, despite finding the presence of hemosiderin, Dr. Choi concluded that A.S.'s injuries were acute, and a reasonable, properly instructed jury could have credited her testimony over that of Moore's experts. *See Day*, 303 P.3d at 296.

More importantly, even assuming the State's experts did not address every basis on which Moore's experts concluded A.S.'s injuries were not recent, a jury here would have good reason to reject the conclusions of Moore's experts. Specifically, in line with Moore's argument—which was *rejected* by the FFCL—

---

[21] The FFCL cited to Dr. Choi's autopsy report to point out that she "noted 'scattered hemosiderin' in the back of the head," but the FFCL omitted that, in so noting, she confirmed her opinion that there was nonetheless *acute* trauma (App. Vol. IX, 2343).

Moore's experts all believed A.S. died from natural or accidental causes, not the intentional and abusive infliction of trauma:

- Dr. Ophoven: "The medical evidence does not support the theory that [A.S.] died from 'shaking' or 'shaking plus impact'" (App. Vol. VII, 1792). "[A.S.]'s death most likely resulted from the complications of multiple falls, with repeated blunt force trauma to the head; a documented but undiagnosed infection; untreated seizures; and other medical conditions . . . ." (App. Vol. VIII, 1799-1800).

- Dr. Mack: "it is unlikely that the child's collapse was caused by significant trauma occurring shortly before the 911 call" (App. Vol. VII, 1740). "Based on the available records, the most likely causes of the child's collapse and radiology findings are a seizure disorder, illness, infection, and/or prior head injury, combined with prior neurological deficits, coagulopathy and cardiac arrest followed by resuscitation" (App. Vol. VII, 1741).

- Dr. Gardner: "[A.S.] was a child with documented pre-existing problems," and "there are many natural and/or accidental causes [such as a clotting disorder or Terson's Syndrome] that would account for the child's injury," and "[t]here is no support for the conclusion that the findings are associated with abuse generally" (App. Vol. VI, 1618-19).

- Dr. Barnes: "the available information suggests that the intercranial findings may have been caused by illness, infection and/or pre-existing conditions, with no specific indicators of head trauma occurring shortly before hospital admission" (App. Vol. V, 1454).

- Dr. Squier: "The findings in this brain are non-specific and do not indicate the cause of collapse and death. . . . [However,] I do not believe shaking is relevant to this case . . . ." (App. Vol. VIII, 1913). "The most likely cause of collapse and death is the consequence of an older injury. There is no direct evidence of fresh trauma but this cannot be definitively excluded by pathology" (App. Vol. VIII, 1916).

And although Moore's experts believed A.S. died of natural causes, they were hardly all consistent or unequivocal on what causes exactly.

If a properly instructed jury could have reasonably rejected these experts'
conclusions regarding the *cause* of A.S.'s death *as the FFCL found*, then a jury could
have also reasonably found these experts impeached and rejected their conclusions
regarding the *timing* of his death. *See City of Enid v. Crow*, 316 P.2d 834, 837 (Okla.
1957) ("Generally, in the absence of unimpeachable scientific conclusions a jury
may accept circumstantial evidence which reasonably tends to support their
conclusion and reject the opinion of experts."); (App. Vol. II, 445-46 ("Q. . . . And
would you agree with me, we call it medical science but some of it's not an exact
science? A [Dr. Griggs:] That's correct.")); (App. Vol. VIII, 1913 (Dr. Squier: "It
should be noted that timing by pathology is not precise . . . .")). *See also Shelby v.
Cain*, No. 1:21-CV-406-HSO-RPM, 2023 WL 2567370, at *5 (S.D. Miss. Feb. 7,
2023) (unpublished) ("The controversy surrounding [Shaken Baby Syndrome] has
been widely viewed by courts as simply a battle of the experts."); *Lomax v. Dir.*,
TDCJ-CID, No. 6:18CV583, 2020 WL 6298105, at *7 (E.D. Tex. Aug. 24, 2020)
(unpublished) ("An expert's opinion does not automatically change a guilty finding
to one of actual innocence," because in a "battle of the experts," "[a]ll factual and
credibility determinations remain within the purview of the jury."); *Stern v. Schriro*,
No. CV0600016TUCDCBJR, 2016 WL 11431554, at *10 (D. Ariz. Aug. 2, 2016)
(unpublished) (a battle of experts who have differing opinions is a standard
characteristic of litigation); *Flores v. Dir.*, TDCJ-CID, No. 6:12CV1000, 2016 WL

