**Case No. 23-6133**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

**BEVERLY M. MOORE,**
*Petitioner-Appellee,*
v.
**TAMIKA WHITE,**
*Respondent-Appellant.*

---

### OPENING BRIEF OF PETITIONER-APPELLEE

---

**On Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. CIV-09-985-G)
The Honorable Charles B. Goodwin, United States District Judge**

---

**CHRISTINE M. CAVE, OBA #19774**
**3500 S. Blvd., Ste. 14-B**
**Edmond, Oklahoma 73013**
**(405)702-9797/(405)576-3956 (Fax)**
ccave@okemployerlaw.com
mainoffice@okemployerlaw.com

**ANDREA D. MILLER, OBA #17019**
**800 N. Harvey Ave.**
**Oklahoma City, OK 7310**
**(405)208-6161**
**admiller@okcu.edu**

### ATTORNEYS FOR PETITIONER-APPELLEE

*February 7, 2024*                 ***ORAL ARGUMENT NOT REQUESTED***

i

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................... ii

TABLE OF AUTHORITIES................................................................... iv

PRIOR OR RELATED APPEALS ......................................................... vi

STATEMENT OF ISSUE(S) PRESENTED FOR REVIEW ...................................1

STATEMENT OF THE CASE............................................................................1

STATEMENT OF FACTS .................................................................................6

SUMMARY OF THE ARGUMENT ....................................................................13

APPLICABLE STANDARD OF REVIEW ...........................................................14

ARGUMENT AND AUTHORITY ......................................................................15

    FIRST GROUND FOR RELIEF – APPELLANT WAIVED HER OBJECTIONS
    TO THE DISTRICT COURT'S FINDING OF ACTUAL INNOCENCE WHEN
    SHE INVITED THE COURT TO REVISIT THE FINDING AND THEN,
    WHEN IT DID, FAILED TO OBJECT TO THE SUBSEQUENT FINDING OF
    INNOCENCE ................................................................................................15

    SECOND GROUND FOR RELIEF – THE DISTRICT COURT DID NOT
    ERROR IN FINDING IT WAS MORE LIKELY THAN NOT THAT NO
    REASONABLE JURY WOULD HAVE CONVICTED MS. MOORE IN LIGHT
    OF THE NEW EVIDENCE PRESENTED..........................................................23

        1.    The District Court applied the correct standard in evaluating the actual
        innocence claim..................................................................................23

        2.    The District Court correctly found that the medical evidence as to timing
        of the fatal injuries was undisputed and satisfied the actual innocence
        standard. ...........................................................................................26

            A.    A reasonable jury could not conclude that A.S. was "perfectly
            healthy" before his collapse on January 13, 2004. .....................................26

                i.    The existence of prior falls is undisputed. .........................................27

                ii.    It is unlikely that a reasonable jury would disregard all of the
                medical evidence and witness observations as to the state of the child's
                health prior to collapse because of the dialogue between Ms. Moore and
                Dr. Griggs at the hospital. .........................................................31

            B.    The undisputed medical evidence is that the injury or illness that
            caused the child's death occurred days if not weeks before his collapse. ...33

i.    The undisputed medical evidence dates the child's injuries to days, if not weeks before January 13, 2004............................................................33

ii.    It is not likely that the jury would disregard the undisputed medical evidence of timing.....................................................................................36

C.   Ms. Moore's statements and actions after A.S.'s collapse do not provide an alternative theory on which a jury could have found her guilty .............37

CONCLUSION ...........................................................................................................41

CERTIFICATE OF COMPLIANCE ........................................................................42

CERTIFICATE OF SERVICE ..................................................................................42

CERTIFICATE OF DIGITAL SUBMISSION .........................................................43

<u>ATTACHMENTS</u>

1.  ECF No. 182 – April 6, 2012, Order Declining to Adopt Report and Recommendation on Issue of Exhaustion, Order Staying Case, U.S. District Court Western District of Oklahoma, CIV 09-985

2.  ECF No. 219 – Jan. 18, 2019, Order Lifting Stay and Establishing Scheduling Order, U.S. District Court Western District of Oklahoma, CIV 09-985

# TABLE OF AUTHORITIES

Cases

*Bland v. Sirmons*, 459 F.3d 999 (10th Cir. 2006)........................................................15
*Brady v. Maryland*, 373 U.S. 83 (1963)..................................................................14
*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003)...................................................15
*Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993)....................27
*Day v. State*, 303 P.3d 291 (Okl. Cr. 2013)............................................................25
*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993)................. 25
*Diestel v. Hines*, 506 F.3d 1249 (10th Cir. 2007)...................................................25
*Fontenot v. Crow*, 4 F.4th 982 (10th Cir. 2021) .....................................................15
*Greer v. Dowling*, 947 F.3d 1297 (10th Cir. 2020) .......................................... 20, 22
*House v. Bell*, 547 U.S. 518 (2006)...................................... 24, 25, 29, 37
*Jackson v. Virginia*, 443 U.S. 307 (1979) ..............................................................24
*Jones v. Taylor*, 763 F.3d 1242 (9th Cir. 2014) ......................................................29
*Little v. Budd Company Inc*., 955 F.3d 816 (10th Cir. 2020) ..................................38
*Littlejohn v. Royal*, 875 F.3d 548 (10th Cir. 2017)..................................................15
*Marshall v. Chater*, 75 F.3d 1421 (10th Cir. 1996)..............................................5, 27
*McCray v Vasbinder*, 499 F.3d 568 (6th Cir. 2007)................................................29
*Moore v. United States*, 950 F.2d 656 (10th Cir. 1991) ..........................................19
*Pacific Bell Telephone Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438 (2009)........20
*Richison v. Ernst Grp., Inc.*, 634 F.3d 1123 (10th Cir. 2011) .................................15
*Ryder v. State*, 83 P.3d 856 (Okl. Cr. 2004) ..........................................................25
*Schlup v. Delo*, 513 U.S. 298 (1995)...................................................... 1, 13, 25,37
*Strickland v. Washington*, 466 U.S. 668 (1984)................................................ 14, 15
*Thomas v. Arn*, 474 U.S. 140 (1985)......................................................................19
*United States v. Oliver*, 278 F.3d 1035 (10th Cir. 2001).........................................25

Statutes

28 U.S.C. § 636............................................................................................18
28 U.S.C. §2244 ............................................................................................2

21 Okla. Stat. §701.7......................................................................................1
70 Okla. Stat. §13-123 ..................................................................................30

Rules

Federal Rule of Civil Procedure 72 .......................................................................19

Treatises

AK Choudhary et al., ***Consensus Statement*** on Abusive Head Trauma in Infants and Young Children, 48 PEDIATRIC RADIOLOGY 1048 (2018) ....................24

R. Papetti *et al*., *Outside the Echo Chamber: A Response to the "Consensus Statement On Abusive Head Trauma In Infants and Young Children."* 59 SANCLR 299 (2019) ...........................................................................24

## **PRIOR OR RELATED APPEALS**

There are no prior or related appeals.

## <u>STATEMENT OF ISSUE(S) PRESENTED FOR REVIEW</u>

Appellant has waived review of the District Court's actual innocence determination by failing to object to the December 12, 2019, Report and Recommendation finding Ms. Moore had presented evidence of actual innocence under *Schlup v. Delo*, 513 U.S. 298 (1005) to overcome procedural bars and allow her to litigate the federal constitutional claims asserted in her Second Amended Petition for Writ of Habeas Corpus.

If the challenge to the *Schlup* gateway finding is not waived, then the District Court correctly determined that Ms. Moore had demonstrated through the presentation of new evidence that it was more likely than not that no reasonable jury would have convicted her after considering such evidence.

## <u>STATEMENT OF THE CASE</u>

The State of Oklahoma charged Ms. Moore with murder in the first degree for the use of unreasonable force against A.S., a child, causing his death, in violation of 21 Okla. Stat. §701.7(C). (App. Vol. IV, 945.)[1]

The State presented three medical experts at trial to support its theory that A.S. had died from being shaken or having been shaken plus sustaining impact during a thirteen-minute window in which Ms. Moore was alone with the child on January

---

[1] References to the appendix shall be cited by volume and page number (e.g., App. Vol. --, ---.)

13, 2004. (App. Vol. II, 407, 425, 427-28, 444, 491-44, 492-93, 495-513; Vol. III, 601-612, 614-15, 623-26, 634-637.) The State contended that this theory was consistent with inculpatory statements made by Ms. Moore during a police interrogation. (*See* App. Vol. III, 611-12, 748-49, 813.) Despite Ms. Moore and her supporters providing relevant information regarding the child's history, financial resources and contact information for experts, Ms. Moore's attorneys did not present any countervailing medical testimony at trial. (App. Vol. XIV, 43.) The jury found Ms. Moore guilty of first-degree murder. (App. Vol. IV, 1030.)

Ms. Moore filed a petition for writ of habeas corpus in the District Court for the Western District of Oklahoma on September 4, 2009, (App. Vol. V, 1197-1199), which she thereafter amended (*Id.* at 1250-1281). The Warden responded by seeking dismissal on the basis that the petition was untimely because it was filed outside the one-year filing period set forth in the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. §2244(d)(1) (*Id.* at 1282-1296.) Through counsel thereafter appointed, Ms. Moore presented substantial medical evidence disputing the cause of A.S.'s death and the timing of his fatal injuries; she contended that these facts demonstrated Ms. Moore's actual innocence, thus warranting equitable tolling of the time to her claim. (App. Vol. VII, 1694-1794, VIII, 1795-1987.)