43

1253664, at *8 (E.D. Tex. Mar. 7, 2016) (unpublished) ("Given this hypothetical 'battle of the experts,' the jury would have looked to its own experience and reached the same verdict."); *Sutton v. Bell*, No. 3:06-CV-388, 2011 WL 1225891, at *19 (E.D. Tenn. Mar. 30, 2011) (unpublished) ("The evidence Petitioner contends demonstrates he is actually innocent constitutes nothing more than a battle between experts and, rather than demonstrating his actual innocence, it merely reveals that a time-of-death determination is not an exact science, but instead is a fairly subjective opinion."); *Day*, 303 P.3d at 296 (claim that Shaken Baby Syndrome has been discredited "is an exaggeration"; rather, "experts disagree on the diagnosis of Shaken Baby Syndrome," and such "disagreement is vigorous").

Relatedly, while the FFCL found that a reasonable jury could not have credited Dr. Griggs's and Dr. Choi's opinions because their opinions rested on "misinformation" regarding A.S.'s alleged history of falls, the same could be said for Moore's experts. In fact, Moore's evidence of prior falls—which is of dubious value, as described above—was central to her experts' opinions (*see, e.g.*, App. Vol. V, 1452-54 (Dr. Barnes); App. Vol. VI, 1613-14 (Dr. Gardner); App. Vol. VII, 1742 (Dr. Mack); App. Vol. VIII, 1797-98 (Dr. Ophoven), 1911 (Dr. Squier)). To the extent a properly instructed jury could have reasonably rejected the questionable evidence of prior falls, it could have likewise rejected the opinions of Moore's experts, by the FFCL's own logic.

**2.    Even assuming a reasonable, properly instructed jury could have believed Moore's "new" experts and evidence, such reasonable jury could have nonetheless determined that Moore was a substantial contributing factor in A.S.'s death under Oklahoma law.**

Even assuming *arguendo* a reasonable jury was *bound* to accept that A.S. had prior falls and an older head injury, it does not follow that the jury would have been precluded from finding Moore responsible for A.S.'s death, as the FFCL concluded (App. Vol. IX, 2360 ("Still, no reasonable jury could have found guilt of murder without some reason to believe the actions on January 13, 2004, had contributed to the death.")). Rather, a jury would have good reason to believe Moore's act of repeatedly shaking A.S.'s head against the floor contributed to his death, based on *Moore's own experts* who posited "second impact syndrome" as a possible cause of death. Dr. Ophoven's declaration stated:

> Complications from multiple accidental blunt force impacts to the head could certainly have caused the death as well as the medical findings.[3] . . . **An impact to the back of the head could very well have been a significant contributing factor in the terminal cascade.** Individuals with significant concussions are at substantial risk for fatal deterioration with subsequent blows.
>
> > [3] The medical findings in this case are consistent with "second impact" syndrome (SIS)—i.e., death from the cumulative effect of more than one fall or other impact. SIS is characterized by edema without significant subdural hemorrhage and is well recognized in the sports literature.

(App. Vol. VIII, 1798 & n.3). Dr. Squier also suggested that "second impact syndrome" could have occurred in A.S.'s case, stating that, in "second impact

cases," even a "very *minor*[] trauma" following prior injury can lead "to collapse with massive brain swelling" (App. Vol. VIII, 1914 (emphasis added)). Further, Dr. Mack cited A.S.'s alleged prior falls and stated, "[i]t is well established that a trivial impact may trigger disproportionate brainswelling and a small hemorrhage in the presence of pre-existing head injury" (App. Vol. VII, 1742). Dr. Barnes likewise noted that A.S.'s CT results could have been consistent with "second impact syndrome" (App. Vol. V, 1453).