The Warden presented argument and additional evidence in response (App. Vol. VIII, 1988-2093, Vol. IX, 1084-2253), specifically challenging whether the

evidence presented by Ms. Moore was (1) "new" and therefore able to be considered; and (2) sufficient to show her factual innocence. (App. Vol. VIII, 1995-2049.) With respect to the second argument, the Warden claimed (1) that Ms. Moore's medical experts' alternative explanations for the child's death were insufficient to affirmatively prove Ms. Moore *didn't* kill A.S.; (2) the presence of hemosiderin in the child's head wound was due to the Medical Examiner not conducting her microscopic examination until a month after the child's death; and (3) a jury could reject Ms. Moore's experts' conclusions as to the cause of death[2] on the basis that they were (a) shaken baby syndrome skeptics, and (b) presumably well-compensated (*Id.* at 2045-48). Lastly, the Warden contended that the jury could still find Ms. Moore guilty in light of her statements and actions immediately following the event, including her failure to disclose to A.S.'s treating doctor that A.S. had suffered from prior falls. (*Id.* at 2016-2049.)

Then-Magistrate-Judge Bacharach proposed that the District Court find that Ms. Moore's claim was subject to an exception to the time-bar as the undisputed evidence of the child's fatal injuries indicated that they occurred days, if not weeks, before January 13, 2004 (App. Vol. IX, 2328-2362).

The Warden objected, renewing her claim that the evidence presented by Ms.

---

[2] The Warden did not challenge the expert's testimony as to the presence of certain medical findings or the timing of the fatal injuries, only their conclusions as to the cause of death. (App. Vol. VIII, 2045-48.)

Moore was not "new" and therefore not properly considered in the actual innocence analysis. (App. Vol. IX, 2365-2377.) Further, disregarding her prior statement that she was *not* disputing the existence of prior falls (App. Vol. VIII, 2044 n.26), the Warden changed course and disputed them on the grounds that the evidence supporting them was unreliable (App. Vol. IX, 2378-2380). The Warden also expanded her prior challenges to Ms. Moore's experts' credibility beyond their conclusions to the *cause* of death (as previously asserted) to their credibility generally (App. Vol. IX, 2392, and Vol. X, 2395), and raised several other new arguments, including (1) that the evidence of timing was inconsistent with the conclusions of the State's experts of trial because they *presumably* would have considered the "medical facts regarding hemosiderin, papilledema, Perl's positive material, vitreous hemorrhaging, or the auto-regulation system" before concluding that Petitioner shaking the child on January 13, 2004, caused him to die (App. Vol. X, 2398-2399 n.12, 2406); [3] and (2) Ms. Moore's inculpatory statements could be

---

[3] Notably, none of these conditions were discussed at the trial, so the Warden's supposition that the experts may have considered them is pure speculation.  This is especially true with respect to the presence of hemosiderin and collagen, as there is no evidence that the state's experts even created the specialized iron and trichrome stains to study the abundance of hemosiderin or the presence of collagen, much less reviewed and considered it. The Warden alternatively contends that she was under no obligation to present any medical evidence in response to the evidence presented on timing (App. Vol. X, 2395-99), yet challenged the Magistrate Judge's characterization that the medical evidence of timing was undisputed. As evident by the Warden's presentation of other evidence (App. Vol. VIII, 2057-2093; Vol. IX,

viewed as admissions to having *slammed* A.S.'s child against the floor such that a jury could conclude that the child suffered prior injuries but still find that Ms. Moore caused A.S.'s death through the use of unreasonable force on January 13, 2004.[4] The District Court overruled the Wardens' objections and adopted Judge Bacharach's proposed findings (App. Vol. X, 2407-2510).[5]

Subsequently, the federal proceedings were stayed at the Warden's request for six and a half years during which Ms. Moore attempted to exhaust her claims in state court, (*See* Dist. Ct. Orders, Attachments 1, 2.) Thereafter, Ms. Moore filed a second amended petition for writ of habeas corpus (App. Vol. XI, 2790-2896). The Warden once again raised the timeliness of the petition and other various procedural bars (App. Vol. XI, 2897-2990; Vol XII, 1991-3015), and specifically claimed that the

---

1084-2253), there is no dispute that the Warden was aware that she had the *opportunity* to present rebuttal evidence.

[4] Despite the Magistrate Judge concluding that Ms. Moore did not demonstrate her innocence as to the *cause* of A.S.'s death, the Warden also renewed arguments related thereto, including challenges to the believability of Ms. Moore's experts on causation because they held a "minority" view as to shaken baby syndrome and the fact that they did not definitely rule out shaken baby syndrome as a cause of death (App. Vol. IX, 2381-2386, Vol. X., 2397-98).

[5] It is unclear whether the district considered the merits of the numerous new arguments raised by the Warden in her response, which ordinarily would be considered waived. *See Marshall v. Chater*, 75 F.3d 1421, 1426-27 (10th Cir. 1996) ("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived."). After addressing the renewed argument on the issue of what is considered "new" evidence, the District Court simply concluded that the Warden's remaining arguments were "unpersuasive". (App. Vol. X, 2508-2510.)

District Court should revisit the issue of actual innocence due to the intervening state proceedings and the filing of an amended petition (App. Vol. XI, 2956-2967).

Over Ms. Moore's objection (App. Vol. XII, 3016-3038), Magistrate Judge Purcell revisited the finding of innocence, but again concluded that Ms. Moore had demonstrated her actual innocence sufficient to overcome the procedural bars to her claim (*Id.* at 3039-3060). The Warden did not object to the second Magistrate Judge's finding of innocence. (*See* App. Vol. I, 0001-24.)

Thereafter, the District Court concluded that Ms. Moore was denied the effective assistance of trial counsel due to their failure to timely pursue medical experts to address the cause and timing of the child's fatal injuries, which prejudiced Ms. Moore (App. Vol. XIV, 3723-3738). Consistent with its findings, the District Court entered a judgment conditionally granting Ms. Moore's writ of habeas corpus (*Id.* at 3739).

## **STATEMENT OF FACTS**[6]

At 2:58 p.m. on January 13, 2004, Beverly Moore frantically called 911, telling the emergency workers that her boyfriends' son, A.S., had collapsed and was only "sort of" breathing. (App. Vol. V, 1406-07.) Her boyfriend, Todd Snyder, had left their home only a few minutes prior, sometime around 2:45 p.m. (App. Vol. VIII,

---

[6] All other necessary facts are contained within the relevant propositions of error.

1874; Vol. I, 65.)

Within about fifteen minutes of the time the 911 call was placed, A.S. was loaded in the ambulance and was speeding towards Baptist Integris Medical Center ("IBMC"). En route, A.S.'s heart stopped beating, resuming only after the administration of CPR and heart-stimulating drugs, and just as the ambulance arrived at IBMC at 3:22 p.m. (App. Vol. I, 190-92, 204-08.)

A.S. underwent a CT scan shortly after arrival, which showed diffuse loss of gray/white differentiation consistent with diffuse cerebral edema (brain swelling) and a "tiny posterior interhemispheric central hematoma". (App. Vol. VI, 1638, 1648.) There was no evidence of any skull fracture or external trauma. (*Id.* at 1638, 1642, 1644, 1648.) At the time of admission, A.S. also suffered from an unspecified infection and disseminated intravascular coagulation – an inability for his blood to clot. (App. Vol. V, 1453; Vol. VI, 1616-17; Vol. VII, 1741-42, 1794; Vol. VIII, 1795-96, 1799.)

The medical providers immediately suspected child abuse. (App. Vol. VI, 1596-1600; Vol. I, 230, 237-38, 261, 275-76.) Dr. Griggs, A.S.'s treating physician, suspected A.S. was the victim of shaken baby syndrome ("SBS") based on the absence of external trauma, a history presented by the intake nurse (relating a story of unknown origin regarding A.S. rolling off a couch), and the presence of bilateral retinal bleeding. (App. Vol. II, 403-05.) Dr. Griggs sought a consultation from Dr.

David Korber, an ophthalmologist, to determine if A.S.'s eye findings were consistent with shaken baby syndrome. (*Id.* at 490, 495; Vol. VI, 1646.) Dr. Korber performed a visual examination and confirmed that A.S. suffered from bilateral retinal and vitreous hemorrhaging, which Dr. Korber claimed could only come from trauma, specifically shaking. (App. Vol. II, 491-44, 495-504, 508, 510-13.) After Dr. Korber conducted his examination, a pediatric neurologist also conducted an examination and found A.S. had swollen optic discs. (App. Vol. VI, 1615, 1647.)