For a murder conviction, Oklahoma law does not require that a defendant be the *sole* cause of the victim's death. In cases where causation is challenged, a jury is instructed that "[a] death is caused by the conduct if the conduct is a *substantial factor* in bringing about the death and the conduct is *dangerous and threatens or destroys life*." Instruction 4-60, Oklahoma Uniform Jury Instruction–Criminal 2d (emphasis added); (*see also* App. Vol. IV, 1036-38 (Moore's jury was instructed that a death must be "caused by" a defendant's conduct, which, in this case involved "unreasonable force" by the defendant)). Thus, under Oklahoma law, the defendant's conduct need only be that which is dangerous and threatens or destroys life and be a *substantial factor* in the victim's death.

For instance, in *Chase v. State*, 382 P.2d 457, 458-59 (Okla. Crim. App. 1963), the defendant severely beat his wife, after which she died. The beating caused the wife's body to go into "shock and collapse, with ensuing death," though the medical

examiner admitted that the fatty condition of her liver made her "more susceptible to such a shock." *Chase*, 382 P.2d at 459. On appeal, the defendant argued that the evidence was insufficient to support his conviction because "death would not have ensued had it not been for the fatty condition of [his wife's] liver." *Id.* at 460. The OCCA rejected this claim at length, reasoning that the defendant inflicted injury upon his wife and *accelerated* her death. *Id. See also Wofford v. State*, 584 P.2d 227, 228-29 (Okla. Crim. App. 1978) ("[O]ne will be held liable for homicide if one accelerates the death of a person in poor physical condition, even though the injury inflicted would not have killed a healthy person and although the condition from which the victim was suffering would itself probably have been fatal.").

Here, even assuming *arguendo* A.S. had prior falls and old injuries, a reasonable jury could have found that Moore's intentional act of repeatedly shaking a toddler's head into the floor was a dangerous and unreasonable act that threatened his life and was a *substantial factor* in his death. Again, the FFCL found that Moore's confession was valid and reliable and could have been believed by a reasonable jury,[22] and the FFCL also found that a reasonable jury could have found A.S. died from the intentional infliction of trauma (App. Vol. IX, 2336-37, 2356-57). Logically, then, a reasonable jury could have also found that repeatedly hitting a

---

[22] Indeed, by its verdict, Moore's jury apparently believed her confession and rejected her later recantation of it.

twenty-two-month-old's head into the floor is a dangerous and unreasonable act that threatens life—indeed, again, Moore's own evidence supports such a finding, as one of the central premises of Dr. Plunkett's study was that seemingly minor head traumas in children could be fatal (App. Vol. VI, 1680-85; App. Vol. VII, 1686-92). Finally, Moore's own experts (Drs. Ophoven, Mack, Squier, and Barnes) provided the final link a reasonable jury would have needed to find that Moore's abuse of A.S. was a substantial factor in causing his death: "An impact to the back of the head could very well have been a significant contributing factor in the terminal cascade." (App. Vol. VIII, 1798).

\* \* \*

In sum, in this battle of the experts, a properly instructed jury could have reasonably rejected the findings and conclusions of Moore's experts, as well as her dubious evidence of prior falls and poor health, and credited the State's evidence that A.S. died from acute trauma intentionally inflicted by Moore on January 13, 2004. Alternatively, even if such properly instructed jury accepted that A.S. had prior falls that played a role in his death, the jury could have still reasonably found that the trauma inflicted by Moore was a dangerous, unreasonable, and life-threatening act that was a substantial factor in his death. The District Court therefore erred in finding Moore met the actual-innocence gateway. Relatedly, by finding a

reasonable probability of a different result under *Strickland* based upon this same evidence, the District Court again erred.

**D.    Conclusion:**

A final point warrants mention. "The actual innocence standard is designed to ensure that petitioner's case is truly extraordinary while still providing a petitioner a meaningful avenue by which to avoid a manifest injustice." *Fontenot*, 4 F.4th at 1031 (alterations adopted and internal quotation marks omitted) (quoting *Schlup*, 513 U.S. at 327). However, the gateway is solely a "creation of equity," and it "turns on the moral culpability of the defendant." *Pacheco v. El Habti*, 62 F.4th 1233, 1242, 1244 (10th Cir. 2023). *See also Schlup*, 513 U.S. at 321 (in order to "ensure that the fundamental miscarriage of justice exception would remain 'rare' and would only be applied in the 'extraordinary case,' while at the same time ensuring that the exception would *extend relief to those who were truly deserving*, th[e Supreme] Court explicitly tied the miscarriage of justice exception" to factual innocence (emphasis added)).