Dr. Griggs was unaware of any significant medical history related to this child. (App. Vol. II, 428-29, 468 (concluding that the child was perfectly health prior to his collapse).) This was due, in part, to the medical history provided and Ms. Moore's and Mr. Snyder's responses to specific questions posed by Dr. Griggs. (App. Vol. II, 411-12.) However, the child had suffered from several falls in the week and months prior, including one three months prior after which the child had stopped growing (App. Vol. VIII, 1797; *Compare* App. Vol. VI, 1585 *with* App. Vol. V, 1427), several the month prior and one within the prior week after which the child had been lethargic and wanted to be held in a specific position (App. Vol. VI, 1649-52, Vol. VII, 1698-99, Vol. V, 1438-39, Vol. VI, 1593-94, 1610-11, Vol. VIII, 1907, 1922-23.) A.S. had been born at home in a bathtub to a mother who used drugs in her pregnancy, had severe developmental disabilities, and a history of failure to thrive (*See, e.g.,* App. Vol. VI, 1650-51, Vol. VIII, 1840, 1901-07.) Witnesses also

8

described the child having suffered seizure-like behaviors (App. Vol. VI, 1650, Vol. VII, 1699, 1742).

A.S. was pronounced brain dead approximately 26 hours after hospital admission. (App. Vol. VI, 1637-1640.) During his autopsy, forensic pathologist, Dr. Chai Choi, identified two deep layer contusions (bruises) on the inside of A.S.'s scalp with accompanying focal subgaleal hemorrhages and small subdural and subarachnoid hemorrhages, which produced about two teaspoons of blood. (App. Vol. V, 1426; Vol. VI, 1739.) In her microscopic examination, Dr. Choi noted that the contusions on the back of A.S.'s head (between the scalp and the skull) were "scattered hemosiderin laden" (App. Vol. V, 1434). The microscopic examination also revealed "focal leukostasis in the hemorrhagic area of the arachnoid space" of A.S.'s brain (*id.*), but there is no indication that Dr. Choi performed any tests or made any special stains of the slides to identify the source of the leukostatis or better determine the development of hemosiderin. Before having performed the autopsy, Dr. Choi had been told by the hospital that it was believed that A.S. suffered from shaken baby syndrome and that Ms. Moore had confessed. (App. Vol. II, 594-97; Vol. V, 1426.)

Ms. Moore was interviewed by the police, during which they repeatedly told her that the child's injuries could only be caused by shaking and that Ms. Moore had to be the one who shook the child because the brain damage would have been

immediate. (App. Vol. VIII, 1884-87, 1890-91; VII, 1773-75.) Ms. Moore repeatedly claimed that she had nothing wrong, but eventually gave a version of events that included having shaken A.S. mildly three or four times, and "guessing" that it was possible that A.S.'s head may have hit the floor once or twice while she was shaking him. (*Id.* at 1776-77; Vol. V, 1440, 1444-45.) These inculpatory statements are what the state and the Warden refer to as a "confession."

Ms. Moore was charged with A.S.'s murder. (App. Vol. IV, 945.)  Ms. Moore and her supporters provided information to Ms. Moore's attorneys about the child's medical history and his history of falls and provided money and contact information for possible experts that would look beyond the traditional shaken baby syndrome "triad" and offer opinions as to alternative causes of the child's death. (*See* App. Vol. VI, 1653.) Despite months going by, the only action taken by Ms. Moore's attorneys with respect to an expert was taken less than two weeks prior to trial, when her trial attorney contacted a pathologist in the Kansas City area. (App. Vol. XIV, 3724-3734.[7]) The pathologist was not asked to consider alternative causes of death or to provide medical expertise as to the timing of the injuries; she was not provided with any documents or other information about the child's history of falls, his prior

---

[7]  The record from the state evidentiary proceedings was not made part of the appellate record. Ms. Moore is therefore citing to the District Court's order on ineffective assistance of counsel and its findings, as the factual findings in that order were not challenged by the Warden in this appeal and therefore can be taken as true.

diagnosis of failure to thrive, history of seizure-like behaviors, or reports of the child's lethargy and positional discomfort the week prior to his death. (*Id.*) Although the pathologist ultimately agreed that medical records reviewed were consistent with shaken baby syndrome, she suggested Ms. Moore's trial attorneys conduct medical follow-up, including obtaining special stains to determine the timing of certain injuries and consulting with specialists such as a neuropathologist. (*Id.*) Ms. Moore's trial attorneys did not follow up on these suggestions. (*Id.*)

At trial, the State's experts all testified that the child's retinal hemorrhaging was "highly suggestive of", "consistent with" or "ha[d] to be" the result of a violent shaking injury. (App. Vol. II, 405, 512; Vol. III, 614-15, 637.) Dr. Choi also testified that the subdural hematoma was caused by tearing of the bridging veins that connect the brain to the sagittal sinus, which could only be caused by shaking. (App. Vol. III, 607-612; *see also* App. Vol. II, 419-25 (similar explanation from Dr. Griggs).) In part because of Beverly's "admission" during interrogation to A.S.'s head having hit the floor, as well as bruising found on the inside of the child's scalp, Dr. Choi concluded that a combination of shaking, and impact led to A.S.'s death. (App. Vol. II, 601-07, 612, 623-24, 634; *see also* Vol. II, 425, 477.)

As for the issue of timing, Drs. Grigg and Choi testified at trial that the interval between the time A.S. was shaken and the time of collapse would have been "immediate" or "within minutes". (App. Vol. II, 428-30, 444-49; Vol. II, 625-26,

636.) Dr. Korber initially disagreed, stating that it would be rare to see that extent of retinal hemorrhaging for an injury that occurred shortly before, and suggested that the injuries were within a week old. (App. Vol. II, 516-17.) However, on redirect, he deferred to Dr. Griggs' analysis on the time frame between injury and collapse. (*Id.* at 523-24.)

The defense, like the prosecution, accepted the SBS diagnosis as medical fact, and offered no alternative theory as to the cause of A.S.'s death or the timing of his fatal injuries. (App. Vol. I, 132-33; Vol. III, 819, 853-55.) Ms. Moore was found guilty. (*Id.* at 877.)

Through the habeas proceedings, Ms. Moore sought medical expertise as to the cause and timing of A.S.'s death. The medical experts created a differential diagnosis as to potential causes of death *other* than shaking. (App. Vol. V, 1448-54; Vol. VI, 1612-19; Vol. VII, 1738-42, 1791-94; Vol. VIII, 195-1800, 1908-16, Vol. IX, 2285-89.) More significantly as it relates to this appeal, is that they conducted various medical tests and made findings that indicated that this child's fatal injuries were sustained days, if not weeks prior to January 13, 2004. (*Id.*) For example, in the wounds the state's experts had attributed to both shaking and impact, the experts applied special stains to the microscopic slides and found the presence of hemosiderin (an iron-storage complex found in cells) and collagen (developing scar tissue) – both evidence of significant healing that takes days, if not longer, to

develop. (App. Vol. III, 608-611; Vol. VI, 1679; Vol. VII, 1740, 1793; Vol. VII, 1740, 1798, 1793; Vol. VIII, 1798; Vol. IX, 2285-87.) The child's eyes revealed papilledema (swelling of the optic nerve), and vitreous hemorrhaging (bleeding into the vitreous cavity), which also take days, if not longer, to develop. (Vol. VI, 1615, 1617-18; Vol. VII, 1794; Vol. VIII, 1795.) The District Court concluded that these conditions, coupled with the child's other medical history, "would prevent any reasonable jury from finding beyond a reasonable doubt that A.S. had died from traumatic injuries inflicted on January 13, 2004" and therefore a jury would "have had no basis to find that Ms. Moore had done anything to cause the boy's death." (App. Vol. IX, 2338-55; Vol. X, 2507-10.) The Court later concluded that the failure of Ms. Moore's trial counsel to timely consult medical experts on the timing and cause of the child's fatal injury was deficient performance and prejudicial to Ms. Moore. (App. Vol. XIV, 3690-3738.)

## SUMMARY OF THE ARGUMENT

Despite the Warden's failure to object to the Magistrate Judge's December 12, 2019, Report and Recommendation, wherein the court accepted the Warden's invitation to revisit the actual innocence determination and found, for the second time, that Ms. Moore had met the factual innocence standard of *Schlup v. Delo*, 513 U.S. 298 (1995), the Warden seeks appellate review and reversal of that finding. The Court should find the Warden's argument waived. Regardless, the District Court

acted well within its discretion in finding that there is a reasonable probability that in light of the new evidence, no reasonable juror would have convicted Ms. Moore of first-degree child abuse murder. Therefore, Ms. Moore's failure to timely file her habeas petition was excused, and the District Court was within its discretion to consider the merits of her constitutional claims.

Appellant does not challenge the district court's application of *Strickland v. Washington*, 466 U.S. 668 (1984) and ultimate finding that Ms. Moore's counsel acted deficiently by failing to consult with a medical expert witness until trial was imminent. This is so because the fact counsel did not contact a medical expert witness until ten (10) days before trial is uncontested.  That expert did not receive records to review until one week before the trial began and did not receive all the records that she requested. (App. Vol. XIV, 3724.) The district court judge found that there was no reasonable trial strategy for counsel's lack of action, and as such, it constituted deficient performance; it further found prejudice based on the new medical evidence. (App. Vol. XIV, 3727.) The Court should affirm the decision of the district court.