Here, while the FFCL explicitly found that a reasonable jury could have credited Moore's statement that she shook A.S. and hit his head against the floor, the FFCL split hairs and determined that her innocence did not "turn on" whether she had shaken A.S. (App. Vol. IX, 2358, 2360). However, in so doing, the FFCL ignored the underlying concerns of the actual-innocence gateway, including equity

and moral culpability. In this case, Moore admitted to shaking A.S. because he would not be quiet—indeed, she admitted to shaking A.S. such that his head repeatedly hit the floor (App. Vol. IV, 922 at 0:43:10-0:45:40, 0:46:00-0:47:40, 0:49:00-0:52:15). A.S. was a defenseless toddler who desperately wanted to be with his father, and instead of his cries being met with comfort, his cries were met with force. At bottom, Moore admitted to abusing A.S., even if she now disputes whether that abuse caused his death. Considering her admission, her case does not rise to a "manifest injustice," nor is Moore "truly deserving" of relief. *See Schlup*, 513 U.S. at 321; *Fontenot*, 4 F.4th at 1031. Consequently, rather than the fact of her conviction being a fundamental miscarriage of justice, "[o]verturning the conviction[] now would be the fundamental miscarriage of justice." *Taylor*, 7 F.4th at 939.

At bottom, the District Court clearly erred in embracing the FFCL's actual-innocence finding and continuing to embrace that finding for the remainder of the proceedings below, eventually finding ineffective assistance of counsel under *Strickland*. In rewinding the tape nearly twenty years, it is clear that a reasonable, properly instructed jury would have convicted Moore despite her "newly proffered evidence." *Taylor*, 7 F.4th at 938 (quoting *Schlup*, 513 U.S. at 329). Moreover, relatedly, even had Moore's counsel offered this "new" evidence of innocence at trial, there is not a reasonable probability of a different result. *Strickland*, 466 U.S. at 694. As such, White is entitled to relief.

## CONCLUSION

Based on the above, the District Court erred in finding Moore passed through the actual-innocence gateway sufficient to overcome the AEDPA's time bar, procedural bars, and establish *Strickland* prejudice. White respectfully requests that this Court vacate the District Court's conditional grant of habeas relief and remand to the District Court to dismiss Moore's Second Amended Petition as untimely under the AEDPA, or, in the alternative, deny relief as to Moore's ineffectiveness claim.

## STATEMENT OF ORAL ARGUMENT

White believes the briefs in this case will be sufficient to support reversal of the District Court's decision. However, recognizing the fact-bound nature of this appeal, White requests oral argument.

Respectfully submitted,

**GENTNER F. DRUMMOND**
**ATTORNEY GENERAL OF OKLAHOMA**

**s/ TESSA L. HENRY**
**TESSA L. HENRY, OBA #33193**
**KEELEY L. MILLER, OBA #18389**
**ASSISTANT ATTORNEYS GENERAL**
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Fax: (405) 522-4534
Service email: fhc.docket@oag.ok.gov

**ATTORNEYS FOR APPELLANT WHITE**

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 12, 997 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point type.

**s/ TESSA L. HENRY**

## CERTIFICATE OF SERVICE

**X**      I hereby certify that a copy of the foregoing document was electronically filed with the Clerk of this Court on December 8, 2023, and for electronic transmission to:

Andrea D. Miller
Christine M. Cave
*Counsel for Appellee Moore*

**s/TESSA L. HENRY**

## CERTIFICATE OF DIGITAL SUBMISSION

This is to certify that:

1.      All required redactions have been made and, with the exception of those redactions, every document submitted in Digital Form or scanned PDF format is an exact copy of the document filed with the Clerk;

2.      The digital submissions have been scanned for viruses with Symantec Endpoint Protection, Updated 12/8/2023, and according to said program, are free of viruses.

**s/TESSA L. HENRY**