## APPLICABLE STANDARD OF REVIEW

Despite the evidentiary hearing held in state court, the merits of Ms. Moore's ineffective assistance of counsel and *Brady v. Maryland*, 373 U.S. 83 (1963) claims were not considered by the Oklahoma Court of Criminal Appeals as that court

deemed all of Ms. Moore's claims procedurally barred. (App. Vol. XI, 2779-2789.)
Therefore, the standard articulated in 28 U.S.C. § 2254(d) is not applicable to this
case. *Bland v. Sirmons*, 459 F.3d 999, 1010 (10th Cir. 2006).

An actual innocence gateway claim is not subject to the differential standard
of § 2254(d). Instead, it presents a mixed question of fact and law that is reviewed
*de novo*. *Fontenot v. Crow*, 4 F.4th 982, 1034 (10th Cir. 2021).

A claim of ineffective assistance of counsel is governed by the two-pronged
test of *Strickland v. Washington*, 466 U.S. 668 (1984). Ineffective assistance of
counsel claims present a mixed question of fact and law that is reviewed *de novo*.
*Cargle v. Mullin*, 317 F.3d 1196, 1206 (10th Cir. 2003). In conducting its review, this
Court accords due deference to the factual findings underlying the district court's
determination. *Littlejohn v. Royal*, 875 F.3d 548, 557-558 (10th Cir. 2017). Therefore,
in conducting *de novo* review, this Court reviews the district court's findings of fact
for clear error. *Id*. Further, this Court "may affirm the district court on any basis
supported by the record." *Richison v. Ernst Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir.
2011).

## ARGUMENT AND AUTHORITY

### *FIRST GROUND FOR RELIEF – APPELLANT WAIVED HER OBJECTIONS TO THE DISTRICT COURT'S FINDING OF ACTUAL INNOCENCE WHEN SHE INVITED THE COURT TO REVISIT THE FINDING AND THEN, WHEN IT DID, FAILED TO OBJECT TO THE SUBSEQUENT FINDING OF INNOCENCE.*

The Warden has waived her objection to the actual innocence determination made by Judge Purcell in his December 12, 2019, Report and Recommendation. (App Vol. XII, 3039-3060.) The Warden appears to contend that her objection to Judge Bacharach's original Report and Recommendation, (App. Vol. X, 2393-2408) addressing the timeliness of Ms. Moore's First Amended Petition for Writ of Habeas Corpus, preserved her objection for appeal in connection with the Court's review of Petitioner's Second Amended Petition and subsequent Report and Recommendation. (Applt's Brief at 21-22.) What the Warden completely overlooks, however, is that she abandoned[8] or waived her objection when she failed to object to Judge Purcell's later finding of innocence to overcome various procedural bars to the Second Amended Petition – a finding that was made after she herself invited the court to reconsider the original finding. (App. Vol. I, 20; Vol. XI, 2959 ("This Court can revisit the prior determination of probable actual innocence in light of the record that is now before this Court."))

After the lengthy period on remand and Ms. Moore's filing of a new pleading – Petitioner's Second Amended Petition for Writ of Habeas Corpus (App. Vol. XI,

---

[8] Curiously, the Warden suggests that she didn't object to the December 12, 2019, Report and Recommendation because of the judge's wholesale reliance on the previous report and recommendation such that "the writing was on the wall." This statement suggests that the Warden made the strategic decision not to object. Therefore, any challenge to those findings should be found to have been purposefully abandoned and therefore, waived for appellate purposes.

2790-2896), the Warden invited the Court to revisit the actual innocence determination the Court had issued prior to remand in response to Petitioner's First Amended Petition for Writ of Habeas Corpus. (App. Vol. XI, 2897-2990.) The Warden raised two procedural bars to the Second Amended Petition in that pleading – timeliness and exhaustion – and claimed that Ms. Moore could no longer overcome these bars by a showing of actual innocence/miscarriage of justice. Specifically, the Warden claimed that Ms. Moore could no longer meet the actual innocence standard in light of the expanded record from the state court proceedings, *and that the Court could not just apply the prior findings of innocence to the claims raised in the Second Amended Petition*. (*See, e.g., id.* at 59-61.)

Over Ms. Moore's objection, Judge Purcell reconsidered anew the evidence supporting Ms. Moore's innocence claim as applied to the Second Amended Petition. However, he reached the same ultimate conclusion as Judge Bacharach and Judge Cauthron had – that the evidence presented by Ms. Moore was sufficient to demonstrate her actual innocence and allow her constitutional claims be heard on the merits. (App. Vol. XII, 3039-3060.) The Warden then *chose* not to object to these findings despite being warned that the findings would not be reviewed on appeal if she did not do so. (*Id.* at 21-22 "The failure to timely object to this Report and Recommendation will result in waiver of appellate review of the recommended ruling.")  The Warden did respond to Ms. Moore's limited objection to the Report

17

and Recommendation (unrelated to the finding of innocence), so the Magistrate's Report certainly didn't go unnoticed.  (App. Vol. XII, 3083-3092.)

The District Court then adopted the factual findings and proposed conclusions of law and ordered briefing on the merits of Petitioner's Second Amended Petition. (App. Vol. XII, 3093-3097.)  In so doing, Judge Goodwin noted that "[N]o party has filed an objection to this portion of the R&R or to any finding therein." (*Id.* at 3095.) In footnote 2 of that Order, Judge Goodwin further noted:

> Nor has either party specifically moved the Court to revisit the Order issued by the Court on October 28, 2011, which specifically found: "Petitioner ha[s] made a sufficient showing of the probability of actual innocence sufficient to permit her case to overcome the limitations bar." Order (Doc. No. 139) at 2 (Cauthron, J.), adopting Proposed Findings of Fact & Conclusions of Law (Doc. No. 135) (Bacharach, M.J.); see also id. at 4 ("[T]he evidence presented by Petitioner demonstrating her actual innocence is sufficient to overcome the time bar which would otherwise bar her claim.").

By so noting, it appears that the District Court believed that the Warden not only waived review of Judge Purcell's findings, but also waived the opportunity to have Judge Goodwin review the original factual innocence finding made in 2011.[9]

The requirement that a party must object to the report and recommendation of a magistrate judge is rooted in 28 U.S.C. § 636 (b)(1)(C), which states in pertinent

---

[9] In the Warden's pleading entitled "Respondent's Objection to Supplemental Report and Recommendation" filed on April 6, 2021, the Warden attempted to renew the objection by referencing her previous objection to Judge Bacharach's *Schlup* determination. (App Vol. XIII, 3620.) However, that renewal is not sufficient to avoid the strict waiver rule.

part,

> Within fourteen days after being served with a copy, any party may serve
> and file written objections to such proposed findings and recommendations
> as provided by the rules of court. A judge of the court shall make a de novo
> determination of those portions of the report or specified proposed findings
> or recommendations to which objection is made.

Federal Rule of Civil Procedure 72 entitled "Magistrate Judges; Pre-trial Orders"

incorporates and expands on the statutory mandate. Specifically, Rule 72(b)(1)

states, "Within 14 days after being served with a copy of the recommended

disposition, a party may serve and file specific written objections to the proposed

findings and recommendations."  Under Rule 72(b)(1) the objection must be specific

so that the district court may conduct a *de novo* review of the objected to portion of

the magistrate's report.

Based on the foregoing, this Court has adopted a firm waiver rule, such that

failure to make timely objection to a magistrate judge's proposed findings waives

appellate review. *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991). Such

a rule is consistent with the Court's efficient allocation of judicial resources and

prevents a party from "'sandbagging' the district judge by failing to object and then

appealing." *Thomas v. Arn*, 474 U.S. 140, 148 (1985). Additionally, any objection

must be specific pursuant to Rule 72(b)(2).

When a second report and recommendation addresses the same arguments as an

earlier one, a party is required to renew any objections to preserve them as to the

second report and recommendation. *Greer v. Dowling*, 947 F.3d 1297, 1303 (10th Cir. 2020). Here, the second Report and Recommendation addressed Respondent's claims that (a) the *Second Amended Petition*[10] was procedurally barred, (b) the Court could not just apply the actual innocence determination made on the timeliness issue to the First Amended Petition, and (c) after consideration of all of the evidence post-remand, the Court would no longer find that Ms. Moore had met the actual innocence standard to allow any of her claims be considered on the merits. At the Warden's invitation, the Court once again reviewed the evidence presented to support Ms. Moore's innocence claim and found it as compelling as it was when presented almost a decade earlier in the First Amended Petition. Thus, if the Warden wanted to preserve any objections to the Court's determination as to Ms. Moore's innocence as providing the gateway to the Court's consideration of the Second Amended Petition, she was obligated to *object* to the second Report and Recommendation that made such a proposed finding.

In this landscape, the Warden gives three (3) reasons why the issue has not been waived for appellate review:  1) First, White objected to the FFCL that initially found

---

[10] The Second Amended Petition was, at that time and for the remainder of the litigation, the controlling pleading. *See Pacific Bell Telephone Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 456 n.4 (2009) (an amended complaint typically supersedes the prior one). It is unclear how the Warden contends that an objection to a prior (superseded) pleading, can preserve or revive an otherwise-waived objection to a second (controlling) pleading.

the actual-innocence [sic] gateway fulfilled; 2) Second, the only time White did not, in the strictest of terms, object was when the Magistrate Judge recommended denying the state procedural bar arguments within White's initial Response to the Second Amended Petition; and 3) Third, even assuming White could have initiated an interlocutory appeal as to the actual-innocence [sic] finding in the FFCL, "[a] failure to seek a stay or pursue an interlocutory appeal generally does not waive or otherwise prevent a party from appealing an adverse judgment." (Applt's Brief at 22-23.)

The Warden unquestionably did object to the first Report and Recommendation finding Ms. Moore had met the *Schlup* threshold showing. That objection properly preserved any appellate review of that finding made in 2011 but clearly could not have preserved appellate review of a report that was not issued until almost a decade later and based on new arguments and evidence. This is particularly true since the magistrate's re-consideration of *Schlup* to overcome the time bar was in response to the Warden's argument that Ms. Moore's Second Amended Petition raised issues not raised in the First Amended Petition.

The second reason the Warden submits her challenge to the gateway findings is not waived, is that her failure to object "in the strictest of terms" to the second Report and Recommendation finding Ms. Moore's evidence cleared the *Schlup* hurdle, is of no consequence, because she objected in later proceedings. Such argument clearly

ignores the fact that under the waiver rule, launching an objection following the issuance of the second Report and Recommendation was exactly the time, and the only time, the Warden needed to object to preserve the purported error for appellate review. To apply the rule any other way would allow issues to be raised on appeal even in the absence of a timely objection to the Report and Recommendation, which would in practice eliminate the rule altogether.

The Warden's argument relies on a strained reading of the holding in *Greer*. In *Greer*, the district court had granted summary judgment twice in a prison conditions lawsuit. The appellant objected to the first report and recommendation granting summary judgment to the defendants on some grounds but failed to object to a subsequent report and recommendation for summary judgment on two additional grounds. *Greer*, 947 F.3d at 1304. Mr. Greer argued that since the second report and recommendation incorporated arguments from the first report and recommendation, his objections to the first report also should have been incorporated. *Id.*

Disagreeing, this Court held that Mr. Greer's failure to renew his objections to the first report and recommendation waived appellate review of those issues. *Id*. It is unclear how a straightforward application of *Greer* gives the Warden here an avenue to overcome her failure to timely object to the second Report and Recommendation. Here, unlike *Greer*, the second Report and Recommendation didn't merely address different grounds for summary judgment on the same

controlling pleading. The Warden objected to the new controlling pleading *on the same grounds* (plus some additional) than she had asserted to the prior one. She may have preserved the objection to the First Amended Petition, but didn't preserve her objection to the Second Amended Petition.

The Warden's failure to file a timely objection to the magistrate's *Schlup* determination in response to the Warden's argument that the claims raised in Ms. Moore's supplemental habeas petition were untimely has clearly waived appellate review of that issue. Likewise, the Warden has waived appellate review of the factual basis of the prejudice analysis in the court's *Strickland* prejudice holding. In light of the waiver of appellate review, the order of the district court should be affirmed.

**SECOND GROUND FOR RELIEF – THE DISTRICT COURT DID NOT ERROR IN FINDING IT WAS MORE LIKELY THAN NOT THAT NO REASONABLE JURY WOULD HAVE CONVICTED MS. MOORE IN LIGHT OF THE NEW EVIDENCE PRESENTED.**

1. *The District Court applied the correct standard in evaluating the actual innocence claim.*

Respondent would have this Court reverse the district court's *Schlup* gateway finding because she can envision other theoretical evidentiary bases for conviction based on the State's evidence presented at trial.[11] In so doing, the Warden conflates

---

[11] While urging that the evidence can still support a finding of guilt, the Warden fails to mention that at least one basis of the State's witness's medical opinions at trial is no longer considered true within the scientific community. Both Dr. Griggs and Dr. Choi testified that A.S. could not have remained conscious after receiving the type

the standard of factual innocence articulated in *Schlup* and *House v. Bell,* 547 U.S. 518 (2006), and a sufficiency of the evidence analysis under *Jackson v. Virginia*, 443 U.S. 307 (1979).   Rather than evaluating the innocence gateway claim with the guidance set forth in *Schlup*, the Warden asks this Court to find that the district court erred in finding the *Schlup* standard because there is still evidence (or at least evidentiary theories) that a reasonable jury could have based a finding of guilt. This analytical framework was expressly rejected by the *Schlup* Court and the *House* Court.

---

of injury they believed he had sustained.  However, that theory has been dispelled by evidence-based medicine and it is unlikely the State could put that evidence on again. *See* AK Choudhary et al., *Consensus Statement on Abusive Head Trauma in Infants and Young Children,* 48 PEDIATRIC RADIOLOGY 1048, 1052 (2018) ("There is no evidence that children with fatal head trauma have prolonged asymptomatic lucid intervals prior to neurologic collapse. Some victims of AHT who sustain non-fatal injuries have nonspecific symptoms for several hours or more before developing either seizures or coma, while others remain relatively asymptomatic. Sixty-five percent of AHT cases present with neurologic abnormality while the remainder present with nonspecific symptoms. This lack of specificity and other factors can lead to inaccurate diagnosis unless the evaluating physician understands the broad clinical spectrum of AHT.") (citations omitted).  *See also* R. Papetti *et al.*, *Outside the Echo Chamber: A Response to the "Consensus Statement On Abusive Head Trauma In Infants and Young Children."* 59 SANCLR 299, 334 (2019) ("The understanding that the brain injury in these cases reflected traumatic DAI contributed to the false beliefs (and courtroom talking points) that these children had endured forces akin to those in auto accidents and multi-story falls and that the nature of the brain injury in these cases is incompatible with the child having a lucid interval between the time of injury and collapse.  But the understanding was wrong.) (citations omitted).

Under the *Jackson* standard, a reviewing court looks at the evidence in the light most favorable to the State to determine whether any rational trier of fact could find guilt beyond a reasonable doubt. *House*, 547 U.S. at 538 (clarifying the rule handed down in *Schlup v. Delo*, 513 U.S. 298 (1995)). Instead, because a *Schlup* claim involves evidence that the jury did not have in front of it, the Court must "assess how reasonable jurors would react to the overall, newly supplemented record." *Id*. The *House* Court further explained "[I]f new evidence so requires; this may include consideration of "the credibility of the witnesses presented at trial." *Id*.

Driving home this point, many of the cases the Warden relies on to support her arguments including *Diestel v. Hines*, 506 F.3d 1249, 1267-1268 (10th Cir. 2007), *United States v. Oliver*, 278 F.3d 1035, 1043 (10th Cir. 2001), and *Ryder v. State*, 83 P.3d 856, 868 (Okl. Cr. 2004) address challenges to the sufficiency of the evidence under the *Jackson* standard. In another of the Warden's cases, *Day v. State*, 303 P.3d 291, 296 (Okl. Cr. 2013) the issue considered by the Oklahoma Court of Criminal Appeals was whether a hearing was required before the State could admit expert testimony as to the theory of Shaken Baby Syndrome under *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), not whether newly discovered evidence probably resulted in the conviction of someone who is factually innocent. While the Warden is correct that, generally speaking, the jury determines the weight and credibility to give to a witness's testimony presented to it, so too can a federal habeas

court conducting the *Schlup* gateway analysis when reliable new evidence is produced.

Consistent with the directives of *Schlup* and *House*, the district court engaged in exactly that analysis and concluded that there was a reasonable likelihood that in light of the new evidence, no reasonable juror would have convicted Ms. Moore.[12] (App. Vol. XII, 3094-3095). Because the district court conducted the analysis prescribed by *Schlup* and *House*, Respondent's complaints about the conclusion the court reached should not result in a reversal of the court's finding.

2. *The District Court correctly found that the medical evidence as to timing of the fatal injuries was undisputed and satisfied the actual innocence standard.*

A. *A reasonable jury could not conclude that A.S. was "perfectly healthy" before his collapse on January 13, 2004.*

Two of the state's experts at trial concluded that A.S.'s collapse would have immediately followed acute trauma. (App. Vol. II, 428-29; App. Vol. III, 625-26, 636.) Both opinions were premised, at least in part, based on their understanding that A.S. was a normal healthy child minutes before. (App. Vol. II, 428-29, 468 (indicating that the basis for Dr. Grigg's opinion was "specifically with the history that this child was perfectly fine until the point of a history of a fall"); Vol. II, 594,

---

[12] Again, the district court adopted the report and recommendation of the magistrate in the absence of any objection by either party. (App. Vol. XII, 3095)

596.) The District Court concluded that these doctors' understanding about the health of the child before collapse was mistaken based on the undisputed evidence of prior injuries and potential health issues leading up to his collapse. (App. Vol. IX, 2340-41, 2352-53, 2360.) The Warden challenges this conclusion based on (a) the omission of this information from the medical history provided by Ms. Moore and the child's father at the time of the child's hospital admission; and (b) by challenging whether the prior falls occurred at all.[13]

### i.     The existence of prior falls is undisputed.

Notably, in proceedings before the Magistrate Judge, the Warden clarified that she was *not* disputing *whether* the falls occurred, only whether they were severe enough to lead to A.S.'s death. (App. Vol. VII, 2044 n.26) The Warden has now reversed course and is challenging the *existence* of the falls; a move that should be rejected on the grounds of waiver. *See Marshall*, 75 F.3d at 1426-27. Should the Court overlook the Warden's waiver and consider her argument on the existence of the prior falls, it should conclude that there is no dispute that the falls occurred and were severe enough to cause the child's fatal injuries.

The Warden concedes that A.S. fell off the porch onto a concrete step three

---

[13] The Warden does not appear to challenge the child's other medical history demonstrating he wasn't a "healthy" "normal" child on January 13, 2004, such as the child's prior diagnosis for failure to thrive or his history of what appears to be seizures; nor does the Warden dispute that the child suffered from some type of infection and a clotting disorder upon admission to the hospital.

months before his collapse. However, the Warden contends that such a fall was minor and unrelated to the child's collapse in January. Specifically, she points to the facts that this fall occurred three months prior to the child's fatal collapse, the child injured his *front* forehead in the fall and was merely treated on an outpatient basis. Although Ms. Moore recognizes the location of the injury, she contends that the injury was still significant and relevant. Photos and statements of witnesses verify that the swelling and bruising on the child's forehead was visible for *months* after the fall (*see, e.g.,* App. Vol. VI, 1576-1579, 1650-51; Vol. VII, 1700) and, indeed, was still visible at the child's autopsy (App. Vol. V, 1427-1428; Vol. VIII, 1797). Perhaps even more significantly, however, is the fact that the child abruptly stopped growing after the fall (App. Vol. VIII, 1797; *Compare* App. Vol. VI, 1585 *with* App. Vol. V, 1427). Therefore, the undisputed medical evidence is that A.S. suffered a significant head injury three months prior to his death.

The Warden challenges the existence of any *other* falls or injuries, including two the month before and one in a cast iron bathtub a week prior to A.S.'s collapse. The Warden claims that Ms. Moore produced no reliable evidence of such falls because the anecdotal history of falls comes from Ms. Moore and her parents. First, the case law the Warden relies on does not warrant the conclusions she seeks. Second, and perhaps even more significantly, the Warden overlooks corroborating evidence of these falls from sources *other* than Ms. Moore and her parents.

28

The Warden relies on three cases for the assertion that the jury could have concluded that the jury could have disregarded evidence of the prior falls. *See House*, 547 U.S. at 552; *Jones v. Taylor*, 763 F.3d 1242, 1249 (9th Cir. 2014), *McCray v Vasbinder*, 499 F.3d 568, 573 (6th Cir. 2007). In all three cases, the respective court considered the source of the affidavits as only one factor, along with a host of other factors, in determining the potential weight to give the affidavits. In *Jones*, 763 F.3d at 1249, the court gave little weight to recantations of prior trial testimony and concluded the affidavits recanting prior testimony were insufficient to meet the *Schlup* standard. Recanting prior sworn testimony is quite different than the situation here where, at best, the claim is that Ms. Moore did not *volunteer* information to A.S.'s treating doctor about the bathtub fall,[14] although it is undisputed that promptly sought to explore this and other falls during the criminal trial but was *prohibited* from doing so. (App. Vol. I, 0081-83; *see also* Vol. VI, 1652-53 (describing pretrial efforts of witness to explore possible link between these falls and child's death.)) Moreover, unlike the facts in both *Jones* and *McCray,* there is significant evidence here corroborating the witness statements about the child's prior falls, most significantly the medical evidence which dates the *only* evidence of an impact injury to the *back* of A.S.'s head to an event that would have occurred approximately a

---

[14] There is no evidence that the treating doctor asked about any prior falls/ head injuries. (App. Vol. II, 411-12; Vol. V, 1439.)

week prior to the child's collapse.

Not only did Ms. Moore present her and her parents *first hand* observations and reports they received of A.S.'s prior falls (App. Vol. V, 1438-39; Vol. VI, 1610-11), she presented additional first hand testimonial evidence of observed falls through the declarations of Ms. Moore's *former* mother-in-law and A.S.'s daycare providers (App. Vol. VI, 1649-52; Vol. VII, 1698-99; Vol. VIII, 1922-23).[15] Additionally, she

---

[15] Although the Warden doesn't directly challenge the reliability of the daycare workers as it relates to the existence or severity of prior falls, she does suggest in another context (regarding the child's developmental disabilities) that their declarations "suffer from the same pitfalls." (Applt's Br., 38 n.19.) The Warden points out that Ms. Moore was friends with Ms. Roth, who owned the daycare and because Ms. Jones was working for Ms. Roth at the time the incident occurred (she was not working for Ms. Roth at the time she gave her affidavit), both Ms. Roth and Ms. Jones' testimony is unreliable on that point. Even were the Court to view Ms. Roth's declaration with an extra dose of skepticism because of her friendship with Ms. Moore, there is no basis to do so for Ms. Jones, with whom Ms. Moore had no contact since the time of arrest and was no longer working for Ms. Roth at the time of her statement. Moreover, the Warden completely ignores the District Court's conclusion that, even when the evidence of prior falls was viewed with skepticism, the undisputed medical evidence was that the child was not "perfectly fine" on January 13, 2004, as presumed by the state's medical experts. (*See* App. Vol. IX, 2339.) The undisputed (and indeed) objective medical evidence supports the statements of the witnesses. For example, with respect to the daycare workers' statements regarding the child's developmental delays (now challenged by the Warden, despite not challenging below and therefore having waived the challenge)) are consistent with the child's eligibility for Sooner Start, which requires the child be "developmentally delayed", *see* 70 Okla. Stat. §13-123, and the child's continued receipt of such services until the time of his death. Moreover, it is consistent with the child's father's representations to the court in his divorce proceedings that A.S. had "*significant* developmental and speech delays." (App. Vol. VIII, 1901.) Thus, although the Warden's challenge to the reliability of the daycare worker statements was limited to their testimony of the child being significantly developmentally

presented evidence as to changes in A.S.'s energy level after the bathtub fall via both witness statements (*Id.*; App. Vol. VI, 1593-94) and the child's Sooner Start records, which describe A.S. on 1/8/2004 (five days before collapse) as "very lethargic and non-cooperative," prompting the therapist to end the session early. (App. Vol. VIII, 1907.)

In short, the Magistrate Judge was correct in concluding that a reasonable jury could not have concluded that the child was "perfectly fine" prior to 2:45 p.m. on January 13, 2004. The undisputed evidence is that this child suffered from numerous and *significant* falls in the past, including a fall within a week or so of his collapse, causing others to observe him as lethargic, along with suffering from a host of other significant medical conditions. Therefore, the appellate court should affirm the District Court's determination that it is more likely than not that no reasonable jury could conclude that the child was "perfectly healthy" prior to 2:45 p.m. on January 13, 2004.

ii.   *It is unlikely that a reasonable jury would disregard all of the medical evidence and witness observations as to the state of the child's health prior to collapse because of the dialogue between Ms. Moore and Dr. Griggs at the hospital.*

The Warden claims that the Magistrate Judge failed to consider whether a reasonable, properly instructed jury, could disregard the undisputed evidence as to

---

delayed, their statements on the issue of the prior falls was also appropriate credited as consistent with other documentary evidence.

the child's medical history and prior falls and find nonetheless that the child was "normal" and "healthy" immediately before the collapse because of the medical history Ms. Moore and Mr. Snyder provided to Dr. Griggs at the hospital. Ms. Moore and Mr. Snyder reportedly answered questions about the child's behavior, and notable changes in his level of consciousness, his gait, or presence of confusion, fever, or vomiting, to which they consistently replied "no". (App. Vol. II, 411-12.) They reported that the child had done well previously that day and seemed in good health but for ongoing issues with diarrhea. (*Id.*) Ms. Moore admits that she did not specifically call Dr. Griggs' attention to A.S.'s energy level/lethargy preceding the fall as she attributed that to his diarrhea; Dr. Griggs did not ask about any prior falls.[16] (App. Vol. V, 1439.)

The colloquy with Dr. Griggs in the hospital is not evidence that the child was "normal" and "perfectly healthy" immediately preceding his collapse; only that neither Ms. Moore or Mr. Snyder noted any changes in levels of consciousness or the child's gait, nor saw evidence of confusion, fever or vomiting earlier in that day. As noted by the Magistrate Judge, whether Dr. Griggs misunderstood the medical history provided by Ms. Moore and Mr. Snyder, or Ms. Moore and Mr. Snyder did

---

[16] There also is no evidence that Dr. Griggs asked any questions about the child's developmental history, or his history of failure to thrive; nor any evidence as to questions that would have elicited information about the child's observed seizure-like behaviors.

not disclose (whether intentionally or by failing to recognize the significance of the information) what ultimately would be relevant information about the child's falls, history of developmental delays and potential seizures, the undisputed medical evidence is that the child was not "perfectly healthy" before January 13, 2004. The appellate court should affirm this finding.

> B.  *The undisputed medical evidence is that the injury or illness that caused the child's death occurred days if not weeks before his collapse.*

> i.  *The undisputed medical evidence dates the child's injuries to days, if not weeks before January 13, 2004.*

The State's experts varied on whether the mechanism of injury that led to A.S.'s death was shaking or shaking plus impact. The evidence they contended showed that the child had been shaken included the presence of (a) retinal (and vitreous) hemorrhaging, (App. Vol. II, 427-28, 444, 492-93, 501-12); (b) subdural bleeding; and (c) cerebral edema (swelling of the brain) indicated that the child had been violently shaken. (*Id.* at 406-07; Vol. III, 608-611.) Although the original examination did not reveal any blunt force trauma to the head, the official cause of death was blunt force head trauma, which Dr. Choi and, eventually, Dr. Griggs contended was evidence of shaking plus impact because of the autopsy findings of (d) a major injury to the back of A.S.'s head, shown by corresponding internal and external bruising and hemorrhaging in the occipital region. (App. Vol. II, 406-07; Vol. III, 610-11, 630-31; Vol. V, 1426.)

Based on his understanding that the child was "perfectly fine" up to the time of his collapse and the degree of injury, Dr. Griggs concluded that the child would have become immediately symptomatic after being shaken. (App. Vol. II, 428-29) Dr. Choi was less definitive, claiming that the length of time between shaking and collapse would have depended on the severity of the impact and how the child tolerated the shaking, but could have been as quickly as immediate. (App. Vol. III, 625-26, 636.)

An analysis of the actual injuries sustained by the child and relied upon by the state's experts demonstrates that the primary injury to the child's brain occurred days before January 13, 2004.

Testing on both the subscapular bruising and bleeding (the impact wound relied upon to show "impact") revealed the presence of hemosiderin (an iron-storage protein found in a type of white blood cells during the healing process) and collagen (developing scar tissue). (App. Vol. VII, 1740, 1793; Vol. VIII, 1798; Vol. IX, 2285-86.) Similarly, with respect to the subdural bleeding (the bleeding in the space between the brain and the membrane), which Dr. Choi attributed to the child having been shaken (App. Vol. III, 608-611), also showed the presence of hemosiderin. (App. Vol. VIII, 1912-13.) Hemosiderin does not develop in a wound until several days after the original injury; the development of scar tissue occurs even later. (*Id*.; App. Vol. VI, 1679; Vol. VII, 1740, 1793; Vol. VIII, 1798; Vol. IX 2285-86.)

Therefore, presence of hemosiderin in both wounds and the presence of collagen in the impact injury indicate that both the "impact" and any subdural bleeding the state's experts attributed to "shaking" occurred days or weeks before January 13, 2004.

The state of the hemorrhaging and swelling of the child's eyes (attributed to the shaking mechanism and trauma) also supports the conclusion that the brain injury occurred days, if not longer, before the child's collapse. Before the child was declared brain dead, he was examined by Dr. Korber, who concluded that the child suffered from retinal and vitreous hemorrhaging. (App. Vol. II, 501-12; Vol. VI, 1646.) A pediatric neurologist who also saw the child concluded that his "[f]undi are remarkable for disc swelling." (App. Vol. VI, 1647.) These conclusions are consistent with those of Ms. Moore's experts, who refer to the swelling as papilledema. (Vol. VI, 1615, 1617-18; Vol. VII, 1794, Vol. VIII, 1795.)

Papilledema is a condition that develops after prolonged intracranial pressure and generally takes at least three days or even a week or more to develop. (App. Vol. VI, 1615, 1617-18; Vol. VII, 1794; Vol. VIII, 1795.) At trial, Dr. Korber opined that, given the level of damage to the child's brain, he did not think that the child would have lost consciousness immediately after injury; he thinks they followed injury by a few days to a week. (App. Vol. II, 1516-10.) The timing suggested by the presence of papilledema is consistent with Dr. Korber's estimate at trial and the fact that A.S.

also had vitreous hemorrhaging, which generally takes time to develop (App. Vol. VI, 1615).

This Court should affirm the District Court's finding that the undisputed medical evidence indicated that the fatal injuries sustained by A.S. occurred days, if not longer, before January 13, 2004.

ii.   *It is not likely that the jury would disregard the undisputed medical evidence of timing.*

The Warden has presented nothing to challenge the medical evidence relied upon by the District Court to determine timing – she doesn't dispute the presence of hemosiderin, collagen, or papilledema, etc. There was no evidence at trial presented on these findings or their significance, and the Warden presented none in the actual innocence proceedings. The Warden claims, however, that a reasonably instructed jury could still disregard these findings because it could have disbelieved Ms. Moore's experts. Specifically, she asserts that (1) she would have cross-examined these experts on their biases and criticism of shaken-baby syndrome, which may have led the jury to reject the evidence on timing, and (2) because Ms. Moore's experts offer varying conclusions as to the causes of the child's injuries, which the jury could reject because of alleged conflict with other evidence, it could similarly reject their conclusions as to timing of the established injuries, despite no conflict with any other medical evidence.

The Warden employs a standard for actual innocence that is much higher than that imposed by law– Ms. Moore is not required to show that there is no way that no possible juror would not have convicted her under any possible theory – only that it is more probable than not that no reasonable juror would have done so after considering the new evidence. *See Schlup,* 513 U.S. at 329; *House*, 547 U.S. at 538. Here, it is more probable than not that a jury would consider the undisputed medical evidence on timing, the consistency of such evidence with many of the medical findings of the state's witnesses, and the statements of numerous witnesses about the child's history and find Ms. Moore not guilty regardless of the witnesses' criticism of an admittedly controversial theory. This is true even if they rejected those same witness's testimony as to causation, for which there was disputed evidence presented. This Court should affirm the District Court's determination that the undisputed evidence of timing makes it more likely than not that no reasonable jury would have concluded that Ms. Moore caused A.S.'s fatal injuries on January 13, 2004.

### C. Ms. Moore's statements and actions after A.S.'s collapse do not provide an alternative theory on which a jury could have found her guilty

The Warden raises another new argument she did not present during the original innocence proceedings (and therefore is waived), that Ms. Moore's alleged admissions the day of the incident would permit the jury to have found her guilty of A.S.'s death because they contain admissions to the use of "unreasonable force" that

may have "substantially contributed" to A.S.'s death. The Warden contends that the evidence of unreasonable force on January 13, 2004, can be found in Ms. Moore's post-incident statement and actions, most notably her statement during her investigative interview regarding having shaken A.S. and her agreement that it is possible that the child's head may have hit the floor once or twice. The Warden further contends for the first time on appeal that this new theory is supported by Ms. Moore's experts' discussions on "second impact syndrome."

This is not a theory advanced at trial on which a jury rendered a verdict, nor was it raised before the Magistrate Judge. It should therefore be rejected on the issue of waiver. Issues argued for the first time on appeal are generally waived. *Little v. Budd Company Inc*., 955 F.3d 816, 821 (10th Cir. 2020). This is true "whether the newly raised argument is a bald-face new issue or a new theory on appeal that falls under the same general category as an argument presented at trial." *Id*. Moreover, it is a theory for which consideration now – without the benefit of additional relevant expert testimony – would require the Court to engage in speculation and would prejudice Ms. Moore without an ample opportunity to respond. Were the Court to consider this new theory, it should nonetheless reject it as it doesn't change the conclusion that it is more likely than not that no reasonable jury would have convicted Ms. Moore in light of the new evidence.

Second impact syndrome occurs when a child has suffered a prior head injury

and then suffers a second (or subsequent) head injury in the following days of weeks that is trivial in nature, causing brain swelling and collapse and even bleeding in the area of the pre-existing head injury.  Ms. Moore's experts' discussions of second impact syndrome included the following:

- Dr. Patrick Barnes, a pediatric neuroradiologist, opined that second impact syndrome – a *trivial* trauma following a prior head injury is one possible explanation for the "tiny interhemispheric hemorrhage noted on the initial CT." (App. Vol. V, 1453.)

- Dr. Janice Ophoven, a forensic pathologist, indicated that the child's history of falls pre-dating January 13, 2004, is consistent with second impact syndrome, resulting from multiple falls/impact. (App. Vol. VIII, 1798.)

- Dr. Julie Mack, a radiologist who specializes in correlating radiology images and other findings to the dura in infants and children, recognizes that a "trivial impact may trigger disproportionate brainswelling and a small hemorrhage in the presence of pre-existing head injury." (App. Vol. VII, 1742.)

- Dr. Waney Squier, a forensic neuropathologist, describes second impact syndrome as evident in typically young persons who have a head injury, usually with a small subdural hemorrhage, who then seemingly recover, only to collapse with massive brain swelling if they have a second, very minor, trauma in the ensuing days. (App. Vol. VIII, 1914.)

The Warden contends that second impact syndrome is consistent with Ms. Moore's admissions to having shaken the child three or four times while his head may have made contact with the carpeted floor. The Warden claims that a jury could conclude that Ms. Moore's characterization of these shakes as "mild" was her minimizing her conduct and that she had, instead, *slammed* A.S.'s head against the

39

floor, triggering his final collapse through an act of unreasonable force sufficient to warrant a conviction for murder.[17]

The medical evidence on second impact syndrome provides as a possible medical explanation for (1) the evidence of a *prior* (older) head injury and (2) the *absence* of evidence of any significant second (new) injury coupled with a sudden collapse.[18] Here, there was considerable evidence showing that A.S.'s subdural bleeding and swelling had been going on for some time and evidence of a prior head injury to the back of A.S.'s head but *no* evidence of a recent injury. (*See, e.g.,* App. Vol. VI, 1647 (pediatric neurologist noting at 17:50 on 1/14/04, that there were "no external signs of trauma, i.e. masses or bruises.")) There was no evidence of any fresh bleeding from a head wound or external inflammation around an alleged impact site, as would have occurred if the child had A.S.'s head "slammed" into the floor, as suggested by the Warden.

Second impact syndrome applies, then, when a *trivial* second injury occurs, triggering a collapse because of the damage from the original brain injury. By definition, and particularly in this case where the medical evidence failed to show any significant injury to the child on January 13, 2004, the second injury would have

---

[17] Ms. Moore never used the term "slammed" or anything close.

[18] Notably, the State's experts were not asked about second-impact syndrome at trial; therefore, there is nothing in the record to suggest that they would have testified differently than Ms. Moore's experts.

been "trivial" and inconsistent with the use of "unreasonable force". Thus, nothing about the discussion of second-impact syndrome and the state's newest theory changes the analysis and conclusion that no reasonable jury could find that Ms. Moore applied unreasonable force to A.S. on January 13, 2004, causing or even substantially contributing to his death.

This Court should either reject the Warden's new theory of liability based on second-impact syndrome as waived, or, alternatively, affirm the District Court's determination that it is more likely than not than no reasonable juror would have concluded that Ms. Moore did *anything* to cause A.S.'s death on January 13, 2004, in light of the undisputed medical evidence as to the timing of the fatal injuries.


## <u>CONCLUSION</u>

The Warden's challenge to the actual innocence exception was waived when (1) she expressly invited the District Court to revisit its prior determination after Ms. Moore filed a Second Amended Petition, (2) the District Court did so, and (3) the Warden elected *not* to object to the second innocence finding. Should this Court find that waiver does not preclude consideration, it should affirm the District Court's finding that Ms. Moore presented sufficient evidence to pass through the actual innocence gateway, such that the District Court properly considered the merits of her constitutional claim.

Respectfully Submitted

**s/ CHRISTINE M. CAVE**
**CHRISTINE M. CAVE, OBA #19774**
3500 S. Boulevard, Suite 14-B
Edmond, Oklahoma 73003
(405) 702-9797
(405) 576-3956 (FAX)
ccave@okemployerlaw.com
mainoffice@okemployerlaw.com

**s/ANDREA DIGILIO MILLER**
**ANDREA DIGILIO MILLER**
800 N. Harvey Avenue,
Oklahoma City, OK 7310
(405) 208-6161
admiller@okcu.edu
**ATTORNEYS FOR PETITIONER**

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 10,690 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point type.

s/CHRISTINE M. CAVE

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was electronically filed with the Clerk of this Court on February 7, 2024, and for electronic transmission to:

42

Tessa L. Henry
Keeley L. Miller
Assistant Attorneys General
Attorneys for the Appellant

<u>s/CHRISTINE M. CAVE</u>

## **<u>CERTIFICATE OF DIGITAL SUBMISSION</u>**

This is to certify that:

All required redactions have been made and, with the exception of those redactions, every document submitted in Digital Form or scanned PDF format is an exact copy of the document filed with the Clerk;

<u>s/CHRISTINE M. CAVE</u>

43

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

BEVERLY MICHELLE MOORE,          )
                                 )
                    Petitioner,  )
                                 )
        vs.                      )          No. CIV-09-985-C
                                 )
WARDEN MILLICENT NEWTON-         )
EMBRY,                           )
                                 )
                    Respondent.  )

ORDER

In 2005, Petitioner was found guilty of murder and sentenced to life without the possibility of parole. Thereafter, the Oklahoma Court of Criminal Appeals ("OCCA") modified her sentence to add the possibility of parole after Petitioner filed a direct appeal of her sentence claiming ineffective assistance of counsel. Petitioner filed a post-conviction proceeding where she again claimed ineffective assistance counsel due to her attorney's failure to present a medical expert, which was ultimately dismissed by the OCCA for failure to attach a copy of the district court's ruling. Presently, Petitioner seeks relief in federal court. Consistent with the provisions of 28 U.S.C. § 636(b)(1)(B), this action was referred to United States Magistrate Judge Robert E. Bacharach. Judge Bacharach entered a Report and Recommendation ("R&R") on February 10, 2012, to which Respondent timely objected and this Court will review de novo.

ATTACHMENT 1

The substantive facts and law are accurately set out in the Magistrate Judge's R&R and there is no purpose to be served in repeating them yet again.  Judge Bacharach concluded that exhaustion would be futile here in light of the prohibition of filing second and subsequent post-conviction proceedings in non-capital cases, and, therefore, found that failure to exhaust state court remedies prior to filing the present action would not be fatal to Petitioner's claim.

Respondent raises as a point of contention with the R&R Judge Bacharach's silence on the Petitioner's "cause and prejudice."  (Resp. Br., Dkt. No. 165, at 5.)  But, as Judge Bacharach aptly points out in his R&R, procedural default was not raised in the Respondent's Limited Answer.  (R&R, Dkt. No. 162, at 6 ("The perceived anomaly implicates the doctrine of procedural default, rather than exhaustion.  Although the Respondent has reserved her right to urge procedural default, she has not raised the issue at this stage." (footnotes omitted)).)

In response to the Respondent's objection, the Petitioner argues that she has in fact exhausted her claim and, if the Court should disagree, that the Petitioner should be excused from exhausting her claims in the interests of justice.

Setting aside, for now, the correctness of Judge Bacharach's findings, the Court instead focuses on the substantial newfound evidence developed in federal court regarding the Petitioner's actual innocence, the state attorneys' persistence that this matter be presented in state court before continuing with federal habeas proceedings, and the importance of comity and federalism.  Considering these factors, the Court concludes that the state courts should be given an opportunity to address this matter in the first instance.  See Granberry v.

Greer, 481 U.S. 129, 134-35 (1987) ("If . . . the case presents an issue on which an unresolved question of fact or of state law might have an important bearing, both comity and judicial efficiency may make it appropriate for the court to insist on complete exhaustion to make sure that it may ultimately review the issue on a fully informed basis.").

Accordingly, the Court declines, at this time, to adopt the Report and Recommendation of the Magistrate Judge, and instead stays the case pending exhaustion of state remedies. The Motion to Stay (Dkt No. 166) is MOOT. Within 30 days, Petitioner will file proof that exhaustion of her state remedies has been initiated, whereupon the Clerk will administratively close the case pending the final resolution of the state court proceedings.

IT IS SO ORDERED this 6th day of April, 2012.


ROBIN J. CAUTHRON
United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **BEVERLY MICHELLE MOORE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-09-985-G** |
| | ) | |
| **WARDEN MILLICENT NEWTON-EMBRY,** | ) | |
| | ) | |
| | ) | |
| **Respondent.** | ) | |

### ORDER

On April 6, 2012, the Court stayed this habeas action so that the state court could address, in the first instance, "substantial newfound evidence developed in federal court." Order (Doc. No. 182).  On November 9, 2018, Petitioner—notifying the Court that her application for post-conviction relief had been denied by the state court on March 27, 2018, and that such denial was affirmed by the Oklahoma Court of Criminal Appeals on October 12, 2018—moved that the stay be lifted.  Pl.'s Mot. at 2-3 (Doc. No. 218).  Respondent's time to object has passed and no response was filed.

There being no objection, and for good cause shown, the Court GRANTS Plaintiff's Motion to Lift the Stay (Doc. No. 218).  Further, the Court orders as follows:

1.  Petitioner shall file any amended pleading on or before March 19, 2019.

2.  Respondent shall file an answer addressing the allegations of Petitioner's operative pleading no later than May 18, 2019.  This answer should address:

   a.  Whether Petitioner's claims were timely filed;

**ATTACHMENT 2**

b. Whether any claim in the petition is barred by a failure to exhaust state remedies, a procedural bar, or nonretroactivity; and

c. Whether an evidentiary hearing is required as to each of the grounds for relief alleged.

The answer should also provide an analysis of each of said grounds and any cases and supporting documents relied upon by Respondent in opposition to said grounds.

3. The answer shall provide all evidence in the record that is relevant to Petitioner's claims, including but not limited to transcripts and recordings that Respondent deems relevant.

4. Respondent must file with the answer a copy of any brief submitted by Petitioner or by the State in either postconviction proceedings or in any appeal contesting the conviction, the sentence, or a judgment or order in postconviction proceedings.

5. Respondent must also file with the answer a copy of all opinions and dispositive orders of the trial and appellate courts relating to the conviction, sentence, or postconviction proceedings.

6. In lieu of filing a formal answer, Respondent, where appropriate, may file a motion to dismiss no later than May 18, 2019.

7. If Respondent files an answer, Petitioner may file a reply within 14 days after the filing of the answer.  If Respondent files a motion to dismiss, Petitioner may file a response within 21 days after the filing of the motion to dismiss.

*See* 28 U.S.C. §§ 2241, 2244, 2254; R. 1(a)(1), 4, 5, 7, 8, R. Governing § 2254 Cases in U.S. Dist. Cts.; LCvR 9.2(c).

IT IS SO ORDERED this 18th day of January, 2019.

CHARLES B. GOODWIN
United States District Judge